**KANTROWITZ, GOLDHAMER & GRAIFMAN**
**GARY S. GRAIFMAN (GSG 2276)**
210 Summit Avenue
Montvale, New Jersey 07645
Telephone  (201) 391-7000

**GREEN & PAGANO, LLP**
**MICHAEL S. GREEN (MSG 2204)**
522 Route 18, P.O. Box 428
East Brunswick, New Jersey 08816
Telephone (732) 390-0480

**DIAMOND LAW OFFICE, LLC**
**PAUL DIAMOND (PD 3088)**
1605 John Street, Suite 102
Fort Lee, New Jersey 07024
Telephone (201) 242-1110

**Attorneys for Plaintiffs**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY (NEWARK)**

_____

CHARLES T. MCNAIR,                          :
THEODORE AUSTIN,                            :
DANIELLE DEMETRIOU,                         :
STEVEN NOVAK, ROD BARE,                     :
USHMA DESAI and JULIE DYNKO                                    :
on behalf of themselves and all others similarly    :
situated,                                   :
                                            :
            Plaintiffs,                     :
                                            :      Case No.  2:06-cv-05072 (JLL) (CCC)
                                            :
            v.                              :          **CIVIL ACTION**
                                            :
SYNAPSE GROUP INC.,                         :          **FIRST AMENDED**
                                            :      **CLASS ACTION COMPLAINT**
                                            :          **AND DEMAND FOR**
                                            :              **JURY TRIAL**
            Defendant.                      :
                                            :          **CLASS ACTION**
                                            :
_____:

1

Plaintiffs, by their attorneys, allege upon personal knowledge as to themselves and upon information and belief as to the other allegations of this Complaint, as follows:

## SUMMARY OF COMPLAINT

1.     This is a class action pursuant to F.R.C.P 23, on behalf of all persons and entities who purchased magazine subscriptions pursuant to offers made by or under the direction of Defendant, Synapse Group, Inc. or its affiliates in the States of New Jersey, New York, Illinois, New Mexico and the District of Columbia.

2.     This is an action to secure compensatory, statutory and punitive damages, preliminary and permanent  injunctive relief,  including cessation of collections and other equitable relief.  The claims asserted herein are premised on deceptive, unlawful and unfair business practices, unconscionable commercial practices, misrepresentations and fraud in violation of the Connecticut Unfair Trade Practices Act §§ 42-110a through 42-110q, the respective State Consumer Fraud Acts of the resident states of the named plaintiffs, 15 U.S.C. §45 (a) of the Federal Trade Commission Act ("FTC Act"), the Unordered Merchandise Statute- 39 U.S.C § 3009 (a), the Electronic Funds Transfer Act ("EFTA") - 15 U.S.C § 1693 , the FTC's Trade Regulation Rule entitled "Use of Prenotification Negative Option Plans" ("the Negative Option Rule"), 16 C.F.R. Part 425, and other claims set forth herein.

3.     As described in more detail below, defendant Synapse Group, Inc. (hereinafter "Synapse Group") is a provider of subscriber acquisition and management services to publishers of consumer magazines that has a principal place of business in Stamford, Connecticut.

4.      Synapse Group offers purportedly discount-priced magazine subscriptions subject to continual automatic renewals of said subscriptions, which are charged to consumers' charge

accounts, typically to a credit card accounts and debit cards associated with bank accounts.

5.      Synapse Group also conducts its magazine subscription business under at least the following names:  TWX Magazines, NSS Magazine Subscriptions, Magazine Direct; New Sub Services; SynapseConnect; Synapse Solutions; and CAP Systems.

6.      Synapse Group fails to adequately notify customers of their forthcoming automatic magazine subscription renewals and their options for cancelling the renewals before charges are incurred by the customers for the renewals.

7.      Synapse Group's written notice of their forthcoming automatic renewal is deceptive in that it does not clearly and conspicuously notify the consumer of the automatic renewal and a customer's options for cancelling the renewals before charges are incurred.  Synapse Group's deceptive notice violates industry standards, federal law and state consumer fraud statutes.

8.      Synapse Group provides an automated telephone system by which customers that have initially subscribed to magazines through Synapse Group are directed to cancel the ensuing automatic renewals of magazine subscription if they so choose, but the options presented by the system are misleading and deceptive causing consumers to believe they have cancelled the renewal of subscriptions when they have not, thereby resulting in unwanted and unauthorized charges to customers.

9.      Synapse Group's renewal cancellation system and practices present an improper barrier to cancellation of customers' magazine subscriptions and to cancellation of automatic renewals of customers' magazine subscriptions.

10.     The subscription renewal rates charged by Synapse Group for at least some of the magazine subscription offerings are unconscionably high versus regular subscription rates and

3

regular subscription renewal rates available in the marketplace, thereby, among other things, depriving consumers of any bargain they may have enjoyed from the initial low-price subscription rate offered through Synapse Group.  The inflated renewal rates are not disclosed to consumers at the time of their purchase of the initial discount subscription.

11.     Synapse Group claims it is the leading independent provider of customer acquisition and management services for publishers of consumer magazines in the United States.  Synapse Group is a wholly-owned subsidiary of Time, Inc., has over 300 full-time employees, and markets over 1,000 consumer magazine titles.  In 2000, Synapse annual magazine sales crossed 30 million subscriptions and Synapse had revenues of $268 million.  See www.synapsegroupinc.com

## PARTIES

12.     a.     Plaintiff, Charles McNair is a resident of Sussex County, New Jersey having a place of residence in Sparta, New Jersey.

b.     Plaintiff, Theodore Austin is a resident of Washington, District of Columbia

c.     Plaintiff, Danielle Demetriou is a resident of Middlesex County, New Jersey having a place of residence in Colonia, New Jersey.

d.     Plaintiff, Steven Novak is a resident of Bernalillo County, New Mexico.

e.     Plaintiff, Rod Bare is a resident of Cook County, Illinois

f.     Plaintiff Ushma Desai is a resident of Warren County, New Jersey having a place of residence in Hackettstown, New Jersey.

g.     Plaintiff, Julie Dynko is a resident of Clinton County, New York.

13.     Defendant, Synapse Group Inc., has a principal place of business at 225 High Ridge Road, Stamford, Connecticut.

4

14.     Defendant, Synapse Group is a wholly owned subsidiary of Time, Inc. which is a wholly owned subsidiary of Time Warner, Inc., which has a principal place of business at One Time Warner Center, New York, NY.

15.     Defendant has had, and continues to have, significant contacts with the State of New Jersey.  Among other things, defendant does business in the State of New Jersey, has derived and continues to derive significant revenue and income from residents of the State of New Jersey.  In addition, Plaintiff McNair, Demetrious and Desai's causes of action against defendant, as alleged below, were and are related to the Company's contacts with the State of New Jersey.

## VENUE, JURISDICTION AND APPLICABLE LAW

16.     Venue is proper in this district pursuant to 28 U.S.C. §1391 because defendant, Synapse Group, provided services to Plaintiffs and Class Members located in this district, and conducted substantial business in this district.  In addition, Defendant provides services to Plaintiffs and Class members located in this district, and conducts substantial business in this district.

17.     Jurisdiction is based upon diversity of citizenship pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. §1331(c) as Plaintiffs believe this is a class action in which the matter in controversy exceeds $5, 000,000 and at least one of the named Plaintiffs is a citizen of a state different from the Defendant.

18.     Synapse Group has its principal place of business in Connecticut. Connecticut has a governmental interest in policing the conduct of its corporations.  Accordingly, Connecticut is an appropriate choice of law for this multi-state class action, and plaintiffs assert claims under Connecticut law, United States federal law, and the laws of each Plaintiff's respective

residence state.

## PLAINTIFFS' ALLEGATIONS OF FACT

19.     The following are the factual allegations of **PLAINTIFF MCNAIR:**

a.      Prior to August 27, 2005 and immediately subsequent to placing an order for unrelated products via the Internet, Plaintiff Charles McNair was presented with an online offer via the Internet to purchase four annual magazine subscriptions at a cost of Two Dollars ($2.00) each.

b.      Pursuant to the online offer for magazine subscriptions, Charles McNair placed an order for four annual magazine subscriptions, presented as costing $2.00 each, which included Time magazine, National Geographic Adventure magazine, National Geographic Traveler magazine and PC World magazine.

c.      The order for the four magazine subscriptions was confirmed by electronic mail on August 27, 2005 in a message sent from the e-mail address orders@mybonuscenter.com to Mr. McNair.

d.       On or around May 25, 2006, Charles McNair received a postcard (Exhibit A) by mail which purports to describe procedures for canceling automatic renewals of the magazine subscription to National Geographic Traveler magazine and indicating a June 29, 2006 deadline for canceling the automatic renewal of the subscription and that no renewal charges would appear if the renewals were canceled by this deadline.

e.      On May 25, 2006, Charles McNair called the telephone number provided on the postcard, 1(800)-927-9351, to cancel all of the subscriptions and interacted with Synapse Group's automated telephone system that verbally presented options in connection with the magazine subscriptions.  Synapse Group's automated telephone system provided a verbal prompt

asking "Do you want to cancel a magazine?" to which Mr. McNair verbally responded in the affirmative.  Mr. McNair interacted with the automated system in a manner completely reasonable for a consumer attempting to effectuate a cancellation of an impending subscription renewal and believed that he had cancelled the renewal of the subscription to all four magazines in response to the options presented to him by the system.

        f.      Despite the fact that he made completely reasonable efforts to cancel the automatic renewal subscription to National Geographic Traveler magazine on May 25, 2006 and that he had performed all actions required by the system therefore, his credit card account was nevertheless later charged $17.95 on June 30, 2006 for the cost of a renewal subscription to this magazine.

        g.      After noticing the June 30, 2006 credit card charge for renewal of National Geographic Traveler magazine, on July 12, 2006 Mr. McNair again called the Synapse Group automated telephone system to cancel the now-charged subscription renewal to National Geographic Traveler magazine and to also again generally cancel the subscriptions to all four originally ordered magazines.  Mr. McNair received a cancellation confirmation number, 410952C, from the Synapse Group automated telephone system.

        h.      Despite Mr. McNair's access to and interaction with the Synapse Group automated telephone system to cancel the subscription to National Geographic Traveler magazine on May 25, 2006 and again on July 12, 2006, the subscription was not cancelled and the amount charged to his credit card on June 30, 2006 for the renewal was not credited back to him.

        i.      The Synapse Group automated telephone system, if cancelling anything with respect to National Geographic Traveler magazine, canceled additional future renewals of the

magazine and not the June 30, 2006-charged renewal, while misleading Mr. McNair that he was in fact cancelling and had cancelled the June 30, 2006-charged renewal.  Mr. McNair called to cancel his subscriptions and was asked by Synapse Group's automated system, "Do you want to cancel a magazine?", and despite his verbally responding in the affirmative to that prompt, the Synapse Group automated system did not cancel his subscription to National Geographic Traveler magazine. Instead, if the Synapse Group automated system cancelled anything; it was future billings, i.e., those not yet charged to Mr. McNair for additional future renewals, as suggested by the automated system's response to a later status request that specifically stated, "All future billings were canceled July 12, 2006."

        j.     On July 11, 2006, an inflated charge of Fifty Four Dollars ($54.00) appeared on Charles McNair's credit card bill for a renewal of his annual subscription to Time magazine. The reference for this charge was placed on his credit card bill and a telephone number was provided.  Mr. McNair called the listed telephone number and was presented with a number of options in connection with the subscription by an automated telephone system, but despite attempting to cancel the automatically renewed subscription in three different ways, he was unable to receive a cancellation from the system.  The options presented were misleading and caused Mr. McNair to reasonably believe he was canceling the annual renewal of the subscription when in fact such cancellation was not effectuated.  Only after enlisting the aid of his credit card company, was the amount for the improper renewal of the Time magazine subscription refunded.

       20.     The following are the factual allegations of **PLAINTIFF AUSTIN:**

        a.     Plaintiff Austin purchased an initial subscription to National

Geographic magazine, ESPN magazine and Maxim magazine from Defendant through an offer presented on a website, some time in 2005 or 2006, using a debit card linked to a bank account of Plaintiff Austin.

b.      Defendant did not send a written notification to Plaintiff Austin in advance of the renewal of the initial subscription to National Geographic magazine, ESPN magazine and Maxim magazine to inform him of the forthcoming renewal and his options for cancelling the forthcoming renewal or in the alternative, Defendant sent a written notification to Plaintiff Austin in advance of the renewal of the initial subscription to National Geographic magazine, ESPN magazine and Maxim magazine which written notification was so misleading, deceptive and contained material misrepresentations that Plaintiff Austin received no notice or inadequate notice of the forthcoming renewal and his options for cancelling the forthcoming renewal.

c.      Approximately one year following the start of Plaintiff Austin's initial subscription to National Geographic magazine, Defendant processed a charge for the renewal of National Geographic magazine of Thirty Four Dollars ($34.00) to the bank account associated with Plaintiff Austin's debit card.

d.   After noticing the renewal charge for National Geographic magazine on his bank statement, Plaintiff Austin called the toll-free telephone number for Defendant's automated telephone system printed on the corresponding charge line of the bank statement with the intent of fully cancelling the subscription for which he was just charged to receive a full refund for the amount charged to him.

e.       Plaintiff Austin took all appropriate and reasonable actions to cancel the

renewal subscription to National Geographic for which he was charged, during his first call to Defendant's automated telephone system.

f.      The language presented to Plaintiff Austin by Defendant's automated telephone system was confusing and misleading.

g.  Plaintiff Austin wanted to speak to a live person during his  calls to Defendant's automated telephone system but was not provided with an opportunity to do so.

h.  While trying to reach a live attendant during his final call to Defendant's automated telephone system, said system impeded his attempt by presenting an automated survey dialogue to Plaintiff Austin, at which point Plaintiff Austin ended the call still unable to obtain his goal of fully cancelling the magazine subscriptions to National Geographic for which he was charged and receiving a refund.

21.   The following are the factual allegations of **PLAINTIFF DEMETRIOU:**

a.      Plaintiff Demetriou purchased an initial subscription to each of Her Sport magazine, Self magazine and Fitness magazine via Defendant some time in 2006, using a debit card associated with a bank account of Plaintiff Demetriou.  On information and belief, the term each of the initial subscriptions was 6 months.

b.      Defendant did not send a written notification to Plaintiff Demetriou in advance of the renewal of the initial subscription to Her Sport magazine, Self magazine and Fitness magazine to inform her of the forthcoming renewals and her options for cancelling the forthcoming renewals or, in the alternative, Defendant sent a written notification to Plaintiff Demetriou in advance of the renewal of the initial subscriptions to Her Sport magazine, Self magazine and Fitness magazine which written notification was so misleading, deceptive and contained material misrepresentations

10

that Plaintiff Demetriou received no notice or inadequate notice of the forthcoming renewal and her options for cancelling the forthcoming renewal.

     c.     Near the end of the term of Plaintiff Demetriou's initial subscriptions to Her Sport magazine, Self magazine and Fitness magazine, Defendant processed charges for the renewal of the magazine subscriptions to the bank account associated with Plaintiff Demetriou's debit card.

     d.     Plaintiff Demetriou's bank checking account was charged three times by Defendant. Plaintiff Demetriou believes she was able to cancel two of the charges on June 25, 2007, but she was charged by Defendant a third time on July 2, 2007.

     e.     Two of the charges by Defendant to Plaintiff Demetriou's back account caused overdrafts of her account, resulting in overdraft fees being levied against her bank account in the amount of at least $20.00.

     f.     Plaintiff Demetriou requested that Defendant reimburse her for the bank overdraft fees she incurred as a result of Defendant's failure to provide adequate notification to Plaintiff Demetriou of the forthcoming renewal charges and her options for canceling the forthcoming automatic subscription renewals..  However, Defendant refused to reimburse Plaintiff Demetriou for these overdraft fees.

     22.     The following are the factual allegations of **PLAINTIFF BARE:**

     a.     Plaintiff Bare purchased an initial subscription to each of Stuff magazine and National Geographic Adventure magazine from Defendant through an offer presented to him during or immediately following an airplane ticket purchase from the Expedia.com website, some time in 2006, using a credit card or debit card.

     b.     Plaintiff Bare did not receive a written notification sent by Defendant to

Plaintiff Bare in advance of the renewals of the initial subscriptions to Stuff magazine and National Geographic Adventure magazine to inform him of the forthcoming renewals and his options for cancelling the forthcoming renewals, or, in the alternative, Defendant sent a written notification to Plaintiff Bare in advance of the renewal of the initial subscriptions to Stuff magazine and National Geographic Adventure magazine which written notification was so misleading, deceptive and contained material misrepresentations that Plaintiff Bare received no notice or inadequate notice of the forthcoming renewals and his options for cancelling the forthcoming renewals.

c.      Approximately one year following the start of Plaintiff Bare's initial subscriptions to Stuff magazine and National Geographic Adventure magazine, Defendant processed a charge for the renewal of Stuff magazine and National Geographic Adventure magazine to Plaintiff Bare's debit or credit card account.  On information and belie, the charge lines appearing on Plaintiff Bare's account statement indicated "TWX" but did not identify which magazines the charges were for.

d.      After noticing the TWX charges on his account statement, Plaintiff Bare called the toll-free telephone number for Defendant's automated telephone system printed on the corresponding line of his account statement with the intent of cancelling the subscription(s) for which he was just charged to receive a full credit for the amount charged to him.

e.      During the course of Plaintiff Bare's call to Defendant's automated telephone system, he was forwarded to a live customer service representative of Defendant.

f.  Upon reaching the customer service representative, Plaintiff Bare indicated that he wanted to receive a refund for the charges to his account and fully cancel all and whatever subscriptions were associated with the charges.  Plaintiff Bare told the customer representative that

12

he did not recall what subscriptions he had or was being charged for but that he wanted to cancel all of them and receive a refund for all for which he was charged.  The customer representative refused to honor Plaintiff Bare's request, would not identify the magazine subscriptions held by Plaintiff Bare and told Plaintiff Bare that his whole account, i.e., all magazine subscriptions in his name, could not simply be canceled at once.

g.  Plaintiff Bare has, accordingly, been damaged in the amount of the subscription renewal charges for the magazine renewals which Defendant has refused to cancel.

23.    The following are the factual allegations of **PLAINTIFF DESAI**:

a.    In 2006, Plaintiff Desai responded to an offer presented in FYE Music Store to order 3-month free trial subscriptions to four magazines, namely Spin, ESPN, Maxim and VIBE magazines.

b.    Approximately three months following Plaintiff Desai's original order, Defendant charged her bank debit card for subscriptions to the four magazines, which resulted in four overdraft charges of $30.00 each to her bank account.  The charges for magazines were indicated as being from "TWX."

c.    Defendant was not aware that her bank account would be automatically charged for the magazines at the end of the three month initial subscriptions, was not adequately notified that it would be charged and was not adequately notified of options for cancelling the subscriptions before being charged for the period following the initial 3-month period.

d.  Plaintiff Desai does not recall receiving written notification in a postcard or in any
other form informing her of the forthcoming magazine charges to follow the 3-month initial

subscription period to the four magazines.

        e.      The addresses indicated for delivery of the magazines were Plaintiff Desai's residence address or the residence address of her fiancé, which were their family addresses.

        f.      In May 2007, the residence address of Plaintiff Desai and her fiancé changed,

but each of them continued to check and receive their mail including the subject magazines at the aforementioned family addresses.

        g.      In July or August 2007, Plaintiff Desai was surprised to see temporary charges called initial renewal fees appearing again on her bank account statement from TWX. These charges were in the amount of $2.01 each.

        h.      Having seen the $2.01 temporary charges on her bank statement, in July or August, 2007, Plaintiff inferred that unauthorized charges for the four magazines might be forthcoming and called Defendant's automated telephone system to preemptively cancel any such forthcoming charges.  Plaintiff Desai does not recall receiving any postcard or written notification from Defendant indicating a forthcoming subscription renewal and options for cancellation thereof.

        i.      Plaintiff found that Defendant's automated telephone system would not readily allow her to fully cancel the magazine subscriptions and prevent any forthcoming charges, but instead made her go through many steps.

        j.      Plaintiff believes that her responses to the options presented by Defendant's automated telephone system fully canceled any charges that would otherwise follow the $2.01 temporary authorization charges that appeared on her bank account statement and she received confirmation numbers from the system for the actions taken.  She is not yet aware whether

14

Defendant actually credited her for, or removed, the $2.01 charges and whether Defendant has prevented any forthcoming renewal charges in connection with the magazines.

k.  Plaintiff desired to speak with a live customer representative during her call to Defendant's automated telephone system, but when she was finally able to navigate the system to a point where she thought she could speak to a person, the system discouraged and dissuaded her from doing so by telling her that she might have to wait long a time to speak to a live a live person and suggesting that she complete her intended business using the automated system.  Since Plaintiff Desai had already been required to spend an unreasonable amount of time trying to conduct her business, she ended the call.

l.  On information and belief, Defendant did not provide Plaintiff Desai with a mail-in option to cancel her magazine subscriptions and forthcoming charges associated therewith.

m.  On information and belief, Defendant did not provide Plaintiff Desai with a World Wide Web-based interface to cancel her magazine subscriptions and forthcoming charges associated therewith.

24.  The following are the factual allegations of **PLAINTIFF DYNKO:**

a.  Plaintiff Dynko was charged for several magazine subscriptions by Defendant over the past several years including Rolling Stone, Newsweek, Skateboarder, Teen People, and Preschool Playroom magazines, which Defendant has been renewing under its continuous service program by charging Plaintiff Dynko's Discover credit card account.

b.  Plaintiff Dynko's Discover credit card account was charged $37.00 by Defendant on August 2, 2006 for automatic renewal of Plaintiff's subscription to Newsweek magazine, despite Plaintiff having called the number provided on Defendant's postcard to cancel the renewal of

Newsweek magazine in advance of the date printed in the postcard for cancelling forthcoming charges.

c.  On information and belief, Defendant disregarded Plaintiff Dynko's request for full cancellation of then forthcoming renewal of Newsweek magazine or in the alternative, Defendant's automated telephone system provided misleading and deceptive language in the scripts presented to Plaintiff Dynko during her access to the system to cancel Newsweek magazine which resulted in non-cancellation of her subscription renewal to said magazine despite her intent to fully cancel the subscription renewal.

d.  Only after enlisting the aid of her credit card company, Discover, was Plaintiff able to obtain a partial refund of the $37.00 charge for the renewal of Newsweek magazine.  As a result of enlisting the aid of Discover, on December 28, 2006 a partial refund in the amount of $21.64 was posted to Plaintiff Dynko's account.  Since Plaintiff took all reasonable actions to fully cancel the renewal of Newsweek magazine and not be charged at all for the renewal or to receive a full refund for the renewal, Plaintiff Dynko has been directly damaged in the amount of $15.36 with respect to the Newsweek magazine subscription.

e.  On information and belief, the $37.00 renewal subscription price for the Newsweek magazine was excessive and unconscionably high.

f.  Plaintiff Dynko's Discover credit card account was charged $18.00 by Defendant on February 6, 2006 for automatic renewal of Plaintiff's subscription to Rolling Stone magazine, despite Plaintiff having called the number provided on Defendant's postcard to cancel the renewal of Rolling Stone magazine in advance of the date printed in the postcard for cancelling forthcoming charges.

g.  On information and belief, Defendant disregarded Plaintiff Dynko's request for full cancellation of the then-forthcoming renewal of Rolling Stone magazine or in the alternative, Defendant's automated telephone system provided misleading and deceptive language in the scripts presented to Plaintiff Dynko during her access to the system to cancel Newsweek magazine which resulted in non-cancellation of her subscription renewal to said magazine despite her intent to fully cancel the subscription renewal.

h.  Only after enlisting the aid of her credit card company, Discover, was Plaintiff able to obtain a partial refund of the $18.00 charge for the renewal of Rolling Stone magazine.  As a result of enlisting the aid of Discover, on December 28, 2006 a partial refund in the amount of $8.65 was posted to Plaintiff Dynko's account.  Since Plaintiff took all reasonable actions to fully cancel the renewal of Rolling Stone magazine and not be charged at all for the renewal or to receive a full refund for the renewal, Plaintiff Dynko has been directly damaged in the amount of $6.35 with respect to the Rolling Stone magazine subscription.

i.  Plaintiff Dynko's credit card account was charged $18.00 for renewal of Skateboarder magazine on February 2, 2006 which she has not tried to cancel because she desires to continue this subscription so that her son may continue to read it.

j.  Although Plaintiff Dynko was charged $20.00 for renewal of a subscription to Teen People magazine on August 12, 2006, she does not recall ever having received the magazine.

k.  Plaintiff Dynko attempted to fully cancel the subscription renewal to Teen People magazine and receive a refund for the August 12, 2006 charge using Defendant's automated telephone system but Defendant did not cancel the subscription.

m.  On information and belief, Defendant disregarded Plaintiff Dynko's request for

full cancellation of the then-forthcoming renewal of Teen People magazine or in the alternative Defendant's automated telephone system provided misleading and deceptive language in the scripts presented to Plaintiff Dynko during her access to the system to cancel Teen People magazine which resulted in non-cancellation of her subscription renewal to said magazine despite her intent to fully cancel the subscription renewal.

      n.  Defendant's automated telephone system did not reasonably provide Plaintiff Dynko on any occasion with an opportunity to speak with a live customer service representative, despite her desire to do so.

      o.  Plaintiff Dynko believes that she was only able to speak with a live customer representative of Defendant on an occasion as the result of enlisting the aid of her credit card company, Discover.

      p.  In 2005, Plaintiff Dynko attempted to fully cancel her subscription to Preschool Playroom using Defendant's automated telephone system because none of her children were any longer of preschool age.  Although she acted properly in requesting a cancellation, Defendant, instead of fully cancelling the subscription, charged Plaintiff Dynko three-times for the same subscription with three separate line charges appearing on a single one of her credit card statements.

      q.  Despite Plaintiff Dynko's earlier efforts to fully cancel her subscription to Preschool Playroom magazine and the fact that children were no longer of preschool age, her Discover credit card was again charged by Defendant for renewal of Preschool Playroom magazine in the amount of $26.00 on October 11, 2006.

      r.  Only after enlisting the aid of her credit card company, Discover, was Plaintiff Dynko able to obtain a refund in the amount of the $26.00 for the October renewal charge for

Preschool Playroom magazine, which posted to her Discover account on December 29, 2006.

s.  Defendant informed her credit card company, Discover, that the magazine subscription renewal charges posted to her account by Defendant were unauthorized but was informed by a customer service representative of Discover that charges from Defendant could not be preemptively blocked despite her desire to have them blocked.

t.  In addition, Plaintiff Dynko incurred further monetary damages in connection with previous unauthorized charges for prior renewals of the referenced magazines which she tried to fully cancel using Defendant's automated telephone system, but given her responsibilities as a full time professional, mother of a then-sick child and mother generally, prioritization did not allow her to expend the unreasonable amount of time and effort required to fully pursue the cancellations and refunds to which she was entitled.

u.  In addition to the direct monetary damages incurred by Plaintiff Dynko as a result of Defendant's misleading and deceptive business practices, Plaintiff has been forced to expend an unreasonable amount of time and effort in seeking the cancellations and refunds to which she is entitled.

v.  In view of the failure of Defendant's automated telephone system to reasonably provide Plaintiff Dynko with an option to fully cancel various magazine subscription renewals, Plaintiff Dynko desired to have a mail-in option to fully cancel magazine subscriptions but was not informed of or provided with any such option by Defendant.

## GENERAL ALLEGATIONS

25.  Synapse Group made uniform misrepresentations to and engaged in deceptive practices with Class Members through the written misrepresentations on its postcards to Class

Members which were designed to mislead members of the Class and via its deceptive automated telephone subscription renewal cancellation system.

26.     Hundreds of complaints on the Internet, including complaints on the RipOff Report.com, BadBusinessBureau.com, FullthrottleV6.com and the FTC website (Federal Trade Commission) refer to these deceptive practices **(See Exhibit C – annexed Internet complaints).**

27**.**     The Better Business Bureau of Connecticut reports on August 2, 2007, 2007 that the Bureau of this state alone processed a total of 238 complaints about the company in the last 36 months (See Exhibit C – annexed Online Report).  Significantly, Synapse Group goes under multiple additional DBA (doing business as) names that make it difficult for consumers to find and report complaints about it.  TWX Magazines, for example, is listed as a DBA for Newsub Magazine Services LLC which in turn lists Synapse Group as a DBA. Synapse Group, Inc.'s website, in turn, lists Newsub Magazine Services LLC as a division.

28.     Synapse Group uses its multiple DBAs and divisions to confuse and deceive consumers.  Initial magazine offers may be made by a number of possible DBAs or divisions.  A subsequent postcard notification of an automatic renewal has a return address from SynapseConnect, Inc. and the charge on the credit card may be from TWX Magazines. Additionally, the postcard does not name on its exterior the names of any magazine companies that the Class Member is receiving magazines through Synapse Group's initial subscription offer. Upon information and belief, the Class Member will not have had any prior contact with SynapseConnect, Inc. when they receive a postcard from it with a large image on the exterior inquiring about moving.  It is small wonder that most Class Members have no recollection of receiving any postcard notification of an automatic renewal from Synapse Group or any division or

<u>DBA that made the initial magazine offer.</u>

29.     These uniform misrepresentations and deceptive practices in its automatic renewals violate standards of practice that have been followed by the defendant's own parent Time, Inc. and its own professional organization, the Magazine Publishers Association ("MPA").  These deceptive practices and violations of industry standards are in turn violations of federal law and state consumer fraud statutes.

**Defendant Violated Standards for Notice of Automatic Renewals of  its Parent Time, Inc.'s Assurance of Discontinuance with Attorneys General**

30.     In response to an investigation of Time Inc.'s magazine automatic renewal business practices by Attorneys General or consumer protection Offices of the States of Alaska, California, Delaware, Florida, Hawaii, Illinois, Iowa, Maine, Maryland, Michigan, Missouri, Nevada, New Jersey, New Mexico, New York, Ohio, Oregon, Pennsylvania, Tennessee, Texas, Virginia, West Virginia and Wisconsin (collectively, "Participating States"),  Time, Inc. entered into an Assurance of Voluntary Compliance or Discontinuance ("the Assurance;" Exhibit D), believed to have been fully executed March 2, 2006 with the Participating States regarding Time Inc.'s magazine subscription practices.

31.     Pursuant to Section 4, paragraph no. 9 of the Assurance (Exhibit D, page 7), wholly owned United States subsidiaries of Time Inc. as of the date of the Assurance, among other entities, are included within the definition of Time Inc. and are parties to the Assurance.

32.     The Assurance pertains to all magazine titles for which Time, Inc. and its qualifying subsidiaries provided automatic subscription renewal services during the class period.

33.     Defendant Synapse Group, Inc. became a wholly owned United States subsidiary of Time, Inc. in April 2006.

34.    Since Defendant Synapse Group, Inc. became a wholly owned United States subsidiary of Time, Inc. in April 2006, Defendant is not party to the Assurance.

35.    On information and belief, Time, Inc. and Synapse Group manipulated the timing of Defendant's full acquisition by its parent Time, Inc. in order to avoid compliance by Defendant with the standards of fair dealing and ethical business practice set forth in the Assurance.

36.    Nonetheless, on information and belief, Defendant Synapse Group has been aware of the standards set forth in the Assurance both before and after Defendant's full acquisition by its parent Time, Inc.

37.    The Assurance provides and instructs on objective criteria and standards pertaining to whether Defendant's magazine subscription business practices including without limitation Defendant's automatic subscription renewal practices are deceptive and misleading in violation of this State's and the other Participating States' consumer protection laws and generally.

38.    Defendant knowingly violated the objective standards of fair dealing and ethical business practice set forth in the Assurance during the class period.

39.    In Sections V.1.A(5) and (6) of the Assurance under heading "Automatic Renewal" (Exhibit D, pages 12 and 13), the agreed to assurances of Time Inc. regarding **the sending of written reminder notices** to Automatic Renewal Customers are set forth.

40.    Section V.1.A(6) of the Assurance (Exhibit D, page 13) specifically provides that: "For a period of five (5) years from the Implementation Date of this Assurance, the notices described in Paragraph 5, above shall: (A.) **Clearly and Conspicuously** remind the Customer that he or she is an Automatic Renewal Customer, in type larger and more prominent than the predominant type in the notice, with a **Clear and Conspicuous** explanation that the subscription is

22

being automatically renewed appearing on the first page on the notice; (B.) **Clearly and Conspicuously** restate the "Automatic Renewal Offer Terms;" and (C.) For Automatic Renewal Customers whose terms are shorter than one (1) year, Time shall send a written reminder notice at least thirty (30) days before and not more than sixty (60) days before the end of the first two (2) terms of the subscription.

41. "**Clearly and Conspicuously**" is defined in Section IV. paragraph no. 4 of the Assurance (Exhibit D, page 6) and requires, inter alia, that a subject statement or communication, whether written or oral is "readily understandable, noticeable and readable."

42. Defendants notices do not comply with the standards for "clear and conspicuously."

**Defendant's Deceptive Automatic Renewal Postcard Notice**

43. On information and belief, each of Plaintiffs Demetriou, Austin, Novak and Bare were not sent a printed renewal notice by Defendant, which failure to send was a violation by Defendant of the standards of the Assurance.

44. Alternatively, one or more of Plaintiffs Demetriou, Austin, Novak and Bare were sent a written renewal notice by Defendant in the form of a postcard, but said postcard(s) were, in violation of the standards of the Assurance, designed to not clearly and conspicuously communicate and were, instead, designed to not notify Automatic Renewal Customers of their option to cancel a forthcoming renewal before charges for such a renewal would be made.

45. The postcards referred to in the previous paragraph, if even sent, were misleadingly designed to appear to be change-of-address cards only and/or presented misleading statements leading an Automatic Renewal Customer in receipt of the postcard to believe that the postcard received was not, itself, the notification that would alert the Automated Renewal Customer to the

options for cancellation of forthcoming magazine subscription renewals.

46.     On information and belief, the postcards shown in Exhibits A and B are typical of the automatic renewal notification postcards that are sent to customers by Defendant.  These postcards do not provide notification of or indicate any mail-in cancellation option or any online cancellation option.

47.     Plaintiffs Demetriou, Austin, Novak and Bare were not adequately notified of their forthcoming automatic subscription renewals and options for cancelling the same by any postcard sent by Defendant.

48.     On information and belief, a vast number and majority of Automatic Renewal Customers who are sent automatic subscription renewal notifications in the form of a postcard by Defendant are neither adequately notified by the postcards of the terms of their forthcoming automatic subscription renewals, nor of their options to cancel said renewals.

49.     On information and belief, automatic renewal notification postcards that may be sent to Automatic Renewal Customers by Defendant are folded having two outer facing sides and two inner facing sides.  With reference to the postcards of Exhibits A and B, the outer facing sides are those with the customer's mailing address and those printed with the moving truck icon adjacent to the prominently printed text "Moving?."  The inner facing sides of the postcards are only readable by unfolding, i.e., opening, the postcards.

50.     With reference to the postcards of Exhibits A and B, the postcard consists of a single piece of paper stock folded in half so as to present two outer facing sides and two inner facing sides. The inner facing sides of the postcards are only readable by unfolding, i.e., opening the postcard.

51.     With reference to the postcards of Exhibits A and B and on information and belief,

typical of post cards sent by Defendant, one of the outer-facing sides of the notification postcard

sent by Defendant includes the Automatic Renewal Customer's mailing address and a return

address to the branch of Defendant processing the subscription, SynapseConnect, Inc. in the case

of the postcards of Exhibits A and B.

52.     As shown by Exhibits A and B, the most prominent features of the outer facing side

of postcards sent by Defendant which is opposite the side printed with the Automatic Renewal

Customer's mailing address are a large moving-truck icon accompanying prominent lettering

"Moving" and lines for entry of a customer's new address in the event their address has changed or

is changing, said features appearing on the right-half of the subject outer-facing side of the

postcard.

53.     The moving-related postcard features described in the preceding paragraph misleads

Automatic Renewal Customers into believing, and deceptively suggests, that the postcard relates to

changes of address that a customer may desire to make.

54.     The written statements appearing on the left-side of the outer facing side of the

postcards opposite the side printed with the customer's address, is misleading, deceptive and/or

comprises at least one misrepresentations in that said statements suggest that the postcard itself is

not the notification providing instructions for cancelling forthcoming automatic magazine renewals

when in fact it is, thereby dissuading a customer from opening the postcard to read and scrutinize

the text printed, in small type, on the interior-facing sides of the postcard which concerns renewals

and cancellation thereof.

55.     The  misleading, deceptive and/or misrepresentative written statements and

presentation referred to in the preceding paragraph as appearing on an outer face of the postcards

sent to class members, as shown by Exhibits A and B, include the following statements in the same paragraph: "[w]e guarantee to send you advance notice every year about your next continuous-service subscription period and rates;" "[w]e will send a notice that spells out: your rate, your number of issues and when your credit card will be charged;" and  "[i]f you don't wish to continue, you can simply cancel before your new term begins."  These statements clearly suggest to a customer that the subject postcard is not the renewal notification referred to on the postcard itself, which is a violation of the standards of the Assurance.

56.     In addition to the misleading features and statements on the left side and right side of the outer facing side of the postcard opposite the customer address side, the combination of said features and statements is even more misleading, deceptive and misrepresentative than either taken alone.

57.     In addition, there is no conspicuous indication or notice whatsoever on the outer facing sides of the renewal postcards sent by Defendant that indicate that the recipient is an Automatic Renewal Customer or that a forthcoming magazine renewal is upcoming and that action must be taken if it is desired to cancel the forthcoming renewal.  This lack of indication on the outer facing side of the automatic renewal notification postcards is in violation of the standards set forth in Section V.I.A.(6)A. of the Assurance (Exhibit D, page 13) which provides that "[f]or a period of five (5) years from the Implementation Date of this Assurance, the reminder notices described in Paragraph 5, above shall:  A.  Clearly and Conspicuously remind the Customer that he or she is an Automatic Renewal Customer, in type larger and more prominent than the predominant type in the notice, with a Clear and Conspicuous explanation that the subscription is being automatically renewed appearing on the first page of the notice ."

26

58.     On information and belief, the number and proportion of Automatic Renewal Customers of Defendant who call Defendant's automated telephone system indicating a desire to cancel their subscription(s) after a renewal charge has appeared on their credit card or bank statement using the telephone number provided on the corresponding statement is so vastly greater than those calling in to cancel from the telephone number listed inside automatic renewal notification postcards sent to customers by Defendant, as to independently indicate the inadequacy of written notification provided by postcards sent by Defendant and as well as to confirm the misleading, deceptive and misrepresentative nature of the automatic renewal notifications that may be provided by Defendant.

59.     Defendant's automatic subscription renewal business practices in violation of the standards set forth in the Assurance as discussed herein are *prima facie* violations of the consumer protection statutes of this State and the other Participating States.

60.     Defendant fails to provide a mail-in option for cancellation of customers' forthcoming automatic magazine subscription renewals.

61.     In the alternative, even if Defendant does provide a mail-in option for cancellation of customers' forthcoming automatic magazine subscription renewals, said option is not clearly and conspicuously communicated to Automatic Renewal Customers.

62.     In the alternative, even if Defendant provides a mail-in option for cancellation of customers' forthcoming automatic magazine subscription renewals, said option is not communicated at all in, or is not clearly and conspicuously communicated in, the renewal notification postcards sent to Automatic Renewal Customers by Defendant.

63.     On information and belief, Defendant fails to provide a mail-in option for customers

27

to cancel forthcoming automatic subscription renewals because printed text-based mail-in options would remove much of the intentional ambiguity, lack of clarity and opportunity for deception and misrepresentation that is present in Defendant's automated telephone system.

64.     On information and belief, Defendant fails to provide a World Wide Web-based web page interface for customers to manage their magazine subscriptions including cancelling forthcoming renewals before being charged for the renewals and cancelling and requesting refunds for the renewals after being charged for them because such a textual web interface would remove much of the intentional ambiguity, lack of clarity  and opportunity for deception and misrepresentation that is present in Defendant's automated telephone system and because such a textual web interface would provide customers with an opportunity to concretely document prompts, offers and propositions made by Defendant in the course of customers' attempts to manage their subscriptions.

**Defendant's Deceptive Automated Telephone Cancellation System (IVR)**

65.     The uniform misrepresentations presented by Synapse Group's automated telephone subscription renewal cancellation system made to all customers who seek to cancel, include, *inter alia,* misrepresenting to customers that the customers are cancelling automatically renewed subscriptions for which customers have recently been charged, while what has actually and only been cancelled, if anything, are billings for additional, future subscription renewals.

66.     On information and belief, Synapse Group uniformly fails to provide a clear and unambiguous option for consumers to cancel magazine subscriptions that have been automatically renewed and charged to consumer's credit cards pursuant to Synapse Group's subscription renewal programs, as distinguished from cancellation of future billings for the next, as of yet uncharged,

28

renewal cycle.

67.     The uniform misrepresentations presented by Synapse Group's automated telephone subscription renewal cancellation system also include, *inter alia,* offering customers who have accessed the cancellation menu of the automated system an option to continue receiving issues of magazines that they have already paid for, wherein the selection of said option by a customer does not result in cancellation of renewal subscription charges and wherein the system does not inform the customer of such, while the customer is led to believe that the renewal subscription and its associated charges have been cancelled.

**Violations of the FTC Act and the Negative Option Rule**

68.     The FTC Act, 15 U.S.C. §45, prohibits unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce. The defendant by automatically renewing magazine subscriptions without clear and conspicuous notice and/or through the use of a deceptive "IVR" or automated telephone cancellation system violated the FTC Act which is a per se violation of the Unfair and Deceptive Acts and Practices statutes (UDAP) of the individual states in the United States.

69.     The Negative Option Rule, 16 C.F.R. 425, promulgated by the FTC regulates sellers of merchandise that operate negative option plans.  A negative option plan is defined by the Rule as "a contractual plan or arrangement under which a seller periodically sends to subscribers an announcement which identifies merchandise (other than annual supplements to previously acquired merchandise) it proposes to send to subscribers to such plan, and the subscribers thereafter receive and are billed for the merchandise identified in each such announcement, unless by a date or within a time specified by the seller with respect to each such announcement the subscribers, in conformity

29

with the provisions of such plan, instruct the seller not to send the identified merchandise."

70.     The Negative Option Rule requires that a seller, prior to sending any selection of merchandise to a negative option plan subscriber, send a form to the subscriber that the subscriber can use to reject the merchandise offered for sale.

71.     Specifically, the Negative Option Rule contains the following provision, Sec. 425.1 (a)(2) "Prior to sending any selection, the seller shall mail to its subscribers, within the time specified by paragraph (a)(3) of this section: (ii) A form, contained in or accompanying the announcement, **clearly and conspicuously disclosing** that the subscriber will receive the selection identified in the announcement unless he instructs the seller that he does not want the selection, designating a procedure by which the form may be used for the purpose of enabling the subscriber so to instruct the seller, and specifying the return date or the mailing date.

The Magazine Publishers of America ("MPA") in their Comment P064202 to the FTC's "Negative Options Marketing Workshop of January 25, 2007, stated the following:

"Publishers using advance consent plans (e.g. automatic renewal plans and free trial offers) should:

- **provide clear and conspicuous disclosure of all material terms** – a standard articulated throughout the MPA educational guide

- have fully disclosed and easily implemented cancellation procedures

- ensure that consumers have given affirmative consent to the plans

72.     The MPA Comment continues, "To ensure that consumers can cancel a subscription easily, the guide recommends:

(1)  for good customer service, a toll-free telephone number for telephone

cancellations should be available for subscriptions solicited by mail or telephone; telephone numbers should be adequately staffed during reasonable hours; telephone cancellations can be processed through recorded messages if effective and prompt; and when the telephone number is not manned by operators or cancellation processing equipment, a recorded message should state when the number will be staffed,…

(3)  while sellers may attempt to encourage subscribers not to cancel,  cancellation procedures should not be unreasonably difficult, and

(4)  Refunds, where appropriate, should be processed and issued promptly."

73.    The MPA Comment continues:  "In addition to the **clear and conspicuous disclosure of material terms** – accompanied by fully disclosed and **easily implemented cancellation procedures**, the MPA educational guide provides guidance on how to ensure that consumers have given their affirmative advance consent to an automatic renewal or free trial offer. The MPA guide recommends that the consumer should take an action demonstrating that he understands and agrees to the terms of the offer, such as checking a box, returning an order form, or pushing a number on a telephone keypad or a key on a computer keyboard, following the disclosure of the material terms of the offer."

74.    The defendant by automatically renewing magazine subscriptions without clear and conspicuous notice violated the Negative Option Rule and its own MPA guidelines.  In addition, the defendant by automatically renewing magazine subscriptions through the use of a deceptive IVR or automated telephone cancellation system violated its own MPA guidelines.  The postcard notifications do not have a cancellation option directly by mail or an online cancellation option indicated on the postcard.  In addition, there is no easily implemented option to reach a live person

31

from Defendant's  automated telephone system or from its postcard in general.

75.    The deceptive practices used in the defendant's automatic renewals, that include

violations of the Negative Option Rule, are in turn violations of the FTC Act which are in turn per

se violations of the Unfair and Deceptive Acts and Practices statutes (UDAP) or consumer fraud

statutes of the individual states in the United States.

## CLASS ACTION ALLEGATIONS

76.    This action is brought and may properly proceed as a class action, pursuant to the

provisions of F.R.C.P. 23.  Plaintiff brings this action on behalf of himself and all others similarly

situated.  The Class is defined as follows:

> All persons and/or entities residing in the States of New Jersey, New York, Illinois, New
> Mexico, and the District of Columbia who obtained magazine subscriptions pursuant to
> offers made by or under the direction of Synapse Group and had their subscriptions
> automatically renewed.  Specifically excluded from this class are any person and/or entity
> in which defendant has a controlling interest, and the officers, directors, employees,
> affiliates, subsidiaries, legal representatives, heirs, successors and their assigns of any such
> person or entity, together with immediate family member of any officer, director or
> employee of said companies (the "Class").

77.    This action is properly maintainable as a class action.  The class for whose benefit

this action is brought is so numerous and geographically dispersed that joinder of all members is

impracticable, and the disposition of their claims in a class action will provide substantial benefits

to both the parties and the Court.  The numerosity requirement of F.R.C.P. 23(a)(1) is therefore

satisfied.

78.    A class action is superior to other methods for the fair and efficient adjudication of

the claims herein asserted, and no unusual difficulties are likely to be encountered in the

management of this class action.  Since the damages suffered by individual class members may be

relatively small, the expense and burden of individual litigation makes it impossible for members

32

of the Class to individually seek redress for the wrongful conduct alleged.

79.     Rule 23(a)(2) and Rule 23(b)(3) are both satisfied because there are questions of law and fact which are common to the Class and which predominate over questions affecting any individual class member.  The common questions include, *inter alia*, the following:

a.   Whether defendant Synapse Group fraudulently and deceptively misleads magazine subscribers to renew their subscriptions when the intent of the subscribers is to cancel renewal of the subscriptions;

b.   Whether defendant Synapse Group's automated cancellation system for subscription renewals is designed to mislead magazine subscribers into renewing their subscriptions when the intent of the subscriber is to cancel renewal of the subscriptions;

c.   Whether defendant Synapse Group's erects improper barriers that impede the cancellation of forthcoming magazine subscription renewals and current term magazine subscriptions by customers;

d.   Whether defendant Synapse Group fails to provide adequate notice to automatic subscription renewal customers of their forthcoming subscription renewals and their options for cancelling the renewals before being charged for the renewals;

e.   Whether defendant Synapse Group was aware of standards of fair dealing and ethical business practices in connection with purveying magazine subscriptions but nevertheless failed to conduct its business according to said standards and practices;

f.   Whether defendant Synapse Group charges unconscionably inflated renewal subscription prices for magazines renewed under its magazine subscription continuance program;

g.   Whether defendant Synapse Group's business practices constitute violations of

the Connecticut Unfair Trade Practices Act, or in the alternative other applicable state consumer fraud statutes , the FTC Act, the Negative Option Rule, the Unordered Merchandise Statute and the Electronic Fund Transfer Act, breach of contract and common law fraud, and, if so, the measure of damages and triple damages;

        h.  Whether defendant Synapse Group's business practices have proximately caused injury to plaintiffs and all others similarly situated and, if so, the proper measure of damages;

        i.  Whether defendant Synapse Group has been unjustly enriched by its practices as detailed herein;

        j.  Whether defendant Synapse Group's actions were sufficiently wrongful so as to entitle plaintiffs and all others similarly situated to punitive damages; and,

        k.  Whether the Class has been damaged and/or suffered irreparable harm and, if so, the extent of such damages and/or the nature of the equitable and injunctive relief which each member of the Class is entitled.

        80.    Plaintiffs' claims and the claims of members of the Class all derive from a common nucleus of operative fact.

        81.    In satisfaction of F.R.C.P. 23(a)(3) and 23(a)(4), Plaintiffs are asserting claims that are typical of the claims of the entire Class, and Plaintiffs will fairly and adequately represent and protect the interests of the Class in that they have no interests that are antagonistic to those of the other members of the Class.  Plaintiffs anticipate no difficulty in the management of this litigation as a Class action.  Plaintiffs have retained counsel who are competent and experienced in the prosecution of class action litigation.

        82.    Pursuant to F.R.C.P. 23(b)(1) and (b)(2), Defendants have acted or refused to act

on grounds generally applicable to the Class, making appropriate injunctive and/or declaratory relief with respect to the Class as a whole.

83.     Notice of pendency of this action can be given either by publication and/or over the Internet.

## **FIRST COUNT**

### **(Breach of Contract and the Implied Covenant of Good Faith and Fair Dealing)**

84.     Plaintiffs hereby incorporates by reference each of the preceding allegations as though fully set forth herein.

85.     As set forth in greater detail above, Synapse Group made false and misleading representations through its automated telephone renewal and cancellation system so that even after Plaintiffs and Class Members attempted to cancel renewals of subscriptions, Synapse Group continued to charge them for the renewals.

86.      Plaintiffs and the Class Members have entered into certain contracts and agreements with Synapse Group when they agreed to obtain the original subscriptions at a discount.

87.     Synapse Group breached its contract with Plaintiffs and all others similarly situated by not performing according to their obligations under the applicable law and the contract when it did not cancel the renewal of those subscriptions upon the request of Plaintiffs and Class Members.

88.     Plaintiffs and Class Members satisfied their obligations under these contracts and agreements.

89.     Defendant Synapse Group breached their contract with Plaintiffs and all other similarly situated by violating the implied covenant of good faith and fair dealing inherent in such contracts and agreements.

90.     By virtue thereof, as a direct and proximate cause of Synapse Group's breach of contract and implied covenant of good faith and fair dealing, Plaintiffs and Class Members have suffered damages in an amount to be determined upon trial, which they are entitled to recover.

## SECOND COUNT
### (Unjust Enrichment)

91.     Plaintiffs hereby incorporate by reference each of the preceding allegations as though fully set forth herein.

92.     As set forth in greater detail above, the Synapse Group made false and misleading representations through its postcard notification and automated telephone renewal and cancellation system so that even after Plaintiffs and Class Members attempted to cancel renewals of subscriptions, Synapse Group continued to charge them for the renewals.

93.     As a result of the conduct described in this Count, the Plaintiffs and Class Members paid monies to defendant for which the Plaintiffs and Class Members received no benefit and to which defendant was not entitled.

94.     In consequence of the acts set forth in this Count, defendant has been unjustly enriched at the expense of the Plaintiffs and Class Members.

95.     The Plaintiffs and Class Members are entitled to the amount of defendant's unjust enrichment as restitution.

## THIRD COUNT
### (Connecticut Unfair Trade Practices Act §§ 42-110a through 42-110q.)

96.     Plaintiffs hereby incorporate by reference each of the preceding allegations as though fully set forth herein.

97.     Synapse Group engaged in unconscionable commercial practices, deception, fraud,

false promise, false pretenses and/or misrepresentations in its interactions with Plaintiffs and all others similarly situated in violation of the Connecticut UDTPA and in violation of 15 U.S.C. §45 (a) of the Federal Trade Commission Act ("FTC Act"), the Unordered Merchandise Statute- 39 U.S.C § 3009 (a), the Electronic Funds Transfer Act ("EFTA") - 15 U.S.C § 1693 , the FTC's Trade Regulation Rule entitled "Use of Prenotification Negative Option Plans" ("the Negative Option Rule"), 16 C.F.R. Part 425, which as deceptive acts and practices are also violations of the Connecticut UDTPA.

98.     Plaintiffs and all members of the Class suffered an ascertainable loss when they were charged by the defendant for an automatic renewal of their magazine subscription(s) despite Plaintiffs and Class Members' attempts to cancel their subscriptions through defendant's automated telephone system.

99.     Plaintiffs and all members of the Class read or heard or saw or knew or were made aware of the misrepresentations made by the defendant in its uniform postcards and automated telephone system which violated the UDTPA.  Defendant's postcards and automated telephone system conveyed false and misleading statements and/or concealed or suppressed the truth.

100.     By virtue thereof, the Class is entitled to injunctive relief to prevent enforcement of the renewed subscriptions, a declaratory judgment setting aside the renewed subscriptions and/or compensatory and statutory damages.

## **FOURTH COUNT**

**(Violations of the Uniform and Deceptive Acts and Practices Statutes  (UDAPs) of New Jersey, New York, Illinois, New Mexico and the District of Columbia**

**Violations of the New Jersey Consumer Fraud Act - N.J.S.A. 56:8-1 et seq;
New York General Business Law §§ 349 and 350 ;
815 Illinois Comp. Stat.Ann. 505/1 through 505/12 Consumer Fraud and Deceptive Business**

**Practices Act and 510/1 through 510/7 Uniform Deceptive Trade Practices Act;
New Mexico Stat. Ann. §§ 57-12-1 through 57-12-22 Unfair Practices Act; and,
D.C. Code Ann. §28-3901)**

101.    Plaintiffs hereby incorporate by reference each of the preceding allegations as though fully set forth herein.

102.    The residents of the five jurisdictions of New Jersey,  New York, Illinois, New Mexico and the District of Columbia respectively each constitute a distinct and separate subclass for each of the five jurisdictions of which the named plaintiffs are residents.

103.    Synapse Group engaged in unconscionable commercial practices, deception, fraud, false promise, false pretenses and/or misrepresentations in its interactions with Plaintiffs and all others similarly situated in violation of the consumer fraud statutes of New Jersey, New York, the District of Columbia, New Mexico and Illinois.  The deceptive acts and practices were also in violation of 15 U.S.C. §45 (a) of the Federal Trade Commission Act ("FTC Act"), the Unordered Merchandise Statute- 39 U.S.C § 3009 (a), the Electronic Funds Transfer Act ("EFTA") - 15 U.S.C § 1693 , the FTC's Trade Regulation Rule entitled "Use of Prenotification Negative Option Plans" ("the Negative Option Rule"), 16 C.F.R. Part 425 which are also violations of the state consumer fraud statutes of New Jersey, New York, Nevada, the District of Columbia, New Mexico, and Illinois.

104.    Plaintiffs and all members of the Class suffered an ascertainable loss when they were charged by the defendant for an automatic renewal of their magazine subscription(s) despite Plaintiffs and Class Members' attempts to cancel their subscriptions through defendant's automated telephone system.

105.    Plaintiffs and all members of the Class read or heard or saw or knew or were made aware of the misrepresentations made by the defendant in its uniform postcards and automated

telephone system which violated these state statutes and federal law.  Defendant's postcards and automated telephone system conveyed false and misleading statements and/or concealed or suppressed the truth.

106.    By virtue thereof, the Class is entitled to injunctive relief to prevent enforcement of the renewed subscriptions, a declaratory judgment setting aside the renewed subscriptions and/or compensatory and statutory damages.

## FIFTH COUNT
### (Violation of the Unordered Merchandise Statute)

107.  Plaintiffs hereby incorporates by reference each of the preceding allegations as though fully set forth herein.

108.    The Unordered Merchandise Statute, 39 U.S.C. §3009 (1970), generally prohibits shipping unordered merchandise, unless such merchandise is clearly and conspicuously marked as a free sample, or is mailed by a charitable organization soliciting contributions.  The statute also prohibits billing recipients for unordered merchandise.

109.    Pursuant to Section (a) of the Unordered Merchandise Statute, 39 U.S.C. §3009(a), violations of the Unordered Merchandise Statute are unfair methods of competition and unfair trade practices and a per se violation of Section 5(a)(1) of the FTC Act, 15 U.S.C.§ 45(a)(1) which in turn is a violation of the state UDAP statutes previously cited herein.

110.    In connection with the marketing, offering for sale, distribution or sale of magazines and magazine subscriptions, defendants, who are not a charitable organization soliciting contributions, have mailed magazines to consumers without their prior expressed request or consent of the recipients, **by automatically renewing the subscriptions without clear and**

39

**conspicuous notice and/or through the use of a deceptive IVR or automated telephone cancellation system**, and without identifying them as free samples, thereby violating Section (a) of the Unordered Merchandise Statute, 39 U.S.C. § 3009(a).

111.    Consumers consent for defendant to mail initial subscription offers does not constitute consent to mail subsequent automatically renewed subscriptions.  In addition, consumers failure to reply to defendant's negative option postcards does not constitute consent for defendant's to mail subsequent automatically renewed subscriptions because defendant did not clearly and conspicuously disclose in its postcards that the defendant would automatically ship subsequent magazines to consumers who failed to respond to the negative option postcards and consumers could not, therefore, agree to that course of conduct.

112.    By virtue thereof, the Class is entitled to injunctive relief to prevent enforcement of the renewed subscriptions, a declaratory judgment setting aside the renewed subscriptions and declaring the magazines received a "gift", restitution and/or compensatory and statutory damages.

### SIXTH COUNT
### (Violations of the Electronic Fund Transfer Act (EFTA), 15 U.S.C. § 1693 et seq.)

113.    Plaintiffs hereby incorporate by reference each of the preceding allegations as though fully set forth herein.

114.    Pursuant to 15 U.S.C.§ 1693 e(b): "In the case of preauthorized transfers from a consumer's account to the same person which may vary in amount, the financial institution or designated payee shall, prior to each transfer, provide reasonable advance notice to the consumer, in accordance with regulations of the Board, of the amount to be transferred and the scheduled date of the transfer.

115.    In connection with the marketing, offering for sale, distribution or sale of magazines

40

and magazine subscriptions, defendants have electronically transferred funds from consumers' accounts **without reasonable advance notice by automatically renewing the subscriptions without clear and conspicuous notice and/or through the use of a deceptive IVR or automated telephone cancellation system**, thereby violating the EFTA.

116.    Pursuant to the EFTA, 15 U.S.C. § 1693o(c), every violation of the EFTA and Regulation E constitutes a violation of the FTC Act which is in turn a violation of the state UDAP statutes previously cited herein.

117.    By virtue thereof, the Class is entitled to injunctive relief to prevent enforcement of the renewed subscriptions, a declaratory judgment setting aside the renewed subscriptions, restitution and/or compensatory and statutory damages.

## SEVENTH COUNT
### (Declaratory Relief)

118.    Plaintiffs hereby incorporate by reference each of the preceding allegations as though fully set forth herein.

119.    The subscription magazine automatic renewals are deceptive and fraudulent.

120.    The magazines sent to Class Members after the automatic renewals are unordered merchandise pursuant to the Unordered Merchandise Statute.

121.    The electronic funds transferred from Plaintiffs and Class Members accounts to defendants as payments for the subscription magazine automatic renewals are unauthorized and fraudulent.

122.    Plaintiffs and Class members seek Declaratory Relief declaring that:

   a.    the automatic renewal contracts of Class Members with defendants are void;

   b.    the magazines sent to Class Members by the defendant after an automatic

41

renewal are gifts pursuant to the Unordered Merchandise Statute;

c.      the electronic transfers from Plaintiffs and Class Members accounts by

defendants for payment of automatic renewals are fraudulent and must be returned

to the Class Members.

## EIGHTH COUNT
**(Injunctive Relief)**

123.    Plaintiffs hereby incorporate by reference each of the preceding allegations as

though fully set forth herein.

124.    Plaintiffs and Class members seek Injunctive Relief, enjoining the defendant from

continuing it deceptive automatic renewal practices that include deceptive notices and deceptive

automated telephone cancellation system.

125.    Plaintiffs and Class members have no adequate remedy at law.

126.    By virtue thereof, the Class is entitled to injunctive relief.

**WHEREFORE,** Plaintiffs, on behalf of themselves and the members of the Class,

demand judgment as follows:

(a) A determination that this action is a proper class action maintainable under Federal

Rules of Civil Procedure, Rule 23, and certifying an appropriate Class and/or Subclass and

certifying Plaintiffs as Class and Subclass representatives;

(b) Equitable and injunctive relief enjoining Synapse Group and affiliates from pursuing the

policies, acts and practices described in this Complaint; and

(c) An order requiring disgorgement and/or imposing a constructive trust upon Synapse

Group monies received from automatic renewals of magazine subscriptions, and requiring

defendants to pay Plaintiffs and all members of the Class for any act or practice declared by this

Court to be unlawful;

(d) Damages in an amount to be determined at trial;

(e) Statutory damages for violations of the applicable federal law and state statutes, including state Unfair and Deceptive Trade Practices Acts (UDAPS) or consumer fraud acts. Pre-judgment and post-judgment interest at the maximum rate allowable at law;

(f)  Compensatory and/or statutory damages for violations of the Unordered Merchandise Statute and the Electronic Fund Transfer Act;

(g) Punitive damages in an amount to be determined at trial;

(h) For a declaratory judgment declaring the subscription renewals unenforceable and setting them aside.

(i) The costs and disbursements incurred by Plaintiff in connection with this action, including reasonable attorneys' fees and expert fees; and

Such other and further relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury.


Dated:                                    **KANTROWITZ, GOLDHAMER & GRAIFMAN**


                                          **By:  s/ Gary S. Graifman**
                                                **GARY S. GRAIFMAN, ESQ.**
                                                210 Summit Avenue
                                                Montvale, New Jersey 07645
                                                Tel: (201) 391-7000
                                                Fax:(201) 307-1086

Dated:                                    **GREEN & PAGANO, LLP**


                                          **By: s/ Michael S. Green**

43

**MICHAEL S. GREEN, ESQ.**
522 Route 18, P.O. Box 428
East Brunswick, New Jersey 08816
Tel: (732) 390-0480
Fax: (732) 390-0481

Dated:                                  **DIAMOND LAW OFFICE, LLC**


By: **s/ Paul Diamond**
    **PAUL DIAMOND, ESQ.**
    1605 John Street, Suite 102
    Fort Lee, New Jersey 07024
    Tel: (201) 242-1110
    Fax: (973) 302-8189

**PLAINTIFFS' COUNSEL**

44