**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| CHARLES T. MCNAIR, et al., | Civil Action No.: 06-5072 (JLL) |
| Plaintiffs, | **OPINION** |
| v. | |
| SYNAPSE GROUP, INC., | |
| Defendant. | |

**LINARES, District Judge.**

This matter comes before the Court on a motion for class certification filed by Plaintiffs Charles McNair, Theodore Austin, Danielle Demetriou, Ushma Desai, and Julie Dynko ("Plaintiffs"). Plaintiffs commenced this action against Defendant Synapse Group, Inc. ("Synapse") alleging that "Synapse's unconscionable deceptive practices violated the New Jersey, the New York, and District of Columbia UDAP (Unfair and Deceptive Acts and Practices) statutes, the FTC Act, the Unordered Merchandise Act and the Electronic Fund Transfer Act, and constituted a breach of contract, a breach of the covenant of good faith and fair dealing and resulted in unjust enrichment." (Pls.' Mem. of Law in Supp. of Pls.' Mot. for Class Cert., at 5 [hereinafter "Pls.' Mem."].) On March 20, 2008 this Court dismissed the fifth count of Plaintiffs' Amended Complaint, a claim for violation of the Unordered Merchandise Statute. Plaintiffs now seek class certification for the following causes of action: violations of the consumer protection statutes of New Jersey, New York, and the District of Columbia; breach of contract and the covenant of good faith and fair dealing under New Jersey, New York, and

District of Columbia law; and violation of the Electronic Fund Transfer Act ("EFTA").   (Pls.'
Supplemental Mem. of Law in Further Supp. of Pls.' Mot. for Class Cert. Pursuant to Ct. Order
Scheduling Oral Arg., at 1-5 [hereinafter "Pls.' Supplemental Mem."].)  On April 17, 2009 this
Court heard oral arguments on Plaintiffs' class certification motion.  Prior to the hearing, the
Court requested additional briefing from Plaintiffs outlining the elements of the causes of action
for which they are seeking class certification and the common questions asserted for each cause
of action.  Synapse was permitted a responsive pleading.  The Court has considered all of the
parties' submissions and the arguments made at the April 17 hearing and, for the reasons set forth
below, denies Plaintiffs' motion for class certification.

I.      **FACTUAL AND PROCEDURAL BACKGROUND**

Synapse, a wholly owned subsidiary of Time, is the largest marketer of magazine
subscriptions in the country, marketing over 1,000 magazine titles.  (Pls.' Mem., at 7.)  "Synapse
offers initial magazine subscriptions, often for free or at greatly reduced rates, through retail
businesses (e.g. FYE Electronics), on websites (e.g. Amazon.com, MagazineOutlet.com) and
other marketing channels (e.g. to Amex and Chevron cardholders)."  (Id. at 1; see also Dec. of
Christopher M. Tyler ¶ 7 [hereinafter "Tyler Dec."].)  The period of the initial subscription
varies–for example, some are 90-day offers while other initial offers are for one year.  (See, e.g.,
First Am. Class Action Compl. ¶¶ 19.b., 20.c., 23.a. [hereinafter "Am. Compl."].)  After the
initial sign-up period has elapsed, if the subscriber has not affirmatively cancelled the
subscription, Synapse automatically charges the credit or debit card used at sign-up for the
amount indicated in the agreement.  (Tyler Dec. at ¶ 4.)  Regardless of how a Synapse subscriber
signs-up, "the continuous service system is explained in the offer" (id. at ¶ 10); all subscribers

"are told that they will be automatically charged" if they do not cancel (Apr. 17, 2009 Hearing

Tr. 9:1-3 [hereinafter "Hearing Tr."] (Plaintiffs' counsel describing initial subscriber sign-ups)).

The following is an example of an automatic renewal authorization for a 90-day offer used by

Synapse:

> **Automatic Renewal Authorization**
> Enjoy 90 days of your favorites FREE.  After your free period, your selections
> will continue for a year unless you cancel and the credit/debit card you provide
> will be charged only the annual rate shown for a total of fifteen months of issues.
> As an additional benefit, your selections will continue.  Each year, you'll receive a
> reminder notice and you authorize your account to be charged at the rate on the
> notice for the next year of issues unless you choose to cancel: 1-877-273-7622.
> Please allow 4-10 weeks for delivery.  The name, address, email and account
> information you provide will be forwarded to SynapseConnect to process and
> fulfill your selections.  Enjoy!

 (Michael S. Green Cert., at SYN-0140709 [hereinafter "Green Cert"].)  Synapse refers to this

automatic renewal way of marketing and selling magazines as an advance consent marketing

program.  (See Tyler Dec. ¶ 5.)

The Magazine Publishers of America, in comments on "Negative Option Marketing" in a

January 25, 2007 publication, described automatic renewal plans as follows:

> Not unlike the automatic billing for the daily newspaper or the credit card charge for
> the monthly internet bill, many magazine readers have taken advantage of automatic
> renewal plans, enabling them to continue their magazine subscriptions without
> having to take the time to fill out a renewal order form and mail a check for every
> renewal period.  Whether it is the morning paper, the On Demand movie, or the
> favorite newsmagazine, the concept is still the same: the consumer and the media
> provider have agreed to be in a relationship providing uninterrupted delivery of a
> particular service with the customer agreeing to automatic billing.  There are
> significant advantages to these programs–for both consumers and media providers.

(Green Cert., Ex. 1, at 4.)  For these programs, "the MPA guide advises that, during the initial

solicitation–in addition to describing the subscription term, price, payment method and

timing–publishers should: 1) disclose the fact that the subscription will automatically continue unless the consumer notifies the publisher to stop; 2) disclose the consumer's right to cancel; and 3) provide a clear description of the cancellation procedures." (Id. at 6.)  In addition, the guide recommends that "prior to the start of each automatic renewal term" a reminder notice should be sent to subscribers. (Id.)  The guide recommends that such notices "should: 1) inform consumers that the subscription is about to be renewed for a specific term and price; 2) tell consumers they will be charged or billed the stated price unless the subscription is affirmatively cancelled; and 3) provide consumers with instructions on how to cancel–cost free." (Id. at 7.)  The guide also recommends that where cancellations are processed using recorded messages, the "cancellation procedures should not be unreasonably difficult." (Id. at 8.)

As noted above, in its initial solicitations and agreements, Synapse informs subscribers of the automatic renewal aspect of the program, informs them that they may cancel, and provides a toll-free cancellation telephone number.  Additionally, prior to a charge, Synapse sends a notification postcard to the subscriber.  (Pls.' Mem., at 11.)  The Synapse postcards relevant to this case do not have the words "renewal notice" or "automatic renewal" on the outside of the postcard.  Rather, the outside of the postcard states:

| | |
|---|---|
| Special Customer Communication<br>**We guarantee a hassle-free subscription**.<br>You'll never miss an issue.  No bills, reminders, publisher renewal notices and no telemarketing calls.  We do the work for you by automatically extending your subscription each year for as long as you want your selections.<br><br>**We guarantee to send you advance notice every year about your next continuous-service subscription period and rates**.  We will send a notice that spells out: your rate, your number of | **Moving ?** [with a moving truck picture]<br>Not a problem. We'll make sure you don't miss a single issue of your favorite magazines.  It's one of the benefits of being a subscriber.  Just complete and return the form below:<br><br>_____<br>Name<br><br>_____<br>New Address |

| issues and when your credit card will be charged. If you don't wish to continue, you can simply cancel before your new term begins.<br><br>**We guarantee you uninterrupted service**.  As a Valued Subscriber, we guarantee you outstanding customer service. | _____ <br><br> _____ <br> City                    State/Zip |
|---|---|
| **SEE INSIDE FOR DETAILS** ||

(Green Cert., Ex. 5 (emphasis in original).)  The inside of the postcard identifies the magazines subscribed to, the number of issues ordered, the cost, and provides a toll-free telephone number for cancellation and the date by which cancellation must occur to avoid a charge.  (Id.)

If the subscription is not cancelled before the date on the notice, the subscriber is charged. When the charge appears on a subscriber's debit or credit card statement, it contains a billing descriptor that provides a toll-free telephone number and generally also includes the name of the magazine for which the amount was charged.  (See, e.g., id., Ex.25, McNair Credit Card Stmt.) Subscribers are able to cancel the subscription even after the charge has appeared, but, depending on the timing of the cancellation, Synapse may only provide a pro rata refund.  Also, "[i]f a customer incurs an overdraft fee directly as a result of a magazine charge, Synapse will reimburse the overdraft charges upon request [if certain criteria are met]."  (Tyler Dec. ¶ 24.)

The telephone number provided in the billing descriptor with the charge is a different toll-free number than the one provided on the postcard described above.  (See Green Cert., Exs. 5 & 25.)  Both numbers go to a Synapse automated "Interactive Voice Recognition" system ("IVR"). The IVR is a "a preprogrammed tree of options."  (Hearing Tr. 61:20-23.)  But, the IVR introduction script and options are different depending on the number called.  (See id. at 21:21-25.)  The options are also different based on other factors such as "which script codes are in use

at the time, the customer's original order date, the type of offer that the customer responded to, the magazine(s) that the customer subscribed to, different marketing client requirements, the customer's account history, including billing history and tenure, and–most importantly–how the caller responds to IVR prompts."  (Tyler Dec. ¶ 16; <u>see also</u> Hearing Tr. 20:15-21:3.)  Thus, "[t]he sequence of options/scripts presented in the IVR is not the same for each customer." (Tyler Dec. ¶ 16.)

Plaintiffs assert that although there are different IVR scripts and options, all "members of this class when they called the IVR . . . have uniformly been asked if they are calling to cancel a magazine, and they have responded affirmatively, or they were asked to select from a group of options, one of which is cancellation."  (Hearing Tr. 12:17-21.)  But, "[n]o matter how the caller [initially] indicates that they are calling to cancel, the IVR will attempt to retain the customer's business by presenting several offers that Synapse believes may be of value to its customers." (Tyler Dec. ¶ 13.)  Synapse calls these "save" options.  (<u>Id.</u>)  Synapse asserts that "[t]here are hundreds of diverse retention offers or 'saves' that Synapse has employed in the IVR over the past eight years."  (<u>Id.</u>)  Therefore, in order to cancel a subscription and receive a full refund, a subscriber must go through all the options presented and reject them or speak to a live operator. (<u>See</u> Hearing Tr. 57:23-58:11; <u>see also</u> Tyler Dec. ¶ 17.)  A live operator may be reached by pressing zero or if certain things happen on the call, but the IVR relevant for the proposed class members does not include a specific option to speak to a live operator.  (Hearing Tr. 23:16-25.)

Two IVR options alleged by Plaintiffs as being deceptive are the "Refund Do Not Cancel-Fee Refund" ("RDNC") option on the postcard IVR number and the "Do Not Renew" ("DNR") option on the billing IVR number.   A sample RDNC script states:

> Instead of calling back for your refund, I can give you one right now AND still keep your subscription active. I'll refund all the money you're due right now, except one dollar for processing and handling, and you'll keep getting your issues. Do you want me to immediately credit your account for this term and keep sending your magazines.

(Green Cert., Ex. 7.) This option refunds the subscriber's initial fee but keeps the subscription active. (<u>Id.</u>) A sample DNR script states: "Do you want me to cancel just your future charges so you can enjoy the remaining magazines you've already paid for?" (<u>Id.</u>) This option cancels future subscriptions–there are no more automatic renewals–but does not refund the current subscription, the amount automatically charged. (<u>Id.</u>)

Plaintiffs base their claims on the design of the notice postcard and the IVR system. In support of Plaintiffs' arguments they point to the fact that one of Synapse's customers, Chevron, required Synapse to change its practices to make the automatic renewal and cancellation process clearer. For example, Chevron insisted that the words "Automatic Renewal Notice" be placed on the front of the notification postcard, that the DNR option be removed from the IVR, and that the IVR provide an option up-front to reach a live operator. (<u>See</u> Pls.' Mem., at 17-18.) Internal Synapse emails include the following:

> Chevron is asking us to print 'Magazine Renewal Notice' in the bottom left corner of the address panel on all of our Chevron pre-bill notices. How okay are you with that? Now obviously this could increase cancellations, but Chevron is pretty adamant about the language being included. What are your thoughts?
> (Green Cert., Ex. 16, Internal Synapse Email, Dec. 11, 2001.)
> * * *
> These contingencies have been brought on by several months of increase[d] customer service noise and irate customers going directly to Chevron after we provided them with a cancel do not renew and confusion since the customer is expecting a full refund . . . .
> (Green Cert., Ex. 17, Internal Synapse Email, Jan. 17, 2003.)

There are five named Plaintiffs: Mr. McNair, Mr. Austin, Ms. Desai, Ms. Demetriou, and

Ms. Dynko.  Plaintiffs assert that they all were sent postcards like the one described above, that

they were never given an option on the IVR to speak to a live operator, that they chose an option

to cancel their subscription, and that they did not receive the refund they believe they were owed.

(See Pls.' Mem., at 18-19.)  Beyond these basics, their individual experiences vary.

Mr. McNair accepted an internet offer for four annual magazine subscriptions.  (Am.

Compl. ¶ 19.b.)  He opened and read the notice postcard and called the postcard IVR number to

cancel.  (Id. at ¶ 19.d. & e.)  He chose the RDNC option, allegedly wanting to cancel, but his

subscription was not cancelled.  (Pls.' Mem., at 20.)  After he was charged for the magazines, he

called the billing IVR and asserts that he chose the DNR cancel option for two magazines,

receiving a full refund for one and no refund for the other.  (Id.)  Synapse records show that of

the four magazines ordered, he used the IVR system to cancel three, leaving one not cancelled.

(Def. Synapse Group, Inc.'s Mem. of Law in Opp'n to Pls.' Mot. for Class Cert., at 7-8

[hereinafter "Def.'s Opp'n"].)  He seeks damages for the one magazine that was not cancelled.

(Pls.' Mem., at 20.)

Ms. Dynko has been a Synapse subscriber for numerous years, with her magazines being

automatically renewed from year to year.  (Am. Compl. ¶ 24.a.)  Beginning in 2006, she admits

that she opened and understood the postcards; she claims she did not open them before 2006

because of their design.  (Pls.' Mem., at 22.)  She asserts that had she "been properly notified of

upcoming automatic charges [before 2006] she would have cancelled the prior automatic

renewals."  (Id.)  Synapse records show that over the years she transacted with a live operator on

several occasions, cancelling several magazines in 2005 for refunds.  (Def.'s Opp'n, at 14-15.)

She seeks damages for the prior renewals that she alleges were not cancelled.  (Pls.' Mem., at

22.)

In 2005 or 2006, Mr. Austin subscribed via the internet to three magazines using a debit card.  (Am. Compl. ¶ 20.a.)   Mr. Austin states that he did not open or read the postcard and, as a result, was automatically charged for the subscriptions.  (Id. at ¶ 20.b.; Pls.' Mem., at 19.)  After being charged he called the billing IVR to cancel the magazines but asserts that for one magazine he received only a partial refund.  (Pls.' Mem., at 19.)  He further asserts that he "wanted to speak to a live person during his calls to [the IVR] but was not provided with an opportunity to do so."  (Am. Compl. ¶ 20.g.)  Synapse records show that he ordered three magazines on three different occasions.  (Def.'s Opp'n, at 9.)  On his first call to the IVR he was transferred to a live operator who cancelled a duplicate subscription to one of the magazines.  (Id.)  The records show that subsequently he successfully cancelled two subscriptions using the IVR, one on a call lasting less than six minutes, the other on a call lasting less than five minutes.  (Id. at 9-10.)  For one of the cancelled magazines he did only receive a pro rata refund.  (Id. at 10.)  He asserts that he suffered a loss equal to the difference between the pro rata refund and the full subscription amount.  (Pls.' Mem., at 19.)

In 2006 Ms. Desai accepted an in-store 90-day offer for four magazines using a debit card.  (Am. Compl. ¶ 23.a.)  After the 90-day period expired, she was automatically charged for the magazines.  (Id. at  ¶ 23.b.)  Ms. Desai did not open or read the postcards and claims that, as a result, she was harmed because she incurred overdraft fees because of the unexpected charges.  (Pls.' Mem., at 21.)  In 2007 Synapse made temporary charges on her account in anticipation of the automatic renewal of the subscriptions.  (Am. Compl. ¶ 23.g.)  She called the billing IVR to cancel the subscriptions.  (Id. at ¶ 23.h.)  Synapse states that its "records show that [she] first

contacted the IVR one day before the amended complaint was filed, cancelling all four of her subscription renewals and upcoming charges." (Def.'s Opp'n, at 13.) Synapse also asserts that Ms. Desai has not provided any documentation supporting the alleged overdraft charges. (Id.)

Finally, using a debit card, Ms. Demetriou subscribed to three magazines in 2006 pursuant to an online 90-day offer. (Am. Compl. ¶ 21.a.; Pls.' Mem., at 21.) She asserts that she did not open or read any notification postcards and, as a result, incurred overdraft charges because of the unexpected charges. (Am. Compl. ¶ 20.e.) Her bank records indicate that she was overdrawn prior to the charges. (Def.'s Opp'n, at 10-11.) After the charges she asserts that she called the IVR to cancel the subscriptions. (Pls.' Mem., at 22.) She testified that on at least one of the calls, "option 3 was to cancel and speak to a customer service representative." (Cert. of Thomas E. Gilbertsen, Ex. E., Demetriou Dep. Tr. 45:20-21.) She stated that she was on hold for an hour and then hung up. (Id. at 46:3-4.) She says that she then learned from a ripoff website to press "0" to speak to an operator, and so called backed and pressed zero. (Id. at 46:6-14.) She testified that again she was on hold for probably another hour before reaching an operator. (Id. at 46:13-17.) Synapse records show that she made a couple of calls to the IVR and received full refunds. (Def.'s Opp'n, at 11.) The records also show that the calls lasted under ten minutes. (Id.) She seeks damages for the unreimbursed overdraft charges. (Pls.' Mem., at 21.)

Plaintiffs in their motion seek class certification of their claims pursuant to a Class defined as:

> From October 23, 2000 to the date of the order certifying the class, all persons residing in New Jersey, New York and the District of Columbia who accepted an initial magazine subscription, or subscriptions, offered by Synapse, were sent a postcard notification with the "standard exterior" in advance of an automatic charge for an additional term or renewal of their subscription(s), and either before or after

being charged for the additional term or renewal of their subscription(s):
(1) called the Synapse "IVR," and responded affirmatively to the recorded question asking whether they were calling to cancel a magazine or selected an option to cancel a magazine from the list of options presented, and rejected all "save attempts" that may have been offered; or,
(2) fully cancelled the subscription(s) by speaking with a Synapse live operator; and, were not refunded all charges for the additional term or renewal of the magazine subscription(s) and/or were not reimbursed upon request to Synapse all bank overdraft charges, on their debit or credit card(s). Excluded from the class are defendant, its agents and affiliates, and any government entities.[1]

(Pls.' Reply Mem. of Law in Supp. of Pls.' Mot. for Class Cert., at 5 [hereinafter "Pls.' Reply"].)

## II.    CLASS CERTIFICATION REQUIREMENTS

"Class certification is proper only 'if the trial court is satisfied, after a rigorous analysis, that the prerequisites' of Rule 23 are met." In re Hydrogen Peroxide Antitrust Litigation, 552 F.3d 305, 309 (3d Cir. 2008) (quoting Gen Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 161(1982)). To meet the prerequisites of Rule 23, a plaintiff must establish both that the four requirements of Rule 23(a) have been met–numerosity, commonality, typicality, and adequacy–as well as that the pleading requirements of Rule 23(b)(1), (2), or (3) have been met.  Fed. R. Civ. P. 23; see also Hydrogen Peroxide, 552 F.3d at 309 n.6.

In analyzing whether Rule 23's requirements have been met, "the district court must make whatever factual and legal inquiries are necessary and must consider all relevant evidence and arguments presented by the parties." Hydrogen Peroxide, 552 F.3d at 307.  This is true even if the class certification inquiry overlaps with the merits of the causes of action.  Id. Additionally, if there is any doubt as to whether the Rule 23 requirements have been met,

_____

[1]Plaintiffs proposed varying definitions in their original Complaint, in their Amended Complaint, in their moving certification brief, and finally in their reply.  At the April 17 hearing they indicated that they were proceeding using the definition from their reply.  (Hearing Tr. 38:20-40:6.)

certification should be denied, regardless of the area of substantive law.  Id. at 321 (discussing

the Rule 23 2003 Amendments).

Here, Plaintiffs seek class certification under Rules 23(b)(2) and 23(b)(3).  Rule 23(b)(2)

"applies when the putative class seeks injunctive or declaratory relief, and 'does not extend to

cases in which the appropriate final relief relates exclusively or predominantly to money

damages.'" Beck v. Maximus, Inc., 457 F.3d 291, 301 (3d Cir. 2006) (quoting Rule 23(b)(2)

advisory committee's note).  While the Seventh Count of Plaintiffs' Amended Complaint seeks

declaratory relief and the Eighth Count seeks injunctive relief, the predominant relief sought in

this case is money damages, including punitive damages and treble statutory damages under

various state unfair and deceptive trade practices acts or consumer fraud acts.  Therefore,

certification under Rule 23(b)(2) is not appropriate in this case.

Rule 23(b)(3) requires a finding "that the questions of law or fact common to the class

members predominate over any questions affecting only individual members [(predominance)],

and that a class action is superior to other available methods for fairly and efficiently adjudicating

the controversy [(superiority)]."  Fed. R. Civ. P. 23(b)(3); see also Hydrogen Peroxide, 552 F.3d

at 310.  "Because the nature of the evidence that will suffice to resolve a question determines

whether the question is common or individual, a district court must formulate some prediction as

to how specific issues will play out [at trial] in order to determine whether common or individual

issues predominate in a given case." Hydrogen Peroxide, 552 F.3d at 311 (citations and

quotations omitted).  "If proof of the essential elements of the cause of action requires individual

treatment, then class certification is unsuitable." Id. (quoting Newton v. Merrill Lynch, Pierce,

Fenner & Smith, Inc., 259 F.3d 154, 172 (3d Cir. 2001)).  Therefore, in addition to the four

requirements of Rule 23(a), Plaintiffs in this case bear the burden of establishing that common

issues of fact and law predominate and that a class action is superior.

## III.    DISCUSSION

Although Synapse challenges the sufficiency of Plaintiffs' showing for all Rule 23

elements, it most persuasively argues that Plaintiffs fail to establish that common issues of fact

and law will predominate as required by Rule 23(b)(3).  Because the Court finds this issue

dispositive of the present motion, discussion of Plaintiffs' causes of action is limited to this

requirement; it is unnecessary to reach arguments related to the other Rule 23 requirements.

As an initial matter, this Court notes that Plaintiffs' proposed class definition appears

inconsistent with their arguments.  The definition include subscribers who "called the Synapse

'IVR,' and responded affirmatively to the recorded question asking whether they were calling to

cancel a magazine or selected an option to cancel a magazine from the list of options presented,

and rejected all 'save attempts' that may have been offered . . . and, were not refunded all charges

for the additional term or renewal of the magazine subscription . . . ."  Yet, at the April 17

hearing, counsel for Plaintiffs stated:

> If a person went through all of the options that were presented [in the IVR] and
> rejected all of them, including the deceptive options and went to the very end, the
> effect would be they wouldn't be charged for the upcoming not yet incurred charge.
> It is parallel to what happens after a person is charged.  There is no affirmative option
> presented to [cancel for a full refund].

(Hearing Tr. 57:23-58:4.)   The proposed class definition and this statement appear to be

inconsistent.[2]  Plaintiffs primary argument regarding the IVR as made in their papers and at the

---

[2] It may be that the perceived inconsistency is related to Plaintiffs utilizing a different
definition of a save attempt than Synapse. This is difficult to determine as Plaintiffs do not
clearly define which options are included in its definition.

April 17 hearing is that the IVR options deceive subscribers into <u>not</u> rejecting them–they accept

options believing they are fully cancelling a subscription when apparently they are not.  Plaintiffs

also make arguments that some subscribers are damaged by the postcards regardless of the IVR

interaction.  Neither of these positions appears appropriately captured by Plaintiffs' proposed

class.  Because this Court has the discretion to reform a class definition, <u>Finberg v. Sullivan</u>, 634

F.2d 50, 64 n.9 (3d Cir. 1980), it analyzes the claims using its understanding of Plaintiffs'

arguments rather than solely as framed by the class as currently defined.

> **A.    Consumer Fraud Claims**

> 1.    <u>New Jersey Consumer Fraud Act</u>

To establish a claim under the New Jersey Consumer Fraud Act ("NJCFA"), N.J.S.A. §§

56:8-1 <u>et. seq.</u>, a plaintiff must show: "1) unlawful conduct . . .; 2) an ascertainable loss . . .; and

3) a causal relationship between the defendants' unlawful conduct and the plaintiffs ascertainable

loss."  <u>See</u> <u>International Union of Operating Engineers Local No. 68 Welfare Fund v. Merck &</u>

<u>Co., Inc.</u>, 929 A.2d 1076, 1086 (N.J. 2007) (quoting <u>N.J. Citizen Action v. Schering-Plough</u>

<u>Corp.</u>, 842 A.2d 174, 176 (N.J. Super. Ct. App. Div. 2003)).  At its core, Plaintiffs' NJCFA

argument is that Synapse's marketing practices represented a common deceptive scheme that

injured them in the form of inappropriate subscription charges.  They further argue that where

there is a common course of deceptive conduct, causation may be presumed–no showing of

individual causation is required.  In other words, Plaintiffs' position is that "[t]he overarching

common question that must be determined is whether Synapse engaged in a deceptive retention

scheme during the Class period, and whether that scheme was unlawful under federal and/or state

law."  (Pls. Mem., at 38.)  Thus, because Plaintiffs focus on Synapse's behavior, which they

assert is common in relation to all class members, they argue that common issues of fact and law will predominate over individual issues.

Synapse, on the other hand, argues that individual issues will predominate.  It first argues that there is no common course of conduct–"no specific representations seen or heard by all class members."  (Def.'s Opp'n, at 27.)  They argue that Plaintiffs have not even alleged that they all were faced with a "finite" or "readily identifiable" set of IVR options.  (Id. at 28 (quoting language from Elias v. Ungar's Food Products, Inc., 252 F.R.D. 233, 238 (D.N.J. 2008)).)  Next, it argues that causation may not be presumed, and that there are individual issues of causation, including individual affirmative defenses, which will predominate over any common issues.

Even assuming that there is a common course of deceptive conduct by Synapse, which the Court does not so find, this Court agrees with Synapse that a presumption of causation on the facts of this case is inappropriate, and that, without such a presumption, individual issues of causation will predominate.  Although there are federal cases that support the broad presumption argument made by Plaintiffs, see, e.g., Elias v. Ungar's Food Prods., Inc., 252 F.R.D. at 238 ("The true burden here for the plaintiffs is to make a showing that the statement found on the packaging were misrepresentations, not to prove causation as to each individual class member."), Plaintiffs do not cite, and this Court cannot find, a case supporting the proposition that whenever there is any common course of conduct a presumption of causation is appropriate.  On the contrary, this Court finds that the New Jersey Supreme Court's recent decision in International Union makes clear that there is no such rule.  See 929 A.2d at 1085-86.  Although the specific matter to be decided for the present motion here is class certification under the federal rules, determination of that issue involves understanding the proofs necessary for the underlying state

causes of action.  And, where a state's highest court has addressed a particular issue of state law,

this Court must apply the law as interpreted by that court.  See  Jewelcor Inc. v. Karfunkel, 517

F.3d 672, 676 (3d Cir. 2008) ("[W]here the applicable rule of decision is the state law, it is the

duty of the federal court to ascertain and apply that law.").

      Much like Plaintiffs here, in International Union the plaintiff argued "that [the court]

should focus on the facts relating to the conduct engaged in by defendant in marketing its product

and in withholding important information about the product's risks."  929 A.2d at 1087.  The

court noted that "[i]n doing so, plaintiff asserts that all of the facts relating to defendant's

behavior and its marketing campaign are common to all class members."  Id.  On the other hand,

the defendant, much like Synapse here, argued that under the NJCFA "the claims must be that

each class member was injured individually."  Id.  They argued that "because each class member

made [the] evaluation [of whether to include Vioxx in its formulary] at different times and based

on different criteria and because each reacted differently with regard to formulary placement even

after the facts that allegedly prove the fraud became known, there are overwhelmingly individual,

rather than common, questions of law and fact."  Id.  Even though the International Union court

acknowledged that there was uniform conduct–"there [was] no disagreement about the fact that,

whatever its specifics, defendant's marketing plan and withholding of adverse information *did*

*not vary as among potential consumers*," it nevertheless held for defendant, finding that common

issues would not predominate under New Jersey's class certification statute, which mirrors Rule

23.  Id. at 1085, 1087 (emphasis added).  In reaching this conclusion, the International Union

court stated:

      More important to our analysis, however, plaintiff does not suggest that each of these

> proposed class members, receiving the same information from defendant, reacted in a uniform or even similar manner. Rather, the record speaks loudly in its demonstration that each third-party payor, relying on PBMs and P & T Committees, made individualized decisions concerning the benefits that would be available to its members for whom Vioxx was prescribed. The evidence about separately created formularies, different types of tier systems, and individualized requirements for approval or reimbursement imposed on various plans' members and, to some extent, their prescribing physicians, are significant. That evidence convinces us that the commonality of defendant's behavior is but a small piece of the required proofs. Standing alone, that evidence suggests that the common fact questions surrounding what defendant knew and what it did would not predominate.

Id. at 1087.  Thus, to establish causation under the NJCFA the New Jersey Supreme Court looked not only to the defendant's conduct but also to the class members' conduct and then evaluated whether both were sufficiently uniform or common for class certification to be appropriate.

The International Union court's decision that causation under the NJCFA could not be presumed merely on a showing of a common course of conduct also is consistent with the Third Circuit's recent decision in Hydrogen Peroxide.  The Court in Hydrogen Peroxide "recognized that "[p]redominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws."  552 F.3d at 321-22 (quoting Amchem Prods. v. Windsor, 521 U.S. 591, 625 (1997)) (alteration in original).  The court, however, also stated that "it does not follow that a court should relax its certification analysis, or presume a requirement for certification is met, merely because a plaintiff's claims fall within one of those substantive categories."  Id. at 322.  The court discussed the use of a presumption of injury in anti-trust cases, where "injury may be presumed when it is clear [based on the evidence presented that] the violation results in harm to the entire class."  Id. at 326 (quoting Newton, 259 F.3d at 179 n.21). In discussing whether such a presumption was appropriate for purposes of class certification, the Hydrogen Peroxide court "emphasize[d] that '[a]ctual, not presumed, conformance' with the

Rule 23 requirements is essential," stating that "[a]pplying a presumption of impact based solely

on an unadorned allegation of price-fixing [in an anti-trust case] would appear to conflict with

the 2003 amendments to Rule 23, which emphasize the need for a careful, fact-based approach,

informed, if necessary, by discovery." Id. (citations omitted) (remanding for further examination

of whether a presumption was appropriate on the facts of that case).

Here, even if it is accepted that Synapse's practices were deceptive and uniform,

Plaintiffs make no attempt to provide a causation link; they do not adequately explain why the

alleged conduct is likely to effect all class members in the same way.  Their causation argument

is simply: If we can show a common course of conduct by Synapse, a presumption of causation is

appropriate.  This is the type of unadorned causation allegation that the Hydrogen Peroxide court

indicated would be insufficient under Rule 23.  In fact, to use the International Union court's

language, Plaintiffs here do "not suggest that each of the[] proposed class members, receiving the

same information from [Synapse] reacted in a uniform or even similar manner."  On the contrary,

like in International Union, the facts clearly demonstrate that each named Plaintiff reacted very

differently to the postcard and the IVR system.  Two of the five named plaintiffs admitted to

reading and understanding the postcards.  With respect to the IVR, the only common allegation is

that all plaintiffs called one of the IVR numbers and initially chose some cancel option; there are

no allegations that all plaintiffs chose the same option or options.  Synapse records and the

testimony shows that all the plaintiffs had very different IVR experiences.

Regardless of the various experiences, Plaintiffs argue that the reaction to the IVR was

uniform because all plaintiffs initially selected an option to cancel–what they assert is an

objective act.  However, that is not where each story ended.  After allegedly selecting an option

to cancel, they all chose different unidentified options within the IVR which had different results for each plaintiff.  In essence what they argue is that after each of them initially selected an option to cancel, nothing else mattered.  Their argument as framed does not recognize any right of Synapse to try to save a customer's business; they do not attack specific save or cancellation options as crossing the line between a legitimate effort to retain a customer and deception.  Plaintiffs do not, for example, allege that they all selected the DNR option or one of several specific options, and yet the subscription was not fully cancelled resulting in an unwanted charge.  Here, with the exception of Mr. McNair, Plaintiffs' allegations do not focus on any specific options each chose beyond the initial choice of some cancel option.

A primary difficulty for Plaintiffs here is that the IVR does not fit nicely into the classic marketing boxes discussed in NJCFA class action cases–written, uniform marketing materials versus oral sales transactions where a presumption of causation has consistently been found to be inappropriate, see, e.g., Stephenson v. Bell Atl. Corp., 177 F.R.D. 279, 291 (D.N.J. 1997).  The IVR is neither of these things.  While the IVR is preprogrammed, it is a preprogrammed set of choices that can vary exponentially depending on how a subscriber reacts.  The question presented then is: While a subscriber may have called *initially* wanting to fully cancel–the only specific uniform action alleged by Plaintiffs, how do you know he did not change his mind during the call, accepting a Synapse save?  If this is the question, then the focus is no longer simply on an objective act, but rather on the individual intent of each plaintiff.

Synapse argues that is exactly what you have here.  For example, Mr. McNair called to cancel all of his magazines but ended up cancelling all but one for a complete refund, choosing the DNR option for the remaining magazine.  (See Hearing Tr. 74:3-4.)  He says he was deceived

by the option and, as a result, was not able to cancel all of the magazines as desired.  Synapse, on

the other hand, argues that his successful cancellation of some the magazines using the IVR

demonstrates that he was not deceived by the system and got exactly what he wanted.  Which

party's argument will be more persuasive to a fact finder is unimportant at this stage.  What is

important is that this will be an argument about what this particular person's actions meant.

Synapse argues that this very individualized inquiry will be the same for all of the plaintiffs.   In

response to Plaintiff Dynko's assertion that she was harmed because she failed to receive proper

notice for subscriptions prior to 2006, Synapse points to records showing several cancellations in

2005.  In response to Plaintiff Austin's allegations that he could not speak to a live operator and

that his pro rata refund should have been a full refund, Synapse points to its records showing that

he did speak to a live operator, successfully cancelling all of his subscriptions.  They further

assert that the question of whether he was due a full versus a pro rata refund will require looking

at the very specific facts related to his subscriptions.  In response to Plaintiff Desai's claim that

she incurred overdraft charges at the end of the 90-day period and that she is unsure if her calls to

the IVR successfully cancelled her magazines, Synapse points out that she has not submitted

documentation supporting the overdraft charges and that its records show that, using the IVR, she

successfully cancelled all of her subscriptions.  The Court also notes that, contrary to her claim

that she did not have notice that there would be an automatic charge at the end of the 90-day

period, Plaintiffs' counsel at the April 17 hearing acknowledged that at initial sign-up all

subscribers "are told that they will be automatically charged."  (Hearing Tr. 9:1-3.)  Finally, in

response to Plaintiff Demetriou's allegations that she incurred overdraft charges because of

inadequate postcard notice and additional difficulty with the IVR including exorbitant wait times,

Synapse points to her bank records showing that she was overdrawn prior to the charges and to its records contradicting her IVR testimony. It argues that these individual fact and credibility questions will predominate over any common questions.  This Court agrees.

In fact, in what this Court finds was a likely preview of how the issues would play out at trial, at the April 17 hearing, with only the five named plaintiffs at issue, the debate on causation was focused on individual issues and defenses.  The Amended Complaint also repeatedly states that Plaintiffs' actions with respect to the IVR were reasonable–they "interacted with the [IVR] in a manner completely reasonable for a consumer attempting to effectuate a cancellation," and they "made completely reasonable efforts to cancel."  (Am. Compl. ¶ 19.e. and f.; see also ¶¶ 20.e.,24.d.)  Whether behavior was reasonable necessarily involves individualized inquiries.  Thus, particularly with respect to the IVR allegations as currently framed by Plaintiffs, individual issues are even more likely to predominate than in International Union.  Here not only is there no demonstration of uniform reactions by Plaintiffs, but unlike in International Union, Plaintiffs have not established that the IVR options experienced by each was uniform.

The same is true with respect to arguments about the postcard.[3]  For starters, two plaintiffs were not deceived by it, they read it and acted on it.  For some others, it is unclear if a postcard was even required.  For example, subscribers that signed up on a 90-day offer accepted

---

[3]The postcard argument also includes some arguments related to interactions with live operators in the IVR.  Although their argument is unclear, Plaintiffs appear to argue that for the individuals who reached a live operator, the claim is not that they were deceived by the operator, but that they were nevertheless harmed by not receiving a full refund.  Presumably the damage, receiving a pro rata versus a full refund, was incurred because they called too late because they did not receive adequate notice before the charge was made.  This is really a postcard not IVR argument–the damage alleged is caused by the timing of the call, not the experience of the call itself.

as part of the offer that they would be charged in 90 days if they did not cancel using the number provided in the initial offer.  Thus, failure to abide by the terms of the initial offer they accepted is, arguably, the cause of any damage for those subscribers.  For others, who did not read the postcard, were required to receive notice, and were harmed, it is conceivable that a class could be created that could demonstrate uniform conduct causing common harm, but that is not a class proposed or as represented by the current plaintiffs.

For these reasons this Court finds that individual issues will predominate for Plaintiffs' NJCFA claim.  Therefore, Plaintiffs have not met their burden of establishing that class certification for this cause of action is appropriate.

2.    <u>New York and the District of Columbia</u>

To establish a claim for unfair or deceptive trade practices under New York law, N.Y. Gen. Bus. Law § 349, a plaintiff must show: "(1) the defendant's deceptive acts were directed at consumers, (2) the acts are misleading in a material way, and (3) the plaintiff has been injured as a result."  <u>Maurizio v. Goldsmith</u>, 230 F.3d 518, 521 (2d Cir. 2000).  Like claims under the NJCFA, "[t]he causation element [for claims under § 349 ]is essential: The plaintiff . . . must show that the defendant's material deceptive act caused the injury."  <u>Newman v. RCN Telecom Servs.</u>, 238 F.R.D. 57, 74 (S.D.N.Y. 2006) (internal quotations omitted).  Although the case law regarding the specific elements for claims for unfair or deceptive trade practices under the District of Columbia law, D.C. Consumer Protection Procedures Act §§ 28-3904 and 28-3905(k)(1) (the "DCCPPA") is not clear, it is clear that the DCCPPA "affords a panoply of strong remedies, including treble damages, punitive damages and attorneys' fees, to consumers who are victimized by unlawful trade practices."  <u>Dist. Cablevision Ltd. P'shp v. Bassin</u>, 828

A.2d 714, 717 (D.C. Cir. 2003).  Pointing to the DCCPPA statutory language, Plaintiffs argue

that this is true "whether or not any consumer is in fact misled, deceived or damaged."  (See Pls.'

Supplemental Mem., at 2 (quoting §§ 28-3904 and 28-3905(k)(1)).)  However, courts have found

that despite this language, injury must be proven.  See Hoyte v. YUM! Brands, Inc., 489 F. Supp.

2d 24, 28-29 (D.D.C. 2007).  Additionally, the language "victimized *by* unlawful trade practices"

suggests that the injury must be as a result of the unlawful practices, requirements similar to the

NJCFA.  Thus, because Plaintiffs also must establish that they have been injured as a result of a

defendant's conduct under both New York and the District of Columbia law, class certification

for these claims fails for the same reasons discussed above for the NJCFA claim.

**B.        Breach of Contract Claim**

The required showing to establish a claim for breach of contract under New Jersey, New

York, and the District of Columbia law is similar.  A plaintiff must show: 1) the existence of a

contract, 2) a breach of the contract by the defendant, 3) damages, and 4) that he performed his

own contractual duties.  See MK Strategies, LLC v. Ann Taylor Stores Corp., 567 F. Supp. 2d

729, 735 (D.N.J. 2008); Harsco Corp. v. Segui, 91 F.3d 337, 348 (2d Cir. 1996); Greenwich Ins.

Co. v. Ice Contrs., Inc., 541 F. Supp. 2d 327, 333 (D.D.C. 2008).  The Amended Complaint

states that "Plaintiffs and the Class Members have entered into *certain contracts and agreements*

with Synapse Group" and alleges that "Synapse Group breached its contract with Plaintiffs," that

"Plaintiffs and Class Members satisfied their obligations under these contracts and agreements,"

and that Plaintiffs and Class Members suffered damages.  (Am. Compl. ¶¶ 86-88, 90 (emphasis

added).)  Plaintiffs entered into a myriad of different contracts depending on how and where they

signed up for a subscription.  Synapse argues that Plaintiffs never identify the contract terms at

issue.  Plaintiffs appear to assert that all Synapse agreements include some obligation to provide notice before any charge and to not hinder Plaintiffs' right to cancel, regardless of the exact wording of any individual contract.  Even if they could establish that Synapse contracted for the same or similar obligations for all Plaintiffs, which they have not attempted to do, individual questions would predominate for this claim.  This is particularly true with respect to whether Synapse hindered Plaintiffs' ability to cancel subscriptions for the same reasons discussed above regarding causation under the NJCFA claim.  All Plaintiffs are told up-front about the automatic renewals, and Plaintiffs do not point to specific IVR options uniformly experienced by proposed class members.  Therefore, the focus likely will be on each Plaintiffs' individual experience and whether it supports a finding that they reasonably performed their own duties and whether their cancellation was hindered by Synpase or whether the facts show that they got what they wanted at the time of the calls.  For the few plaintiffs that were customers for several years, individual affirmative defenses are also particularly likely to predominate.  Therefore, the Court also finds that Plaintiffs have failed to meet their burden of establishing that common issues will predominate for this cause of action.

### C.      Electronic Fund Transfer Act Claim

Section § 1693e(b) of the Electronic Fund Transfer Act ("EFTA") provides:

> In the case of preauthorized transfers from a consumer's account to the same person which may vary in amount, the financial institution or designated payee shall, prior to each transfer, provide reasonable advance notice to the consumer, in accordance with regulations of the Board, of the amount to be transferred and the scheduled date of the transfer.

15 U.S.C. § 1693e.  As an initial point, this claim clearly does not apply to all class members because only a few used debit cards.  So, at most, this claim applies to a subclass of the proposed

class.  Synapse argues that Plaintiffs have failed to establish that it applies to any of the proposed class because they have not alleged that the charged amount varied from the authorized amount. Plaintiffs have submitted no evidence regarding whether the renewal amounts charged by Synapse varied from the amounts authorized by Plaintiffs.  Plaintiffs argue that varying amounts are not required under the EFTA, focusing on the language "which *may* vary in amount."  (See Hearing Tr. 85:19-25.)  But, the regulation implementing this statute states:

> Notice of transfers varying in amount– (1) Notice. When a preauthorized electronic fund transfer from the consumer's account will vary in amount from the previous transfer under the same authorization or from the preauthorized amount, the designated payee or the financial institution shall send the consumer written notice of the amount and date of the transfer at least 10 days before the scheduled date of transfer.

12 C.F.R. § 205.10(d).  This language supports Synapse's interpretation–notice is required *when* the automatic transfer will vary in amount.  Plaintiffs cite no law to the contrary.  Therefore, this Court finds that Plaintiffs have failed to demonstrate that this claim applies to any of the proposed class.

### D.    Superiority

Because this Court has found that Plaintiffs have not met their burden in establishing that common issues will predominate, it need not reach the other Rule 23 requirements, including the other requirement of Rule 23(b)(3), superiority.  However, because of the facts of this case and the arguments made by Plaintiffs' counsel, this Court comments briefly on this element.  At the April 17 hearing, counsel for Plaintiffs stated:

> Synapse relies on the fact that there is no way that an individual consumer challenging the deceptive practice could actually challenge it legally and do something about it legally without doing it as a class action.  It is inconceivable . . . in terms of the amount of damages that are here and the complexity [that the case

would be brought other than as a class action and] then the deceptive practice will continue to go unchallenged.

(Hearing Tr. 88:10-21.)  This Court is sympathetic to Plaintiffs' position and agrees with this statement to a point.  But, if the issue for class certification was merely whether, as a practical matter, a case only would be brought as a class action because of the amount of damages or a case's complexity, Rule 23 would be written in the disjunctive rather than the conjunctive; as written, all requirements must be established for class certification to be appropriate. Additionally, this Court's ruling is simply that, as the class is currently defined, Plaintiffs have not met their burden.  A differently defined class or one that does not predominantly seek money damages may pass muster.  Synapse's practices also could be challenged by the state versus individual subscribers, an action that would require less stringent proofs, at least under the NJCFA.  In fact, the attorney generals for numerous states have challenged policies similar to those at issue here with Time, Synapse's parent.

## IV.    CONCLUSION

For the foregoing reasons, this Court denies Plaintiffs' motion for class certification.  An appropriate Order accompanies this Opinion.

DATED: June 29, 2009                          /s/ Jose L. Linares
                                              _____
                                              JOSE L. LINARES
                                              UNITED STATES DISTRICT JUDGE