```
1                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF NEW JERSEY
2                       Civil No. 06-5072(JLL)

3
        - - - - - - - - - - - - - - -X
4    CHARLES T. MC NAIR, THEODORE     :
     AUSTIN, DANIELLE DEMETRIOU,      :        TRANSCRIPT OF
5    USHMA DESAI; and JULIE DYNKO,    :
     on behalf of themselves and all  :        PROCEEDINGS
6    others similarly situated,       :
                                      :
7              Plaintiffs,            :        April 17, 2009
                                      :
8              -vs-                   :
                                      :
9    SYNAPSE GROUP, INC.,             :
                                      :
10             Defendant.             :        Newark, New Jersey
                                      :
11      - - - - - - - - - - - - - - -X

12

13

14

15
        B E F O R E:
16
                    THE HONORABLE JOSE L. LINARES,
17               UNITED STATES DISTRICT COURT JUDGE

18

19

20        Pursuant to Section 753 Title 28 United States Code, the
     following transcript is certified to be an accurate record
21   as taken stenographically in the above-entitled proceedings.

22   s/Phyllis T. Lewis, CCR, CRCR
        - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
23                  PHYLLIS T. LEWIS, C.C.R., C.R.C.R.
          Official Court Reporter - United States District Court
24              P.O. Box 25588, Newark, New Jersey  07101
                          (732) 735-4522
25
```

```
 1        A P P E A R A N C E S:

 2              KANTROWITZ, GOLDHAMER & GRAIFMAN, PC
                210 Summit Avenue
 3              Montvale, New Jersey 07645
                (201) 391-7000
 4              BY:  GARY S. GRAIFMAN, ESQ.
                     -and-
 5              DIAMOND LAW OFFICE, LLC
                1605 John Street (Suite 102)
 6              Fort Lee, New Jersey 07024
                (201) 242-1110
 7              BY:  PAUL DIAMOND, ESQ.,
                     -and-
 8              GREEN & PAGANO, LLP
                522 Route 18
 9              PO Box 428
                East Brunswick, New Jersey 08816
10              (732) 390-0480
                BY:  MICHAEL S. GREEN, ESQ.,
11              Attorneys for Plaintiffs.

12              KELLEY DRYE
                200 Kimball Drive
13              Parsippany, New Jersey 07054
                (973) 503-5922
14              BY:  GEOFFREY W. CASTELLO, ESQ.,
                     -and-
15              KELLY DRYE
                3050 K Street NW (Suite 400)
16              Washington, DC 20007-5108
                (202) 342-8505
17              BY:  THOMAS E. GILBERTSEN, ESQ.,
                Attorneys for Defendant.
18
        A L S O   P R E S E N T:
19
                GARY A. GREENE, ESQ.,
20              Vice President, Chief Corporate Counsel
                for the Defendant.
21

22

23

24

25
```

```
1                THE CLERK:  All rise.

2                THE COURT:  Good morning.

3                Please be seated.

4                All right.  Counsel, in the matter of McNair, et al

5      versus Synapse.  Is it Synapse or Synapse, how do you

6      pronounce it?

7                MR. GILBERTSEN:  Synapse, your Honor.

8                THE COURT:  Synapse Group, Inc., Docket No.

9      05-0572.

10               Counsel, may I have your appearances for the

11     record, please.

12               MR. GRAIFMAN:  Good morning, your Honor.

13               Gary Graifman, Kantrowitz, Goldhamer & Graifman,

14     co-counsel for plaintiffs.

15               MR. DIAMOND:  Your Honor, Paul Diamond of the

16     Diamond Law Office, co-counsel for plaintiffs.

17               MR. GREEN:  Michael Green, Green & Pagano,

18     co-counsel for plaintiffs.

19               THE COURT:  Who will argue from your side?

20               MR. GRAIFMAN:  I will, your Honor.

21               THE COURT:  You will?

22               MR. GRAIFMAN:  Yes.  Although, if possible, at some

23     point if the Court has questions, my co-counsel, Mr.

24     Diamond --

25               THE COURT:  We are going to start with a lot of
```

```
 1    questions.  Okay.

 2                MR. CASTELLO:  Good morning, your Honor.

 3                Geoffrey Castello, Kelly, Drye & Warren.  I have

 4    here with me today my partner from the Washington office,

 5    Thomas Gilbertsen.  He will be arguing today.  Your Honor

 6    admitted Mr. Gilbertsen pro hoc vice earlier in this case.

 7                We also have with us in-house counsel for the

 8    defendant, Gary Greene.

 9                THE COURT:  Counsel, I'm sorry.  Your name was

10    Graifman?

11                MR. GRAIFMAN:  Yes, Gary Graifman.

12                THE COURT:  Graifman, right?

13                MR. GRAIFMAN:  Yes.

14                THE COURT:  All right.

15                Mr. Graifman, look, this is your motion for class

16    certification.  Before we start, I want to try to narrow

17    some things down.  I brought you in for oral argument

18    because I want to narrow some things down in my own head,

19    and some of the questions might need some response from the

20    defendant as well.

21                Bear with me.

22                What I would really like to focus on today as far

23    as -- I know that there is a motion by the way as an aside,

24    I know there is also a motion to preclude Dr. Keegan.  I

25    already read the papers on that, and I will give you a
```

1    ruling on that at the end.  I don't need any argument on

2    that, but I do want to focus on the issue of the requirement

3    of predominance, all right, under 23(b)(3).

4            MR. GRAIFMAN:  Sure.

5            THE COURT:  And in order to aid in your argument

6    and to aid the Court's understanding of this whole thing, I

7    want to make some statements and then ask you some

8    questions.

9            As counsel is aware, part of what the law requires

10   me to do is to conduct an analysis, some cases call it a

11   rigorous analysis of this matter and determine whether or

12   not class certification is appropriate.  In some

13   circumstances the cases indicate, and I know you take a

14   different position on that, but the cases that I read at

15   least indicate that under some circumstances, I have to look

16   into the merits of the claims to the extent necessary to

17   address that analysis.

18           There was a case, which I am sure you are aware of,

19   the Hydrogen Peroxide case that was cited.  That case seems

20   to make at least clear to this Court that it applies to all

21   claims, this analysis, not just claims under the Consumer

22   Fraud Act or something like that, so that obviously is the

23   analysis that I have to go through, if you need to convince

24   me.  If you leave me with a doubt as to whether or not the

25   class needs to be certified, you won't get your class

```
 1    certification, and obviously that is why you are here, and
 2    you have the burden of establishing that.
 3          I want to as part of that analysis clarify certain
 4    facts because the record is such, and if there is an exhibit
 5    that you can point to that is specific, that this is where
 6    that fact is contained or something that you can provide me
 7    today, then tell me because I spent an awful lot of time
 8    with my clerk trying to figure all of these things out and
 9    the factual underpinnings of this, and some of it, to be
10    honest with you, is confusing.
11          Number one:  Obviously these people signed up for
12    the subscriptions somehow, yes?
13          MR. GRAIFMAN:  Correct.
14          THE COURT:  Okay.
15          Does everyone sign up via the same method?  Are
16    these are all like internet sign-ups?
17          MR. GRAIFMAN:  The answer to that question, your
18    Honor, would be that the method of signing up, which I want
19    to make clear we are not contesting here --
20          THE COURT:  I understand that.  Your problem is
21    with the --
22          MR. GRAIFMAN:  Cancellation and renewal --
23          THE COURT:  -- renewal.
24          MR. GRAIFMAN:  -- essentially, yes, but there are
25    different methods of signing up to answer the question.
```

1           Some of them are done in a store when you buy

2      something, and you are presented with an offer to get a low

3      cost or a free subscription.

4           Some of them I believe are written solicitations.

5      Some of them come in fact with your credit card, I believe.

6      There are different marketing methods.

7           THE COURT:  So there are different methods by which

8      someone can get a subscription, right?  We agree on that.

9           MR. GRAIFMAN:  Yes, to agree to do the

10     subscription, yes.

11          THE COURT:  Regardless of how you sign up, does

12     everyone authorize the automatic renewal via some type of an

13     obligation to the defendant?

14          MR. GRAIFMAN:  Yes.  That is another thing that we

15     do not contest, that Synapse's method of selling magazines

16     is that when you sign up, you are going to be automatically

17     renewed.

18          THE COURT:  And everyone is told that in some

19     kind --

20          MR. GRAIFMAN:  When they receive the initial

21     materials, it is in the initial materials.

22          THE COURT:  That includes the internet, I guess,

23     also?

24          MR. GRAIFMAN:  Yes.  It is in the initial -- but

25     what they are also told is that they will get a notice

```
 1      that --

 2              THE COURT:  I understand.  I understand where you

 3      want to go.  Just play with me a little bit here.  We will

 4      go along, and once I understand the facts, then we will deal

 5      with your argument.

 6              So everyone authorizes, I guess in the beginning

 7      they get some kind of a written notice or some kind of an

 8      indication that there is going to be automatic renewals,

 9      right?

10              MR. GRAIFMAN:  Yes.

11              THE COURT:  Okay.

12              So the example that one of the exhibits have, it

13      says automatic renewal authorization, that is what everybody

14      gets, the same language?

15              MR. GRAIFMAN:  I am just going to defer to Paul

16      Diamond, my co-counsel, who actually looked at every piece

17      of paper that the defendants have produced and --

18              THE COURT:  Which exhibit number was that, do you

19      remember?

20              THE CLERK:  I don't remember.

21              THE COURT:  There is an exhibit that you provided

22      to me that is under Automatic Renewal Authorization, and it

23      has the language in there.

24              Mr. Diamond, my question to you is:  Is that

25      something everyone gets?
```

1          MR. DIAMOND:  They all are told that they will be

2     automatically charged, and they will receive a notification

3     for that charge to continue their subscription.  Whether

4     that specific language may vary slightly between offers,

5     probably it does.

6          MR. GRAIFMAN:  People are given the same

7     information again that they have subscribed -- that they are

8     getting this magazine subscription, and that they will get a

9     renewal notice, but the actual exhibit that your Honor is

10     referring to is probably one method of that, and there are

11     probably other methods in which people are given that

12     notification.  I am not sure if that answers your question.

13          THE COURT:  My next question is:  Is the language

14     in the Automatic Renewal Authorization the same for

15     everybody.

16          You are saying the language may vary a little bit,

17     but the content is the same.  They are all told you are

18     going to get an automatic renewal, and you will be given

19     notice of this --

20          MR. DIAMOND:  Yes, your Honor.

21          THE COURT:  -- in essence.

22          By the way, if the defense disagrees with any of

23     the factual underpinnings, I want to know before the

24     argument begins, because I want to hear the arguments in

25     context.  Okay?

```
1                    MR. GILBERTSEN:  Yes, your Honor.

2                    THE COURT:  Okay.

3                    Now, the papers seem to indicate that plaintiff

4         McNair, for example, received a confirmation via email,

5         right?

6                    MR. GRAIFMAN:  Yes.  I believe that is correct,

7         your Honor.

8                    THE COURT:  What is the information that was

9         contained in the confirmation, do we know?

10                   MR. GRAIFMAN:  Mr. Diamond?

11                   MR. DIAMOND:  The confirmation email did not

12        contain that information.

13                   THE COURT:  Does not.  It doesn't say anything

14        about automatic renewal, the confirmation?

15                   MR. DIAMOND:  I believe you are referring to the

16        confirmation from Bizrate.com and --

17                   THE COURT:  For McNair.

18                   MR. DIAMOND:  -- to McNair does not contain that

19        information.

20                   THE COURT:  It does not say anything about

21        automatic renewals or anything?

22                   MR. DIAMOND:  Yes, your Honor.

23                   THE COURT:  Yes, it does not say it?

24                   MR. DIAMOND:  It does not say it.

25                   THE COURT:  All right.
```

1                    Do we know what it says?

2                    Do you have a copy of that?

3            MR. DIAMOND:   A copy is on record.  I'm sorry, but

4       I don't have it handy.

5            THE COURT:  But if we still need it after the

6       argument, we will request it.

7            MR. GRAIFMAN:  We can provide it after the

8       argument, yes.

9            THE COURT:  Now, one of the exhibits that I was

10      given shows various introduction scripts from the voice

11      activated --

12           MR. GRAIFMAN:  The IVR system.

13           THE COURT:  -- the IVR system, and each

14      introduction seems to vary depending on which magazine it

15      was or which company it was.

16           MR. GRAIFMAN:  Well, the scripts themselves,

17      although there are variations in the scripts, our

18      contention, as I am sure you know, is that there are certain

19      aspects of each that are the same that are key to the

20      decision that the person will make, so I am not sure which

21      aspect -- you mean just the introduction saying, Hello, you

22      reached your magazine provider or magazine assistant?

23           THE COURT:  Well, my next question would be:  If

24      the introductions are different, are the options then that

25      follow also different for each company and for each caller

1     therefore?

2              MR. GRAIFMAN:  Then again, I will ask Mr.

3     Diamond --

4              THE COURT:  Why doesn't Mr. Diamond just stay up

5     here because as long as I stay with the facts, I just want

6     to know --

7              MR. GRAIFMAN:  He is much more attuned to the

8     documents because he has seen all of the IVR scripts.

9              THE COURT:  Do you understand my question?

10             MR. DIAMOND:  Yes, I believe I do.

11             There are some companies, some customers, for

12     example, who ordered through a company like Chevron or AMEX,

13     which have special arrangements with the defendant to

14     provide custom language upfront.  Those people are not a

15     member of those classes.  Those defendants have asked for a

16     more consumer friendly language.

17             The members of this class when they called the IVR,

18     they have uniformly been asked if they are calling to cancel

19     a magazine, and they have responded affirmatively, or they

20     were asked to select from a group of options, one of which

21     is cancellation --

22             THE COURT:  Wait.

23             Are the options different depending on whether you

24     are calling to cancel Magazine A versus Magazine B?

25             MR. DIAMOND:  No, I don't believe they are.  They

1      are not.

2              THE COURT:  Well, the introductions are certainly

3      different.

4              MR. DIAMOND:  In most cases the introductions are

5      not different.  Hello, I am your magazine --

6              THE COURT:  Wait.  Let me pull them out because I

7      just looked at them before, and they all seem to be a little

8      bit different.

9              Where is my exhibit?

10             (The Court and Law Clerk confer)

11             I actually have it.  It bothers me that I can't

12     find it.

13             Well, here it says, for example, if you are calling

14     with regard to Amex, thank you.  You are calling the

15     American Express VIP subscription service.  If you are

16     calling -- generic:  Hi, there, I am your auto -- let's

17     see -- Newport News is a whole long one about a hundred

18     dollars or more savings.  You know you are a valued

19     customer.  Not that these are relevant to your claims here,

20     because I know it is not the introduction that you take

21     issue with, but they all seem to be different.

22             Since I didn't have the script of the options to

23     back up to this, this led me to believe that perhaps the

24     options, whether you were calling for Newport News or Bank

25     of America or generic or Chevron, they may be different, and

1      that is really what I am more interested in is whether or

2      not the options are different that each member of your class

3      is going to get to choose from.

4              MR. DIAMOND:  Thank you, your Honor.  I think I

5      understand your question now.

6              Customers of AMEX or Chevron receive a different

7      postcard, and they go to a different IVR.

8              The members of the class receive the generic

9      introduction.  They receive the generic script.

10             THE COURT:  Okay.  They are all receiving the

11     generic, the members of your class?

12             MR. DIAMOND:  They're always receiving the generic

13     version.  That is correct.

14             THE COURT:  Do I have a copy of what those options

15     are or something that would tell me this is what members of

16     your class all would hear regarding options?

17             MR. DIAMOND:  We have a document that was produced

18     that has --

19             THE COURT:  That was produced to me?

20             MR. DIAMOND:   I'm sorry?

21              THE COURT:  That was produced to who, me?

22             MR. DIAMOND:  No, I'm sorry.

23             It was produced by the defendant, and I believe it

24     is an exhibit to our motion.

25              THE COURT:  Which exhibit number is that?

```
 1              (Counsel confer)
 2              So all members of your class are receiving the
 3    options that are included with the generic, is that the
 4    generic options?
 5              MR. DIAMOND:  Yes.
 6              THE COURT:  Okay.
 7              And do you disagree?
 8              MR. GILBERTSEN:  Yes, your Honor, if I may --
 9              THE COURT:  Well, wait.  Let him finish, and then
10    just write down the things that you disagree on, and then I
11    will let you get up, and then I will hear the legal
12    arguments.
13              MR. DIAMOND:  I will add there are different
14    versions of the generic script.
15              In one version a person may be asked if they want
16    to cancel the magazine, and their response will be cancel --
17    and then be asked to select from a group of options, and one
18    is to cancel magazine, and they would actually recite cancel
19    magazine.
20              In another version they may be asked, are you
21    calling to cancel a magazine --
22              THE COURT:  That is what I am asking.
23              Are the different scripts for the same people in
24    your class who called the same generic option?
25              MR. DIAMOND:  There are different versions that
```

1       have minor differences.

2              THE COURT:  Okay.

3              Is there on all IVR scripts, okay, Mr. Diamond, on

4       all IVR scripts, is there an option that says, do you want

5       to cancel?

6              MR. DIAMOND:  Do you want to cancel, or an option,

7       cancel the magazine to select from.

8              It might ask, literally ask:  Do you want to cancel

9       a magazine, or it may give you a list of options, select one

10      of these options, quote, cancel a magazine is one of those

11      options.

12             THE COURT:  Then I suppose if people say yes, I

13      want to cancel, then as the automatic conversation

14      continues, they may then choose not to do it.  In other

15      words, they say yes, I want to cancel, and then at the end

16      they choose, you know, they choose not to do.  That could

17      happen as well, right?

18             MR. DIAMOND:  They may inadvertently do that.

19             THE COURT:  Well, they have that option, right?

20             MR. DIAMOND:  The option is presented.

21             THE COURT:  Now, one of the things that you said in

22      your briefs also was that there was no option to speak with

23      a live operator.

24             Are you maintaining that is applicable to the

25      members of your class?

1          MR. DIAMOND:  Yes.

2          No option is presented by the IVR to talk to a live

3    operator.  No announcement is made by the IVR to the caller

4    that they could press zero to contact a live operator.

5          THE COURT:  Well, okay.

6          In their response, one of the things they said was

7    that, for example, with plaintiff Demetriou, he was given

8    the opportunity to cancel and speak to a customer service

9    representative and apparently did, so isn't that --

10         MR. DIAMOND:  Plaintiff Demetriou only received

11   that information by going online and learning from the

12   website Rip Off Report how to contact a live operator.

13         Then she went back into the IVR.  She knew then to

14   press zero in order to contact a live operator.

15         These IVRs, what we learn generally, is that if one

16   knew that they should press zero, they could actually be

17   transferred to a live operator.  But the consumers are never

18   told that by the IVR neither upfront or at all, and they are

19   never informed by Synapse at all in any of the

20   communications which occur how to do that.

21         THE COURT:  Now, with regard to the issue of

22   notification, I think your side takes the position that

23   Synapse was legally required to give the notification to all

24   members within your class.

25         MR. DIAMOND:  Well, we would argue under the

1      negative option rule, that they were legally required, and

2      also the mag -- not legally, but according to industry

3      standards, the Magazine Publishers of America articulates a

4      standard of clear and conspicuous notification.

5                  THE COURT:  Okay.  Because I know, for example,

6      Exhibit 39, and I think that appears to be the internal

7      document of Synapse, I believe it is a document prepared by

8      them, but I am not sure, and I wanted to know where that

9      document came from.

10                 But Exhibit 39, because that is what appears to be

11     an internal document that discusses under what circumstances

12     notifications are required, legally required, and under what

13     circumstances it isn't, and I want to get a clarification in

14     my head of what that document is, or where did it come from.

15                 Do you know what I am talking about?

16                  Does anyone know what I am talking about?

17                 I can show you what I mean.

18                 THE CLERK:  Do you want it?

19                 THE COURT:  Lissette, just show them this document.

20     I need this document back because I have handwriting on it.

21                 I think it is called a retention strategy or --

22                 MR. GILBERTSEN:  Your Honor, that is an internal --

23                 THE COURT:  Wait.

24                 Counsel, can I have that back?  I just wanted you

25     to look at it because I have notes in there.

1                What is that?

2                MR. DIAMOND:  That's an internal document of

3      Synapse that was produced by the defendant.

4                THE COURT:  Do you agree or disagree with the areas

5      indicated in there as to when they are legally required to

6      notify and when they are not?

7                MR. DIAMOND:  I believe that the document

8      articulates that they are recognizing that legal requirement

9      now exists.  I don't agree that it did not previously exist.

10               THE COURT:  Okay.

11               MR. DIAMOND:  If I could add to that, there are

12     different versions of that same document published from year

13     to year, and many of them have the same language.

14               THE COURT:  All right.

15               I want to know if they disagree with any of those

16     facts, and I guess I should have you come back because I am

17     going to ask you some questions about the elements of the

18     Consumer Fraud Act and predominance and all of that, but I

19     just wanted to get some facts clear in my head.

20               Thank you, Mr. Diamond.

21               Counsel, you wanted to tell me some things that you

22     disagree with on these facts?

23               MR. GILBERTSEN:  Yes, your Honor.  Thank you for

24     permitting me to.

25               THE COURT:  I don't want you to argue your case.

1       Just clarify facts.

2              MR. GILBERTSEN:  I understand.

3              In the Tyler declaration that was submitted with

4       our brief, at paragraph 16, Mr. Tyler details some of the

5       factors that determine how different customers will hear

6       different options and different scripts and different

7       sequences of scripts when they phone.

8              Mr. Diamond and Mr. Graifman mentioned, as did your

9       Honor, different requirements from merchant clients.  They

10      mentioned Amex.  They mentioned Chevron, and there are

11      others, and those are detailed in Chris Tyler's and Mr.

12      Farrell's declarations.

13             THE COURT:  They say their class only applies to

14      the generic.

15             MR. GILBERTSEN:  There is no such thing as a

16      generic IVR in this case, your Honor.  It has been

17      constantly evolving.  The company has been developing new

18      scripts, but also depending on -- and, again, Chris Tyler's

19      declaration, paragraph 16 lays these out, which script codes

20      are active at the time of the call, the original order date,

21      the type of offer, is this person calling in off of a 90-day

22      risk free offer, or is this a second renewal after

23      subscribing for two years.

24             The account history and the status of that account,

25      the tenure of the subscriber overall, not just the

1    subscription, and essentially how the caller responds to the

2    prior prompts will determine which scripts that particular

3    caller hears.

4           One example that Mr. Tyler identifies in his

5    declaration is when a customer calls in from the prebill

6    postcard, the system is geared to assume that that person is

7    calling to cancel, and so it just goes through those

8    cancelled.  That is a cancelled tree in and of itself.

9           After the billing event, if somebody calls in to

10   cancel -- well, if somebody calls in after the billing

11   event --

12           THE COURT:  From the billing director number?

13           MR. GILBERTSEN:  -- the charge going on the --

14   right.  They call the billing toll free number that is

15   provided on each of the credit card statements, they are

16   presented with a menu of options:  Would you like to check

17   the status of the order, you know, have questions, what have

18   you, and one of those is do you want to cancel.

19           If they answer yes, then the system, you know,

20   logically goes into the cancel tree.

21           THE COURT:  The cancel tree, is that the same as it

22   would be under the cancel tree as in the postcard garden?

23           MR. GILBERTSEN:  No, your Honor, because different

24   offers and retention attempts would be offered to somebody

25   who is calling off of a postcard.

1              THE COURT:  Why?

2              MR. GILBERTSEN:  They still have issues probably

3      that they are entitled to receive.  They have issues that

4      they already paid for, so, for example --

5              THE COURT:  Isn't that the same case in both,

6      whether you are getting a billing or a postcard?  In both

7      situations you are an existing customer.

8              MR. GILBERTSEN:  They do, but one message might

9      say, you have a few issues remaining on your order.  Would

10     you like to continue receiving those, and call back by X

11     date.  Or, you know, if they are calling off of a billing

12     descriptor event in the credit card statement, it might make

13     any other kind of offer, like how about if I refund the

14     amount you paid and keep your subscription active.

15             It would make a variety of different retention

16     attempts based on how situated that individual subscriber

17     is.

18             THE COURT:  Okay.  Thank you.

19             What else?

20             MR. GILBERTSEN:  And also your Honor asked about

21     the options to speak to a live operator.  I just wanted to

22     point out that it was contrary to what was stated by

23     opposing counsel.

24             Danielle Demetriou, she testified that, and it was

25     her deposition testimony, that the IVR presented her with an

```
 1    option to speak to a live operator, and she selected that,

 2    and there are a variety of situations.  And, again, Chris

 3    Tyler's declaration discusses those, but that might be

 4    disclosed upfront, but it is always the case if you hit

 5    zero, you will get to an operator if you are calling --

 6              THE COURT:  Does the IVR tell that you, though?

 7              MR. GILBERTSEN:  In some situations it does.  Some

 8    merchant clients have negotiated for a statement upfront

 9    about that.

10              THE COURT:  Yes, but those merchant clients are not

11    part of the class action, so take them out of here.  I don't

12    want to hear about them.

13              Do the ones who are part of the class get an option

14    to speak to a live operator?

15              MR. GILBERTSEN:  They do have the option.

16              THE COURT:  No.  That is not the question.  They

17    always have the option by pressing zero, I realize that, but

18    are they given, does somebody verbalize to them, if you wish

19    to speak to an operator, you know, to a live operator, press

20    two, press zero, press 55, whatever?

21              MR. GILBERTSEN:  Your Honor, I believe the

22    testimony is that it would not automatically arise that that

23    option is presented, but if somebody was not responding to

24    the IVR, they weren't, you know, responding to the prompts,

25    I believe the declaration is that those people say -- do
```

1        you -- do you want to speak to a live operator, are you

2        having trouble, and it will dump them into the live call

3        center environment.

4                THE COURT:  Okay.

5                Anything else on that?

6                MR. DIAMOND:  Your Honor, may I address that

7        briefly?

8                MR. GILBERTSEN:  My only last point was about the

9        requirement by law, but I think this is more legal argument

10       as to whether and in what circumstances the negative option

11       rule applies.

12               THE COURT:  Yes.  We are going to deal with that.

13               Mr. Diamond, you wanted to say something?

14               MR. DIAMOND:  I just wanted to say that some of the

15       circumstances are if a person was having such difficulty

16       with the IVR, that they pressed in nonsense numbers that

17       didn't make sense, then they might be transferred to a live

18       operator.

19               THE COURT:  By the way, what do you say about the

20       fact that your client testified at the deposition that she

21       didn't get it from the internet, but she got it from the

22       IVR?

23               MR. DIAMOND:  My understanding of her deposition,

24       which I read very recently before this, is that she went to

25       the website, Rip Off Report, and she learned that

1          information there.

2                  THE COURT:  Well, her deposition is what it is.  I

3          will go back and read it, and not subject to

4          interpretation --

5                  MR. DIAMOND:  I don't agree with what defense

6          counsel said, but not necessarily his interpretation of the

7          deposition transcript --

8                  THE COURT:  Okay.  I will look at it myself.

9                  Let's talk about the Consumer Fraud Act.  I guess

10        we will start with New Jersey.

11                 MR. GRAIFMAN:  The Consumer Fraud Act in New Jersey

12        requires, as your Honor knows, unlawful --

13                 THE COURT:  Unlawful deceptive conduct.  It

14        requires ascertainable loss, right?

15                 MR. GRAIFMAN:  Right.

16                 THE COURT:  And it requires a causal connection

17        between the unlawful conduct and the ascertainable loss.

18                 MR. GRAIFMAN:  Those are the three elements.

19                 THE COURT:  Do you agree or disagree that the

20        common questions have to predominate as to all of those

21        elements?

22                 MR. GRAIFMAN:  Well, I am not sure it has to

23        predominate as to each element.

24                 If the common questions predominate as to those

25        elements, that will substantially advance this litigation.

 1      It will be --

 2              THE COURT:  Wait.  What do you mean by

 3      "substantially advance this litigation"?

 4              In order to prove a claim for the Consumer Fraud

 5      Act, right, and you don't prove them, you don't have a

 6      claim, you have to prove those three things --

 7              MR. GRAIFMAN:  On a class-wide basis.

 8              THE COURT:  -- on a class-wide basis, and on a

 9      class-wide basis the common questions have to predominate as

10      to all of the elements.

11              MR. GRAIFMAN:  I misunderstood your question.

12              The answer is yes, there can be minor individual

13      issues.

14              THE COURT:  Right, and I agree.

15              This certainly doesn't mean that it can't be any

16      individual issues.

17              The question is what is going to predominate.  I

18      have to sit here and imagine a trial, and imagine you trying

19      to make a class-wide Consumer Fraud Act claim, and one of

20      the things you would have to prove, right, and are those

21      questions going to predominate because otherwise we will

22      have a lot of individual trials --

23              MR. GRAIFMAN:  Right.  We want a trial, where --

24      I'm sorry.

25              THE COURT:  In your brief you have argued that if I

1     were to find, or if it is to be found that the FTC Act or

2     the negative option rule were violated, that that would be a

3     per se violation, right, a per se violation of the New

4     Jersey Consumer Fraud Act, but you didn't cite to any cases

5     or any authority for that proposition.  If you have it, I

6     would like to look at it.

7              MR. GRAIFMAN:  I think in our supplemental, we did,

8     but just to express the theory, an unconscionable commercial

9     practice is an unlawful practice expressly under the New

10    Jersey Consumer Fraud Act.  Our position is --

11             THE COURT:  But that is only for selling.

12             MR. GRAIFMAN:  Right.  But we are saying as the

13    first element, it would -- a violation of the negative

14    option rule, for example, if these notices were not in

15    conformance, the negative option rule makes it an unlawful

16    practice.  Therefore, under the New Jersey Consumer Fraud

17    Act, it would be an unconscionable commercial practice.

18             THE COURT:  So you by definition would have

19    satisfied the first element, that is your position, right?

20             MR. GRAIFMAN:  Yes.

21             THE COURT:  Not all of the elements.

22             MR. GRAIFMAN:  Right.  No.  We are saying it is an

23    unconscionable commercial practice and a violation of the

24    first element.

25             MR. GILBERTSEN:  I believe --

```
 1                    THE COURT:  Now, if in fact in order to get to that
 2         first element you have to prove a uniform deceptive
 3         practice, right, do you agree that that is what you would
 4         have to do here?
 5                    MR. GRAIFMAN:  Yes.  That is what we believe we
 6         have to do.
 7                    THE COURT:  If you in fact have to demonstrate a
 8         uniform deceptive practice, given that all five named
 9         plaintiffs here appeared to have had different types of
10         interaction with the defendant, do you agree with that?
11                    MR. GRAIFMAN:  Some of that I agree with.  Some of
12         it I don't because --
13                    THE COURT:  Well, this is what I meant by it.
14         Maybe we agree.
15                    MR. GRAIFMAN:  Explain.
16                    THE COURT:  Some of them, for example, read the
17         postcard.  Some did not read the postcard.  Some spoke with
18         a live operator, and some did not.
19                    McNair chose the DNR, right, the do not renew
20         option, but it is not clear to me what were the options that
21         were actually chosen by the other four plaintiffs, so I am
22         at a loss to know or I want you to direct me to what
23         specific common course of deceptive conduct, or what are the
24         specific misrepresentations or omissions you claim are
25         deceptive that are common to everybody.  I want you to focus
```

29

1    me on that and tell me what that is.

2             And if there is some type of uniform deceptive

3    practice that you say were common to all of them, no matter

4    whether their interactions were different, whether they had

5    the postcard or not, or whether they spoke to a live

6    operator, this is what is common to all of them.

7             MR. GRAIFMAN:  Right.

8             THE COURT:  I think you need to convince me of that

9    and what it is, and then we can talk about -- I wanted to

10   focus you on the Consumer Fraud Act and what my concerns

11   were with that.

12            MR. GRAIFMAN:  I am prepared to address that right

13   now, your Honor.

14            One thing, though, is I had some notes, and I had

15   them up here, and in between other people moving back and

16   forth, I just wanted to find them.

17            THE COURT:  Get them, and then I will be quiet for

18   a while and listen.

19            Like everything else, what I think we should do is

20   after you get finished talking about the Consumer Fraud Act

21   and why you think there is predominance there, I will let

22   you address that, and then we can move on to the breach of

23   contract claim and then we can talk about the automatic --

24            MR. GRAIFMAN:  Electronic phone transfer.

25            With regard to the Consumer Fraud Act, as we said,

1      the elements are some deceptive or fraudulent or knowing

2      omission, which causes an ascertainable loss, and that there

3      is a casual connection between the unlawful act and the loss

4      or injury.

5              With regard to this case, it is our contention that

6      the overriding legal and factual issues relating to the

7      Consumer Fraud Act claim and the other two Consumer Fraud

8      Act claims, which we contend have similar elements --

9              THE COURT:  New York and D.C., right?

10             MR. GRAIFMAN:  New York and D.C., yes, your Honor.

11             -- are simple and common and are essentially

12     whether the exterior postcard -- the postcard that Synapse

13     uses for the renewal notification that is an obligation

14     under the law on their part to provide clear --

15             THE COURT:  Hang on, hang on, hang on.

16             MR. GRAIFMAN:  -- I'm sorry.

17             THE COURT:  All right.

18             Go ahead.

19             The common is what?

20             MR. GRAIFMAN:  The standard renewal postcard,

21     notification postcard, that Synapse uses in this case is a

22     common postcard that they have testified is used in 90

23     percent or more of the cases, and the only difference is the

24     other grouping that is not in the 90 percent of those other

25     companies that have asked for a specialized postcard, as we

```
 1    spoke about before, such as Chevron and Amex, we are not
 2    talking about those.
 3          We are talking about the standard postcard, which
 4    we contend was used by them to -- for their legal obligation
 5    to notify the consumer that you are going to be charged for
 6    an automatic renewal does not have clear and conspicuous
 7    language and is required to have clear and conspicuous
 8    language that indicates that it is a renewal, and you will
 9    be charged for the renewal.  That is common to every single
10    plaintiff in this case.
11          THE COURT:  Okay.  So that conduct you say
12    predominates on the issue of unlawful conduct?
13          MR. GRAIFMAN:  That is one.
14          The two issues we say predominate on that issue,
15    yes, and the fact that the IVR system that your Honor was
16    asking questions about before have features in it that we
17    have enumerated that constitute again a deceptive and
18    unconscionable business practice, which violates these
19    consumer fraud acts --
20          THE COURT:  What are those features?
21          MR. GRAIFMAN:  Features of the IVR -- I was going
22    to deal with the postcard first, if I can.
23          THE COURT:  Okay.  Do it that way, please.
24          But do you agree, Counsel, that this predominates,
25    these claims with regard to deceptive practice vis-a-vis the
```

```
1      postcard predominate as to the first element of the Consumer

2      Fraud Act, right?

3                  MR. GRAIFMAN:  Those -- the deceptiveness, yes.

4                  THE COURT:  Yes.

5                  MR. GRAIFMAN:  Yes.

6                  But in order to have an injury based on that, we

7      need to demonstrate first the uniformity because there is

8      case law, as your Honor knows, that says that where there is

9      a uniform common scheme, there can be a presumption.

10                  THE COURT:  Well, we need to talk about that.

11      There is also New Jersey law that seems to address that

12      issue.  We need to talk about that.  Okay.

13                  MR. GRAIFMAN:  Okay.

14                  So with regard to the commonality of the elements

15      of deception, if I may, you have the postcard.  This is the

16      postcard that everybody gets.

17                  When I say "everybody," 90 percent or more pursuant

18      to the testimony of defendant's representatives.

19                  THE COURT:  I have that as one of the exhibits.  It

20      has a little truck on the right-hand side.

21                  MR. GRAIFMAN:  Right.

22                  We contend, and our expert has opined on this as

23      well, that the moving -- first of all, the fact that it says

24      moving, it is the largest thing your eyes are drawn to,

25      indicates this is to a consumer that gets it, that this is
```

1    something which is a notification for change of address,

2    which it is not primarily.  I mean, if you are moving, you

3    can obviously provide it, but that is not the primary

4    purpose of it.

5         Secondly, nowhere on this postcard exterior, which

6    is presented here, does it indicate that this is an

7    automatic renewal notice.  The simple language, this is your

8    automatic renewal notice could be on here, but it is not,

9    and there is a reason why it is not.

10        This is a highly sophisticated company.  The reason

11   it is not is because they have tested these postcards with

12   that on it, and they have tested these postcards without it

13   on it.  They have found that when you add that to it,

14   surprise, the number of cancellations go up because people

15   are aware that this is a renewal of a magazine, and they are

16   going to be charged.

17        This postcard does not tell you that.  People do

18   not know that when they look at this exterior.  Most people

19   will throw that card out.

20        In the case of Chevron, which is not in this

21   lawsuit, but is illustrative of what happens, they had

22   originally used this postcard for the Chevron promotion --

23        THE COURT:  I am aware of that, and Chevron said we

24   called them and said, look, we want you to change it.  We

25   want you to put it at the margin by the label address, and

```
 1        there were emails back and forth, and that that would

 2        increase the number of --

 3                 MR. GRAIFMAN:  Right --

 4                 THE COURT:  -- I've read it.

 5                 MR. GRAIFMAN:  -- so the postcard exterior is not

 6        clear and conspicuous notice of the renewal.  It is very

 7        interesting that defendants in their brief nowhere say or

 8        contest that this is clear and conspicuous notice, as my

 9        interpretation --

10                 THE COURT:  Let's just for a hypothetical, I am a

11        jury sitting here, and I say, okay, I will buy that

12        argument.

13                 Now, you have gotten past step number one.

14                 MR. GRAIFMAN:  Right.  So now we proved element

15        number one.

16                 THE COURT:  Now, you have to tell me how it

17        predominates.

18                 You said this predominates, because 90 percent of

19        the people get the postcard, which you claim is deceptive

20        because it doesn't tell you anything about a cancellation on

21        the outside.  It is their notice.  It is a postcard that

22        they use as a result of their notice requirement, and

23        therefore, it should conspicuously tell them it has to do

24        with cancellation.

25                 Therefore, you say, ladies and gentlemen of the
```

1      jury, this shows that the class was deceived and you met

2      your first element of the Consumer Fraud Act.

3              MR. GRAIFMAN:  Right.

4              THE COURT:  The case still doesn't go to the jury,

5      though.  You will now tell me that what predominates, right,

6      with regard to the issue of causation and the issue of

7      damages.

8              MR. GRAIFMAN:  Well, yes.

9              First would be the issue of damages.  I believe the

10     way it is written would be the second element of the

11     statute.

12             So with regard to the element of ascertainable

13     damages -- well, putting causation aside for a second, the

14     ascertainable damages in this case, first of all, each of

15     the plaintiffs have incurred ascertainable damages because

16     they were charged for a renewal that they tried to cancel,

17     and they actually rejected the save attempts.  They went in

18     and tried to cancel the subscription, and they ended up

19     getting billed on their credit card nonetheless for the

20     remainder of the term.

21             In that regard, I want to explain that when you get

22     the postcard, you call the toll free number.  You go to the

23     IVR.  What you are presented with is something that says, do

24     you want to, and this is on all of the IVRs, there is no

25     distinction between the -- do you want me to just cancel

1    your future charges, so you can enjoy the remaining

2    magazines you already received.

3         That is what you are presented with as an option

4    for cancellation.

5         If you say yes, then you will be charged for the

6    remaining portion of your current term.  In other words,

7    what I -- there is no what I would call a full cancellation,

8    meaning I want to cancel today, I want my money back, I

9    don't want any more magazines.

10        You are not presented with that from the postcard

11   IVR.  Therefore, we would contend that anybody who is

12   charged for the renewal for the subscription suffers an

13   ascertainable loss, so therefore, we believe that every

14   member of the class who received the card who tried to

15   cancel and couldn't cancel and ended up being charged

16   suffered an ascertainable loss.

17        Under the law of New Jersey, an ascertainable loss

18   can be any charge or any charge that you, you know, that you

19   have not agreed to, or that you didn't want on, or that a

20   deceptive act has essentially caused you to incur.

21        There is case law in New Jersey that says that even

22   if you have not incurred the out-of-pocket loss, for

23   example, there is a case where a kitchen was redone.  It was

24   not properly done.  It was not done in the way the consumer

25   wanted.  It was a violation of the Consumer Fraud Act, and

1      plaintiff proved that it would cost him X amount to redo it

2      and pay this money, and the Court found it was an

3      ascertainable loss in that case.

4              THE COURT:  Okay.  Stop for a second.

5              MR. GRAIFMAN:  Okay.

6              THE COURT:  In the postcards, right, you say a lot

7      of people throw them away, and they don't call, right, and

8      some do call?

9              MR. GRAIFMAN:  Yes.

10             THE COURT:  The ones who do call do not get an

11     option for what you call a full cancellation.  I want my

12     money back, and I don't want to be charged for any future

13     renewals, right?

14             MR. GRAIFMAN:  Correct.  They are not told they

15     have that option.

16             THE COURT:  Some decide to call and cancel some

17     magazines and not cancel others, which happened in this

18     case.

19             MR. GRAIFMAN:  Yes.

20             THE COURT:  Some decided to just throw the card

21     away.  Some decided to open the card, read it, but do

22     nothing about it.  Isn't there therefore an element of

23     intent that goes into this whole case?  In other words, what

24     each plaintiff --

25             MR. GRAIFMAN:  It requires --

1          THE COURT:  -- because it requires some type of

2    action and decision-making process by your clients, right?

3          MR. GRAIFMAN:  -- it requires the clients to try to

4    cancel is the definition of our class, that they sought to

5    cancel and didn't get a refund, or they were charged

6    essentially.

7          So if they didn't try to cancel, then technically

8    they are not part of the class.  I mean, they have to have

9    attempted to cancel --

10         THE COURT:  Your class is limited to only those

11   people who had the intent to cancel?

12         MR. GRAIFMAN:  Well, not only attempt, but actually

13   went to the IVR system and tried to push the correct right

14   button or verbalize the cancellation and made the

15   cancellation, but the cancellation they made did not give

16   them their money back.  That's what it is.

17         It is not intent.  It is act.  I think if I can

18   show you the class definition, one of the things I was going

19   to do was show --

20         THE COURT:  Your class definition has changed a few

21   times --

22         MR. GRAIFMAN:  It has, yes, and the reason it

23   changed, your Honor, we had one --

24         THE COURT:  -- a moving target here --

25         MR. GRAIFMAN:  -- well, we had one in our original

1     complaint, and then we did class discovery, and class

2     discovery is, you know, posted to help us define the class,

3     which we did in the complaint, and the defendants pointed

4     out some language that required us to change it because we

5     felt, you know, although we needed to disagree, we felt

6     there was some merit to what they were saying.  Even the

7     Court can change the definition, as you know --

8          THE COURT:  Right. I could come up with a class

9     different than the one you're coming up with.

10          MR. GRAIFMAN:  Yes.  And I've seen, you know, cases

11     where that has happened.  But I mean, this is the definition

12     in our reply brief --

13          THE COURT:  The latest one, and that is, I don't

14     know -- let's see.  From October 23rd, 2000, I can't read

15     what you o--

16          MR. GRAIFMAN:  Yes.

17          THE COURT:  -- I believe you said:  From October

18     23, 2000 to the date of the order certifying the class,

19     right, all persons residing in New Jersey, New York and the

20     District of Columbia will accept an additional magazine

21     subscription, right --

22          MR. GRAIFMAN:  Right.

23          THE COURT:  -- blah, blah, blah, and who were then

24     sent a postcard notification in advance of the automatic

25     charge, and either before or after being charged for the

1    additional term of renewal of their subscription called the

2    IVR and responded affirmatively to the reported question

3    asking whether they were calling to cancel the magazine or

4    selected an option to cancel from the list of options

5    presented.

6          MR. GRAIFMAN:  Yes.

7          The point being that those are people who took an

8    affirmative action to cancel, which is different than an

9    intent to cancel.  I assume the Court's implication is that

10   if you have a class of people who intended to do something,

11   who knows what they intended to do --

12         THE COURT:  How do you prove predominance on --

13         MR. GRAIFMAN:  Sure, you can't, and that is why we

14   don't have that in this class.

15         Every one of these aspects, and that's why I wanted

16   to bring this over to the definition are objectively

17   ascertainable.

18         With regard to, for example, where it says:  Called

19   the IVR system and responded affirmatively to the recorded

20   question asking whether they were calling to cancel a

21   magazine or selected an option to cancel to reject these

22   savings, that is something that they have information on,

23   every one of the class members.  They could tell us who

24   accepted the magazine.  They have it in their records who

25   accepted the magazine.

1    They have in the records who got the postcard.

2    They have in the records who called the IVR system and

3    attempted a cancellation, and they certainly know who was

4    charged, so those are all objective criteria that are

5    ascertainable through their records, and the last one, of

6    course, being that they were not refunded the charges for

7    the additional term of renewal and were not reimbursed upon

8    request by Synapse, which is the bank overdraft charges,

9    which is kind of more of a sublet, the overdraft charges,

10   but those who were charged for the renewal after they

11   effected the cancellation are simply those who suffered an

12   ascertainable loss, and objectively a jury can say that all

13   of those people that tried to cancel and didn't get their

14   money back suffered an ascertainable loss to the class.

15   THE COURT:  How would you prove that the members of

16   your class attempted to cancel and were not able to?

17   MR. GRAIFMAN:  Because they pushed the option

18   asking them if they wanted to cancel.

19   THE COURT:  How would you prove that?

20    MR. GRAIFMAN:  How would we prove that --

21   THE COURT:  That they pushed the option attempting

22   to cancel.

23   MR. GRAIFMAN:  I will defer to Mr. Diamond again,

24   if your Honor allows me to, who has the factual aspects of

25   the IVR system itself down more --

1          MR. DIAMOND:  Your Honor, all of that information

2     is recorded in the electronic systems of the defendant or

3     that the defendant has access to.  In fact, we have even

4     been provided with that information in the form of codes and

5     explanations of codes --

6          THE COURT:  You can look at some electronic

7     documentation I guess and be able to show that X number of

8     people during this time period called and pushed number

9     five, which is the cancellation number.

10         MR. DIAMOND:  Yes, your Honor.

11         We believe with that data base technology, they can

12    query the data base, and that information is provided back.

13    It is not necessary to go through one, by one, by one to see

14    what happened.  The data base can be questioned in a

15    manner --

16         THE COURT:  That is a discovery item I am sure you

17    will have when this case certifies.  I just want to have one

18    fight at a time.

19         Thank you.

20         Go ahead.

21         So you are saying this is an ascertainable --

22         MR. GRAIFMAN:  Loss.

23         THE COURT:  -- event that occurred.

24         MR. GRAIFMAN:  Yes, exactly.  An ascertainable

25    event --

```
1              THE COURT:  And the loss is ascertainable because

2       it is limited to the people who were then thereafter charged

3       either a going forward fee, a renewal fee, or were not given

4       their money back or sustained an overdraft --

5              MR. GRAIFMAN:  Yes.  And, again, sustained an

6       overdraft --

7              THE COURT:  -- and that would be information that

8       you can obtain from the defendant as well.

9              MR. GRAIFMAN:  Yes, except for sustaining the

10      overdraft part.  That the plaintiffs would have to provide,

11      you know, that there was a charge from TWX, which is the --

12             THE COURT:  How do you prove that for the class?

13             MR. GRAIFMAN:  Well, I mean, I think, again --

14             MR. DIAMOND:  If I just could answer that and

15      clarify it.

16             The class only requires -- only includes consumers

17      who requested that Synapse refund their overdraft charge.

18      It is not that they were overdrafts, which could never be

19      determined because that information would only be in the

20      possession of the bank or the consumer.

21             THE COURT:  How is that an ascertainable loss?

22             MR. DIAMOND:  Well, Synapes improperly charged the

23      bank account of the class member, and the class member

24      incurred as a result of that charge a bank overdraft fee.

25             In the case, for example, of Demetriou, she
```

1        actually was able to call Synapse and get them to refund the

2        charge, but that didn't help them out with the bank charge.

3        If not for Synapse's deceptive scheme, that charge would

4        never have been put on her account, and she would never have

5        incurred an overdraft charge --

6                THE COURT:  That is one person,

7                The class, how does that do that, the ascertainable

8        loss?

9                MR. GRAIFMAN:  I view that more of a sub class who

10       can demonstrate that they wrote to Synapes and demanded that

11       they refund the overdraft, and then that --

12               THE COURT:  That is the sub class --

13               (The Court and Law Clerk confer.O)

14               MR. GRAIFMAN:  -- but every member of the class

15       would have had to have been charged with the additional term

16       of the renewal.  There's no question, and that is the

17       singular event that causes an ascertainable loss to the

18       class member.

19               THE COURT:  Okay.

20               Let's move on to the bill then, because this is one

21       way you say they were deceptive, right?

22               MR. GRAIFMAN:  I'm sorry?

23               THE COURT:  You were talking to me about the

24       postcard --

25               MR. GRAIFMAN:  Yes, right.

1                THE COURT:  -- and you're saying --

2                MR. GRAIFMAN:  I'm just saying --

3                THE COURT:  -- if you call the postcard number,

4        this is what happened.

5                Do you allege that the same is what occurs if you

6        call the number that you are directed to call in the bill?

7                MR. GRAIFMAN:  In other words, if you get a charge

8        on your credit card, and you look at it, it says TWX charge,

9        and it has a number on your credit card, that that is a

10       separate toll free number, separate from the charge -- the

11       number on the renewal postcard.

12               The difference is that now you already have been

13       charged, and now you have the charge on your credit card,

14       and now you have to call to reverse the charge.

15               So clearly from an ascertainable loss standpoint,

16       if that is the question, clearly the person has now, you

17       know, suffered the ascertainable loss because they got the

18       charge on their credit card, but the question is:  Do they

19       call into the same IVR.

20               THE COURT:  Yes.  That's the question.  I thought

21       it was a different IVR --

22               MR. DIAMOND:  The scripting of the IVR is slightly

23       different, if it is prebill versus post bill.

24               The prebill IVR if one reaches it, and one actually

25       recognizes the postcard and calls it, the deception there --

1          THE COURT:  Your class is only limited to those

2     people who actually called.  That is what he said.

3          MR. GRAIFMAN:  Called either by virtue of getting

4     the postcard --

5          THE COURT:  Or the bill.

6          MR. GRAIFMAN:  -- or the bill exactly.  Those are

7     the two possibilities.

8          MR. DIAMOND:  A person could call the pre bill IVR

9     or the post bill IVR.  In cases such as McNair, he called

10     both.  In that situation, he, being the only plaintiff, as

11     he testified, almost threw out the postcard, but did open it

12     and see what it was.

13          He called the IVR.  That was a prebill IVR, and he

14     received deceptive language which was geared towards

15     preventing him from cancelling the upcoming charge, but he

16     was charged anyway, and then he went back into the same

17     pathway, back into the same pathway that all of the

18     plaintiffs were in.

19          The person gets charged, and then they call the

20     post bill IVR, and they receive a different type of

21     deceptive language, the DNR, which is do not renew, which is

22     geared towards getting the person to only cancel the renewal

23     that is going to occur in the future, not the one that just

24     occurred.  I hope that clarifies it.

25          THE COURT:  Yes.

```
1              MR. GRAIFMAN:  So getting back -- unless your Honor
2         has another question on that --
3              THE COURT:  I am trying to think if I do have
4         another question.
5              MR. GRAIFMAN:  -- okay.
6              THE COURT:  All right.
7              Go ahead, Counsel.  If I do have other questions, I
8         will interject them.
9              MR. GRAIFMAN:  So I believe that the first two
10        elements of the Consumer Fraud Act claim can be presented
11        and proven through common evidence and common methods of
12        activity primarily on the part of the defendant and to that
13        extent as it requires ascertainable loss on the part of the
14        class.
15             The third element is the causal connection element
16        of the Consumer Fraud Act claim, that the ascertainable loss
17        be caused by the unlawful act.
18             In this case we would contend that there are two
19        aspects to that.  First of all, if the materials, which are
20        alleged to be the material omission or the misrepresentation
21        are uniform, the causal connection may be presumed under the
22        Elias v. Ungar Foods case in which case there was --
23             THE COURT:  That was Judge Hayden's opinion, but
24        you need to talk to me about that connection, not with just
25        that opinion, but also the International Union case, for
```

```
 1      example --

 2              MR. GRAIFMAN:  Is that the --

 3              THE COURT:  -- the New Jersey Supreme Court case

 4      that came in between the motion for reconsideration and

 5      actually Judge Hayden's opinion, and certainly subsequent to

 6      my Varacallo opinion, which you guys have quoted to as well.

 7              MR. GRAIFMAN:  Is that the Merck case, your Honor?

 8              THE COURT:  This is the Vioxx --

 9              MR. GRAIFMAN:  Yes, the Vioxx Merck case.

10              Well, first of all, in that case, one of the

11      problems that the Court found was the issue of manageability

12      in that case because Judge Higby I believe certified a

13      class -- a 50-state class, and actually went through a very

14      in-depth analysis of the state's law in that case, if I

15      remember the opinion, but the Court found that the -- I

16      believe -- I believe one of the main issues of manageability

17      in that case of a 50-state class would not be -- you would

18      need to determine, you know, in each particular state

19      whether the violation occurred.

20              I'm not -- if your Honor has specific language --

21              THE COURT:  Even if you look at, for example, let's

22      just stay within the Third Circuit for a second, the

23      Hydrogen Peroxide case, right?

24              In that case the Court states:  It does not follow

25      that a Court should relax its certification analysis or
```

```
 1    presume a requirement for certification.  By that I suppose
 2    they mean predominance on causation merely because
 3    plaintiff's claim falls within one of the substantive
 4    categories.  In this case it would be the Consumer Fraud
 5    Act.  That seems to run contrary to what you are saying,
 6    that I should be able to presume it.  I don't think that in
 7    light of the Hydrogen Peroxide case and the New Jersey
 8    Supreme Court case that this presumption seems to apply.
 9             MR. GRAIFMAN:  Well --
10             THE COURT:  It even states:  Applying the
11    presumption of impact based solely on the Dorn allegation --
12    talking about the Hydrogen Peroxide case -- would appear to
13    conflict with the 2003 amendment to Rule 23, which
14    emphasizes the need for a careful fact based approach,
15    informed, if necessary, by discovery.
16             It seems to be dispelling the notion, but I thought
17    frankly discuss, and I may have even talked about it in one
18    of my cases, that there is this presumption.
19             MR. GRAIFMAN:  I think in the Hydrogen Peroxide
20    case, I think one of the issues that was raised was that
21    there was not a factual determination done by the District
22    Court, and I don't think the Court in the Hydrogen Peroxide
23    case actually determined that a class couldn't be certified,
24    but they actually remanded it back to the District Court to
25    make the factual determinations necessary and stated that
```

1      the District Court upon review of all of the evidence

2      consistent with its opinion may again consider whether the

3      reasoning in Pagonian is compatible with the record in this

4      case --

5              THE COURT:  Right.  The point there is that you

6      still have to do a factual analysis to see if there is

7      predominance, and you can't just presume it.

8              MR. GRAIFMAN:  Oh, yes.  On the predominance issue

9      I would agree.  But on the presumption of a causal

10     relationship, I think certain factors are present.

11             THE COURT:  I am talking about predominance on

12     causation, because you have to have predominance as to all

13     elements --

14             MR. GRAIFMAN:  Right.

15             THE COURT:  -- and I can't just assume that there

16     will be predominance on causation.  You have to give me the

17     factual underpinnings on which I could say, okay, now,

18     looking at this, he has met all of the other elements, are

19     there common issues with regard to the issue of causation

20     that predominate.  I can't just presume that because it

21     happens to be a Consumer Fraud Act and because it happens to

22     be a common scheme by the defendant or a uniform scheme.

23             MR. GRAIFMAN:  Correct.

24             What I was going to do, we had prepared a slight

25     bit of a flow chart, which relates to the class definition,

1    and I think that I am going to, if I may, use that to try to

2    tie that in.

3              THE COURT:  That will be helpful.

4              MR. GRAIFMAN:  Okay.

5              The initial -- okay -- the retention scheme that we

6    have outlined and also the way that the path of each class

7    member will take would be essentially one of two paths.

8              One would be after they are given an offer, and

9    they accepted the offer, then they get the postcard, and

10   they all go through step numbers one, two and three.

11             THE COURT:  They get an offer.  They accept the

12   subscription.  They send in the postcard.

13             MR. GRAIFMAN:  I'm sorry.  This is probably

14   difficult to see.

15             THE COURT:  All right.

16             MR. GRAIFMAN:  I will move it as close as possible,

17   if that helps.

18             THE COURT:  That's fine.

19             MR. GRAIFMAN:  I'm sorry.

20             THE COURT:  I can see it.

21             MR. GRAIFMAN:  So then after that, the deceptive

22   postcard, the person gets the postcard and let's say they

23   call the IVR.  If they call the IVR, they then try to

24   cancel --

25             THE COURT:  Do you agree that in order to make it

PHYLLIS T. LEWIS, CSR, CRR, OFFICIAL COURT REPORTER

1        into your punitive class here, they have to get to step

2        number four, assuming that step number four is the IVR for

3        the sake of this question?

4                MR. GRAIFMAN:  They either call the IVR from the

5        postcard, or they get a charge on their credit card --

6                THE COURT:  And then --

7                MR. GRAIFMAN:  -- and then they call the IVR so

8        they end up here either way, right.

9                So once they get into the IVS -- it is our

10       contention that the IVR is the common deceptive aspect,

11       which prevents them from cancelling when they push the fact

12       that they want to cancel.

13               When they indicate that they want to cancel and

14       they end up getting charged, in other words, if the IVR is

15       found by a jury to be a common scheme and deceptive, and

16       that there is an ascertainable loss --

17               THE COURT:  Regardless of whether the IVR is via

18       the phone call from the billing number or the phone call

19       from the postcard?

20               MR. GRAIFMAN:  Right.

21               THE COURT:  Let me see if I understand, because it

22       is helpful to you if I understand your argument.

23               MR. GRAIFMAN:  Oh, please.

24               THE COURT:  As I understand it then, you are

25       saying, Judge, I can satisfy the causal connection because I

1    can prove to the jury, number one, that the use of this

2    postcard was deceptive, right?  That when they used the

3    number in the postcard, those that only did, right, they

4    were put into what I allege is uniform at least as to the

5    confusion, right --

6             MR. GRAIFMAN:  Right.

7             THE COURT:  -- IVR system, which causes them to not

8    get what they wanted to get, which was a cancellation.

9             MR. GRAIFMAN:  Right.  Hence, the causal connection

10   between the charge that they tried to cancel and the

11   deceptive IVR, and that is -- the presentation to the jury

12   is that the IVR, if not --

13            THE COURT:  Wait, wait.

14            And the intent of the person is not really an issue

15   here you would say because I can prove that they pushed a

16   button that indicates their intent --

17            MR. GRAIFMAN:  Right.

18            THE COURT:  -- so it is not that we have to take it

19   step by step, because I could say, they all intended to

20   cancel, Judge, and I can prove that by virtue of the fact

21   that they pushed a particular button in the system --

22            MR. GRAIFMAN:  It's affirmative objective action

23   taken to demonstrate that.  But for the deceptive IVR, they

24   would not have had that charge.  That is a question for the

25   jury.

```
1                    THE COURT:  What is it about the IVR that you say
2         is deceptive specifically?
3                    MR. GRAIFMAN:  We started talking about that.  I'm
4         sorry.
5                    Where is it?
6                    Okay.  I am not sure --
7                    THE COURT:  Lissette, mark that Court's Exhibit 1,
8         that chart.
9                    MR. GRAIFMAN:  I am sorry.  This one?
10                   THE COURT:  Yes.
11                   (Chart marked Court's Exhibit 1)
12                   MR. GRAIFMAN:  Should we continue?
13                   THE COURT:  Yes.
14                   MR. GRAIFMAN:  I'm sorry.
15                   Okay.  So the IVR, first of all, as we said, does
16        not allow anybody to get to a live operator by virtue of
17        informing them.
18                   I think, as your Honor heard, if you put in, you
19        know, gobblygook or under certain unusual circumstances,
20        maybe you can score and get lucky and reach an operator, but
21        the system won't tell you how to get an operator.  It
22        doesn't say, you know, push zero, or if you want a live
23        operator, just say "operator" --
24                   THE COURT:  Do you agree by the way, if they reach
25        a live operator, those people are not in your class?
```

1           MR. GRAIFMAN:  No, because the definition includes

2      those people who actually said to a live operator, I want to

3      cancel, and still didn't get the cancellation.

4           THE COURT:  How will you prove that, what was said

5      or not said?  Are those recorded?

6           MR. DIAMOND:  If I may, your Honor, what's recorded

7      in their records is that the person went to a live operator.

8      Then if that person received what was referred to as a full

9      cancellation, that immediately halts whatever subscription

10     they're in and gives a refund, either a full refund or a

11     partial refund, all of that information is in their system.

12          These people who reach a live operator under number

13     two are in the class, because if they were not notified by

14     the postcard, they received the charge, and the whole

15     process was delayed in trying to cancel.  Those people, such

16     as plaintiff Austin, when they received the cancellation, in

17     his case for Maxim magazine, he only received a pro rata

18     refund.

19          THE COURT:  Counsel, how are you going to prove

20     what was the interaction between a live operator and a live

21     member of your class, and what was said back and forth and

22     the ultimate decision that was reached?

23          It would be different if there was an objective

24     thing, Push number five if you want to cancel.  I pushed

25     number five, and I didn't get my total refund.  That's one

1      thing.

2            With a live operator, how do I know what the

3      operator said?

4            How about you just cancel one thing, and we don't

5      give you your refund, and the plaintiff said, that's okay,

6      how do we get around that?

7            MR. DIAMOND:  We are not putting in contention that

8      there was deception by the live operator.  We believe that

9      if the person is calling up, they want a full refund, the

10     biggest refund that they are entitled to.

11           THE COURT:  How do you know if during that

12     conversation, the intent may have changed?  We don't know.

13           All right.  We will talk about it.  I don't need

14     further argument on that.

15           MR. GRAIFMAN:  The IVR never presented the option

16     and, again, let's focus on the recorded version of a full

17     cancellation.  They give you what we referred to as a do not

18     renew, which is that you will not be charged -- they won't

19     renew your subscription for the next term, but you will be

20     charged the balance of your current term, so they never

21     presented you with the option to fully cancel.

22           THE COURT:  Just so that I understand something,

23     you get the postcard when your subscription is about to run

24     out.  Is that what happened?

25           MR. GRAIFMAN:  Yes.  You haven't been charged for

1    the renewal yet.

2            THE COURT:  So if you called to cancel at that

3    point and say I want to cancel --

4            MR. GRAIFMAN:  Right.

5            THE COURT:  -- they would say, okay, you cancel,

6    you are not getting any renewals, but the one that was about

7    to happen, happens anyway?

8            MR. GRAIFMAN:  I believe so.  Again, you know, I'd

9    ask Mr. Diamond to confirm it.

10           In other words, when you call from the postcard,

11   and it is a precharge, do you have the option to prevent --

12           THE COURT:  Mr. Diamond, my question is this:

13           When does the postcard go out, right before your

14   subscription runs out?

15           MR. DIAMOND:  It goes out a few weeks before the

16   charge for renewal or extension.

17           THE COURT:  And if one were to call the number on

18   the postcard and hit the cancellation button, what in fact

19   happens, I'm just saying this, and if I am wrong, correct

20   me, what in fact happens at that point is that there is not

21   any further renewals, but you are still charged for the

22   upcoming renewal?

23           MR. DIAMOND:  If a person went through all of the

24   options that were presented and rejected all of them,

25   including the deceptive options and went to the very end,

1    the effect would be they wouldn't be charged for the

2    upcoming not yet incurred charge.  It is parallel to what

3    happens after a person is charged.  There is no affirmative

4    option presented to do what you suggest.

5            The caller has to reject, reject, reject, reject,

6    reject.  And if they make all of those objections to get to

7    the end, then the upcoming charge will not occur.

8            MR. GRAIFMAN:  But you are not presented with that

9    option.

10           MR. DIAMOND:  It is not affirmatively presented,

11   exactly.

12           MR. GRAIFMAN:  It is designed that way to be

13   confusing, so you are not presented with the option, do you

14   want to cancel your upcoming subscription.  That would be

15   the question that I think your Honor is asking, do they ask

16   that question, and the answer is no.  They don't ask that

17   question.

18           THE COURT:  Well, if a person calls the number on

19   the postcard now that I hear this, and hits the cancellation

20   button, that person is not going to ascertain a loss.

21           MR. DIAMOND:  Your Honor, I have in front of me the

22   defendant's production, second supplemental objections in

23   answer to plaintiffs' first set of interrogatories, and I am

24   on Page 38, where it has a transcript of what occurred to

25   plaintiff McNair when he called the number from the postcard

1       before he was billed, and I quote:

2               The IVR says:  "Hi, there!  You've reached Susan,

3       your automated renewal system.  Are you calling to cancel

4       your magazine?

5               "Please say yes or no.

6               "Caller Response:  Yes."

7               The IVR:  "I've accessed your account record.

8       Please say the name of the magazine you want to cancel.

9       Keep in mind, I can only process one at a time, so please

10      say only one magazine name."

11              So he had four magazines at that time, and the same

12      thing happened with all four, the first one.

13              Then he identifies the magazine, and then the IVR

14      said:  "For this magazine, you were charged a nominal fee

15      that covered the cost of processing your subscription.  But

16      you still have time until," and then parenthetically it

17      says, "next bill date" "to receive your magazines at no

18      additional cost.  Do you want to take advantage of the

19      remaining time?"

20              Each time McNair was presented with the above

21      offer, he responded "yes."

22              Now, we have --

23              THE COURT:  Wait.  He responded "yes."

24              MR. DIAMOND:  He responded, "yes," so we have

25      asserted that any reasonable consumer or person reading this

1      would understand that McNair was cancelling the upcoming

2      charge, and he may have had issues on his original

3      subscription that needed to be served out.  It is difficult

4      to imagine any interpretation that this language, which I

5      have just read, is anything --

6                THE COURT:  Read that language again.

7                MR. DIAMOND:  Sure.

8                "For this magazine you were charged a nominal fee

9      that covered the cost of processing your subscription.  But

10     you still have to time until," parenthetically, "(next bill

11     date)" -- that's the date indicated when you will be

12     charged -- "to receive your magazines at no additional cost.

13     Do you want to take advantage of the remaining time?"

14               And he says, "Yes."

15               So the only interpretation that this question is

16     not deceptive would be that the caller would think the

17     question is asking --

18               THE COURT:  Well, when he said yes, what happened?

19               MR. DIAMOND:  He was charged.  The charges

20     occurred, and he went through the same tree during the same

21     call for all four magazines, and then he was charged for all

22     four magazines.

23               THE COURT:  If he said, no, he would have not

24     gotten charged.

25               MR. DIAMOND:  But if he would have said no, he

1    wouldn't have been charged, but we argue that no reasonable

2    person could interpret this question in a manner that if you

3    say yes, that you are not cancelling the magazine.

4          You would have to interpret this question in the

5    way McNair is saying to himself during his first original

6    subscription before being charged with a renewal, Ah, if I

7    say -- if I say no to this question -- he would have to

8    interpret this as meaning the question is asking whether he

9    wants to stop his current subscription, not the one that's

10   being renewed, stop it in its tracks.  If he has one more

11   issue, stop it in its tracks immediately.

12         A person calling up on the renewal postcard, no

13   reasonable person could interpret the question that way.

14         THE COURT:  Do you have a copy of that transcript?

15         MR. DIAMOND:  This is Exhibit 23 of plaintiffs' --

16   it is Exhibit 23 of plaintiffs' motion for certification.

17         THE COURT:  Okay.

18         MR. GRAIFMAN:  Okay.

19         So I think we were talking about the IVR system,

20   and again, you know, our proof -- we contend that the IVR

21   system is a preprogrammed tree of options, not an oral

22   conversation like one might have with a live operator.  It

23   is preprogrammed.  It is scripted and certain aspects as the

24   one he just read, which are always in the IVR, and we

25   contend that the IVR as presented to a jury can be a uniform

 1      deceptive practice on the part of the defendant that could

 2      be presented as a common question to a jury as part of the

 3      first element of the Consumer Fraud Act elements.  It is

 4      defendant's material.  It is not individualized as to each

 5      class member as to the aspects we enumerated, which we

 6      allege to be deceiving.

 7              There may be other non material aspects, like

 8      hello, today is whatever date, I am your magazine assistant

 9      or advisor.  There may be material -- I'm sorry -- minor

10      charges, but the material aspects of it remain deceptive and

11      are designed to remain deceptive.  We are not suggesting

12      here there is anything accidental about this.  This is a

13      very sophisticated system.

14              It is, you know, using the highest level of

15      technology.  It is designed to do something, which it does

16      very well, and the proof of that is, for example, on the

17      postcard, getting back to the postcard, another point I

18      wanted to raise is that the number of people who called to

19      cancel with a postcard is about one-sixth of the people who

20      actually looking at their credit card bill, saying, Oh, my

21      God, I was charged, what is this, I better call this number.

22              You would think that if a postcard were truly clear

23      and conspicuous notice of a renewal, that the percentages

24      would be reversed.

25              THE COURT:  But what you allege as deceptive really

```
1        is the IVR because whether or not the postcard was deceptive

2        is almost irrelevant, because you are only alleging a class

3        of the people who opened the postcard, understood it and

4        called the number.

5                    MR. GRAIFMAN:  Or those that didn't know it and saw

6        their charge on their credit card, and then called the

7        number.  But your Honor is correct, both lines of the

8        scheme --

9                    THE COURT:  Got to get you to the IVR.

10                   MR. GRAIFMAN:  -- will get you to the IVR.  That is

11       the flow chart that we saw before.  Both of those get you to

12       the IVR.

13                   May I take this?

14                   THE COURT:  My point is that your allegation of the

15       common deceptive practice really is the way that the

16       questioning or the system has been developed in the IVR.

17                   The postcard may be deceptive.  It may lead you to

18       want to throw it in the garbage as junk mail, which I think

19       is one of your arguments, but at the end of the day we don't

20       know whether they threw it in the junk mail because they

21       wanted to throw it in the junk mail, or throw it away as

22       junk material, or whether they threw it away because they

23       opened it, and they read it, and they understood it, and

24       they still threw it away, so we don't know any of that --

25                   MR. DIAMOND:  Right.
```

1          THE COURT:  -- and because we don't know any of

2     that, your point is that it doesn't make a difference,

3     Judge.  I am focusing under the guise of people that did

4     call, whether, because when they got billed and threw it

5     away, or whatever, and those are the people that we claim

6     were deceived because it is clear that they -- with regard

7     to the billing people -- and I am just articulating

8     arguments to see if I have it clear in my head -- with

9     regard to the billing people, they wanted to cancel, so

10    obviously they were deceived by the card because they called

11    when they got the bill.  Had they understood the card, they

12    would have called then.

13          MR. GRAIFMAN:  Right.

14          THE COURT:  And then once they got there, the

15    deception was uniform because everybody went into the same

16    cancellation tree.

17          MR. GRAIFMAN:  Correct.

18          THE COURT:  All right.

19          Any other argument?

20          I think I understand your argument on the consumer

21    fraud.

22          MR. GRAIFMAN:  No.  I think that that is the

23    consumer fraud argument.

24          THE COURT:  Okay.

25          MR. GRAIFMAN:  The contract argument --

```
 1                    THE COURT:  We will get to the contract argument
 2          later.  Let them address that now.
 3                    MR. GRAIFMAN:  I'm sorry.
 4                    THE COURT:  Lissette, I want that exhibit back,
 5          okay, the one with the flow chart.
 6                    Keep it.
 7                    MR. GILBERTSEN:  Thank you, your Honor.
 8                    Plaintiffs' case has a lot of moving parts, and
 9          that really is the overarching problem here.
10                    By my count, there are about 24 or 25 different
11          alleged misrepresentations or omissions, but 24 or five
12          different statements that they allege make up this soup of
13          deception.
14                    THE COURT:  When you say there are about 25
15          statements, you are talking about the things that the IVR
16          says?
17                    MR. GILBERTSEN:  No, your Honor.
18                    THE COURT:  What are you talking about?
19                    MR. GILBERTSEN:  No, that form the basis of their
20          overall claim of deceptive practices.
21                    Some of them relate to the notice, and he just went
22          through a number, Mr. Graifman did.
23                    Some of them do relate to the initial offers that
24          is in their brief.
25                    Some of them relate to the postcard, and the
```

1    outside of the envelope, and then they really don't have

2    much to challenge about the inside of the envelope.

3         Then they have challenges to different statements

4    or different codes that are in the IVR.

5         I do want to point out that Mr. Diamond read a

6    version of a do not cancel type of retention effort that Mr.

7    McNair heard on his first call.

8         It is in the record, and it's also in the Tyler

9    declaration in our briefing, your Honor, but there are a

10   number of different versions of that particular script

11   saved, if you will, and a number of the others have an

12   additional statement about, if you like this, you know, call

13   back before X date to cancel.

14        We dispute so much of what has been said over the

15   past 45 minutes, your Honor, all of the merit stuff, and I

16   understand why they need to go into it, and why we need to

17   look at it.  But at the end of the day, there are 24 or five

18   different statements that they challenge.

19        The cases that we cited at our brief at Page 28 of

20   the principal opposition brief make this point, and I think

21   it is a signal in the case, that when you have allegations

22   of deception and consumer fraud that are based on a series

23   of oral and written misrepresentations or omissions of

24   material fact, it presents a special problem in the class

25   action context because it raises significant risk that the

1        individual issues are in fact going to overwhelm --

2                THE COURT:  You said "oral."

3                MR. GILBERTSEN:  Oral and written, yes.

4                When you are in the IVR context, we are starting to

5        deal with oral communications because how Mr. McNair, how

6        Ms. Desai and Demetriou, how Mr. Austin, how Ms. Dynko, how

7        they respond to the questions that they are getting and the

8        prompts that they are getting is part of the transaction,

9        and when they interact with live operators, that indeed

10       is --

11               THE COURT:  I realize that.  But their point is:

12       If I convince the jury that this prompting the way you've

13       created it is deceptive, right, if I could make that

14       showing, it would be deceptive to everybody that would

15       predominate.  And if I could show that, and if I can further

16       show through the defendant's document the person's objective

17       intent to cancel, then I have accomplished what I need to

18       accomplish, and the Court should certify my class because

19       everything predominates.  All of the elements are common.

20               MR. GILBERTSEN:  I don't agree with that, your

21       Honor.

22               THE COURT:  The facts and the issues are common.

23               MR. GILBERTSEN:  They are not common.  You only

24       need to identify, as your Honor mentioned at one point, the

25       individual experiences of the named plaintiffs to see that

1    they do not.

2          What we end up disputing in this case is what

3    exactly happened in this transaction.

4          We have named plaintiffs who deny ever using the

5    IVR, but our records show that they transacted with the IVR

6    for three or four minutes and got their cancellation with a

7    complete refund.

8          We have named plaintiffs, who deny ever speaking

9    with a live operator, but again, our records show them

10   transacting with live operators and getting cancellations

11   for complete refunds from live operators.  That is why it is

12   a little puzzling to me to read a class definition and hear

13   the plaintiffs' counsel state that this is going to be

14   people, we are going to populate this class from defendant's

15   records, when their own plaintiffs dispute our records.

16   That is what the whole dispute is about with these five

17   named plaintiffs is what happened.  We don't escape that by

18   taking a 30,000 foot view over the entire business model of

19   Synapse.

20         We dispute that these things are uniform.  They are

21   not.  The do not renew script that Mr. McNair heard that was

22   just emphasized in their argument is not uniform.  There are

23   a number of different versions of that that were used in the

24   systems over -- what are we up to now -- nine years of the

25   class period they assert.

1              The policy on live operators changed in 2005.

2              The standard postcard didn't become standard until

3      we were smack dab in the middle of this class period in

4      2004, and it never became standard.

5              Other clients negotiated their own requirements for

6      that.  Even for the rest, that postcard is not material.  It

7      doesn't serve the same crucial role that uniform disclosures

8      in these other cases have served because what happened with

9      these named class members time and again is that you have

10     two of them who read it and understood it.  That is Mr.

11     McNair and Ms. Dynko who was a customer six or seven years.

12             The others end up calling off of the billing

13     statement, so there are a series of disclosures here that

14     followed the postcards.  The billing statement includes a

15     1-800 toll free number to call.  How many line items on a

16     credit card statement provide that?

17             So people call that and they get the cancellation.

18             We dispute that the IVR does not present an option

19     to cancel off of the postcard.  It was the first question

20     that came out of their mouths when they read the McNair

21     transcript.

22             Are your calling to cancel?

23             Yes.

24             What title are we talking about?

25             The information is provided.

1              And then save attempts are made.

2              THE COURT:  But once they indicate an intent to

3       cancel, which they say all of their plaintiffs did --

4              MR. GILBERTSEN:  Uh-huh.

5              THE COURT:  -- then the issue becomes:  Is the

6       manner in which they are to accomplish that deceptive,

7       right?

8              Under your contract with these people, with these

9       subscribers, they have a right to cancel.  Do you agree or

10      disagree?

11             MR. GILBERTSEN:  They do typically.

12             THE COURT:  And do you agree or disagree that under

13      the good faith and fair dealing concept, you are not

14      supposed to impede the right to perform within the contract,

15      in other words, to cancel?

16             MR. GILBERTSEN:  Not supposed to act unreasonably

17      to impede their rights.  That is correct, your Honor.

18             THE COURT:  I am getting to the contract, which I

19      really shouldn't do here right now, but let's go back to the

20      consumer fraud for a second.

21             If they can prove, and they claim all of the

22      members of their class wanted to cancel, a full

23      cancellation, it may not be what in actuality happened to

24      all of the five named plaintiffs, but that is what they

25      wanted to do, and they didn't get to accomplish that because

1     their IVR system is designed to be deceptive and misleading.

2     If they can prove that, then haven't they met their burden

3     here today or not?

4          MR. GILBERTSEN:  They have not.  They have not

5     established causation.  I would demonstrate that by focusing

6     on the named plaintiff, Desai and --

7          THE COURT:  Let me get them.  I have them all

8     broken down.

9          He read the postcard -- no, he did not read the

10    postcard --

11         MR. GILBERTSEN:  She.

12         THE COURT:  -- I'm sorry.

13         She did not read the postcard.  She did not speak

14    to a live operator.  I am not entirely sure what option she

15    in fact selected.  There was a debit card used with her, and

16    there was an overdraft charge, and I am not so sure what she

17    was able to fully cancel.  I don't know exactly what

18    happened with that.

19         MR. GILBERTSEN:  We summarized both her

20    allegations, her testimony, and what our records show and do

21    that for all of the named plaintiffs.  Desai is at pages 11,

22    12 and 13 of our opposition.

23         The short story is this:  She contracts to receive

24    her subscription while she's shopping at an FYE store.  They

25    direct the subscriptions to the fiancee's grandmother's

1    house, where they are living.  Then they move, but they

2    don't change their subscriptions.  They don't change the

3    address on the subscription or indicate that they are moving

4    to Synapse, and she accepts the type of offer that is a

5    90-day risk free offer.

6            We have scores of different types of promotions at

7    issue here, and that's a significant aspect of the case to

8    keep in mind as well.  But this particular one that she

9    agreed to is here are three magazines, try them for 90 days,

10   and if you like them, I am going to bill you on the card

11   that you provided me, and here is how much I am going to

12   bill you, twelve-ninety-five for Her Fitness, I don't -- for

13   Rolling Stone, here is what -- well, for whatever magazines

14   by way of example, the price is disclosed at the time that

15   she signs up.  This is how much I am going to charge you 90

16   days from now, unless within that time period, you call and

17   say that you no longer want these.  So it is a risk free

18   trial offer, and in 90 days she testified that she noticed

19   these charges and did nothing.

20           She did not attempt to contact Synapse.  She didn't

21   try to call the toll free number on her billing statement.

22   She didn't try to contact anybody to cancel the

23   subscriptions, and she said she had overdraft charges for

24   those billing events, and she never sought reimbursement

25   from Synapse.

1          A year went by and when her renewals came up, she

2     noticed the temporary charges on her billing statement.

3          What are those?

4          A number of the named plaintiffs testified about

5     them.

6          A temporary charge is just a very small nominal

7     amount that the vendor - and this is common practice in the

8     economy - sends out to the card to make sure it's still

9     good, saying, I'm going to see if it will pay a dollar.  So

10    we put a dollar temporary charge on Ms. Desai's account.

11    She sees that, and it also has a number.

12         She calls that and she cancels her subscriptions in

13    the IVR, I believe it was, and gets a complete refund.

14         She has no claims, your Honor.  She never ends up

15    satisfying this class definition.

16         Mr. McNair, you know, we can't get past the

17    subjective issues that this Byzantine class definition he's

18    trying to fix, it does not, and the 7th Circuit case that we

19    cited in our brief that talks about the difference between

20    belief, intent, and fact, and in this context is a good one

21    to focus on.

22         Mr. McNair called in July, and in one call he

23    cancels two magazine subscriptions for a complete refund and

24    they do not renew on the third.

25         Responding to the same prompts for each of those

```
1      three magazines, he elects to do one thing with one

2      magazine, and the other two he elects to cancel for a

3      complete refund, which he got.  So where is the objective

4      intent that comes from these actions?

5           We submit it is fair to say that he did exactly as

6      he intended, and that it is reasonable for us to believe he

7      did under those circumstances.

8           MR. DIAMOND:  Your Honor, may I comment?

9           THE COURT:  No.  I mean, he didn't interrupt while

10     you guys were talking.

11          At the end if you disagree with anything, I will

12     give you a brief opportunity to respond because I want to

13     finish this argument, and I want to talk about breach of

14     contract and the other elements.

15          MR. GILBERTSEN:   Nor can this class definition be

16     populated from the electronic information on the clients.

17          What we have been able to do is with the name of

18     five individuals and their providing us their information,

19     we can go into a system that is, you know, whose business

20     purpose it is to respond to individual inquiries to

21     subscribers, and we can start tracking what happened, and

22     through a laborious process, we can rebuild these IVR

23     transactions and conversations that happened within a time

24     frame that goes back, you know, more than a year, but at

25     some point has an ending point.  We can do that if we know
```

1     that starting point of these individuals.

2             What we cannot do is just start -- you know, we can

3     populate a group of DC and New Jersey and New York

4     addresses, but after that, populating this, what I have

5     counted now as nine steps versus the 13 steps that they

6     submitted with their motion, Mr. Tyler's declaration makes

7     clear that that cannot be done, and this is particularly

8     true with the live operators, nor does it view what

9     transactions and what was said in those live operator calls.

10    We would need to go back and look at with our eyes notes

11    that were made by the call reps in order to determine what

12    transpired and whether people were satisfied.

13            When the plaintiffs talk about we're not refunded

14    all charges, and they defined that in their briefing, they

15    don't mean a complete refund there, your Honor.  They mean a

16    complete refund or the pro rata refund that was appropriate

17    under the circumstances.  That is going to be a case-by-case

18    inquiry.

19            Mr. Austin got a prorated refund on one of these

20    subscriptions, and he got a complete refund on two or three

21    others.  But on the one, he paid $20 and got back $18.27, so

22    we say he was refunded all charges because all charges,

23    according to the plaintiffs, include a pro rata refund.

24            What they want to do is dispute the

25    appropriateness, the lawfulness, the fairness of every pro

1      rata refund.

2              That is why this case and consumer fraud claims

3      present no common issues.  It is a case-by-case inquiry.

4      Causation, therefore, cannot be presumed for the class, your

5      Honor.

6              THE COURT:  Let me ask you a question about the

7      retention strategy document.  Remember you spoke about it

8      earlier?

9              MR. GILBERTSEN:  Exhibit 39, your Honor?

10             THE COURT:  Yes, where you were talking about the

11     circumstances under which you are required to provide

12     written notice.

13             MR. GILBERTSEN:  Uh-huh.

14             THE COURT:  All right.

15             And the basis, what is the legal basis of this

16     requirement, that you acknowledge in this document?

17             MR. GILBERTSEN:  That the clients acknowledged.

18     That's an ordinary course of business document, and I don't

19     recall the testimony if there was any about it right now,

20     but my understanding is this.

21             For example, that if the price was disclosed, and

22     then charged 90 days later, like the 90-day risk free offer,

23     there may be no legal duty that arises under either state or

24     federal Section 5 law of what the plaintiffs are pursuing

25     here, the negative option rule, which we claim does not

1    apply to our programs at all, but if it does, it is going to

2    apply to some aspects of these programs differently, and

3    this is an example, the 90-day risk free offer.

4            The price that I am going to charge the subscriber

5    in 90 days I have disclosed to the subscriber at the time

6    that I make the offer.  The subscriber accepts that and

7    agrees to my terms.

8            Whether I need to notify that subscriber again just

9    before that charge happens 90 days later, I don't believe is

10   required by any FTC Guidelines or Section 5 of the FTC

11   because it is the same amount I already --

12           THE COURT:  In what circumstances do you say that

13   it is required?

14           MR. GILBERTSEN:   I don't believe any of our

15   programs are subject to the negative option rule.

16           There are other FTC guidelines about advanced

17   consent marketing.

18           Are they that different?

19           You know, no, these are all different species I

20   think of various marketing programs that you could put into

21   one bucket.

22           But the FTC recognizes a difference between them,

23   and so in this case we are going to be disputing whether the

24   negative option rule, as these plaintiffs are asserting in

25   this case, applies to any of our programs, and then after

1       that, we are going to be disputing whether it applies to all

2       of our programs because certain of our programs are like

3       miles for minutes -- miles for magazines -- I'm sorry --

4       where people redeem frequent flier miles for magazines.

5       Does that apply to that?

6               I don't think it would under a fair reading of the

7       negative option rule.

8               At certain points, the initial charge off of a

9       90-day risk free trial offer, the negative option rule I

10      don't think applies at all to that particular transaction.

11              THE COURT:  Okay,

12              MR. GILBERTSEN:  Thank you, your Honor.

13              THE COURT:  Thank you.

14              Mr. Diamond, what did you want to reply to?

15              MR. DIAMOND:  Thank you, your Honor.

16              First of all, plaintiff Desai testified that she

17      did try to cancel.  She tried to cancel after the first

18      charges by contacting the publisher.  She had little way to

19      know that Synapes was actually the entity that charged her,

20      and she testified that she contacted the publisher.

21              Contacts with the publisher previously occurred

22      under the prior submitted class definition as number three.

23      Now, because even though those publishers are part of

24      Synapse, those records of contacting publishers might not be

25      in Synapse's records, so item three was removed.

1          It turned out McNair receiving the do not renewal

2     language, our marketing expert, Dr. Keegan, has opined that

3     the DNR questions are compound questions that could be

4     answered both yes or no.

5          It is difficult for a consumer to know really

6     whether the answer that we get from a full cancel is a yes

7     or no, and in this respect it is really no surprise that

8     plaintiff McNair answered yes to some of them in one call

9     and answered no in another.

10          Earlier you asked whether we had a document, which

11     showed the generic introduction scripts to the IVR.  I have

12     now located that document.  It is presented as Exhibit 21 to

13     Dr. Keegan's report.  This is from the defendant's

14     production.  It is a document entitled "Magazine Customer

15     Service User Interface."  The first Bates number is SYN

16     double zero 74161.

17          Turning to the second page of the document, it

18     shows the introductory welcome language that is generic as

19     well as those for Chevron, Use Subscribe, AMEX, Newport

20     News, and the Bank of America.

21          May I present that?

22          THE COURT:  I have it.  That is what I was reading

23     from to you before.  That was just the introductory

24     language.  At that point I was asking you about what

25     occurred after the introduction, was the follow-up language

1          different, the introduction seemed to be different for

2          Chevron and all of the different magazines.  I was just

3          wondering if the options, depending on whether you call the

4          IVR -- I'm sorry -- whether you called as a result of your

5          bill, or as a result of your postcard were different,

6          whether the options were different.  That was my question.

7                    I have that exhibit, and I read it.  That was the

8          one I was quoting from.

9                    MR. DIAMOND:  I apologize for misunderstanding.

10                   THE COURT:  That is all right.

11                   MR. DIAMOND:  With respect to Danielle Demetriou,

12         just to resolve the dispute we had, I now have her

13         deposition transcript on Page 46 from lines 3 to 9, where

14         she described that she learned that she should -- actually

15         to line 13, that she learned to press zero in the IVR from

16         the Ripoffreport.com.  It is on Page 46 of her deposition.

17                   THE COURT:  Okay.

18                   MR. DIAMOND:  That is all I have at this time,

19         your Honor.

20                   THE COURT:  Mr. Graifman, talk to me now briefly,

21         okay, because we are running out of time, and I want to try

22         to finish the argument on both sides in the next half-hour.

23                   Talk to me briefly about your breach of contract

24         claim and your electronic --

25                   MR. GRAIFMAN:  Which refers only to the people who

```
1      got overcharged --

2              THE COURT:  Debited.

3              MR. GRAIFMAN:  -- debited.

4              With regard to the breach of contract action, we

5      have a contract here, which I don't believe is a dispute

6      that it involves the offer of a magazine subscription, which

7      includes an automatic renewal, and that the magazine both --

8      that the defendant would give the subscriber prior notice of

9      the automatic renewal and --

10             THE COURT:  Is that a uniform contractual clause

11     that everybody got?  I think we started there today --

12             MR. GRAIFMAN:  I don't think that these are written

13     contracts.  Well, I mean, to the extent they are written,

14     yes, there are no uniform -- I mean, it is not uniform

15     because the offers come from different places.  That is

16     where we did start today such as the FYE or the various --

17             THE COURT:  No matter where they come from, though,

18     they all contain the same language about the automatic

19     renewal --

20             MR. GRAIFMAN:  Yes.  We contend that they do, that

21     they contain the same language, and they basically agree

22     that they will give them prior notice, or that they would

23     certainly -- this is a negative option plan, that they

24     would -- in good faith and fair dealing dictates that they

25     would provide notice required by law, which would be clear
```

1       and conspicuous.

2              They are also told that they could cancel at any

3       time as part of the contract, so --

4              THE COURT:  By the way, are all plaintiffs

5       automatic renewal plaintiffs as opposed to the 90-day signup

6       people that Mr. Gilbertsen referred to?

7              MR. GRAIFMAN:  Yes, I believe they all are

8       automatic.

9              THE COURT:  They are all automatic renewals?

10             MR. GRAIFMAN:  Yes, because they all received a

11      postcard as well.

12             (Counsel confer)

13             MR. DIAMOND:  I am sorry, your Honor, if I could

14      add, some of the plaintiffs were quote, 90-day customers,

15      but you should know the way the procedure works, at three

16      months they will go for an additional 12 months, and after

17      that they convert to a conventional 12 month at a time

18      automatic renewal, so some might --

19             THE COURT:  But your proposed class captures 90-day

20      signup people, that were under a 90-day period.

21             MR. DIAMOND:  Yes.  We refer to that as an

22      additional term rather than, quote, a renewal.

23             An example of renewal would be McNair, where he

24      received 12 months, and that 12 months was going to be

25      renewed, where as Demetriou, she was on three months, and

1     she was charged for an additional 12 months.  But

2     effectively, the things which are material, which occurred,

3     are the same, so the postcard is the same, and the issues in

4     the IVR are the same.

5               THE COURT:  Okay.

6               Mr. Graifman?

7               MR. GRAIFMAN:  So given the fact that the elements

8     of the contract here are in our contention uniform, in other

9     words, that we can prove a common contract in terms of the

10    basic elements of it, obviously the amounts for each

11    magazine and the length of time are going to differ.  The

12    magazine order will differ, but the basic terms, you know,

13    you agree to accept this magazine subscription, you agree to

14    an additional term, an automatic renewal term, and we will

15    give you prior notice on the renewal, and you can cancel it

16    at any time are basic terms of this contract.

17              We contend that by failing to provide the postcards

18    that gives clear and conspicuous notice, it is no notice at

19    all essentially.  And as a result of that, that's a breach

20    of the contract, and the IVR essentially is a deceptive

21    breach of the contract, and particularly, and as your Honor

22    knows, under the contract, there is an obligation of good

23    faith and fair dealing.  And this certainly, if it turns out

24    that a jury finds that these are common deceptive parts to

25    this retention scheme, would constitute a violation of the

1      good faith and fair dealing, which is implicit in every

2      contract in all three jurisdictions.

3              So rather than going into the lengthy reasons why

4      they are common proofs, I mean, we already covered that

5      ground, and I think the same proof we contend would show the

6      elements of a violation of a breach of contract and of good

7      faith and fair dealing.

8              THE COURT:  And damages.

9              MR. GRAIFMAN:  I'm sorry?

10             THE COURT:  And damages.

11             MR. GRAIFMAN:  And damages flowing for the same

12     reason because people contact the IVR, indicate that they

13     want to cancel and are charged and not cancelled.

14             So, I mean, again, the same proof will provide the

15     basis for the elements of the breach of contract claim.

16             With respect to the -- I don't know if your Honor

17     wants me to go into the electronic funds --

18             THE COURT:  Yes, I do.

19             I did want to go into that because I did have a

20     question with regard to that, and I think it had to do with

21     the requirement that there be varying charges, I believe.

22     Remember that?

23             MR. GRAIFMAN:  Well, the language is in the case of

24     a preauthorized transfer from a consumer's account to the

25     same person which may vary in amount --

```
 1                    THE COURT:  Vary in amount.  But if it's always the
 2         same amount, then it doesn't apply.
 3                    MR. GRAIFMAN:  Does not apply.
 4                    I am not sure --
 5                    THE COURT:  If you are getting charged
 6         nineteen-ninety-five to renew your subscription, and it is
 7         the same amount all the time, it doesn't seem to apply.
 8                    MR. GRAIFMAN:  The way I read the language, it was
 9         that it may vary in amount, meaning it doesn't have to be
10         the same --
11                    THE COURT:  Talking about the EFTA 1693e(b) --
12                    MR. GRAIFMAN:  Correct.
13                    THE COURT:  -- a subscriber used a debit card, not
14         a credit card, pre-authorized referring payments in varying
15         amounts and failed to provide -- and then the failure to
16         provide reasonable advance notice of the transfer ten days
17         prior to the scheduled date of the transfer of the varying
18         amount, so the amount has to vary.
19                    MR. GRAIFMAN:  I -- well, in reading the language
20         it said that to the same person, which may vary in amount, I
21         took it to mean that it can vary in amount.  It doesn't have
22         to be the same amount.
23                    In other words, I didn't read it to the same
24         person, which must vary an amount, which I think your Honor
25         is suggesting.
```

```
1                  I have the excerpt of the subdivision e(b), the
2        part that I am reading, and I may not have the whole --
3                  THE COURT:  Which part are you reading?
4                  MR. GRAIFMAN:  Quote:  In the case of preauthorized
5        transfers from a consumer's account to the same person,
6        which may vary in amount, financial institution designated
7        payee shall prior to each transfer, provide reasonable
8        advanced notice to the consumer in accordance with the
9        regulations of the Board of the amount to be transferred at
10       the scheduled date of the transfer, so that it is a
11       prearranged date, but I read that to mean that it may vary
12       in amount.  It doesn't mean it must vary in amount.  I
13       understood that to mean that it could be the same, or if it
14       varied, it is still a violation.
15                 THE COURT:  All right.  I have to look at that --
16                 MR. GRAIFMAN:  Yes, I mean --
17                 THE COURT:  -- the question in my mind was whether
18       the reason it was requiring written notification was because
19       you would be debiting these people different amounts from
20       time to time, and therefore, you had to given them written
21       notification, otherwise the person already knew.  Every
22       month I'm going to lose ten bucks, so they could make
23       arrangements for that, whereas if it was going to be varying
24       from time to time, then you should be giving them notice
25       because he's never going to know how much he's being
```

1   debited.  That was my general interpretation, but I'm

2   certainly wiling to look at cases interpreting it, but

3   that's why I asked you, and I thought maybe you would point

4   me in the right direction.  You are focusing on the wording,

5   "may vary in amount" under Subsection (b).

6           MR. GRAIFMAN:  The point your Honor raises is one

7   that I would be glad to take a look at the case law and

8   provide the Court with.

9           THE COURT:  Well, we certainly are going to look at

10  it.

11          MR. GRAIFMAN:  But I mean in terms of the -- I

12  mean, the charges here are debited at the point in time that

13  the renewal takes place, so I am not sure that there is a

14  varying amount because it is really a one time charge for

15  each renewal.  If it's only one renewal, it would only be a

16  one-time charge, so I don't think the varying becomes

17  material.

18          I think we still have an issue as to if in fact

19  varying is not a material element of the statute, it is just

20  there as an additional type of charge that may be required

21  to meet this -- the real question then becomes whether we

22  have a reasonable advance notice to the consumer.

23          Again, without belaboring the point and going

24  through all of the argument, I think your Honor has seen our

25  position certainly that the renewal notice cards that have

1      been used and the IVR itself, which --

2                THE COURT:  Is not proper written notification

3      under the statute.

4                MR. GRAIFMAN:  -- yes, that is essentially it.

5                The same evidence and the same proof that we rely

6      on the other causes of action, we would rely on the

7      Electronic Fund Transfer Act.

8                THE COURT:  All right.

9                MR. GRAIFMAN:  I think that just in closing, if I

10     could quickly say, that our contention is that Synapse

11     relies on the fact that there is no way that an individual

12     consumer challenging the deceptive practice could actually

13     challenge it legally and do something about it legally

14     without doing it as a class action.

15               It is inconceivable, you know, in terms of the

16     amount of damages that are here and the complexity that

17     anybody would have to break through to try to show what this

18     system is about on an individual basis.  It is not possible,

19     so in terms of superiority and method, if this is not done

20     as a class action, then the deceptive practice will continue

21     to go unchallenged.

22               Thank you.

23               MR. GILBERTSEN:  Your Honor, in response to that

24     last point, this is not a deceptive practice.  This company

25     has been in business since 1991.

1           The declaration from Mr. Tyler testified that the

2    company has awarded in excess of $700 million in refunds.

3    We do pay overdraft charges up to a formula that they don't

4    challenge.

5           We continue to enjoy the business of many reputable

6    companies, Bank of America and AMEX, it is a timing

7    subsidiary, so I want to make sure that the Court

8    understands and, your Honor, I respectfully submit I do

9    dispute that.

10          A couple of quick points:

11          Your Honor was asking about where various script

12   components are found in the record and also scripts that the

13   named plaintiffs heard, and I wanted to emphasize that the

14   Chris Tyler declaration provides a number of different

15   exhibits that show different retention scripts that have

16   been used over time, and these are all business documents.

17          Also, Plaintiffs' Exhibit 22 to their brief, are

18   Synapes' supplemental interrogatory answers, where the

19   results of our laborious efforts to build back the Q and A

20   from the named plaintiffs' IVR actions are spelled out.

21   That is Exhibit 22 of the plaintiffs.

22          Another quick note about the contract claim, my

23   understanding of New Jersey law, Wade versus Kessler, is

24   that you cannot have both a breach of contract claim and a

25   claim for a breach of the covenant of good faith and fair

1    dealings when the claims are based on the same operative

2    facts.

3         If there is a provision in the contract that you

4    are alleging covers this and has been breached, that's your

5    claim.  You cannot say, okay, well, that provision wasn't

6    breached, but I'm also going to assert good faith and fair

7    dealing.  That's a common law in many other jurisdictions.

8         These plaintiffs cannot say today, your Honor, that

9    all of the contracts that were entered were uniform in any

10   respect, and there is no proffer about that.

11        There have been times throughout discovery when the

12   offers were in the case and now they are out, but at this

13   point there is no proffer on the uniformity of those

14   contracts, and I want to emphasize the only breach alleged

15   in the amended complaint has to do with cancellation, and

16   whether a refund that the contracting party was entitled to

17   was given.

18        What the amended complaint candidly sets forth as

19   the elements here include the reasonable action of the

20   subscriber.  There is an allegation that they each acted

21   reasonably.  That every class member and the named

22   plaintiffs complied with their contractual obligations, but

23   you don't see any common issues from plaintiffs about those

24   issues, because those are going to be individual fact

25   finding exercises and a breach of contract claim, and it is

 1      going to be a case-by-case inquiry on whether a complete

 2      refund or a pro rata refund was given, and if a pro rata

 3      refund was given whether that was what the subscriber was

 4      entitled to under the contract.

 5              On the EFTA claim, I have very little to add beyond

 6      what we briefed.  It does relate to varying amounts.  It's

 7      also debit versus credit cards, so I am not sure that that

 8      is a field that we're going to be able to postulate with

 9      certainly from Synapes' records.

10              That is a question Synapes asks subscribers, are

11      you paying with a debit card, but the degree to which people

12      respond with the answer and provide a form is not exactly a

13      hundred percent.

14              Moreover, the EFTA is going to apply differently at

15      different points than some of these promotions.  The 90-day

16      risk free trial offer, Mr. Diamond is correct, that after

17      the 90-day period there is what they call an additional

18      term.  We just call it the initial charge for the

19      subscription, that the price was disclosed right out of the

20      gate when the offer was accepted and the contract was

21      formed.

22              The FTA does not apply, would never apply to any of

23      the additional charges named on the 90-day risk free trial.

24      We know that because the price was already disclosed.

25              Your Honor is correct that if the price remained

```
1        the same for one of the subscriptions and changed for one of

2        the others, and you know, when the renewal rolls around, the

3        automatic renewal rolls around a year later, the EFTA might

4        apply to one of them, if we are talking about a debit card

5        because the price has changed a little bit, but the price

6        has not changed on the other magazine, then it would not,

7        it's our view.

8                    Thank you, your Honor.

9                    THE COURT:  Okay.  Thank you.

10                   I have one other question for the plaintiffs'

11       counsel I think.

12                   If in fact you have a breach of contract claim, can

13       you also then have a consumer fraud action claim?

14                   MR. GRAIFMAN:  Hum, yes, I don't see why not.

15                   It's a different standard.  I think you could have

16       a breach of contract, which is not a -- a theory, which is

17       not a deceptive act.  It's just a breach of contract.

18                   I think to prove a Consumer Fraud Act claim, you

19       have to show that there was a deceptive act or a fraudulent

20       act, you know, a longer list, a knowing omission, et cetera,

21       et cetera.

22                   THE COURT:  I misspoke I guess.

23                   Can you under the theory of your case -- your

24       breach of contract is that they said they would notify me,

25       and they didn't, right?
```

```
1              MR. GRAIFMAN:  Right.

2              THE COURT:  Isn't that your breach?

3              Isn't that your breach?

4              MR. GRAIFMAN:  Yes.  One of the two breaches, and

5    also you can cancel at any time, correct.  But sticking with

6    that one --

7              THE COURT:  You can cancel at any time.  If it's a

8    pure breach of contract claim without the unfair dealing

9    part for a second, if that is what it is, then it's really

10   not a Consumer Fraud Act, right?

11             MR. GRAIFMAN:  In theory, yes, that's true.  If you

12   can't prove deception or fraud, yes.  You could have one

13   without the other, if that is the question.

14             THE COURT:  But if you have the fraud or the

15   deception, then you are dealing with a fair dealing concept,

16   not a breach of contract claim.

17             MR. GRAIFMAN:  I think that would be true.  I think

18   that would be true.

19             THE COURT:  Okay.  It was just something that I

20   thought of as counsel was speaking before when he said you

21   can't have a claim under the breach of the covenant of good

22   faith and fair dealing and a breach of contract claim.  It's

23   either one or the other.

24             MR. GRAIFMAN:  I don't know if that is true because

25   in every contract is implicit an implied covenant of good
```

1    faith and fair dealing.

2              THE COURT:  But it is a different type of claim.

3               MR. GRAIFMAN:  It is.  I agree with that.

4              THE COURT:  Thank you.

5              Now, obviously I will take this under advisement.

6    I am not going to rule on this right now because there are

7    several items that I have to think through and make a

8    determination on this, and I want to do the analysis that I

9    believe the law requires.

10             With regard to the motion to exclude the expert's

11   report, I did look at that.  The defendant has moved to

12   exclude the expert report of Dr. Warren Keegan for the

13   purpose of this class certification.  Basically their

14   argument with regard to that, and Professor Keegan for the

15   record is purported to be a marketing expert, specifically a

16   direct marketing expert, and a professor of marketing and a

17   graduate at the Dunford level, and defendant's argument is

18   that his opinions with regard to class certification are

19   either not relevant or inappropriate because they make legal

20   conclusions.

21             We are at a class certification level where I am

22   the one that is looking at this.  We don't have a jury

23   involved here.  To the extent that the doctor does reach

24   into legal conclusion issues and makes legal statements, and

25   I think there are some areas where he probably goes close to

```
1       that, I am going to disregard them.  I don't have to deal
2       with it.  To the extent where it is or it isn't relevant, if
3       I find after analyzing this, that it is not relevant, I will
4       disregard it, but I don't think I am going to strike his
5       report at this point.  I could say that, of course, without
6       prejudice if it is the intent of plaintiffs to later use him
7       for the purpose of this trial, if the class certification
8       goes forward or any further, there can be subsequent motion
9       practice as to whether or not a jury is ever going to get to
10      hear some of his opinions.  But for the purpose of this
11      class certification motion, I am not going to strike his
12      report, and that is my ruling.
13              Thank you.
14              MR. GILBERTSEN:  Thank you, your Honor.
15              THE COURT:  Thank you.
16              Thank you, Counsel.  I appreciate your helping me
17      understand this a little better.
18              (Court adjourned.)
19
20
21
22
23
24
25
```