**KANTROWITZ, GOLDHAMER & GRAIFMAN**
**GARY S. GRAIFMAN (GSG 2276)**
210 Summit Avenue
Montvale, New Jersey 07645
Telephone  (201) 391-7000

**GREEN & PAGANO, LLP**
**MICHAEL S. GREEN (MSG 2204)**
522 Route 18, P.O. Box 428
East Brunswick, New Jersey 08816
Telephone (732) 390-0480

**DIAMOND LAW OFFICE, LLC**
**PAUL DIAMOND (PD 3088)**
1605 John Street, Suite 102
Fort Lee, New Jersey 07024
Telephone (201) 242-1110

**Attorneys for Plaintiffs**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY (NEWARK)

———————————————————————
CHARLES T. MCNAIR,                                    :
THEODORE AUSTIN,                                      :
DANIELLE DEMETRIOU,                                   :
USHMA DESAI and JULIE DYNKO                           :
on behalf of themselves and all others similarly     :
situated,                                            :
                                                     :
            Plaintiffs,                              :
                                                     :     Case No.  2:06-cv-05072 (JLL) (CCC)
                                                     :
            v.                                       :     **CIVIL ACTION**
                                                     :
SYNAPSE GROUP INC.,                                  :     **SECOND AMENDED**
                                                     :     **CLASS ACTION COMPLAINT**
                                                     :     **AND DEMAND FOR**
                                                     :     **JURY TRIAL**
            Defendant.                               :
                                                     :     **CLASS ACTION**
———————————————————————:


Plaintiffs, by their attorneys, allege upon personal knowledge as to themselves and upon

information and belief as to the other allegations of this Complaint, as follows:

## SUMMARY OF COMPLAINT

1.      This is a class action pursuant to F.R.C.P 23, on behalf of all persons who obtain magazine subscriptions under Defendant, Synapse Group, Inc.'s negative option magazine plans in the States of New Jersey, New York, and the District of Columbia and are then subjected to Defendant's unconscionable commercial and deceptive business retention practices.

2.      This is an action to secure preliminary and permanent injunctive relief, and other equitable relief as may be deemed appropriate.  The claims asserted herein are premised on deceptive, unlawful and unfair business practices, unconscionable commercial practices, misrepresentations and fraud in violation of the respective State Consumer Fraud Acts of the resident states of the named plaintiffs.

3.      As described in more detail below, defendant Synapse Group, Inc. (hereinafter "Synapse Group") is a provider of subscriber acquisition and management services to publishers of consumer magazines that has a principal place of business in Stamford, Connecticut.

4.      Synapse Group also conducts its magazine subscription business under at least the following names:  TWX Magazines, NSS Magazine Subscriptions, Magazine Direct; New Sub Services; SynapseConnect; Synapse Solutions; and CAP Systems.

5.       Synapse Group offers purportedly discount-priced magazine subscriptions subject to continual automatic renewals of said subscriptions, which are charged to consumers' charge accounts, typically to credit card account and debit cards associated with bank accounts.

6.      Synapse Group enrolls its magazine customers in a negative option plan by which the customers' credit cards or bank accounts are automatically charged unless a customer is able to

cancel the subscription before the charge occurs.

7.  In one type of negative option offer made by Synapse Group, a customer accepts a subscription to a magazine for an initial term of less than one year, for example 3 months, for free or for a low introductory price. At the end of the initial term, the customer is automatically charged for an additional term of the subscription, for example 12 months more, unless a customer is able to cancel the subscription before the charge occurs.  At the end of the additional term, the subscription will be automatically renewed, typically for another 12 month period, with the customer automatically charged for the renewal and this automatic renewal will periodically continue in the future unless the customer is able to cancel their subscription.

8.  In another type of negative option offer made by Synapse Group, a customer accepts a one-year subscription to a magazine for a set price, which may be a discounted price, and at the end of the one year subscription period is automatically renewed for and automatically charged for another one-year period and so on, until and unless the customer is able to cancel their subscription.

9.  Synapse Group fails to adequately notify customers of forthcoming automatic charges for magazine subscription renewals or terms extensions, and of their options for cancelling before charges are incurred by the customers for the renewals or term extensions.

10.  Synapse Group's written notice of their forthcoming automatic renewal charges is deceptive in that it does not clearly and conspicuously notify the consumer of the automatic renewal and a customer's options for cancelling the renewals before charges are incurred.  Synapse Group's deceptive notice violates industry standards, and state consumer fraud statutes.

11.  Synapse Group provides automated telephone systems by which customers that have

subscribed to magazines through Synapse Group are directed to cancel the automatic charges, before or after they have occurred, if they so choose, but the systems are designed to unconscionably hinder cancellation by not telling a customer how to reach or transfer to a live operator, thereby resulting in unwanted and unauthorized charges to customers.

12.     Synapse Group's renewal cancellation system and practices present an improper barrier to cancellation of customers' magazine subscriptions and to cancellation of automatic renewals of customers' magazine subscriptions.

13.     Synapse Group claims it is the leading independent provider of customer acquisition and management services for publishers of consumer magazines in the United States.  Synapse Group is a wholly-owned subsidiary of Time, Inc., has over 300 full-time employees, and markets over 1,000 consumer magazine titles.  In 2000, Synapse annual magazine sales crossed 30 million subscriptions and Synapse had revenues of $268 million.  See www.synapsegroupinc.com

## PARTIES

14.     a.     Plaintiff, Charles McNair is a resident of Sussex County, New Jersey having a place of residence in Sparta, New Jersey.

          b.     Plaintiff, Theodore Austin is a resident of Washington, District of Columbia

          c.     Plaintiff, Danielle Demetriou is a resident of Middlesex County, New Jersey having a place of residence in Colonia, New Jersey.

          d.     Plaintiff Ushma Desai is a resident of Warren County, New Jersey having a place of residence in Hackettstown, New Jersey.

          e.     Plaintiff, Julie Dynko is a resident of Clinton County, New York.

15.     Defendant, Synapse Group Inc., has a principal place of business at 225 High Ridge Road, Stamford, Connecticut.

16.     Defendant, Synapse Group is a wholly owned subsidiary of Time, Inc. which is a wholly owned subsidiary of Time Warner, Inc., which has a principal place of business at One Time Warner Center, New York, NY.

17.     Defendant has had, and continues to have, significant contacts with the State of New Jersey.  Among other things, defendant does business in the State of New Jersey, has derived and continues to derive significant revenue and income from residents of the State of New Jersey.  In addition, Plaintiff McNair, Demetrious and Desai's causes of action against defendant, as alleged below, were and are related to the Company's contacts with the State of New Jersey.

## VENUE, JURISDICTION AND APPLICABLE LAW

18.     Venue is proper in this district pursuant to 28 U.S.C. §1391 because defendant, Synapse Group, provided services to Plaintiffs and Class Members located in this district, and has conducted and continues to conduct substantial business in this district.

19.     Jurisdiction is based upon diversity of citizenship pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. §1331(c) as Plaintiffs believe this is a class action in which the matter in controversy exceeds $5, 000,000 and at least one of the named Plaintiffs is a citizen of a state different from the Defendant.

20.     New Jersey has a compelling governmental interest in policing the conduct of corporations conducting business with its residents.  Accordingly, New Jersey is an appropriate choice of law for the New Jersey resident members of the Class in this multi-state class action and

Plaintiffs assert claims under the consumer fraud statutes of each Plaintiff's respective state of residence.

## PLAINTIFFS' ALLEGATIONS OF FACT

21.     The following are the factual allegations of **PLAINTIFF MCNAIR:**

a.   On August 26, 2005, plaintiff McNair accepted an offer via Synapse partner Bizrate.com to receive 1-year subscriptions "for free," paying only a $2.00 processing fee per magazine, which were *National Geographic Traveler* ("*NG-Traveler*"), *TIME*, *National Geographic Adventure* ("*NG-Adventure*") and *PC World*.

b.   Pursuant to McNair accepting the offer, Synapse enrolled McNair in its continuous service automatic renewal plan.

c.   Prior to the automatic renewal charges, Synapse mailed its deceptive standard exterior postcard notification. (Exhibit A).  McNair almost threw the postcard out due to the deceptive "Moving?" motif on its exterior since he was not moving, but did open it and then realized it related to his subscriptions.

d.   The inside of the postcard stated a toll-free number ("TFN") and a critical date before which to call Synapse's automated telephone system ("IVR") to cancel the upcoming charges before they occurred which McNair did, but the IVR presented a deceptive cancellation option to McNair and it did not cancel his upcoming automatic renewal charge despite his attempt to do so.

e.   Seeing the automatic charges then appear on his statement, on July 12, 2006 McNair again called the postcard TFN, but since he had already been charged, the IVR gave him a

different TFN handling post-charge requests.

      f. On July 12, 2006, McNair called the different TFN reaching the IVR, indicated his wish to cancel the four subscriptions, was presented with save attempts in each case which he declined. This was followed by the deceptive Do Not Renew (DNR) cancellation option for each of *TIME* and *NG-Traveler,* to which his responses resulted in a full refund for *TIME,* but no refund of the recent charge for *NG-Traveler,* for which McNair is damaged $17.95.

      g. McNair desired to speak to a live customer representative but was never informed during his IVR calls, or otherwise by Synapse, how to contact a live customer service representative.

      h. The IVRs at the telephone numbers provided to McNair by Synapse in its written notification postcard, by the postcard TFN IVR on July 12, 2006 and in the billing descriptor of his credit card statements do not audibly announce to a caller how to transfer to a live operator.

    22**.** The following are the factual allegations of **PLAINTIFF AUSTIN:**

      a. Plaintiff Austin placed an order on March 16, 2006 via Synapse online marketing partner Adteractive, for *Maxim* and *ESPN* entitling him to an initial term of the subscriptions before being automatically charged for an additional term.

      b. Synapse mailed its deceptive standard exterior postcard notification in advance of the upcoming charges. However, Austin did not open and read the postcard due to its deceptive design.

      c. Austin called the IVR and cancelled *Maxim* only 9 days after the automatic charge posted to his account, but received only a *partial* refund of $18.33 of the $20.00

charge, incurring damage of $1.67.[1]

            d.  Synapse through other deceptive practices of as well did not make cancellation easily implementable for Austin.

            e.  The IVRs called at the telephone numbers in the written notification postcard sent to Austin and the billing descriptor of his credit card statements do not audibly announce to a caller how to transfer to a live operator.

    23.  The following are the factual allegations of **PLAINTIFF DEMETRIOU:**

            a.  Plaintiff Demetriou accepted an offer for free magazines via Synapse partner Active.com on March 14, 2007, selecting *Her Sports & Fitness* (hereinafter "*Her Sports*"), *Shape*, and *Fitness*. As a result, Demetriou was enrolled in a 3-month free trial period for each magazine, to be followed by automatic charging for 12 more months and automatic charging for yearly renewals thereafter, according to Synapse's negative option plan.

            b.  Synapse mailed its deceptive standard exterior postcard notification in advance of the impending end-of-3-month charges. However, Demetriou did not open and read the postcard due to its deceptive design.

            c.  Synapse failed to notify Demetriou of the upcoming automatic charges due to its deceptive postcard, thereby causing her bank account to be debited for the renewal charges which resulted in two bank overdraft fees for which Demetriou was damaged in the amount of $70.00.

---

1 Prior to June 9, 2007, Austin noticed preauthorization charges of $2.01 each on his bank statement and a TFN in their billing descriptors 800-773-3142. On May 4, 2007, Austin called 800-773-3142 and reached the IVR. Austin asked for and allegedly received an unspecified

d.  As a result of calls made to the post-bill IVR  on June 25, 2007 by Demetriou, she received full refunds of the automatic charges for *Shape* and *Her Sports*, which posted June 27, 2007.

e.  On July 3, 2007, she called the post-bill IVR to cancel *Fitness* and was transferred to a live operator by pressing zero, which she only learned to do as a result of her own research at RipOffReport.com.

f.  On July 18, 2007 she asked Synapse to compensate her for these overdraft fees but her request was denied.

g.  The IVRs at the telephone numbers in the written notification postcard sent to Demetriou and in the billing descriptor of her bank statement did not audibly announce how to transfer to a live operator option.

24.    The following are the factual allegations of **PLAINTIFF DESAI**:

a.  Desai's two magazine orders of June 2006, which included *Maxim* and *ESPN*, were each for 3 months free, followed by an automatic charge for 12 more months, and automatic charges for yearly renewals thereafter according to Synapse's negative option plan.

b.  Before the first automatic charge after 3 months, Synapse mailed its deceptive standard exterior postcard notifications, one postcard for *ESPN, Spin, Maxim* and a separate postcard for *Vibe*.   However, Desai did not open and read the postcards due to their deceptive design.

c.  Synapse then automatically charged Desai $57.00 for 12 more months of *Maxim*

---

explanation of the preauthorization charges during the call but the upcoming full automatic charge was not cancelled.

and *ESPN*, which caused $35.00 in overdraft charges to be incurred due to the automatic charge for

*ESPN*, for a total of $92 in damages.[2]

    25.    The following are the factual allegations of **PLAINTIFF DYNKO:**

    a.    Plaintiff Dynko was charged for several magazine subscriptions by

Defendant over the past several years including Rolling Stone, Newsweek, Skateboarder, Teen

People, and Preschool Playroom magazines, which Defendant has been yearly renewing under its

automatic renewal program by charging Plaintiff Dynko's Discover credit card account.

    b.  At least three Synapse orders were processed for Plaintiff Dynko which resulted

in damages due to Synapse's failure to provide advance notification of automatic charges by using

its deceptive standard exterior postcard notification.[3]

    c.  Only in 2005 did Dynko learn, by chance, that the standard deceptive postcards

contained, on the inside, information regarding automatic renewal and cancellation of her magazine

subscriptions. Dynko did not open and read Synapse's deceptive standard exterior postcard

notification previously due to their deceptive design.  Had Dynko been properly notified of

upcoming automatic charges she would have cancelled the prior automatic renewals of *Family*

---

2  Desai noticed these charges on her online back statements which did not show the TFNs shown in the print version of her bank statements. After seeing these charges appear, Desai, who was not notified as to how to obtain refunds for these charges due to Synapses deceptive practices, attempted to cancel and get refunds via the magazine publishers, which was not successful.
3  Plaintiff Dynko placed an order (no. 107721015) through Synapse partner FreeLotto on July 3, 2000 for Sesame Street, Family Circle, Family Money, and Family PC. Dynko's subscription for Family Circle was automatically renewed for 6 years and her credit card was charged in each instance.  On December 19, 2002, Dynko placed an order (no. 232192515) through Synapse's website MagazineOutlet.com for Electronic Gaming Monthly, Preschool Playroom[PP#1] and Budget Living. These were automatically renewed each year until they were fully cancelled for a *pro rata* refund on September 3, 2005. On January 27, 2003, Synapse's partner Bizrate.com processed an additional order naming Dynko (no. 236902825) for Preschool Playroom[PP#2].

*Circle*, *Electronic Gaming Monthly*, *Preschool Playroom*[(PP#1)], *Budget Living* and *Preschool Playroom*[(PP#2)] orders and not been damaged in the amounts of the prior renewal charges which included $19.98 for *Family Circle* posted May 5, 2004 to Dynko's Discover card and $19.98 for *Family Circle* posted May 6, 2003 to the card.

## GENERAL ALLEGATIONS

26.    Synapse Group made uniform misrepresentations to and engaged in unconscionable commercial and deceptive practices with Class Representatives through the written misrepresentations and material omissions of its postcards to Class Representatives which were designed to mislead members of the Class, and via its unconscionable and deceptive automated telephone subscription renewal cancellation system, which does not tell customers how to reach or transfer to a live operator, thereby hindering renewal cancellation.

27.    Hundreds of complaints on the Internet, including complaints on the RipOff Report.com, BadBusinessBureau.com, FullthrottleV6.com and the FTC website (Federal Trade Commission) refer to these deceptive practices (see Exhibit B – annexed Internet complaints).

28.    The Better Business Bureau of Connecticut reports on August 2, 2007, that the Bureau of this state alone processed a total of 238 complaints about the company in the last 36 months (See Exhibit B – annexed Online Report).  Significantly, Synapse Group goes under multiple additional DBA (doing business as) names that make it difficult for consumers to find and report complaints about it.  TWX Magazines, for example, is listed as a DBA for Newsub Magazine Services LLC which in turn lists Synapse Group as a DBA. Synapse Group, Inc.'s website, in turn, lists Newsub Magazine Services LLC as a division.

29.     Synapse Group uses its multiple DBAs and divisions to confuse and deceive consumers.  Initial magazine offers may be made by a number of possible DBAs or divisions.  A subsequent postcard notification of an automatic renewal may have a return address from SynapseConnect, Inc. while the billing descriptor for the charge on the credit card may be from TWX, the Time Warner Inc. stock ticker symbol .

30.     These uniform misrepresentations and unconscionable commercial and deceptive practices in its automatic renewals violate standards of practice that have been followed by the defendant's own parent Time, Inc. and its own professional organization, the Magazine Publishers of America ("MPA").  These unconscionable commericial and deceptive practices and violations of industry standards are in turn violations of federal law and state consumer fraud statutes.

**Defendant Violated Standards for Notice of Automatic Renewals of  its Parent Time, Inc.'s Assurance of Discontinuance with Attorneys General**

31.     In response to an investigation of Time Inc.'s magazine automatic renewal business practices by Attorneys General or consumer protection Offices of the States of Alaska, California, Delaware, Florida, Hawaii, Illinois, Iowa, Maine, Maryland, Michigan, Missouri, Nevada, New Jersey, New Mexico, New York, Ohio, Oregon, Pennsylvania, Tennessee, Texas, Virginia, West Virginia and Wisconsin (collectively, "Participating States"),  Time, Inc. entered into an Assurance of Voluntary Compliance or Discontinuance ("the Assurance;" Exhibit C), believed to have been fully executed March 2, 2006 with the Participating States regarding Time Inc.'s magazine subscription practices.

32.     Pursuant to Section 4, paragraph no. 9 of the Assurance (Exhibit C, page 7), wholly owned United States subsidiaries of Time Inc. as of the date of the Assurance, among other entities,

are included within the definition of Time Inc. and are parties to the Assurance.

33.     The Assurance pertains to all magazine titles for which Time, Inc. and its qualifying subsidiaries provided automatic subscription renewal services during the class period.

34.     Defendant Synapse Group, Inc. became a wholly owned United States subsidiary of Time, Inc. in April 2006.

35.     Since Defendant Synapse Group, Inc. became a wholly owned United States subsidiary of Time, Inc. in April 2006, Defendant is not party to the Assurance.

36.     On information and belief, Time, Inc. and Synapse Group manipulated the timing of Defendant's full acquisition by its parent Time, Inc. in order to avoid compliance by Defendant with the standards of fair dealing and ethical business practice set forth in the Assurance.

37.     Nonetheless, on information and belief, Defendant Synapse Group has been aware of the standards set forth in the Assurance both before and after Defendant's full acquisition by its parent Time, Inc.

38.     The Assurance provides and instructs on objective criteria and standards pertaining to whether Defendant's magazine subscription business practices including without limitation Defendant's automatic subscription renewal practices are unconscionable, deceptive and misleading in violation of this State's and the other Participating States' consumer protection laws and generally.

39.     Defendant knowingly violated the objective standards of fair dealing and ethical business practice set forth in the Assurance during the class period.

40.     In Sections V.1.A(5) and (6) of the Assurance under heading "Automatic Renewal"

(Exhibit C, pages 12 and 13), the agreed to assurances of Time Inc. regarding **the sending of written reminder notices** to Automatic Renewal Customers are set forth.

41.     Section V.1.A(6) of the Assurance (Exhibit C, page 13) specifically provides that: "For a period of five (5) years from the Implementation Date of this Assurance, the notices described in Paragraph 5, above shall: (A.) **Clearly and Conspicuously** remind the Customer that he or she is an Automatic Renewal Customer, in type larger and more prominent than the predominant type in the notice, with a **Clear and Conspicuous** explanation that the subscription is being automatically renewed appearing on the first page on the notice; (B.) **Clearly and Conspicuously** restate the "Automatic Renewal Offer Terms;" and (C.) For Automatic Renewal Customers whose terms are shorter than one (1) year, Time shall send a written reminder notice at least thirty (30) days before and not more than sixty (60) days before the end of the first two (2) terms of the subscription.

42.     "**Clearly and Conspicuously**" is defined in Section IV. paragraph no. 4 of the Assurance (Exhibit C, page 6) and requires, inter alia, that a subject statement or communication, whether written or oral is "readily understandable, noticeable and readable."

43.  Defendant's notices do not comply with the standards for "clear and conspicuously."

**Defendant's Deceptive Automatic Renewal Postcard Notice**

44.     Each of Plaintiffs McNair, Austin, Demetriou,  Desai and Dynko were sent a written renewal notice by Defendant in the form of a postcard, but said postcard(s) were, in violation of the standards of the Assurance, designed to not clearly and conspicuously communicate and were, instead, designed to **not** notify customers of their option to cancel a forthcoming renewal or

14

extension charge before the charge would be made.

45.    The postcards referred to in the previous paragraph were misleadingly designed to appear to be change-of-address cards only and/or presented misleading statements leading an Automatic Renewal Customer (a customer enrolled in Defendant's negative option magazine program) in receipt of the postcard to believe that the postcard received was not, itself, the notification that would alert the customer to the options for cancellation of forthcoming automatic charges in connection with their magazine subscription(s).

46.    The postcard shown in Exhibit A is typical of the advance-of-charge notification postcards that are sent to customers by Defendant particularly with respect to its exterior.  These postcards also do not provide notification of or indicate any mail-in cancellation option or any online cancellation option.

47.    Plaintiffs Austin, Demetriou, Desai and Dynko were not adequately notified of their forthcoming automatic subscription charges and options for cancelling the same by the postcards sent by Defendant.  Plaintiff McNair almost threw out the postcard he received, but did open it. Plaintiff Dynko was not adequately notified by Defendant's "standard exterior" notification postcards until, at one point, after years of unwittingly having been a customer Synapse, she discovered that the non-descript postcards sent by Defendant actually contained material information on their inside panels.

48.    The vast number and majority of Defendant's magazine customers who are sent advance notifications of forthcoming automatic charges by Defendant are sent a notification in the form of a postcard that neither adequately notifies of the terms of their forthcoming automatic

charges for subscription renewals or extensions, nor of their options to cancel said renewals or extensions before the charges occur.

49.  Indeed, the vast number and majority of Defendant's magazine customers who are sent advance notifications of forthcoming automatic charges by Defendant are sent a postcard having a standard exterior characterized by certain uniform written statements and uniform graphical icons and further characterized by the uniform omission of certain identifying text.  This is referred to as the "standard exterior" postcard herein.  The uniform exterior features of the standard exterior postcard are designed to cause the postcard to be ignored, rather than to be noticed.

50.  An example of the exterior of Defendant's "standard exterior" postcard, specifically that which was sent to Plaintiffs appears immediately below (and as pages 3 and 4 of Exhibit A).



**Front Exterior Panel of Standard Exterior Postcard (above)**

**Back Exterior Panel of Standard Exterior Postcard (above)**

51.  Each of the Plaintiffs was sent a standard exterior postcard of this sort as the ostensible advance notification of a forthcoming automatic charge for their magazine subscriptions.

52.   The standard exterior postcards are folded having two outer facing sides (the exterior) and two inner facing sides and are sealed so the inside panels of the card can only be viewed by breaking the seal and unfolding the card.  With reference to the postcard of Exhibit A, the outer facing sides are those with the customer's mailing address and those printed with the moving truck icon adjacent to the prominently printed text "Moving?."  The inner facing sides of the postcards are only readable by unfolding, i.e., opening, the postcards.

53.   As shown above and in Exhibit A, the most prominent features of the outer facing

17

side of postcards sent by Defendant which is opposite the side printed with the customer's mailing

address are a large moving-truck icon accompanying prominent lettering "Moving" and lines for

entry of a customer's new address in the event their address has changed or is changing, said

features appearing on the right-half of the subject outer-facing side of the postcard.

54.     The moving-related postcard features described in the preceding paragraph misleads

customers into believing, and deceptively suggests, that the postcard relates to changes of address

that a customer may desire to make.  If a customer is not in the process of moving, they are likely to

toss the card into the trash immediately.

55.     The written statements appearing on the Back Exterior Panel of the Standard

Exterior, are misleading, deceptive and/or comprise at least one or more misrepresentations in that

said statements suggest that the postcard itself is not the notification providing instructions for

cancelling forthcoming automatic magazine renewals when, in fact it is, thereby dissuading a

customer from opening the postcard to read and scrutinize the text printed, in small type, on the

interior-facing sides of the postcard which concern renewals and cancellation thereof.

56.     The  misleading, deceptive and/or misrepresentative written statements and

presentation referred to in the preceding paragraph as appearing on an outer face of the postcards

sent to class members, as shown by Exhibit A, include the following statements in the same

paragraph: "[w]e guarantee to send you advance notice every year about your next

continuous-service subscription period and rates;" "[w]e will send a notice that spells out: your rate,

your number of issues and when your credit card will be charged;" and  "[i]f you don't wish to

continue, you can simply cancel before your new term begins."  These statements clearly suggest to

a customer that the subject postcard is not the renewal notification referred to on the postcard itself, which is a violation of the standards of the Assurance.

57.     In addition to the misleading features and statements on the left side and right side of the Back Exterior Panel of the Standard Exterior (e.g., the side of the postcard opposite the customer address), the combination of said features and statements is even more misleading, deceptive and misrepresentative than either taken alone.

58.     In addition, there is no conspicuous indication or notice whatsoever on the outer facing sides of the renewal postcards sent by Defendant that indicate that the recipient is an Automatic Renewal Customer or that a forthcoming magazine renewal or term extension is upcoming and that action must be taken if it is desired to cancel the forthcoming renewal or extension.  This lack of indication on the outer facing side of the automatic renewal notification postcards is in violation of the standards set forth in Section V.I.A.(6)A. of the Assurance (Exhibit C, page 13) which provides that "[f]or a period of five (5) years from the Implementation Date of this Assurance, the reminder notices described in Paragraph 5, above shall:  A.  Clearly and Conspicuously remind the Customer that he or she is an Automatic Renewal Customer, in type larger and more prominent than the predominant type in the notice, with a Clear and Conspicuous explanation that the subscription is being automatically renewed appearing on the first page of the notice ."

59.     The number and proportion of Automatic Renewal Customers of Defendant who call Defendant's automated telephone system indicating a desire to cancel their subscription(s) AFTER a renewal charge has appeared on their credit card or bank statement using the telephone

number provided on the corresponding statement is so vastly greater than those calling in to cancel from the telephone number listed inside automatic renewal notification postcards sent to customers by Defendant, as to independently verify the inadequacy of written notification provided by the standard exterior postcards sent by Defendant and as well as to confirm the misleading, deceptive and misrepresentative nature of the postcards sent by Defendant.

60.    Defendant's deceptive advance notification practices in connection with automatically charging for magazine subscriptions are in violation of the standards set forth in the Assurance as discussed herein and, as such, are clearly in violation of the consumer protection statutes of this State and the other Participating States.

61.    Defendant fails to provide a mail-in option for cancellation of customers' forthcoming automatic magazine subscription renewals.

62.    In the alternative, even if Defendant provides a mail-in option for cancellation of customers' forthcoming automatic magazine subscription renewals, said option is not communicated at all in, or is not clearly and conspicuously communicated in, the  standard exterior notification postcards sent  by Defendant.

63.    Defendant fails to provide a mail-in option for customers to cancel forthcoming automatic subscription renewals because printed text-based mail-in options would remove much of the intentional ambiguity, lack of clarity and opportunity for deception and misrepresentation that is present in Defendant's automated telephone system.

**Defendant's Deceptive Automated Telephone Cancellation System (IVR)**

64.    On information and belief, Synapse Group uniformly fails to provide a clear and

unambiguous option for consumers to cancel magazine subscriptions that have been automatically renewed and charged to consumer's credit cards pursuant to Synapse Group's subscription renewal programs.

65.     The vast number and majority of telephone numbers provided to customers who are sent a standard exterior postcard as the ostensible notification for a forthcoming automatic charge (either in the inside of postcard or in the billing descriptor for the charge) <u>do not announce whatsoever to the caller how the caller can transfer to a live person during the call or otherwise contact a live customer service representative.  This is an unfair, unconscionable commercial practice that violates industry standards and hinders renewal cancellations.</u>

**Violations of the FTC Act, the Negative Option**
**<u>Rule and Magazine Publishing Industry Standards</u>**

66.     The FTC Act, 15 U.S.C. §45, prohibits unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce. The Defendant, by automatically renewing magazine subscriptions without clear and conspicuous notice and/or through the use of a deceptive "IVR", automated telephone cancellation system, WITH NO AUDIBLE LIVE OPERATOR OPTION, violated the FTC Act.

67.     The Negative Option Rule, 16 C.F.R. 425, promulgated by the FTC regulates sellers of merchandise that operate negative option plans.  A negative option plan is defined by the Rule as "a contractual plan or arrangement under which a seller periodically sends to subscribers an announcement which identifies merchandise (other than annual supplements to previously acquired

merchandise) it proposes to send to subscribers to such plan, and the subscribers thereafter receive and are billed for the merchandise identified in each such announcement, unless by a date or within a time specified by the seller with respect to each such announcement the subscribers, in conformity with the provisions of such plan, instruct the seller not to send the identified merchandise."

68.     The Negative Option Rule requires that a seller, prior to sending any selection of merchandise to a negative option plan subscriber, send a form to the subscriber that the subscriber can use to reject the merchandise offered for sale.

69.     Specifically, the Negative Option Rule contains the following provision, Sec. 425.1 (a)(2): "Prior to sending any selection, the seller shall mail to its subscribers, within the time specified by paragraph (a)(3) of this section: (ii) A form, contained in or accompanying the announcement, **clearly and conspicuously disclosing** that the subscriber will receive the selection identified in the announcement unless he instructs the seller that he does not want the selection, designating a procedure by which the form may be used for the purpose of enabling the subscriber to so instruct the seller, and specifying the return date or the mailing date.

70.     The Magazine Publishers of America ("MPA") in their Comment P064202 to the FTC's "Negative Options Marketing Workshop of January 25, 2007 (Exhibit D), stated the following: "Publishers using advance consent plans (e.g. automatic renewal plans and free trial offers) should:

- **provide clear and conspicuous disclosure of all material terms** – a standard articulated throughout the MPA educational guide
- have fully disclosed and easily implemented cancellation procedures

- ensure that consumers have given affirmative consent to the plans

71.     The MPA Comment continues, "To ensure that consumers can cancel a subscription easily, the guide recommends:

(1)  for good customer service, a toll-free telephone number for telephone cancellations should be available for subscriptions solicited by mail or telephone; telephone numbers should be adequately staffed during reasonable hours; telephone cancellations can be processed through recorded messages if effective and prompt; and when the telephone number is not manned by operators or cancellation processing equipment, a recorded message should state when the number will be staffed,…

(3)  while sellers may attempt to encourage subscribers not to cancel,  cancellation procedures should not be unreasonably difficult, and

(4)  Refunds, where appropriate, should be processed and issued promptly."

72.     The MPA Comment continues:  "In addition to the **clear and conspicuous disclosure of material terms** – accompanied by fully disclosed and **easily implemented cancellation procedures**, the MPA educational guide provides guidance on how to ensure that consumers have given their affirmative advance consent to an automatic renewal or free trial offer.  The MPA guide recommends that the consumer should take an action demonstrating that he understands and agrees to the terms of the offer, such as checking a box, returning an order form, or pushing a number on a telephone keypad or a key on a computer keyboard, following the disclosure of the material terms of the offer."

73.     The Defendant by automatically renewing magazine subscriptions without clear and

conspicuous notice violated the Negative Option Rule and its own MPA guidelines. In addition, the Defendant by automatically renewing magazine subscriptions through the use of an unconscionable, deceptive IVR or automated telephone cancellation system WITH NO AUDIBLE LIVE OPERATOR OPTION violated its own MPA guidelines.

74.    Defendant's deceptive and unconscionable notification and cancellation practices are violations of the Negative Option Rule, which are in turn violations of the FTC Act, are further in violation of the standards set forth by its own industry association, the Magazine Publishers of America, and are in violation of the standards set forth for it's parent Time, Inc. in Time's Assurance of Discontinuance with the Attorneys General of 23 states (*including* the States of New Jersey, New York and District of Columbia), an agreement which as a matter of timing fortuitously does not apply to the Defendant, but of no doubt which the Defendant has been aware.

## CLASS ACTION ALLEGATIONS

75.    This action is brought and may properly proceed as a class action, pursuant to the provisions of F.R.C.P. 23. Plaintiffs bring this action on behalf of themselves and all others similarly situated and are seeking certification of the following proposed Class and subclasses pursuant to F.R.C.P 23(a)(1)-(4) and 23(b)(2). The proposed Class is defined as follows:

> From October 23, 2000 to the date of the order certifying the class, all persons residing in New Jersey, New York and the District of Columbia who are or will be magazine subscription customers of Synapse and will be sent in the future Defendant's "standard exterior" postcard as the advance notification of an automatic charge for an additional term or renewal of their subscription(s). Excluded from the class are Defendant, its agents and affiliates, and any government entities.

76.    Thus, the proposed Class is directed to Defendant's magazine customers who will be sent Defendant's standard exterior postcard as the ostensible advance notification of a forthcoming

automatic charge.  To be clear, Plaintiffs are asking for the certification of 3 separate classes:  a class

of New Jersey residents to which New Jersey law shall apply; a class of New York residents to

which New York shall apply; and a class of District of Columbia residents to which District of

Columbia law shall apply.  To wit, the respective laws of the three jurisdictions will similarly apply

to their residents with respect to the proposed subclasses.

77.     Plaintiffs also propose a subclass for certification which is directed to Defendant's

unconscionable commercial and deceptive cancellation practices in connection with its automated

telephone system (interactive voice recognition system; IVR)

> Proposed Sub-Class Definition– No Audible Live Operator Option on IVR:
>
> Members of the Class for whom their postcard notification and/or billing descriptor on their
> credit card or bank statement provide a telephone number to an IVR that does not audibly
> announce how to transfer to a live operator.

78.     This action is properly maintainable as a class action.  The class for whose benefit

this action is brought is so numerous and geographically dispersed that joinder of all members is

impracticable, and the disposition of their claims in a class action will provide substantial benefits

to both the parties and the Court.  Indeed, each year during the class period, millions of persons were

enrolled in Defendant's negative option magazine subscription plan.  The numerosity requirement

of F.R.C.P. 23(a)(1) is therefore satisfied.

79.     A class action is superior to other methods for the fair and efficient adjudication of

the claims herein asserted, and no unusual difficulties are likely to be encountered in the

management of this class action.  Since the damages suffered by individual class members may be

relatively small, the expense and burden of individual litigation makes it impossible for members

of the Class to individually seek redress for the wrongful conduct alleged.

80.    Rule 23(a)(2) is satisfied because there are questions of law and fact which are common to the Class.  The common questions include, *inter alia*, the following:

a.  Whether Defendant Synapse Group's "standard exterior" notification postcard is deceptive and whether its use is a deceptive practice under each of the consumer fraud statutes of New Jersey, New York and District of Columbia.

b. Whether Defendant Synapse Group fraudulently and deceptively misleads magazine subscribers into renewing their subscriptions;

c.  Whether Defendant Synapse Group erects improper barriers including a deceptive notification postcard and the unconscionable commercial practice of the lack of  an audible live operator option in its IVR that impede the  cancellation of magazine subscription renewals by customers;

d.  Whether Defendant Synapse Group fails to provide adequate notice to automatic subscription renewal customers in advance of their subscription renewals charges;

e.  Whether the use of Defendant Synapse Group's "standard exterior" postcard notification and the failure to inform customers how to contact a live person in the IVR system, are unconscionable commercial and deceptive acts and practices that impede cancellations.

g.  Whether Defendant Synapse Group was aware of industry and other standards of fair dealing and ethical business practices in connection with purveying magazine subscriptions but nevertheless failed to conduct its business according to said standards and practices;

81.    F.R.C.P. 23(a)(3) is satisfied because Plaintiffs are asserting claims that are typical

26

of the claims of the entire Class. Indeed, Plaintiffs' claims and the claims of members of the Class all derive from a common nucleus of operative fact, namely, Plaintiffs became magazine subscribers under Defendant's negative option plan and were sent Defendant's "standard exterior" notification postcard as the advance notification of a forthcoming charge.  Further, with respect to the subclass, both the pre-bill and post-bill IVRs provided for them did not audibly announce how a live operator could be reached.

82.     In satisfaction of 23(a)(4), Plaintiffs are asserting claims that are typical of the claims of the entire Class, and Plaintiffs will fairly and adequately represent and protect the interests of the Class in that they have no interests that are antagonistic to those of the other members of the Class.  Plaintiffs anticipate no difficulty in the management of this litigation as a class action. Plaintiffs have retained counsel who are competent and experienced in the prosecution of class action litigation.

83.     In connection with F.R.C.P. 23(b)(2), Defendant has acted or refused to act on grounds generally applicable to the Class and subclass by use of its "standard exterior" notification postcard and IVR unconscionable practice of no audible live operator option, making appropriate injunctive and/or declaratory relief with respect to the Class as a whole.

84.     Each of the named Plaintiffs has standing to seek injunctive relief since they are likely to become magazine customers of Defendant in the future, for the following reasons:

(a) Plaintiffs demonstrated that they are consumers of magazine subscriptions.  Indeed each of the plaintiffs has ordered more than one subscription, i.e., for different magazines, from Synapse and was enrolled in Synapse's negative option plan;

(b) Synapse is the leading third-party purveyor of magazine subscriptions in the U.S. and bombards the public with its offers through multiple channels such as the Internet, in credit card statements, in retail stores, and in-flight (air travel);

(c) Synapse's market dominance is underscored by the monopoly it holds for purveying negative option subscriptions of publishers' titles by way of its U.S. Patent No. 6,014,641;

(d) Synapse's offers are compelling propositions as evidenced by the Plaintiffs' own acceptance of these offers (even on more than one occasion) and the *tens of millions* of acceptances of such offers by the public;

(e) as previously set forth by Plaintiffs, Synapse, if it identifies itself at all in these offers, does so in the fine-print and later also seeks to suppress its identity by failing to state its name in the billing descriptors for customer billings and failing to do so during IVR calls; thus, it is quite likely that a Plaintiff who may no longer be a customer of Synapse will again become a customer, even unwittingly;

(f)  Defendant's deceptive standard exterior postcard is designed to look like junk mail and will continue to be treated as such by Plaintiffs who do not have a duty of hyper-vigilence;

(g) The capable-of-repetition doctrine of *Spencer v. Kemna*, 523 U.S. 1, 17, 118 S. Ct. 978, 140 L. Ed. 2d 43 (1998) clearly applies in support of Plaintiffs standing because (i.) Plaintiffs are not only capable of being, but likely to be, affected again for the reasons set forth above and (ii.) since the term of a subscription purveyed by Synapse is shorter than the course of a typical litigation, including this one, a plaintiff should not be required to allow themselves to be continually billed for unwanted renewals either before or during the course of the litigation merely for standing purposes.

Underscoring the capability of the repetition, Plaintiff Austin was again charged by Synapse on November 20, 2008 and Plaintiff Dynko was also charged again by Synapse during the course of this litigation. The instant situation is also exceptional given that *tens of millions* of consumers are being subjected to the Defendant's deceptive business practices.

85.     Notice of pendency of this action can be given either by publication and/or over the Internet.

<u>**FIRST COUNT**</u>
**Violations of the New Jersey Consumer Fraud Act - N.J.S.A. 56:8-1 et seq**

86.     Plaintiffs hereby incorporate by reference each of the preceding allegations as though fully set forth herein.

87.     As to the New Jersey resident Plaintiffs, Synapse Group engaged in unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, and/or the knowing, concealment, suppression, or omission of material facts with intent that others rely upon such concealment, suppression or omission, in its interactions with Plaintiffs and will as to all others similarly situated in violation of the New Jersey Consumer Fraud Act.

88.     Plaintiffs suffered an ascertainable loss when they were automatically charged by the defendant for an automatic renewal or additional terms of their magazine subscription(s) and did not obtain a full refund or incurred bank overdraft fees as a result of the automatic charges.

89.     Plaintiffs were subjected to the unconscionable commercial and deceptive practices, misrepresentations and/or omissions made by the defendant through its uniform "standard exterior" postcards and IVR with no audible live operator option which violated this state consumer fraud

statute.  Defendant's postcards and automated telephone system were deceptive and/or conveyed

false and misleading statements and/or concealed, suppressed or omitted material information

and/or were unconscionable commercial practices.

90.      By virtue thereof, the Plaintiffs, the New Jersey Class and subclass members are

entitled to injunctive relief under the NJCFA to prevent the continuation of Defendant's

unconscionable commercial and deceptive business practices and to the costs and attorney's fees of

this litigation, which is hereby requested.

91.      **Wherefore, as a result of Synapse Group's violations of the New Jersey**

**Consumer Fraud Act, the individual Plaintiffs have suffered ascertainable losses and**

**monetary damages in an amount to be determined upon trial, which they hereby seek to**

**recover.**


## SECOND COUNT
### Violations of New York General Business Law §§ 349 and 350

92.      Plaintiffs hereby incorporate by reference each of the preceding allegations as

though fully set forth herein.

93.      As to the New York resident Plaintiffs, Synapse Group engaged in unlawful

deceptive acts and practices by use of its "standard exterior" notification postcard and deceptive

automated telephone system, in its interactions with Plaintiffs and will as to all others similarly

situated in violation of New York General Business Law §§ 349 and 350.

94.      Plaintiffs suffered an ascertainable loss when they were automatically charged by the

defendant for an automatic renewal or additional terms of their magazine subscription(s) and did

not later obtain a full refund.

95.     Plaintiffs and all members of the Class were or will be subjected to the unconscionable commercial and deceptive practices, misrepresentations and/or omissions made by the defendant through its uniform "standard exterior" postcards and IVR with no audible live operator option which violates this state consumer fraud statute.  Defendant's postcards and automated telephone system are unconscionable, deceptive and/or conveyed false and misleading statements and/or concealed, suppressed or omitted material information.

96.     By virtue thereof, the Plaintiffs, the New York Class and subclass members are entitled to injunctive relief under the New York General Business Law consumer fraud statute to prevent the continuation of Defendant's unconscionable and deceptive business practices and to the costs and attorney's fees of this litigation which is hereby requested.

**97.     Wherefore, as a result of Synapse Group's violations of the New York General Business Law, the individual New York Plaintiff has suffered ascertainable losses and monetary damages in an amount to be determined upon trial, which she hereby seeks to recover.**

### THIRD COUNT
**Violations of District of Columbia Consumer Protection Procedures Act (DCCPA)**
**D.C. Code Ann. §28-3901**

98.     Plaintiffs hereby incorporate by reference each of the preceding allegations as though fully set forth herein.

99.     As to the District of Columbia resident Class and subclass members, Synapse Group made misrepresentations as to material facts which had a tendency to mislead and failed to state material facts wherein the failure had a tendency to mislead, by use of its "standard exterior" notification postcard and unconscionable and deceptive automated telephone system in its interactions with Plaintiffs and will make as to all others similarly situated in violation of D.C. Code Ann. §28-3901.

100.    Plaintiffs suffered an ascertainable loss when they were automatically charged by the defendant for an automatic renewal or additional terms of their magazine subscription(s) and did not obtain a full refund.

101.    Plaintiffs and all members of the Class were or will be subjected to the unconscionable and deceptive practices, misrepresentations and/or omissions made by the defendant through its uniform "standard exterior" postcards and IVR with no audible live operator option which violated this state consumer fraud statute.  Defendant's postcards and automated telephone system are unconscionable, deceptive and/or conveyed false and misleading statements and/or concealed, suppressed or omitted material information.

102.    By virtue thereof, the Plaintiffs, the District of Columbia Class and subclass members are entitled to injunctive relief under the Washington D.C. Consumer Protection Procedures Act, to prevent the continuation of Defendant's deceptive business practices and to the costs and attorney's fees of this litigation which is hereby requested.

**103.    Wherefore, as a result of Synapse Group's violation of the Washington D.C. Consumer Protection Procedures Act, the individual D.C. Plaintiff has suffered ascertainable**

**losses and monetary damages in an amount to be determined upon trial, which he hereby**

**seeks to recover.**

## FOURTH COUNT
### Equitable Relief

104.    Plaintiffs hereby incorporate by reference each of the preceding allegations as though fully set forth herein.

105.    Plaintiffs and the Class and subclass members seek Injunctive Relief, enjoining the Defendant from continuing use of the following unconscionable deceptive practices in its negative option magazine subscription programs:

        a. the "standard exterior" notification postcard and each of the deceptive features that characterize it;

        b. the  IVR unconscionable commercial practice of having not audibly announcing how to transfer to a live operator; and,

        c. other equitable relief as this Court may deem appropriate.

106.    Plaintiffs and Class and subclass members have no adequate remedy at law.

107.    By virtue thereof, the Class and subclass members are entitled to injunctive relief.

## FIFTH COUNT
### Declaratory Relief

108.    Plaintiffs hereby incorporate by reference each of the preceding allegations as though fully set forth herein.

109.    Plaintiffs and Class members seek Declaratory Relief declaring that:

      a.     use by the Defendant of the "standard exterior" notification postcards is a deceptive act and practice and that use of each of the particular features of postcard asserted herein as deceptive, misleading and unconscionable is a deceptive act and practice;

      b.     lack of an audible live operator option in the Defendant's IVRs is an unconscionable commercial and deceptive act and practice; and,

      c.     automatic renewals obtained in the future using these practices are null and void.

**WHEREFORE,** Plaintiffs, on behalf of themselves and the members of the Class, demand judgment as follows:

(a) A determination that this action is a proper class action maintainable under Federal Rules of Civil Procedure, Rule 23, particularly Rule 23(b)(2), and certifying an appropriate Class and/or Subclass(es) and certifying Plaintiffs as Class and Subclass representatives;

(b) Equitable and injunctive relief enjoining Synapse Group and affiliates from pursuing the policies, acts and practices described in this Complaint; and

**(c)  Monetary damages for the individual plaintiffs only, who suffered ascertainable losses each incurred individually and other monetary damages to which each may be individually entitled as a result of Synapse Group's violations of the applicable Consumer Fraud Acts including the New Jersey Consumer Fraud Act, the New York General Business Law, and the Washington D.C. Consumer Protection Procedures Act;**

(d) For a declaratory judgment declaring the subscription renewals that use the "standard

exterior" postcard unenforceable and setting them aside.

(e) The costs and disbursements incurred by Plaintiff in connection with this action, including reasonable attorneys' fees and expert fees; and

(f)  Such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury.

Dated: December 31, 2009      **KANTROWITZ, GOLDHAMER & GRAIFMAN**

                          **By:  s/ Gary S. Graifman**
                                **GARY S. GRAIFMAN, ESQ.**
                                210 Summit Avenue
                                Montvale, New Jersey 07645
                                Tel: (201) 391-7000
                                Fax:(201) 307-1086

Dated: December 31, 2009      **GREEN & PAGANO, LLP**

                          **By: s/ Michael S. Green**
                                  **MICHAEL S. GREEN, ESQ.**
                                522 Route 18, P.O. Box 428
                                East Brunswick, New Jersey 08816
                                Tel: (732) 390-0480
                                Fax: (732) 390-0481

Dated: December 31, 2009      **DIAMOND LAW OFFICE, LLC**

                          **By: s/ Paul Diamond**
                                  **PAUL DIAMOND, ESQ.**
                                1605 John Street, Suite 102
                                Fort Lee, New Jersey 07024
                                Tel: (201) 242-1110
                                Fax: (973) 302-8189

                        **PLAINTIFFS' COUNSEL**