# Exhibit D

**FEDERAL TRADE COMMISSION**

**"NEGATIVE OPTIONS:
AN FTC WORKSHOP ANALYZING NEGATIVE OPTION MARKETING"
JANUARY 25, 2007
WASHINGTON, DC**

**Negative Option Workshop - Comment P064202**



**COMMENTS OF
MAGAZINE PUBLISHERS OF AMERICA**

The Magazine Publishers of America (MPA), the national association for consumer magazines, is pleased to comment on the issue of negative option or "advance consent" marketing and on the Federal Trade Commission (FTC)'s January 25, 2007 workshop, *Negative Options: An FTC Workshop Analyzing Negative Option Marketing*. MPA, established in 1919, represents hundreds of domestic publishing companies, international publishers, and associate members. MPA members publish well over a thousand different titles, including some of the nation's best-known and most loved magazines. Our diverse membership also includes publishers of many small, regional, and niche titles serving very diverse communities and interests. On behalf of our member companies, we thank the Commission for the opportunity to comment on the proceedings and provide information on the magazine industry's use of advance consent marketing offers and our educational guidance for publishers.

**Executive Summary**

In these comments, we will explain the advance consent programs used by magazine publishers, discuss the benefits of these programs, and outline the education resources MPA provides to its members to help them ensure that magazine subscribers fully understand the terms and conditions of the advance

consent subscription plans whose benefits and convenience they have come to enjoy.  Finally, we will comment on the proceedings at the workshop.  MPA believes that current laws and regulations and the FTC's present guidance—including guides for both businesses and consumers—are sufficient to protect consumers using advance consent programs.  We agree with the conclusions of panelists who stated that regulation and guidance should not be overly prescriptive.  While we believe that one panelist's suggestion on free trial offers would be counterproductive, we support the three main themes of the workshop—that advance consent marketing should feature clear and conspicuous disclosure, cancellation procedures that are disclosed fully and easy to implement, and the affirmative consent of the consumer.  These concepts are also important to magazine publishers from a business perspective.  One of the main benefits magazine publishers realize from advance consent programs is the ability to build long-term relationships with loyal readers.  If a subscriber were dissatisfied with an advance consent program, the publisher would lose the very benefit it was seeking from the program.  This built-in incentive to keep the reader happy helps guide publishers as they create their marketing promotions.

**Magazines and Advance Consent Marketing**

Most magazines in the United States are sold by subscription—fully 87 percent of audited U.S. circulation in 2005.[1] As part of their subscription marketing plans, many magazine publishers offer "advance consent" programs—marketing concepts that the FTC has categorized as "negative option" marketing.  We should note that these advance consent programs are used widely outside the magazine industry, and they have become second nature for those ordering many products Americans use on a daily basis, especially and including various media.  From their daily newspapers to their cable television to their broadband Internet access, Americans have come to enjoy and expect the convenience

---

[1] Magazine Publishers of America, *The Magazine Handbook: A Comprehensive Guide 2006/07*, 11 (2006) (citing Audit Bureau of Circulation, ABC Publisher's Statements 2005).

2

advance consent programs provide. Magazine publishers employ two main types of advance consent programs: automatic renewal plans and free trial offers.[2] Both of these programs provide significant benefits to consumers, and provide a convenient and efficient method for readers to purchase their publications.

**Automatic Renewal Plans**

Not unlike the automatic billing for the daily newspaper or the credit card charge for the monthly Internet bill, many magazine readers have taken advantage of automatic renewal plans, enabling them to continue their magazine subscriptions without having to take the time to fill out a renewal order form and mail a check for every renewal period. Whether it is the morning paper, the On Demand movie, or the favorite newsmagazine, the concept is still the same: the consumer and the media provider have agreed to be in a relationship providing uninterrupted delivery of a particular service with the customer agreeing to automatic billing. There are significant advantages to these programs—for both consumers and media providers.

For consumers, automatic renewal plans guarantee uninterrupted service for as long as the reader wishes to keep receiving the magazine. The plans also simplify the renewal process and reduce the number of renewal notices the consumer receives. If the consumer is enjoying the magazine, the renewal process is quick and easy. The consumer merely reads the reminder notice the publisher provides and makes sure she is satisfied with the terms of the renewal. With consumers facing long work hours and hectic schedules, the ease and convenience of having a simple renewal process is a tremendous benefit.

For publishers, automatic renewal plans provide streamlined procedures at reduced cost. The cost of creating and mailing multiple renewal notices and

---

[2] Some magazine publishers also engage in continuity programs for books and audio-visual offerings.

processing payment checks is substantial. In addition, when subscriptions are interrupted, publishers must modify their mailing lists, and once the subscription is restarted, they usually mail out missed copies in a separate, expensive mailing. With automatic renewal, publishers realize substantial savings, enabling them to keep magazine prices affordable. Perhaps more importantly, automatic renewal plans offer publishers an excellent opportunity to build long-term relationships with loyal readers.

These benefits to both consumers and publishers have resulted in a growth in the use of automatic renewal. Both new subscribers and existing customers have chosen to take advantage of these plans. In fact, we estimate that automatic renewal now accounts for approximately eight to ten percent of total subscriptions, and that percentage is growing.

**The Free Trial**

The free trial is another advance consent marketing program used by many media, including magazines. A popular practice for many years, in a free trial, consumers are allowed to try a magazine for a trial period, which can be several weeks in the case of weekly magazines or several months for monthly publications. If a reader enjoys the magazine and wants to keep receiving it, he continues with the agreed-upon subscription. On the other hand, if a reader decides she does not want the magazine, she can cancel it without having to pay anything. As is the case with automatic renewal programs, free trials have substantial benefits for both consumers and publishers.

For consumers, free trials give the reader the ability to try new magazines risk free. Whether it is a new title in a magazine category they have read for years or a completely new genre for the reader, free trials offer a convenient and cost-free way for consumers to sample magazines and discover new titles to enjoy. While consumers can sample magazines by purchasing them at retail outlets, free trials

4

allow them to take the titles for a test drive with the convenience of home delivery and without having to pay for the magazines they sample.

For publishers, free trials are beneficial because they encourage new readers to try their magazines. Consumers are more likely to try a new magazine if they can cancel without having to pay anything or buy a full subscription. Free trials are an excellent way for publishers to attract new readers. If the consumer enjoys the magazine, the publisher is likely to have a new long-term reader, and long-term readers are magazine publishers' best customers.

**Refunds**

Not only do magazine publishers have a strong desire to keep their customers happy and provide excellent customer service, they have a built-in incentive as well. One of the main benefits magazine publishers realize from advance consent programs is the ability to build long-term relationships with loyal readers. If a subscriber were dissatisfied with an advance consent program, the publisher would lose the very benefit it was seeking from the program. Thus, publishers offer important consumer protections for readers who use automatic renewal and free trial programs. Even if consumers fail to cancel before an automatic renewal date or before the end of a free trial period and receive a bill or have their credit cards charged, they can contact the magazine, cancel the subscription, and receive a refund for the remainder of the subscription period—no questions asked.

**MPA Educational Guides**

MPA provides educational guides to our members on a broad array of topics, including advance consent programs. These guides, which are available in a special members only section of the MPA website, www.magazine.org, provide information on key consumer protection considerations for both automatic

renewal and free trial programs. MPA's educational guide, *Advance Consent Subscription Plans*, makes three important points that were major themes of the Negative Options workshop:

> **Publishers using advance consent plans should:**
>
> ● **provide clear and conspicuous disclosure of all material terms—a standard articulated throughout the MPA educational guide**
> ● **have fully disclosed and easily implemented cancellation procedures**
> ● **ensure that consumers have given affirmative consent to the plans**

For automatic renewal programs, the MPA guide advises that, during the initial solicitation—in addition to describing the subscription term, price, payment method and timing—publishers should:

1) disclose the fact that the subscription will automatically continue unless the consumer notifies the publisher to stop;
2) disclose the consumer's right to cancel; and
3) provide a clear description of the cancellation procedures.

The MPA guide also recommends that publishers communicate with subscribers prior to the start of each automatic renewal term. These "reminder notices" should:

1) inform consumers that the subscription is about to be renewed for a specific term and price;
2) tell consumers they will be charged or billed the stated price unless the subscription is affirmatively cancelled; and
3) provide consumers with instructions on how to cancel -- cost free.

For free trial or free-to-pay conversion offers, the MPA guide reminds publishers to inform consumers in the initial solicitation:

1) the subscription term and price if the consumer continues the subscription;
2) that the subscription will automatically continue unless the consumer cancels;
3) that the consumer will be billed or charged after the free trial period has ended;
4) payment method and timing; and
5) how to cancel.

6

To ensure that consumers can cancel a subscription easily, the guide recommends:

1) for good customer service, a toll-free telephone number for telephone cancellations should be available for subscriptions solicited by mail or telephone; telephone numbers should be adequately staffed during reasonable business hours; telephone cancellations can be processed through recorded messages if effective and prompt; and when the telephone number is not manned by operators or cancellation processing equipment, a recorded message should state when the number will be staffed,
2) a URL address for canceling should be used alone only for subscriptions solicited electronically or when the subscriber has affirmatively consented to electronic communications from the seller through a URL address,
3) while sellers may attempt to encourage subscribers not to cancel, but cancellation procedures should not be unreasonably difficult, and
4) Refunds, where appropriate, should be processed and issued promptly.

In addition to the clear and conspicuous disclosure of material terms—accompanied by fully disclosed and easily implemented cancellation procedures, the MPA educational guide provides guidance on how to ensure that consumers have given their affirmative advance consent to an automatic renewal or free trial offer.  The MPA guide recommends that the consumer should take an action demonstrating that he understands and agrees to the terms of the offer, such as checking a box, returning an order form, or pushing a number on a telephone keypad or a key on a computer keyboard, following the disclosure of the material terms of the offer.

As will be discussed below in the context of the workshop's afternoon session, MPA's educational guide does not attempt to be overly prescriptive as to specific formats and consent mechanisms.  Publishers' marketing techniques, styles, and formats differ, and there is more than one way to make clear and conspicuous disclosures and implement affirmative consent mechanisms.

7

**Comments on Workshop Proceedings**

**Current Laws, Regulations, and FTC Guidance**

MPA believes the discussions and presentations at the workshop show clearly that the FTC already has the necessary enforcement tools to deal with false and deceptive negative option marketing offers and that the FTC has several guidance documents—both for businesses and for consumers—that explain the consumer protection considerations that businesses must take into account and that help consumers understand these types of offers.

We do not believe additional laws, regulations, or FTC guidance is necessary at this time. As FTC Staff Attorney Gregory Ashe's presentation indicated, the FTC has the enforcement tools necessary to bring enforcement actions against entities that engage in deceptive advance consent marketing, including the Federal Trade Commission Act, the Electronic Fund Transfer Act, the Negative Option Rule, and the Telemarketing Sales Rule.

In addition, the FTC provides extensive guidance for both businesses and consumers. In its business guides, *Advertising and Marketing on the Internet: Rules of the Road* and *Dot Com Disclosures: Information About Online Advertising*, the Commission provides useful guidance for Internet marketing, while its consumer information guides, including *Prenotification Negative Option Plans, Trial Offers: The Deal is in the Details, Continuity Plans: Coming to You Like Clockwork,* and *Unordered Merchandise*, cover the various types of negative option offers.

MPA also believes that the enforcement data provided by Mr. Ashe illustrated that advance consent marketing in general—and magazine advance consent marketing in particular—are not major consumer protection problems. For instance, of the 707 federal district court enforcement cases during the 1996-

8

2006 study period, only 45 involved allegedly unlawful negative option marketing. Of these 45 cases, only four involved books or magazines.

If the Commission decides that additional guidance is needed, it is important to remember that overly prescriptive guidance can be counterproductive. As the presentations of FTC Division of Consumer and Business Education Attorney Leslie Fair at the beginning of the afternoon session, Electronic Retailing Association representative Linda Goldstein and Consumer Reports WebWatch Director Beau Brendler in the fourth panel, and the discussion with University of Tennessee Professor Mariea Grubbs Hoy and Direct Marketing Association Senior Vice President Jerry Cerasale in the third panel illustrated, different consumer protection approaches can be effective in ensuring customers receive the information they need when using advance consent programs, and an overly prescriptive approach can cause unintended negative consequences.

For example, in the mock ad for Closet Gourmet Cook's Club, Ms. Goldstein used a shorter disclosure than Mr. Brendler did. While Mr. Brendler's mock-up featured a more thorough explanation of material terms, the discussants pointed out that the shorter disclosure was more likely to be read and understood by the consumer, illustrating clearly that sometimes less is more.

During the third panel, Professor Hoy suggested that pop-up notices could be effective in getting consumers' attention and increasing their awareness of material terms. However, Mr. Cerasale noted that many computer users use pop-up blockers, thereby limiting the benefit of the attention-grabbing technique. Also in that panel, while discussing font size and screen placement, Mr. Cerasale noted that consumers may see ads on widely varying size screens—most notably with mobile phones where many consumers can now view websites. When it comes to disclosures, one size does not fit all.

MPA agrees with the position taken by FTC Attorney Fair when she said that, while advance consent disclosures must follow the FTC's "clear and conspicuous" standard, the Commission should not be overly prescriptive in promulgating regulations and issuing guidance. As Ms. Fair stated with regard to the clear and conspicuous standard:

> It is not a one size fits all standard simply because we realize that the experts in clear and conspicuous aren't attorneys at the Federal Trade Commission. The experts in how to make information clear and conspicuous to consumers are marketers, advertisers, and the attorneys who represent them. We appreciate [that] you know how to make information clear, clean, understandable, and accessible to consumers, which is why you're not going to find an FTC ruling on a preferred font face [or] a minimum type size. Generally speaking, all we want is that it's clear and conspicuous, and advertisers and marketers are free to use their many tools of creativity to figure out the best way to convey that information.

As the examples above and others illustrate, overly prescriptive guidance—such as mandating disclosure length, specific font sizes, placement, website design, or pop-up notification—could have unintended consequences or prohibit some advance consent consumer protection methods that would actually benefit consumers.

**Free Trials**

As stated above, MPA believes that consumers should be advised in advance of the specific terms and conditions of free trial offers. However, we disagree with the suggestion by National Consumers League Vice President Susan Grant that consumers should have to give a second consent at the end of the free trial, i.e., that they should have to opt-in for a continuation of the subscription. Ms. Grant's suggestion for duplicative consent at the end of the free trial would completely undermine the convenience that the free trial offer provides. MPA believes the best approach is to clearly and conspicuously explain all materials terms, including the cancellation and billing procedures, at the time of the free trial offer. That way, consumers can make an informed decision at the outset. They are

10

also given all the information they need to be able to cancel at the end of the free trial if they don't like the magazine, while enjoying the convenience of having their full-term subscription begin uninterrupted at the end of the free trial if they are enjoying the magazine.  Further, magazine publishers' refund policies ensure that if someone forgets to cancel before the end of the trial period, they can still cancel at any time and get a refund for the remainder of the term.

**Conclusion**

The advance consent marketing programs used by magazine publishers are popular with subscribers, and that popularity is growing.  Both automatic renewal plans and free trial offers give magazine readers convenient ways to enjoy their favorite magazines and try new titles.  As these programs have become more popular, MPA has sought to help publishers include best consumer protection practices in their advance consent marketing plans.  MPA believes that no new legislation, regulation, or guidance is necessary at this time.  In addition, we agree with the position of FTC Attorney Leslie Fair that FTC regulation and guidance should not be overly prescriptive.  As the workshop sessions indicated, present laws, regulations, and FTC guidance provide sufficient protections for consumers using advance consent programs, and MPA looks forward to working with the FTC to help ensure that these programs remain popular with consumers by encouraging clear and conspicuous disclosure, cancellation procedures that are disclosed fully and easy to implement, and the affirmative consent of the consumer.