Geoffrey W. Castello
Lauri A. Mazzuchetti
KELLEY DRYE & WARREN LLP
200 Kimball Drive
Parsippany, New Jersey 07054
(973) 503-5900

Thomas E. Gilbertsen
Joanna Baden-Mayer
KELLEY DRYE & WARREN LLP
3050 K Street N.W.
Washington, D.C.  20007
(202) 342-8400

Attorneys for Defendant
Synapse Group, Inc.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| CHARLES T. MCNAIR, THEODORE AUSTIN, DANIELLE DEMETRIOU, STEVEN NOVAK, ROD BARE, USHMA DESAI and JULIE DYNKO,<br><br>          Plaintiffs,<br><br>     v.<br><br>SYNAPSE GROUP, INC.,<br><br>          Defendant. | CIVIL ACTION NO. 2:06-cv-05072 (JLL) (CCC) |

**DEFENDANT SYNAPSE GROUP, INC.'S
MEMORANDUM OF LAW IN OPPOSITION TO
PLAINTIFFS' RENEWED CLASS CERTIFICATION MOTION**

# TABLE OF CONTENTS

**Page**

FACTS ................................................................................................................. 3

THE SYNAPSE MAGAZINE SUBSCRIPTION PROGRAM ............................... 3

THE NAMED PLAINTIFFS' CLAIMS ............................................................... 6

THE WARD DECLARATION .............................................................................. 9

ARGUMENT ....................................................................................................... 12

I.      PLAINTIFFS CONTINUE TO DISAVOW THEIR RULE 23 BURDENS ................. 12

II.     PLAINTIFFS' MONETARY LOSSES ARE NOT THE TYPE OF GROUP
        INJURIES APPROPRIATE FOR RULE 23(B)(2) CERTIFICATION ....................... 13

III.    PLAINTIFFS' CLAIMS LACK COHESION .............................................. 15

IV.     LACK OF PREDOMINANCE, AND THUS COHESION, IS LAW OF THE
        CASE ........................................................................................................ 21

V.      PLAINTIFFS FAIL TO MEET THEIR BURDENS UNDER  RULE 23(A) ................ 21

        A.      Plaintiffs' Claims Are Not Typical of the Class ................................. 21

        B.      Plaintiffs and Their Counsel Are Not Adequate Class Representatives ............. 23

VI.     PLAINTIFFS' PROPOSED CLASS IS FATALLY OVERBROAD ........................... 26

CONCLUSION ................................................................................................... 29

# TABLE OF AUTHORITIES

## CASES

*Allen v. Holiday Universal*, 249 F.R.D. 166 (E.D. Pa. 2008)...........................................26

*Arch v. America Tobacco Co., Inc.*, 175 F.R.D. 469 (E.D. Pa. 1997)..............................25

*Baby Neal v. Casey*, 43 F.3d 48, 56 (3d Cir.1994)............................................................23

*Barnes v. America Tobacco Industrial*, 161 F.3d 127 (3d Cir. 1998).................14, 16, 24

*Beck v. Maximus, Inc.*, 457 F.3d 291 (3d Cir. 2006)........................................................14

*Blain v. SmithKline Beecham Corp.*, 240 F.R.D. 179 (E.D. Pa. 2007) ......................13, 22

*Canady v. Allstate Insurance Co.*, No. 96-0174, 1997 WL. 33384270 (W.D. Mo. June 19, 1997)...........................................................................................................27

*Chin v. Chrysler Corp.*, 182 F.R.D. 448 (D.N.J. 1998).....................................................13

*Dhamer v. Bristol-Myers Squibb Co.*, 183 F.R.D. 520 (N.D. Ill. 1998)............................18

*Feinstein v. Firestone Tire & Rubber Co.*, 535 F. Supp. 595 (S.D.N.Y. 1982)................25

*Geraghty v. U.S. Parole Commission*, 719 F.2d 1199 (3d Cir. 1983)...............................15

*Heffner v. Blue Cross & Blue Shield of Ala., Inc.*, 443 F.3d 1330 (11th Cir. 2006) .........17

*Hohider v. United Parcel Serv., Inc.*, 574 F.3d 169 (3d Cir. 2009) ..................................24

*Holmes v. Continental Can Co.*, 706 F.2d 1144, 1155 (11th Cir. 1983)...........................14

*In re Allstate Insurance Co.*, 400 F.3d 505 (7th Cir. 2005)..............................................24

*In re Fosamax Products Liability Litigation*, 248 F.R.D. 389 (S.D.N.Y. 2008)...............25

*In re Hydrogen Peroxide Antitrust Litigation*, 552 F.3d 305 (3d Cir. 2008) ..................13

*In re Managerial, Prof'l & Technical Employees, No. MDL1471, 02-2924*, 2006 WL. 38937 (D.N.J. Jan. 5, 2006)................................................................................15

*In re Rezulin Prod. Liability Litigation*, 210 F.R.D. 61 (S.D.N.Y. 2002).........................16

*In re St. Jude Medical, Inc.*, 425 F.3d 1116 (8th Cir. 2005)..............................................16

*In re The Prudential Insurance Co. of America Sales Prac. Litigation*, 148 F.3d 283 (3d Cir. 1998) ........................................................................................ 23

*Jones v. America General Life & Accident Insurance Co.*, 213 F.R.D. 689 (S.D. Ga. 2002) (refusing to certify (b)(2) ............................................................... 17

*Krueger v. Wyeth, Inc.*, No. 03-2496, 2008 WL. 481956 (S.D. Cal. 2008) ..................... 25

*Lemon v. International Union of Operating Engineers*, 216 F.3d 577 (7th Cir. 2000) ("Rule 23(b)(2) ............................................................................... 14

*McClain v. Lufkin Industrial, Inc.*, 519 F.3d 264 (5th Cir. 2008) ..................................... 25

*Miller v. Baltimore Gas & Electric Co.*, 202 F.R.D. 195 (D. Md. 2001) ......................... 25

*Nafar v. Hollywood Tanning Sys., Inc.*, 339 Fed.Appx. 216, 223-24 (3d Cir. 2009) ........ 25

*Oritz v. Fireboard Corp.*, 527 U.S. 815 (1999) ................................................................. 24

*Owen v. Regence Bluecross Blueshield*, 388 F. Supp. 2d 1318 (D. Utah 2005) ............... 27

*Perlstein v. Transamerica Occidental Life Insurance Co.*, No. 07-cv-5782, 2008 WL. 2837185 (D.N.J. July 21, 2008) ............................................................ 24

*Rowe v. E.I. Dupont De Nemours and Co.*, 262 F.R.D. 451 (D.N.J. 2009) ..................... 17

*Sanders v. Johnson & Johnson, Inc.*, No. 03-2663, 2006 WL. 1541033 (D.N.J. 2006) .............................................................................................................. 14

*Santiago v. City of Philadelphia*, 72 F.R.D. 619 (E.D. Pa. 1976) ................................... 17

*Wachtel v. Guardian Life Insurance Co. of America*, 453 F.3d 179 (3d Cir. 2006) ........ 13

*Waldorf v. Borough of Kenilworth*, 878 F. Supp. 686 (D.N.J. 1995) ............................... 21

*White v. Williams*, 208 F.R.D. 123 (D.N.J. 2002) ........................................................... 26

*Zachery v. Texaco Exploration & Prod., Inc.*, 185 F.R.D. 230 (W.D. Tex. 1999) .......... 26

*Zapka v. Coca-Cola Co.*, No. 99-8238, 2000 WL. 1644539 (N.D. Ill. Oct.27, 2000) .............................................................................................................. 27

*Zehel-Miller v. Astrazenaca Pharms., L.P.*, 223 F.R.D. 659 (M.D. Fla. 2004) ............... 16

**STATUTES**

Fed. R. Civ. P. 23(b)(2) ...................................................................................24

16 C.F.R. 425.1..............................................................................................6

**MISCELLANEOUS**

1 McLaughlin on Class Actions § 5:15 (6th ed.).......................................16, 17

5 Newberg on Class Actions § 16:25 (4th ed.)..............................................24

1 Newberg on Class Actions § 4.11, at 4-39 .................................................14

18B Fed. Prac. & Proc. Juris. § 4478 (2d ed.) ..............................................21

Defendant Synapse Group, Inc. ("Synapse") respectfully submits this memorandum of law in opposition to plaintiffs' renewed class certification motion.

This is a case where plaintiffs allege that they and a class of Synapse customers are incurring "unauthorized charges" for magazine subscription renewals as a result of various deceptive practices. *See* Second Amended Complaint at ¶ 11; Plaintiffs' Memorandum of Law in Support of Plaintiffs' Motion for Class Certification Under F.R.C.P. 23(B)(2), filed June 18, 2010, at 1 (the "Plaintiffs' Brief"). In the proceedings conducted on plaintiffs' initial motion for class certification, the Court entertained voluminous briefing and conducted a lengthy hearing before denying class certification in a detailed opinion. *See* Order Denying Class Certification, dated June 29, 2009 (Doc. 81) (the "Opinion"). The Court denied certification under Rule 23(b)(3) upon finding that individual issues predominated over any common issues presented by the plaintiffs' statutory consumer fraud claims. Specifically, the Court held that causation and ascertainable loss were elements of the statutory consumer fraud claims asserted, and that those elements defied classwide proof because each class member would need to establish whether and how she suffered any injury as a result of the conduct alleged. Having failed in their first attempt to certify a class after three years of litigation, plaintiffs now attempt to masquerade their alleged monetary losses as a Rule 23(b)(2) injunctive class.

Not every lawsuit is suited for class action status, and this case simply defies certification under any provision of Rule 23. Rule 23(b)(2) is a class action device intended specifically for the type of group injuries presented by civil rights cases, and is therefore ill-suited for cases attempting to aggregate diverse claims about monetary losses. Applying (b)(2) certification to this case would constitute error, even though the named plaintiffs are willing to waive absent class members' damage claims. Plaintiffs jettisoned the class damage claims from their latest

version of the complaint, but this case remains a collection of individual disputes about whether Synapse customers suffered ascertainable monetary losses (unauthorized charges).  However disguised, this is a case about disputed monetary losses and plaintiffs are misapplying Rule 23(b)(2) to their claims.  In any event, the necessary cohesion for (b)(2) certification is not presented by varying claims about Synapse's notice postcards and how customers reach a live operator from the defendant's interactive voice recognition ("IVR") system.

Plaintiffs brief this motion as if a (b)(2) class would absolve them of proving all elements of their consumer fraud claims for the class.  But even in a (b)(2) class setting, plaintiffs would need to prove their claims – including the elements of causation and ascertainable loss.  Third Circuit precedent equates (b)(2)'s "cohesion" requirement with (b)(3)'s "predominance" requirement.  Having ruled that the case lacks predominance because common proof of ascertainable loss and causation elements is lacking, plaintiffs provide no rational basis to reverse course and find that the same statutory claims now present the requisite cohesiveness for a (b)(2) certification.

On this renewed motion, the Court should be alarmed by plaintiffs' willingness to sacrifice class claims for monetary damages, while preserving their own damage claims, all as an expediency to gain a class at all costs.  None of the five named plaintiffs, nor a class of those who have suffered losses, gain anything of substance by certifying a (b)(2) class – only the plaintiffs' lawyers benefit.  The plaintiffs' tactics are all the more troubling given that the injunction they seek merely duplicates relief that, according to plaintiffs, has already been imposed by twenty-two state Attorneys General.  *See* Plaintiffs' Brief at 1, 11-12.  Such a transparent manipulation of the class certification rules, in pursuit of hollow injunctive relief, should not be rewarded.  Only lawyers would benefit from granting this certification motion, not

consumers.  Synapse respectfully urges the Court to deny this motion, the granting of which would constitute an abuse of discretion.

## FACTS

The facts of this case are detailed in the Court's June 29, 2009 opinion denying plaintiffs' initial class certification motion.

### The Synapse Magazine Subscription Program

Synapse is a wholly-owned subsidiary of Time Inc. and offers initial magazine subscriptions, often for free or at greatly reduced rates, through retail businesses, websites and other marketing channels.  Opinion at 2.  The initial subscription term usually varies and, as it lapses, Synapse automatically charges the customer's credit or debit card for a renewal subscription unless the customer cancels.  *Id.*  Regardless of how a Synapse subscriber signs up, this "continuous service" system is explained in the offer and all subscribers are told that they will be automatically charged for renewals if they do not cancel.  Opinion at 2-3.  The continual service system is similar to the way consumers usually purchase newspaper subscriptions, cable television service and a variety of other media services – and there are significant advantages to these programs for both consumers and media providers.  *Id.* at 3 (citing Magazine Publishers of America materials submitted by plaintiffs' counsel).

In its initial solicitations and agreements, Synapse informs subscribers about its continuous service program, informs them that they may cancel, and provides a toll-free cancellation telephone number.  Opinion at 4.  Plaintiffs admit that all customers consent to Synapse's continuous service program when they sign up.  *See* Transcript of April 17, 2009 Proceedings at 7 ("Trans.").  Prior to an automatic charge, Synapse sends a notification postcard to the subscriber.  *Id.*  At the time of plaintiffs' first class certification motion in 2008, the Synapse renewal notice was a sealed double postcard that provided a customer with details about

3

her renewal and cancellation options on the inside of the postcard.  Opinion at 4.[1]  The inside of
the postcard identified the magazines subscribed to, the number of issues ordered, the cost, a toll-
free telephone number for cancellation and the date by which cancellation must occur to avoid a
charge.  *Id*. at 5.[2]  This same information is now displayed on the outer-facing side of Synapses'
new oversized (approximately 8' x 5") postcard notice.

If the subscription is not cancelled before the date on Synapse's reminder notice, the
subscriber is charged for a renewal term.  Opinion at 5.  But the subscriber's right to cancel for a
full refund continues.  When the charge appears on a subscriber's credit or debit card statement,
it contains a billing descriptor that includes the magazine for which the amount was charged and
a toll-free number to call with questions.  Opinion at 5.  Subscribers are able to cancel
subscriptions even after the charge but, depending on the timing of the cancellation and terms
negotiated by the marketing partner participating in the initial sale at issue, Synapse may provide
only a *pro rata* refund.  When customers incur overdraft fees as a direct result of a magazine
charge, Synapse reimburses the overdraft fees upon request if certain criteria are met.  *Id.*

The telephone numbers provided in Synapse renewal notices and billing descriptors are
different, but each go to the Synapse automated IVR systems.  Opinion at 5.  As the Court

---

[1]    As Synapse demonstrated in opposition to plaintiffs' first class certification motion, the
content and format of its renewal notice have been evolving over the past several years
and Synapse marketing clients sometimes negotiate different formats and contents for
notices sent to their customers.  *See* Defendant Synapse Group, Inc.'s Memorandum of
Law in Opposition to Plaintiffs' Motion for Class Certification, filed Sept. 3, 2008
("Synapse Initial Opposition") at 5.  (Docket No. 61-4).  As plaintiffs' point out in their
renewed motion, the content and format of Synapse's renewal notice have continued
evolving during this five-year litigation, such that most renewal notices are now
formatted as single, two-sided postcards that do not require unsealing.  *See* Plaintiffs'
Brief at 15-16.

[2]    The Court's June 29 Opinion also acknowledged plaintiffs' citation to industry
association guidelines recommending that reminder notices should:   "1) inform
consumers that the subscription is about to be renewed for a specific term and price; 2)
tell consumers they will be charged or billed the stated price unless the subscription is
affirmatively cancelled; and 3) provide consumers with instructions on how to cancel –
cost free."  Opinion at 4.

detailed in its Opinion, a customer can cancel a subscription and receive a refund through the IVR if they reject all IVR "save" options or speak to a live operator.[3]  Opinion at 6.  A live operator may be reached by well-known, traditional means – pressing zero – or if certain things happen on the call, but the IVR does not usually announce how to reach a live operator.  *Id.  See generally* Synapse Initial Opposition.[4]

Whether engaging the Synapse IVR or live operators, between 70% and 80% of all customers who call Synapse expressing an initial intent to cancel, do so successfully in that same call.  *See* Declaration of Christopher M. Tyler, dated Sept. 3, 2008, at ¶ 20 [Docket No. 61-6].  As of August 2008, Synapse credited or paid out over $727,000,000 in refunds to cancelling subscribers since 2000.  *Id.* ¶ 23.  Despite data suggesting that a vast majority of subscribers understand and successfully navigate their renewal and cancellation options in the Synapse IVR system and with defendant's live operators, plaintiffs argue that an overarching fraudulent scheme makes cancellation difficult.  But the plaintiffs' varying experiences with Synapse paint a different picture.

---

[3]     It is unclear whether plaintiffs are still pursuing claims about whether some of the IVR's cancellation and save options are deceptive.  *See, e.g.,* Plaintiffs' Brief at 22 ("[T]he IVR presented its confusing and deceptive cancellation option to McNair and it did not cancel his upcoming automatic renewal charge despite his attempt to do so."); *id.* at 30 (asserting as a common issue "[w]hether the subject postcard and IVR practices described herein, [sic] constituted, alone or together, unconscionable commercial practices…").  In their second class certification motion, plaintiffs' chief complaint about the IVR seem to be that it does not actively instruct all users about how to reach a live operator, and they attempt to define a subclass of uninjured subscribers to pursue that issue.  Plaintiffs' Brief at 6.

[4]     Notably, none of the named class members allege that they did not know that pressing "0" might take them to a live operator.  Given that the "dial-zero-to-reach-an-operator" function is widely known, it is unlikely that plaintiffs could establish that failure to call out this functionality would deceive a reasonable consumer or lead to ascertainable losses.

## The Named Plaintiffs' Claims

Plaintiffs base their claims on the design of the notice postcards and the IVR system. Opinion at 7.[5]   Yet, the record shows that each of the named plaintiffs had different experiences with, and reacted very differently to, Synapse's renewal postcards and its IVR cancellation systems.   *Id.* at 18.   Two of the five named plaintiffs admit to opening, reading and understanding the former double-postcard notice, and most of the named plaintiffs reached and transacted business with a Synapse live operator.   *Id.*  It remains the case that each of the named plaintiffs' cases involves a "debate on causation" that is "focused on individual issues and defenses."  Opinion at 21.

Plaintiff Charles McNair is the original plaintiff in this long-running litigation, but his original claims are no longer in the case.  McNair filed a complaint in August 2006 alleging that he subscribed to four (4) different magazines in a Synapse offer.   Opinion at 8.   Later, after receiving, reading and understanding a Synapse renewal postcard, he called the toll-free number provided to cancel.   *Id.*  The Synapse IVR presented save and cancellation options which he claims confused him.   *Id.*  The result of McNair's confusion is that he successfully used the Synapse IVR system to cancel three of his subscriptions for a complete refund, but left one subscription active.   *Id.*  His sole injury claimed is the money he paid for the allegedly unintended subscription renewal.   *Id. See generally* Synapse Initial Opposition at 7-8.

---

[5]     Plaintiffs claim that Synapse's renewal notice postcard and cancellation procedures do not comply with the Federal Trade Commission's ("FTC") Negative Option Rule (16 C.F.R. 425.1), the Magazine Publisher's Association private industry guidelines, or an Assurance of Discontinuance ("AD") entered into between Time Inc. and multiple state Attorneys General prior to Time Inc.'s acquisition of Synapse. *See* Plaintiffs' Brief at 31 (identifying alleged common issues including "[w]hether Synapse did not follow the objective standards set forth in the Assurance of Discontinuance…with respect to its standard notifications and cancellation procedures."). During the five years this litigation has pended, neither the FTC, the MPA, nor any Attorneys General have initiated any action against Synapse or Time alleging a violation of the Assurance of Voluntary Compliance or the Negative Option Rule.

6

Julie Dynko was a long-standing Synapse customer who joined the case as a new plaintiff on the First Amended Complaint.  Ms. Dynko admits that she opened and understood a number of different Synapse renewal postcards, but claims that she did not open them prior to 2006 because of their design.  Opinion at 8.  Dynko denies ever speaking with a live Synapse operator. *See e.g.,* Deposition of Julie Dynko at 21, 69 (submitted as Exhibit "G" to Certification of Thomas E. Gilbertsen dated Sept. 3, 2008) ("Gilbertsen Certification") [Docket No. 61].  Ms. Dynko admits receiving Synapse notification postcards for many different subscriptions over the past eight years.  *Id.* at 27, 34, 41, 43, 56-58.  Dynko admits that Synapse's notification postcard "gave [her] the information that [she] needed" and she "understood it clearly."  *Id.* at 57.  Ms. Dynko regards the information on the inside of the sealed postcard to be her "personal information."  *Id.* at 58.

Dynko had a long tenure as a Synapse customer, placing and canceling several different subscriptions over the years.  Ms. Dynko testifies that she never spoke to a live Synapse operator, but Synapse records indicate that she transacted with a live operator on several occasions to cancel magazines and get refunds.  *See* Opinion at 8; Plaintiffs' Ex. 22 at 30-31 (Dynko cancels three subscriptions with Synapse live operators on September 3, 2005, and cancels another subscription with live operators on December 28, 2005).[6]  Like the other named plaintiffs, Ms. Dynko's sole claimed injury is money she allegedly lost on prior renewals that were not cancelled.  *Id.  See generally* Synapse Initial Opposition at 13-15.

Ted Austin is another named plaintiff whose sole injury is an alleged monetary loss. Opinion at 9.  Austin subscribed via a Synapse internet offer to three magazines, and he alleges

---

[6]    At her deposition, Ms. Dynko could not recall the most basic aspects of her case and she answered most questions with "I can't be sure," "I don't recall," and "I don't remember." In a 100-page deposition transcript, Dynko denies recall in 117 answers to questions about whether she ordered particular magazines, received them, paid for them or cancelled them.  Gilbertsen Certification ¶ 9.

that he did not open or read Synapse's renewal postcards, which resulted in unintended automatic charges for subscription renewals.  Opinion at 9.  Austin denies receiving a renewal notice or an email confirmation for his subscriptions. Deposition of Ted Austin ("Austin Dep.") at 29, 35 (attached to Gilbertsen Certification as Exhibit "B").  But Austin also testified that he placed his orders on the internet from a work colleague's computer and that he only checks his mail at home "periodically."  *Id.* at 18, 37-38.  After being charged for renewals, Austin called the Synapse IVR and was able to cancel two of his three subscriptions for a complete refund, but he alleges that one subscription cancellation netted only a partial refund.  *Id.*  Synapse records show that Austin canceled one of his subscriptions with a live operator and successfully canceled two other subscriptions in the IVR system – without needing a live operator's help.  *Id.* Testifying about the one time he did speak with a Synapse live operator, Austin confirmed that he had no trouble reaching the live operator.  Austin Dep. at 21.  *See generally* Synapse Initial Opposition at 8-10.

Monetary loss is also Ushma Desai's sole claimed injury.  Opinion at 10.  In 2006, Ms. Desai accepted a 90-day offer for four magazines and, thereafter, was automatically charged the previously disclosed price for a one-year subscription.  Opinion at 9.  Desai alleges that she received no advance notice of these charges, but she directed her subscriptions to different addresses:  "Desai's residence address or the address of her fiancé," and in "May 2007, both Desai and her fiancé changed their addresses."  First Amended Complaint ¶ 23(e) and (f).  In the days just before the First Amended Complaint was filed in August 2007, Ms. Desai claims that she noticed Synapse's temporary charges on her debit card account and called the toll-free number provided to cancel the upcoming renewal charges.  *Id.*  Synapse records show that Ms. Desai contacted the IVR one day before the amended complaint was filed and successfully

cancelled all four of her subscription renewals and the upcoming charges were thereby avoided. *Id.* at 9-10. Ms. Desai accomplished these complete refund cancellations using the Synapse IVR, without the aid of a live operator. *See generally* Synapse Initial Opposition at 11-13.

Danielle Demetriou is the remaining named plaintiff. She subscribed to three magazines in 2006 pursuant to a 90-day offer. Opinion at 10. She asserts that she did not open or read any notification postcards and, as a result, incurred overdraft fees because of unexpected charges. *Id.* She testified that when she called the Synapse IVR, it presented her with an option "to cancel and speak to a customer service representative." Opinion at 10. Synapse records show that Ms. Demetriou made a couple of calls to the IVR and received full refunds after canceling her subscriptions, and that the calls lasted under 10 minutes. *Id.* Demetriou denies using the Synapse IVR and testifies that she transacted ***only*** with Synapse live operators. Deposition of Danielle Demetriou ("Demetriou Dep.") at 51 (Gilbertsen Certification Ex. "E"). Synapse records show that Demetriou contacted the IVR on June 25, 2007, and used the system to cancel subscriptions to *Her Sports* and *Shape* for a complete refund. *See* Plaintiffs' Ex. 22 at 17. Demetriou claims that her call lasted "a good hour," but Synapse records show that it lasted just shy of 9 minutes. *Id.* at 22. Demetriou called the IVR again on July 3, 2007, transferred to a live operator and cancelled *Fitness* for a complete refund. *Id.* at 24-25. Synapse disputes whether Demetriou encountered unreasonable difficulties canceling her subscriptions. Like each of the other named plaintiffs, Ms. Demetriou's sole alleged injury is monetary: unreimbursed overdraft charges. Opinion at 10. *See generally* Synapse Initial Opposition at 10-11.

### The Ward Declaration

In support of their motion, plaintiffs submit a previously-unproduced declaration from a previously undisclosed witness, John Ward. Plaintiffs' Ex. 52 ("Ward Decl."). John Ward is introduced to show that "[c]ustomers continue to complain about Synapse's deceptive postcard

notifications and its difficult cancellation procedures to this day." Plaintiffs' Brief at 25. But the Ward declaration further illustrates that significant and varying fact issues will need to be resolved for each putative class member, and their claims are about monetary damages.

Mr. Ward is an Ohio resident who claims that he "has been charged for magazine subscription renewals by Synapse Group, Inc., without my authorization for what I believe to be at least a dozen times." Ward Decl. ¶ 4. Mr. Ward claims that he has never received a notice postcard, but that he found a telephone number on the internet through which he was able to cancel his subscriptions for refunds. *Id.* ¶¶ 5-6. He claims that although his charges were refunded, "subsequent subscription renewals continued despite [his] wishes ." *Id.* ¶ 5. Mr. Ward does not provide details regarding the magazines he subscribed to, nor expressly allege whether or how he tried to cancel the magazines for which the allegedly unauthorized subscription renewals continued. Further, he does not allege that he wanted to or was unable to speak to a live customer service representative.

Synapse records show that Mr. Ward placed thirteen (13) subscription orders with Synapse. Declaration of Christopher M. Tyler dated July 19, 2010 at ¶ 3. Synapse records also show that Mr. Ward has contacted Synapse at least six times via the IVR system and live customer service operators. *Id.* Mr. Ward's first order, in July 2007, was through Bizrate for *Sporting News, This Old House, Car and Driver,* and *Popular Photography and Imaging. Id.* ¶ 4. Mr. Ward paid a $2.00 processing and handling for a one-year subscription to each of these four titles*. Id.* Synapse records also indicate that it did send him a postcard notice prior to any renewal charges for these magazines. *Id.* During the first two weeks of July 2008, Synapse charged Mr. Ward's account for subscription renewals on the four magazines he ordered. *Id.*

On July 17, 2008, Mr. Ward contacted Synapse and spoke with a live operator, canceling three magazine subscriptions and accepting *pro-rata* refunds. *Id.* ¶ 5. At this point, Mr. Ward had received issues for three different magazine titles (one of which is a weekly publication) for over one year at a total cost of less than $15. *Id.*

Synapse records indicate no further activity on this order until the following year, when Mr. Ward was sent a postcard notice about his upcoming renewal for *Popular Photography*. *Id.* ¶ 6. The notice that Synapse sent to him was of the new single postcard format illustrated by Exhibit 50 to plaintiffs' renewed motion. *Id.* On July 7, 2009, Mr. Ward's account was billed $29.00 for another – his third – yearly subscription to *Popular Photography*. The following day, Mr. Ward contacted Synapse and cancelled this subscription for a full refund, using the IVR system without live operator assistance. *Id.*

On July 25, 2007, Mr. Ward ordered an additional four magazine titles in response to a Synapse offer on the internet site Bizrate. *Id.* ¶ 7. On that date, he accepted an offer to pay $2 processing and handling for the first year of a subscription to *Stuff*, *Kiplinger's Personal Finance Magazine*, *Electronic House*, and *Seventeen*. *Id.* Synapse charged the processing and handling fees to an account number that Mr. Ward provided when he accepted the offer. *Id.* One year later, after sending Mr. Ward a postcard notice about his upcoming subscription renewals, Synapse charged his account for three of the titles, while one of his titles, *Stuff*, had ceased publishing in August 2007. *Id.*

On August 4, 2008, Mr. Ward contacted a Synapse live operator and cancelled his three renewals, accepting a *pro-rata* refund for two of his renewal cancellations and a full refund for his third. *Id.* ¶ 8. At this point, Mr. Ward had received thirteen months of issues for three different magazines at a total cost of $10.75. *Id.*

On November 20, 2007 – four months after Mr. Ward ordered the foregoing eight (8) magazine subscriptions through Bizrate – Mr. Ward contacted a Synapse live operator using a toll-free telephone number maintained by the company.  Synapse records indicate that its customer service agent accessed Mr. Ward's two Bizrate orders, but no further action was requested or taken during that telephone conversation.  *Id.*  ¶ 9.

On October 29, 2008, Mr. Ward ordered five additional magazine subscriptions from Synapse using travel awards he accumulated with US Airways.  None of these subscriptions were eligible for continuous service terms and Mr. Ward incurred no charges for these subscriptions.  The five new subscriptions were for *JPG, Entertainment Weekly, ESPN, Automobile* and *Motor Trend.  Id.* ¶ 10.  *JPG* ceased publishing in January 2009.  Synapse records reflect no further activity for this order.  *Id.*

Synapse records indicate that Mr. Ward contacted the IVR on October 11, 2009, located the two Bizrate orders indicated above, and then transferred to a live operator.  *Id.* ¶ 11.  The Synapse customer service representative created a "Customer Service Action form" indicating that Mr. Ward claims he was charged $77.00 for *Sports Illustrated. Id.*  This form indicates that the Synapse customer service representative was unable to find any order for that title or charge in that amount for Mr. Ward.  *Id.*  Customer service called Mr. Ward back, requesting additional information, and Synapse records indicate no further activity since that time.  *Id.*

## ARGUMENT

### I.   PLAINTIFFS CONTINUE TO DISAVOW THEIR RULE 23 BURDENS

Like their first class certification motion, plaintiffs' second motion continues to ignore current certification standards in the Third Circuit, and disavows their Rule 23 burdens. Plaintiffs again argue that the Third Circuit has "adopted a liberal construction of Rule 23," and that "when in doubt," the Court "should err in favor of allowing the case to proceed as a class

action." Plaintiffs' Brief at 26. As this Court recognized in its June 29, 2009 Opinion, plaintiffs' "when in doubt, certify" standard was rejected and abandoned by the 2003 amendments to Rule 23. Under current Third Circuit law, "if there is any doubt as to whether the Rule 23 requirements have been met, certification should be denied, regardless of the area of substantive law." Opinion at 11-12 (citing *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 321 (3d Cir. 2008)).

Plaintiffs again fail to present a workable trial plan. The Third Circuit recognizes a "critical need" at certification to "determine how the case will be tried," and urges plaintiffs to submit a trial plan that "describes the issues likely to be presented at trial and tests whether they are susceptible of class-wide proof." *Wachtel v. Guardian Life Ins. Co. of Am.*, 453 F.3d 179, 186 (3d Cir. 2006). Courts in this circuit have deemed workable trial plans essential to certification motions. *See Blain v. SmithKline Beecham Corp.*, 240 F.R.D. 179, 192 (E.D. Pa. 2007) (court must consider "manageability of the plaintiffs' proposed trial plan"); *Chin v. Chrysler Corp.*, 182 F.R.D. 448, 454 (D.N.J. 1998) (denying certification for "principal reason" that plaintiff failed to demonstrate "suitable and realistic plan for trial of the class claims"). These plaintiffs again fail to present a workable plan to try all elements of their consumer fraud claims in a unified proceeding that decides the issues for the entire class. There is no plan for class trial because this case defies class treatment.

## II.    PLAINTIFFS' MONETARY LOSSES ARE NOT THE TYPE OF GROUP INJURIES APPROPRIATE FOR RULE 23(B)(2) CERTIFICATION

Plaintiffs assert that "[e]ach of the claims asserted here is the type recognized as appropriate for prosecution on a class basis." Plaintiffs' Brief at 27. Yet plaintiffs cite no consumer fraud cases certified under Rule 23(b)(2).

As Synapse asserted in opposition to plaintiffs' first class certification motion – which also sought certification of an injunctive class under Fed. R. Civ. P. 23(b)(2) – each category of Rule 23(b) "has different purposes and different requirements." Synapse Initial Opposition at 16 n.5; *Beck v. Maximus, Inc.*, 457 F.3d 291, 301 (3d Cir. 2006). Rule 23(b)(2) was "designed *specifically* for civil rights cases seeking broad declaratory or injunctive relief." *Barnes v. Am. Tobacco Indus.*, 161 F.3d 127, 142 (3d Cir. 1998) (quoting 1 Newberg on Class Actions § 4.11, at 4-39) (emphasis added).

The Third Circuit recognizes that (b)(2) classes are used "most frequently as the vehicle for civil rights actions and other institutional reform cases" where "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." *Barnes*, 161 F.3d at 142 (citations omitted). *See also* Fed. R. Civ. P. 23(b)(2). Unlike a (b)(3) class, where the class members are legal strangers related only by some common question of law or fact, (b)(2) class members are "generally bound together through 'preexisting or continuing legal relationships' or by some significant common trait such as race or gender." *Barnes,* 161 F.3d at 143, n. 18 (quoting *Holmes v. Continental Can Co.*, 706 F.2d 1144, 1155 (11th Cir. 1983)). *See also Lemon v. Int'l Union of Operating Engineers*, 216 F.3d 577, 580 (7th Cir. 2000) ("Rule 23(b)(2) operates under the presumption that the interests of the class members are cohesive and homogeneous such that the case will not depend on adjudication of facts particular to any subset of the class nor require a remedy that differentiates materially among the class members.").

The Third Circuit has "committed to the district court the discretion to deny certification in Rule 23(b)(2) cases in the presence of disparate factual circumstances." *Sanders v. Johnson &*

*Johnson, Inc.*, No. 03-2663, 2006 WL 1541033, at *10 (D.N.J. 2006). *See also Geraghty v. U.S. Parole Comm'n*, 719 F.2d 1199, 1205-06 (3d Cir. 1983).

In this case, by stark contrast to a genuine (b)(2) class, lost money is the principal – indeed, only – injury claimed. *See* Plaintiffs' Brief at 1 (acknowledging claim that all class members were subject to alleged conduct that "results in unauthorized charges on the victim's debit or credit cards"). Monetary loss is the only injury that any of the four versions of the complaint, including the most recent revised Second Amended Complaint, have sought to redress on behalf of the five named plaintiffs and the putative class. There are no claims of discrimination here nor do plaintiffs claim the violation of any constitutional rights or other group injuries of any kind presented by this case. But in a vain attempt to gain certification for the benefit not of a class but of lawyers, all class claims for money damages have been dropped. In a case where the only claimed injury is monetary, monetary relief is the appropriate remedy. Certifying this action to proceed under a rule designed to redress civil rights cases would make a mockery of the law. However disguised by plaintiffs' revised complaint and second motion, this is a case "about" monetary losses – not the violation of group rights – and cannot be certified under Rule 23(b)(2).

## III.   **PLAINTIFFS' CLAIMS LACK COHESION**

Plaintiffs' decision to waive damages claims on behalf of all absent class members does not render this case suitable for Rule 23(b)(2) certification. Significant liability fact issues that vary by class member remain, requiring individual hearing and adjudication to determine Synapse's liability to each customer and barring Rule 23(b)(2) certification. *See In re Managerial, Prof'l & Technical Employees*, No. MDL1471, 02-2924, 2006 WL 38937 (D.N.J. Jan. 5, 2006) ("[E]ven though non-damages cases generally implicate fewer individualized issues

15

than ones involving damages, there may still be significant individualized issues that would bar class certification.").

Individual issues remain because, no matter the type of class, plaintiffs still must prove each element of their consumer fraud claims at trial. At the Court's hearing on plaintiffs' initial motion, it was established – and agreed by plaintiffs' counsel – that ascertainable loss and causation are elements that need to be proved for the class at trial. *See* Trans. at 25:11-18, 26:6-10. As the Court already correctly ruled, no presumption of classwide injury or causation will operate here to relieve the plaintiffs of their burden of proof. Opinion at 15; Trans. at 48:21-25 – 49:1-8.

As plaintiffs acknowledge, "[i]t is well recognized that a Rule 23(b)(2) class must be cohesive because absent class members cannot opt-out and thus their rights to seek relief could be precluded." Plaintiffs' Brief at 36 (citing *Barnes, supra,* at 143). Cohesion simply means that, because (b)(2) class members generally have no opt-out rights, fairness dictates that "no material variation distinguish the class members' circumstances concerning the claim." 1 McLaughlin on Class Actions § 5:15 (6th ed.).

In *Barnes,* the Third Circuit explained that Rule 23(b)(2)'s cohesion requirement is the functional equivalent of Rule 23(b)(3)'s predominance requirement and that a Rule 23(b)(2) class should actually have more cohesiveness than a rule 23(b)(3) class. 161 F.3d at 142-43. *See also* 1 McLaughlin on Class Actions § 5:15 (6th ed.) at 5-61; *In re Rezulin Prod. Liab. Litig.*, 210 F.R.D. 61, 75 (S.D.N.Y. 2002) (holding that "individual issues that defeat the predominance requirement of Rule 23(b)(3) also pose an obstacle to class certification in the Rule 23(b)(2) context"); *Zehel-Miller v. Astrazenaca Pharms., L.P.*, 223 F.R.D. 659, 666 (M.D. Fla. 2004) (same); *In re St. Jude Medical, Inc.* 425 F.3d 1116, 1121-22 (8th Cir. 2005) ("Because unnamed

members are bound by the action without the opportunity to opt out of a Rule 23(b)(2) class, even greater cohesiveness generally is required than in a Rule 23(b)(3) class.") (citations omitted); *Santiago v. City of Philadelphia,* 72 F.R.D. 619, 628 (E.D. Pa. 1976) (courts "should be more hesitant in accepting a (b)(2) suit which contains significant individual issues than it would under subsection 23(b)(3)").

Where class claims to relief require individualized determinations, "the cohesiveness is lost, and (b)(2) certification becomes inappropriate." 1 McLaughlin on Class Actions § 5:15 (6th ed.). *See also Hohider v. United Parcel Serv., Inc.,* 574 F.3d 169, 184 (3d Cir. 2009) (reversing district court's grant of (b)(2) class certification because court could not adjudicate plaintiffs' claims and reach a finding of class-wide liability and relief without undertaking individualized inquiries). Just as in every other type of class action, plaintiffs seeking certification under Rule 23(b)(2) "must demonstrate that proposed class members can prove the elements of their … claims through common evidence." *Rowe v. E.I. Dupont De Nemours and Co.*, 262 F.R.D. 451, 458 (D.N.J. 2009). Where common evidence will not establish liability with respect to the class – *i.e.*, where the success of the named plaintiffs' case does not establish the absent class members' claims – "final injunctive relief or corresponding declaratory relief with respect to the class as a whole [is not] warranted." *Heffner v. Blue Cross & Blue Shield of Ala., Inc.*, 443 F.3d 1330, 1344 (11th Cir. 2006). *See also Jones v. Am. Gen. Life & Accident Ins. Co.*, 213 F.R.D. 689, 702 (S.D. Ga. 2002) (refusing to certify (b)(2) class "[b]ecause each individual's reliance would be in question" and "there would be no way to say with any certainty that the same relief would be appropriate for all class members").

Here, the Court has already held that plaintiffs and all class members must individually prove injury (ascertainable loss) and causation to obtain any relief under the consumer protection

statutes at issue.  *See* Opinion at 14, 23 (observing that injury and causation are essential elements of all three statutes); *id.* at 17-19 (holding that because plaintiffs had different experiences and reacted differently to the conduct alleged, causation cannot be presumed).  At the Court's certification hearing, plaintiffs' counsel repeatedly acknowledged their burden of proving an ascertainable loss and a causal connection between the conduct alleged and the ascertainable loss.  Trans. at 25, 30.  The evidence necessary to prove the ascertainable loss and causation elements will vary by customer.  As the Court previously found, "the facts clearly demonstrate that each named Plaintiff reacted very differently to the postcard and the IVR system."  Opinion at 18.  For example, "[t]wo of the five named plaintiffs admitted to reading and understanding the postcards," and "Synapse records and the testimony shows that all the plaintiffs had very different IVR experiences."  *Id.*

There is no common proof available to establish injury and causation for all plaintiffs and the class.  The cohesion necessary to certify a Rule 23(b)(2) class is therefore lacking, regardless of whether monetary damages are abandoned for the class.  *See Dhamer v. Bristol-Myers Squibb Co.*, 183 F.R.D. 520, 529 (N.D. Ill. 1998) ("[E]ven if the relief sought is appropriately classified as injunctive relief obtainable for a Rule 23(b)(2) class, certification would be inappropriate here because individual issues predominate.").

Cohesion is lacking for the additional reason that Synapse's legal duty to provide a notice may differ among different customers receiving the challenged postcards.  For example, and as demonstrated at the Court's hearing on the initial class certification motion, customers who accept a 90-day risk free trial offer are charged for a one-year subscription at the conclusion of 90 days.  *See* Trans. at 17-19; 76-78.  The amount they are charged is something that was already disclosed at the time they accepted the initial offer, so Synapse's legal obligation to provide

further notice prior to the automatic charge differs from its duty to notify differently-situated subscribers about upcoming renewal charges.  *Id.*

At the Court's initial certification hearing, plaintiffs' counsel described the postcard class as "every member of the class who received the card who tried to cancel and couldn't cancel and ended up being charged suffered an ascertainable loss."  Trans. at 36:11-16.[7]  That argument conceded what each customer would need to prove under the consumer fraud statutes pled, but plaintiffs' renewed motion takes no account of that burden.  In order to identify those with ascertainable losses among the postcard class, the Court would need to initially determine, through thousands of individual inquiries, whether each customer received the postcard and how they reacted to it (*i.e.,* did they throw it out, open it, read it, understand it, etc.) before attempting to cancel a subscription renewal.  *See* Trans. at 37:20-24, 38:1-2; *id.* at 63:17-25, 64:1-18 ("[A]t the end of the day we don't know whether [customers threw the postcard] in the junk mail because they wanted to throw it in the junk mail, or throw it away as junk material, or whether they threw it away because they opened it, and they read it, and they understood it, and they still threw it away…").

Similar individual inquiries would be required to ascertain the "live operator" class.  There is no way to know, without case-by-case investigation, whether class members would have chosen to speak with a live operator if instructed about how to "press zero," or whether they would have chosen different options (cancellations or "save" offers) in a live operator v. IVR

---

[7]   *See also* Trans. at 41:10-12 ("[T]hose who were charged for the renewal after they effected the cancellation are simply those who suffered an ascertainable loss"); at 44:14-18 ("[E]very member of the class would have had to have been charged with the additional term of the renewal.  There's no question, and that is the singular event that causes an ascertainable loss to the class member."); at 50-54 (plaintiffs' counsel presents flow chart to demonstrate that a class member challenging the postcard notice would need to subsequently telephone Synapse and attempt a cancellation to establish an ascertainable loss and causation.)

environment.  Moreover, the vast majority of all Synapse subscription cancelations occur within the IVR system without live operator involvement.

Plaintiffs' live operator claims do not present a cohesive issue for the class.  Plaintiffs claim that Synapse's IVR is deceptive because it fails to announce how to reach a live operator. The undisputed factual record is that customers using the IVR may reach a live operator by pressing "zero," and that many of the named plaintiffs reached a Synapse customer representative in just this well-known manner.  The factual record also demonstrates that a vast majority of subscribers successfully cancel their subscriptions in the IVR system without speaking to a live operator, and another sizeable minority of all subscribers have canceled subscriptions by reaching a Synapse live operator via the traditional method of pressing "zero."[8]

Plaintiffs' pursuit of a class to challenge the IVR's live operator functions, like their pursuit of a class to challenge Synapse's postcards, is hopelessly flawed because it presents the Court with no definable class with cognizable injuries.  At the Court's prior hearing, plaintiffs' counsel even suggested that subscribers who successfully reached a live operator would remain in the class.  Trans. at 55:1-3 (arguing that subscribers who spoke to a live operator but still incurred unwanted renewal charges suffered an ascertainable loss).  Plaintiffs' live operator claim is highly tenuous and does not present the court with a definable class of persons who were allegedly deceived and suffered an ascertainable loss as a direct result of the conduct alleged.

In sum, the case remains an amalgamation of disparate individual contests about the ascertainable loss and causation elements of plaintiffs' claims, which require individual adjudication.

---

[8]    Plaintiffs do not claim that Synapse erects arcane barriers to reaching a live operator, such as use of an arbitrary code that is unknown to consumers.  The undisputed evidence is that Synapse employs a decades-old means for reaching an operator – pressing "zero" – which is widely known and familiar to the consuming public.

**IV.    LACK OF PREDOMINANCE, AND THUS COHESION, IS LAW OF THE CASE**

"Under the Law of the Case Doctrine, once an issue is decided, it will not be relitigated in the same case, except in unusual circumstances." *Waldorf v. Borough of Kenilworth,* 878 F. Supp. 686, 695 (D.N.J. 1995). *See also* 18B Fed. Prac. & Proc. Juris. § 4478 (2d ed.) ("Legions of cases, both in trial courts and appellate courts, illustrate law-of-the-case refusals to reconsider a matter once resolved in a continuing proceeding."). The Law of the Case Doctrine should bar a finding of cohesion here because any finding of cohesion would contradict the Court's earlier ruling that predominance is lacking on the consumer fraud elements of ascertainable loss and causation because no presumption of classwide injury operates to relieve plaintiffs of their burden of proof for the class. Opinion at 14 (noting that ascertainable loss and causation are essential elements of a NJCFA claim); *id.* at 22-23 (noting that the same is true under the D.C. and New York statutes).

Plaintiffs have failed to provide the Court with any cause to depart from its prior ruling. Because predominance and cohesion are functional equivalents, and because plaintiffs seek to certify the same consumer fraud statutory claims challenging the same conduct for which the Court already found that individual issues predominate, no finding of cohesion is possible.

**V.    PLAINTIFFS FAIL TO MEET THEIR BURDENS UNDER RULE 23(A)**

Plaintiffs' certification motion fails to meet the typicality and adequacy requirements of Rule 23(a) for reasons raised by Synapse in the initial class certification proceedings, which are issues that the Court did not reach in its Opinion.

**A.    Plaintiffs' Claims Are Not Typical of the Class**

Under Fed. R. Civ. P. 23(a)(3), plaintiffs must demonstrate that the claims and defenses applicable to them are typical of the class claims they assert. Absent class members are entitled to a representative plaintiff who is unencumbered by unique defenses. *Beck v. Maximus, Inc.,*

457 F.3d 291, 300-01 (3d Cir. 2006) (typicality not satisfied where there is "some degree of likelihood a unique defense will play a significant role at trial").  Typicality also requires more than just "one unifying factual or legal question," mandating that legal theories available to absent class members be aligned with the named plaintiffs' stated claims.  *Blain*, 240 F.R.D. at 187 (typicality requires "strong similarity of legal theories") (citations omitted).

Unique factual and legal defenses apply to the named plaintiffs in this case.  The factual record, detailed in the Court's Opinion, demonstrates that none of the named plaintiffs have standing to pursue all of the claims asserted.  Neither McNair nor Dynko have claims about the postcard notices because they admit to receiving, recognizing, reading, understanding, and acting upon them.  *See* Opinion at 18.  Desai's claims are subject to unique defenses because she directed her renewal notices to a third party and subsequently changed residences.  She never tried to cancel or seek a refund in response to her initial subscription charges and, the following year, she called the Synapse IVR on the eve of filing the complaint and successfully cancelled all upcoming renewal charges.  *Id.* at 20.  Plaintiff Demetriou was also able to cancel renewal charges for a complete refund, but sought further compensation for overdraft charges that she claims were caused by Synapse.  Demetriou Dep. at 48.  On the day in question, her bank account was already overdrawn by earlier purchases - an intervening cause.  Opinion at 21. Mr. Austin was able to work with the Synapse IVR and live operators to cancel his renewal charges with ease, but claims that he never received a pre-bill renewal notice.  Austin Dep. at 29.  But he also testified that he checks his mail infrequently.  *Id.* at 37-38.  Ms. Dynko is a category unto herself after a years-long relationship with Synapse that involved numerous subscriptions and successful cancellations with Synapse live operators and within the IVR.  *See* Opinion at 8. Dynko will be unable to pursue other subscribers' claims about the notification postcard after

22

testifying that it "gave [her] the information that [she] needed" and that she "understood it clearly." Dynko Dep. at 57.

In a fair trial where Synapse presents all factual and legal defenses, the major focus will be disputes about the events transpiring between Synapse and each named plaintiff. The named plaintiffs dispute Synapse records showing that they entered continuous service subscription contracts, were sent notification postcards, and that they cancelled renewal charges and obtained refunds with relative ease both in the IVR and with live customer representatives.[9] The named plaintiffs are poor representatives to hoist upon a hypothetical class prosecuting the broad indictment detailed in plaintiffs' motion and their "expert" reports.

### B.    Plaintiffs and Their Counsel Are Not Adequate Class Representatives

Rule 23(a)(4) requires plaintiffs to establish their "adequacy," or ability to "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Plaintiffs are inadequate class representatives for the reasons set forth in Synapse's opposition to plaintiffs initial motion for class certification. *See* Synapse Initial Opposition at 36-39.

Plaintiffs and their counsel have further demonstrated their inadequacy by their conduct since the initial class certification motion was denied. First, plaintiffs elected, after years of alleging significant monetary harm to the class they sought to represent (*see, e.g.,* FAC ¶¶ 2, 22,

---

[9]    Plaintiffs cite *In re The Prudential Ins. Co. of Am. Sales Prac. Litig.,* 148 F.3d 283, 312 (3d Cir. 1998) for the extraordinary proposition that "[a]ny potential differences in the degree of harm suffered by Class members has no bearing on the typicality requirement." Plaintiffs' Brief at 31. But this case holds the opposite of plaintiffs' proposition. In *Prudential,* the Third Circuit noted that "factual differences among the claims of the putative class members do not defeat certification." 148 F.3d at 311 (citing *Baby Neal v. Casey,* 43 F.3d 48, 56 (3d Cir.1994)). But the Third Circuit found it important that the plaintiffs and class "suffered the same injury" and the "same generic type of harm-… economic damages-as the named plaintiffs." *Id.* at 311. According to *Prudential,* the degree and type of harm suffered by plaintiffs and class members does indeed have a significant bearing on the typicality analysis. In any event, the *Prudential* class was certified under Rule 23(b)(3) for settlement purposes only. In such cases, the court "need not inquire whether the case, if tried, would present intractable management problems … for the proposal is that there be no trial." *Id.* at 316 n. 57.

23, 24, 98, 104), to waive damage claims for themselves and the putative class as an expediency to pursue Rule 23(b)(2) certification. After the Court ruled that plaintiffs' NJCFA claims must be stricken since plaintiffs were not seeking damages, [Doc. 94], plaintiffs elected to seek monetary damages *only for themselves*, and not for the absent class members, to salvage their NJCFA claims.

These contrivances severely prejudice the interests of absent class members by waiving their damage claims to pursue hollow injunctive relief. Under Rule 23(b)(2), there usually is no right to class notice or opportunity to opt-out.[10] *See, e.g., Oritz v. Fireboard Corp.,* 527 U.S. 815, 833 n.13 (1999); *Barnes,* 161 F.3d at 142-43.; *In re Allstate Ins. Co.,* 400 F.3d 505, 507 (7th Cir. 2005). If certification is somehow granted in this case, all class members will be bound by the outcome because, like any other judgment of this Court, a final decision in a (b)(2) class is *res judicata* as to the entire class. *See Perlstein v. Transamerica Occidental Life Ins. Co.,* No. 07-cv-5782, 2008 WL 2837185, *4 (D.N.J. July 21, 2008); 5 Newberg on Class Actions § 16:25 (4th ed.) ("As a general rule, a judgment in a class action will bind the absent members of the class described in that judgment with respect to the common issues adjudicated."). Certification of plaintiffs' revised Second Amended Complaint will waive individual damage claims for all class members and preclude them from ever pursuing monetary recovery. In a case where the only injury alleged is monetary, plaintiffs' counsel's willingness to pursue such an outcome illustrates their inadequacy.

In similar situations, federal courts have recognized that "named plaintiffs who would intentionally waive or abandon potential claims of absentee plaintiffs have interests antagonistic

---

[10]   The absence of opt-out rights and mandatory nature of a (b)(2) class presents particular difficulties in this case because the proposed class purports to include future Synapse customers. Plaintiffs' Brief at 5-6 (defining a class of Synapse customers who receive postcards or call the IVR from October 23, 2006 to the date of the order certifying the class).

to those of the class." *Arch v. Am. Tobacco Co., Inc.*, 175 F.R.D. 469, 480 (E.D. Pa. 1997). *See also Nafar v. Hollywood Tanning Sys., Inc.*, 339 Fed.Appx. 216, 223-24 (3d Cir. 2009) (class certification reversed where district court failed to consider effect of named plaintiff's decision to drop claims for personal injury damages on absent class members); *Krueger v. Wyeth, Inc.*, No. 03-2496, 2008 WL 481956, at *4 (S.D. Cal. 2008) (plaintiff who "leaves the class open to those who have suffered personal injuries, while stating she does not seek to pursue personal injury damages claims" was inadequate); *Feinstein v. Firestone Tire & Rubber Co.*, 535 F. Supp. 595, 606 (S.D.N.Y. 1982) (class representatives who "tailored the class claims in an effort to improve the possibility of demonstrating commonality" obtained this "essentially cosmetic" benefit only by "presenting putative class members with significant risks of being told later that they had impermissibly split a single cause of action").

In many other cases where plaintiffs attempted to achieve (b)(2) certification by abandoning class claims for monetary damages, courts have deemed the named plaintiffs inadequate. For example, in *McClain v. Lufkin Indus, Inc.*, 519 F.3d 264 (5th Cir. 2008), the Fifth Circuit affirmed a district court's determination that representative plaintiffs lacked adequacy where they sought to drop the class members' demand for compensatory and punitive damages in order to protect the "predominance" of non-monetary claims. The Fifth Circuit reasoned that "if the price of a Rule 23(b)(2) … class both limits individual opt outs and sacrifices class members' rights to avail themselves of significant legal remedies, it is too high a price to impose." *Id.* at 283. *See also In re Fosamax Prods. Liab. Litig.*, 248 F.R.D. 389, 401 (S.D.N.Y. 2008) ("The adequacy of the class representatives is also undermined by [plaintiffs'] decisions to seek monetary damages for themselves but only medical monitoring for the class, which may cause substantial prejudice to other class members."); *Miller v. Baltimore Gas &*

*Elec. Co.*, 202 F.R.D. 195, 203 (D. Md. 2001) (declining to allow amendment to complaint to forego claim for damages because "the proposed removal of the compensatory and punitive damages claims raises serious questions regarding the ability of the named plaintiffs to represent the putative class adequately"); *Zachery v. Texaco Exploration & Prod., Inc.,* 185 F.R.D. 230, 244 (W.D. Tex. 1999) ("[T]he decision by the named Plaintiffs to drop the monetary damages claim cannot be imposed upon the absent class members without raising a very serious conflict of interest").

Plaintiffs' decision to jettison the class damage claims – while preserving their own – renders them inadequate class representatives under Rule 23. The named plaintiffs and their counsel are also inadequate for the reasons asserted in Synapse's opposition to the initial motion. *See* Synapse Initial Opposition at 36-39 (demonstrating that some of the named plaintiffs had little to no familiarity with the facts of this litigation or the responsibilities of representative plaintiffs in a class action). Most of the named plaintiffs were recruited for this case by plaintiff counsel's website, and most of their claims arise from events that transpired in the weeks just prior to the filing of the First Amended Complaint. *Id.*

## VI.    PLAINTIFFS' PROPOSED CLASS IS FATALLY OVERBROAD

Rule 23 and fundamental due process obligate plaintiffs to define a precise, objective, and presently ascertainable class. Federal courts recognize that "the proposed class must be sufficiently identifiable" and it "must be administratively feasible to determine whether a given individual is a member of the class." *White v. Williams*, 208 F.R.D. 123, 129-30 (D.N.J. 2002) (denying certification where class definition "would require the Court to conduct a number of mini-trials or to employ some other screening mechanism prior to defining the class"). It is also imperative that the class not be overbroad, and "a class definition is overly broad where the class encompasse[s] persons who ha[ve] not suffered any injury." *Allen v. Holiday Universal*, 249

F.R.D. 166, 171 (E.D. Pa. 2008).  *See also Owen v. Regence Bluecross Blueshield*, 388 F. Supp. 2d 1318, 1334 (D. Utah 2005) ("[T]he proposed definition of the class is overbroad because many of the proposed class members have suffered no damages."); *Zapka v. Coca-Cola Co.*, No. 99-8238, 2000 WL 1644539, at *3 (N.D. Ill. Oct.27, 2000) (holding class definition improper where it included individuals who were not harmed); *Canady v. Allstate Ins. Co.*, No. 96-0174, 1997 WL 33384270, at *3 (W.D. Mo. June 19, 1997) ("[B]ecause the court cannot accept plaintiffs' blanket contention that every member of the proposed broad class definition has allegedly suffered harm as a result of the defendants' wrongdoing, the court must find that the class definition is overbroad").

At the certification hearing, the Court observed that plaintiffs' class definition had changed a number of times throughout the litigation, becoming a "moving target."  Trans. at 38. Plaintiffs' difficulties lie in the nature of their claims.  These disputes defy aggregation into a class of cohesive issues.  In its Opinion, the Court detailed the varying experiences that the named plaintiffs had with Synapse's postcard and billing notices, IVR system, and live operators. Opinion at 18-22.  The Court rightly held that there was no classwide proof available for establishing injury and causation on behalf of the asserted class, and therefore predominance was lacking.  *Id.* at 22.  The Court concluded with an observation that it might be "conceivable" that a class could be created for those who "[1] did not read the postcard, [2] were required to read the notice, and [3] were harmed."  *Id.*  While Synapse submits that such a class would not be identifiable or otherwise meet the requirements of Rule 23, that is not the class that plaintiffs are attempting to create.  Rather, plaintiffs seek to certify a class of all Synapse customers in New Jersey, New York and D.C. who were **sent** either of the postcards at issue during the stated class period.  Plaintiffs' Brief at 5.  The proposed class, as defined, would include (1) all customers

27

who opened and acted on the postcard, (2) all customers who were not required to receive a renewal notice postcard, and (3) all customers who were not harmed by the postcard's perceived deficiencies.  Further, plaintiffs seek to certify a subclass of all Synapse customers "for whom the postcard and/or billing descriptor on their credit card or bank statement provided a telephone number to an IVR that did not audibly state how to transfer to a live operator."  *Id.* at 6.  This subclass includes customers who were provided with a telephone number, regardless of whether they called it, successfully transacted their business with the IVR, or spoke with a live operator.

As plaintiffs' themselves assert, their class motion seeks injunctive relief on behalf of "the world at large of millions of consumers" (Plaintiffs' Brief at 25):  a class of all Synapse customers in New Jersey, New York, and D.C., regardless of whether such customers ever intended to cancel a magazine subscription or were harmed after finding cancellation "unreasonably difficult" in the manner alleged.  Plaintiffs' proposed class includes all Synapse customers regardless of whether they suffered any injury, and is therefore fatally overbroad and cannot be certified.

## CONCLUSION

For the foregoing reasons, Synapse respectfully urges the Court to deny plaintiffs' second motion for class certification under Red. R. Civ. P. 23(b)(2).

DATED:  July 19, 2010     Respectfully submitted,

         By:  /s/ *Geoffrey W. Castello*
          Geoffrey W. Castello
          Lauri A. Mazzuchetti
          KELLEY DRYE & WARREN LLP
          200 Kimball Drive
          Parsippany, New Jersey  07054
          Telephone:  (973) 503-5900
          Attorneys for Defendant
          Synapse Group, Inc.

          Thomas E. Gilbertsen (*pro hac vice*)
          Joanna Baden-Mayer (*pro hac vice*)
          KELLEY DRYE & WARREN LLP
          3050 K Street, N.W., Suite 400
          Washington, D.C.  20007
          Telephone:  (202) 342-8400
          Facsimile:  (202) 342-8451

          OF COUNSEL:

          Gary A. Greene
          Chief Corporate Counsel
          Synapse Group, Inc.
          225 High Ridge Road, East Building
          Stamford, CT  06905
          Telephone:  (203) 391-0594
          Facsimile:  (212) 467-2395

          Attorneys for Defendant
          Synapse Group, Inc.