Geoffrey W. Castello (GC 1509)
Lauri A. Mazzuchetti (LM 8035)
KELLEY DRYE & WARREN LLP
200 Kimball Drive
Parsippany, New Jersey 07054
(973) 503-5900
Attorneys for Defendant
Synapse Group, Inc

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| CHARLES T. MCNAIR;<br>THEODORE AUSTIN;<br>DANIELLE DEMETRIOU;<br>USHMA DESAI; and<br>JULIE DYNKO,<br>on behalf of themselves and all<br>others similarly situated,<br><br>                    Plaintiffs,<br><br>           v.<br><br>SYNAPSE GROUP, INC.,<br><br>                    Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civ. Action No. 06-cv-5072 (JLL)(CCC) |

## CERTIFICATION OF THOMAS E. GILBERTSEN

THOMAS E. GILBERTSEN duly sworn hereby certifies as follows:

1.      I am a partner in the Washington, D.C. office of Kelley Drye & Warren LLP, and am admitted *pro hac vice* to this Court to represent Synapse Group, Inc. ("Synapse") in the above-captioned lawsuit. I make this declaration in support of Synapse's Memorandum of Law in Opposition to Plaintiffs' Motion for Class Certification, filed herewith.

2.      Attached hereto as Exhibit "A" is a true and accurate file-stamped copy of a June 15, 2006 order denying class certification in *Fingal v. MDSC Corp.*, No. 22032-00742 (Mo. Cir. Ct.).

3.      Attached hereto as Exhibit "B" is a true and accurate copy of cited excerpts from the transcript of the deposition upon oral examination of Plaintiff Theodore Austin taken by Synapse on December 11, 2007.

4.      Attached hereto as Exhibit "C" is a true and accurate copy of a document produced by plaintiffs and bearing production numbers MCNAIR 000043-45, representing Plaintiff Theodore Austin's bank statements reflecting magazine renewal charges of July 16, 2007.

5.      Attached hereto as Exhibit "D" is a true and accurate copy of cited excerpts from the transcript of the deposition upon oral examination of  Plaintiff Charles McNair, taken by Synapse on November 5, 2007.

6.      Attached hereto as Exhibit "E" is a true and accurate copy of cited excerpts from the transcript of the deposition upon oral examination of Plaintiff Danielle Demetriou, taken by Synapse on November 12, 2007.

7.      Attached hereto as Exhibit "F" is a true and accurate copy of cited excerpts from the transcript of the deposition upon oral examination of Plaintiff Ushma Desai, taken by Synapse on November 26, 2007.

8.      Attached hereto as Exhibit "G" is a true and accurate copy of cited excerpts from the transcript of the deposition upon oral examination of Plaintiff Julie Dynko taken by Synapse on April 5, 2008.

9.     I reviewed the full transcript of the deposition upon oral examination of Plaintiff Julie

Dynko and counted 117 instances in which Dynko testified that she did not recall events

sufficient to answer the questions posed.

10.     Attached hereto as Exhibit "H" is a true and accurate copy of documents produced by

plaintiffs and bearing production numbers MCNAIR 000039-41, representing printed pages of

plaintiffs' counsel's "CONSUMER INVESTIGATION WEBSITE," dated August 29, 2006.

I certify that the foregoing statements made by me are true.  I am aware that if any of the

foregoing statements made by me are willfully false, I am subject to punishment.

Dated: Sept. 3, 2008

Thomas E. Gilbertsen

# **<u>Gilbertsen Exhibit A</u>**

STATE OF MISSOURI    )
                     )
CITY OF ST. LOUIS    )



JUN 15 2006

MARIANO V. FAVAZZA
CLERK, CIRCUIT COURT
BY ———————— DEPUTY.

### MISSOURI CIRCUIT COURT
### TWENTY-SECOND JUDICIAL CIRCUIT
### (City of St. Louis)

CHRISTI M. FINGAL,              )
                               )
            Plaintiff,          )
                               )      Cause No. 2203-00742
v.                             )
                               )      Division No. 1
MDSC CORPORATION,              )
                               )
            Defendant.         )

### ORDER

This matter comes before the Court on (1) Plaintiff's motion for class certification and (2) Defendant's motion to preclude certain evidence offered by Plaintiff in support of her motion for certification. The latter motion is denied. As to class certification, the Court now rules as follows.

### I. BACKGROUND

The parties' familiarity with the factual and procedural background of this matter is presumed; and accordingly the Court will summarize it only briefly for purposes of this order.

Plaintiff Christi M. Fingal (Plaintiff) has brought the present action against Defendant MDSC Corporation (Defendant or MDSC) alleging that she was offered a free "trial subscription" to several magazines from MSDC or its affiliates in conjunction with her telephone order for catalog merchandise from Spiegel

1

Inc.[1]  She alleges that Defendant, a large seller of magazine subscriptions, sold many such subscriptions by means of "free trial offers" which were made to the customer over the phone by telemarketers for catalog merchandise, wherein the telemarketer would typically tell the consumer under the terms of the offer that the consumer would be able to cancel the subscription within a certain amount of time during the free "trial" period if dissatisfied with the magazines for any reason, etc.  Plaintiff alleges that these telephone offers for trial magazine subscriptions were typically made (both in her individual case and generally speaking) by catalogue merchandise telemarketers pursuant to contractual agreements with Defendant, in which the telemarketer, when pitching such an offer to the consumer on behalf of MDSC, was contractually required to read, substantially follow, and not deviate from an agreed-upon script.

In her particular case, Plaintiff alleges that she was told a number of misleading things when the offer for a free trial magazine subscription was made over the phone, and also that the catalog merchandise company's telemarketer with whom she spoke never informed her that it would provide Defendant MSDC with her credit card account information, such that MDSC could and would charge her credit card account for a full one-year subscription to each of the three magazines that she selected if she did not

---

[1] Spiegel Inc. is no longer a named Defendant in this action.

cancel the subscription before the expiration of the free trial period.

Plaintiff further alleges that as a general practice the Defendant, once a customer agrees to such a "free trial" offer, often essentially ignores a customer's attempts to cancel the magazine subscription (either before the expiration of the free trial period or afterwards), and/or that Defendant engages in a variety of practices designed to make it "unreasonably difficult" for the consumer to cancel the magazine subscription.

In her own particular case, Plaintiff alleges that after she accepted the free "trial offer" she began receiving the three magazines she chose, and within two months or so received a separate bill for each one of them. But, she claims, when she wrote "cancel" across each of these bills and promptly returned them in the mail---which, she alleges in her first amended petition[2], the Spiegel sales representative had told her was all she would need to do if she wished to cancel and not be billed for the magazines---these attempts to cancel were ignored by Defendant. Instead, Plaintiff says in her pleading, she was sent numerous post cards with a "1-800" number which indicated she would need to call that number to cancel the subscriptions. But,

---

[2] The record shows that Plaintiff's first amended petition, although not styled as such (it is titled "Class Action Petition") was filed on or about January 31, 2005. It was filed partly in response to the Court's earlier order dismissing two of Plaintiff's three counts, and partly due to some of the earlier-named defendants being dropped as party defendants.

Plaintiff alleges, calling the number listed on the cards only resulted in her being sent through "seemingly endless layers of phone menus, making it extremely difficult for a caller to actually speak with a live person" about the magazine subscription. Indeed, she alleges, she never succeeded in being able to speak with a live person.[3]

Thus, Plaintiff claims, even though some of the magazines began to stop coming even before the first year subscription period had run out, she nevertheless was billed in full for this "first wave" of the three magazines that she had ordered pursuant to the trial offer and had then tried to cancel. Specifically, she says, in August of 2001 her Visa card was charged $57 for the first magazine she had chosen, $50 for the second magazine, and $22 for the third. Then, she alleges, in May and June of 2002, her card was again charged the same amounts, for renewed subscriptions to the same magazines, after which magazines started coming to her again.

Finally, Plaintiff alleges as regards her own individual experience, none of the above charges was ever "authorized" by her in any meaningful sense, but instead they were completely un-authorized and contrary to her expressed intent to cancel the magazine subscriptions.

---

[3] Plaintiff does not indicate in her petition the number of times she called this number in an attempt to speak to someone, or if she tried more than once to do so.

4

Plaintiff seeks to bring her cause of action as a class action, on behalf of herself and "all persons nationwide who are similarly situated." Plaintiff alleges broadly that the above-mentioned conduct and marketing methods of Defendant violate the Missouri Merchandising Practices Act (MMPA, or Act), § 407.020 RSMo., *et seq.*, and constitute an "unlawful practice" as defined in the Act. She alleges that she and members of the putative class have suffered damages as a result of such conduct. The MMPA provides, in crucial part:

> The act, use, or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or concealment, suppression or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce . . . is hereby declared to be unlawful.

Section 407.020 RSMo. The Act further provides for a private cause of action to recover actual and punitive damages; and it specifically authorizes claims under the MMPA to be brought as class actions, in appropriate cases, "if the unlawful method, act or practice has caused similar injury to numerous other persons." Section 407.025 RSMo.

## II.  PROPOSED CLASS DEFINITION

As a preliminary matter, the Court will first note the somewhat odd fact that, apparently, Plaintiff has never filed a formal, written class action certification "motion" as such in this case. Defendant has noted at least twice in its briefs that

5

it has never been served with such a motion; and a review of the actual court file appears to indicate that no such motion was ever filed.[4] The Court does not see this apparent omission as any particular problem, but rather simply wishes to carefully note for the record that there appears to be no specific written "motion" for class certification that the Court can refer to, for guidance, in seeking to clarify any ambiguities or uncertainties that may exist regarding the precise parameters of the proposed class and the definition of the class.[5]

In that regard the Court will also note that, in the class action papers which Plaintiff *has* filed, she appears to be offering two different proposed class definitions, which differ from each other to a significant degree. The broader of the two proposed class definitions is found in the Plaintiff's Class

---

[4] The electronic docket sheet minute entries do appear to suggest that a "motion for class certification" was filed on or about August 11, 2005--some 10 months after Plaintiff filed her first legal memorandum in support of class certification. However, no such document appears in the actual Court file itself. The Court file instead suggests that the 8-11-05 minute entry actually refers to a document filed on that date by Plaintiff entitled "Memorandum To Clerk," in which Plaintiff merely advised the Court that she was passing the hearing on the issue of class certification, which at that time was scheduled for August 17, 2005, "to a time mutually acceptable to the parties and the Court."

[5] The Court is not aware of any rigid rule which absolutely requires that a **written** motion must always be filed before the Court may take up the issue of whether a cause styled as a class action may properly be certified as such, or that such a motion cannot be oral. To the extent that such a rule might otherwise exist, the Court believes it can be waived where, as here, the party opposing class action status has not objected on that basis, and where the parties instead have fully briefed the issue and proceeded with the matter just as if a formal "motion" seeking class certification had been filed.

Action Petition, in which she seeks to define the putative class as consisting of:

> all persons nationwide who have had unauthorized charges charged to their credit cards, debit cards, checking accounts, or other accounts for any amount by MDSC regardless of whether said charges were accompanied by unsolicited magazines.[6]

In contrast, in her later-filed "Amended Memorandum in Support of Class Certification," which was filed on or about May 31, 2005, Plaintiff proposes the following class definition, which is different from---and narrower than---the one above. The new definition differs in that it adds the below-underlined language; and the added words tend to both (a) attach some time constraints to the class definition which did not exist before, and (b) (at least to some extent), limit the scope of what could be meant by the phrase "unauthorized" charges[7]. This revised proposed class definition is:

> All persons nationwide who have had unauthorized charges charged to their credit cards, debit cards, checking accounts, or other accounts for any amount by MDSC after canceling a trial subscription, from 1998 through the present.

---

[6] See Class Action Petition, paragraph 44. The proposed class definition in Plaintiff's petition also contains standard boilerplate language (which the Court has not repeated, above) noting that Defendant or its affiliated parties, as well as the Court and its personnel, are excluded from the class.

[7] The revised proposed class definition also differs from the earlier one in that it omits the closing words "regardless of whether said charges were accompanied by unsolicited magazines." The omitted language is probably unnecessary, as the MMPA provides that a person receiving unsolicited merchandise may either refuse to accept delivery of the merchandise, or may deem it to be a gift and use it or dispose of it in any manner without obligation to the sender. See § 407.200 RSMo.

The Court will assume that the later, narrower proposed class definition is the one that Plaintiff is seeking to have the Court certify[8]. The Court notes that, although Defendant complained at the hearing on class certification that this later proposed definition amounted to something of a "moving target" for Defendant relative to the earlier one, the later definition is in fact more consistent with the arguments and overall theory of the case propounded in Plaintiff's briefs. Those arguments lay very heavy emphasis on the so-called "back end" of the transaction---(that is, Defendant's alleged practice of ignoring customers' attempts to cancel the trial subscriptions and/or making such cancellation efforts unreasonably difficult)---as constituting the real crux of this case, and as being the core determinant of whether billing charges for the magazine sub-scriptions should be deemed "unauthorized."

### III.   Class Action Standard

Rule 52.08(a)(1)-(4) and § 407.025.3(1)-(4) RSMo set out the prerequisites for a class action MMPA claim; they require, at a minimum, "that (1) the class be so numerous that joinder of all members is impracticable, (2) questions of law or fact common to

---

[8] The Court, if requested to do so, would reject the earlier, broader proposed definition as being far too vague and amorphous. The phrase "unauthorized charges" could mean a very wide variety of things in a variety of different contexts as applied to magazine subscriptions---whereas addition of the key qualifying phrase "after canceling a trial subscription" (which if generously construed would presumably include reasonable attempts to cancel) at least arguably gives "unauthorized charges" a more reasonably narrow focus and specific meaning.

the class exist, (3) the claims of the representative parties are typical of the claims of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." Craft v. Philip Morris Companies, Inc., No. ED 85142, 2005 Mo. App. LEXIS 1213, at *16-*17 (Mo. App. E.D., decided August 16, 2005)[9] (quoting State ex rel. American Family Ins. v. Clark, 106 S.W.3d 483, 486 (Mo. banc 2003)). These requirements are mandatory, and certification is appropriate only if each listed element is met. Id.

In addition to the requirements of Rule 52.08(a), a class must also satisfy one of the three requirements of Rule 52.08(b). Craft, 2005 Mo. App. LEXIS 1213, at *17; Clark, 106 S.W.3d at 487. Plaintiff has alleged facts indicating that she seeks certification under Rule 52.08(b)(3).[10] That rule allows a lawsuit

---

[9] The Missouri Court of Appeals' opinion in Craft is not final until full expiration of the applicable rehearing period. However, the Court of Appeals did deny the motion for rehearing/transfer in that case; and the case was apparently then removed to federal court for some period of time thereafter. Although the current status of Craft is still not entirely clear to this Court, it nonetheless appears that the Missouri Supreme Court has now denied a motion by the appellants seeking transfer of the cause to that court. (See entry in official minutes of Missouri Supreme Court dated May 30, 2006.) If so, then even though the Court of Appeals' opinion in Craft has not yet appeared in the official Southwestern 3rd Reporter, it would appear that Craft is now final, and thus may properly be cited and relied on as precedential authority in Missouri.

[10] As a fallback position, Plaintiff also makes a fleeting argument in her briefs that certification in her case would be appropriate as well under Rule 52.08(b)(1)((A). That rule permits class actions where prosecution of separate actions by individuals would present a risk of "inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class." The Court disagrees. Individual damages actions will of course always result (to some degree) in "varying adjudications;" but that fact alone does not show that such actions would establish "incompatible" standards of conduct. See Green v. Occidental Petroleum Corp., 541 F.2d 1335, 1340 (9th Cir. 1976).

to proceed as a class action if the court finds that common questions of law or fact "predominate over any questions affecting only individual members" and that "a class action is superior to other available methods for the fair and efficient administration of the controversy."

The burden of proof, to show that all of the necessary requirements are met, is on the party seeking class certi-fication. Craft, 2005 Mo. App. LEXIS 1213, at *17 (citing Coleman v. Watt, 40 F.3d 255, 258 (8th Cir. 1994)). See also Grossner v. Kandel-Iken Builders, Inc., 647 S.W.2d 911, 917-918 (Mo. App. E.D. 1983).

Because Missouri Rule 52.08 and Federal Rule of Civil Procedure 23 are identical, Missouri courts may consider federal decisions interpreting Rule 23 in interpreting Rule 52.08. Craft, 2005 Mo. App. LEXIS 1213, at *10. See also Union Planters Bank, N.A. v. Kendrick, 142 S.W.3d 729, 735 n.5 (Mo. banc 2004); Koehr v. Emmons, 55 S.W.3d 859, 864 n.7 (Mo. App. E.D. 2001).

## IV.  DISCUSSION

Because all required elements must be shown in order for class certification to be appropriate, if the Court determines that one or more specific required factors are lacking, then it need not extensively consider (or even consider at all) other required factors. See Saey v. CompUSA, Inc., 174 F.R.D. 448, 451 (Mo. App. E.D. 1997). Accordingly, because this Court, as

10

discussed more fully hereinafter, has determined that certain other elements are lacking, the Court will simply assume, without deciding, that Plaintiffs have shown the element of numerosity, as well as that there exist at least one or more common questions of law or fact.[11]   Instead, the Court's discussion will focus on two areas of difficulty which the Court believes preclude class certification in this instance.

### (1)   No Nationwide Class

The first and by far the most glaring difficulty with Plaintiff's proposed class is that, for a variety of related reasons, a nationwide class simply is not proper in this case.

Regardless of whether the problems associated with nation-wide classes are deemed to be an aspect of the "commonality" requirement or of the "predominance" requirement, the Missouri Supreme Court has made clear that such classes are not favored if they would require a trial court to contend with widespread variations in applicable state laws.

In State ex rel. American Family Ins. v. Clark, 106 S.W.3d 483, 486-487 (Mo. banc 2003), the court held that, even with

---

[11] The Court nonetheless briefly notes that, as a general matter, even as to these elements, Plaintiff has made a remarkably weak evidentiary showing. As Defendant notes, Plaintiff has offered virtually no formal evidence at all; and the supporting affidavit of a paralegal who works for Plaintiff's counsel's law firm, discussing the purported contents of a website (www.ripoffreport.com) on the Internet, would certainly be inadmissible hearsay at trial. Even so, the Court may perhaps be free to consider the affidavit---and, indeed, the Court has considered it, for what it may be worth---in the context of this class certification proceeding. However, the burden of proving the class action prerequisites still rests with the party seeking certification. Allegations alone are not enough, nor is mere conjecture.

differences in as few as fourteen states, multi-state classes should not be allowed in Missouri when there are significant differences in the state laws that would have to be applied to the class members in the various other states outside of Missouri.[12]

Although Clark articulated what amounts in substance to a fairly strong presumption against multi-state classes if the claim involves significant variations in the applicable state laws, that is precisely the type of class that Plaintiff here has proposed. Her only stated claim in the amended petition is under the Missouri Merchandising Practices Act. On its face the MMPA **only** applies to alleged conduct that emanates from or occurs in the State of Missouri (see 407.020.1 RSMo); and by the same token Missouri does not have the power to regulate purely out-of-state transactions affecting only non-Missouri residents. Thus, unless Plaintiff and her counsel can find some way to circumvent these inconvenient legal realities, a nationwide class is plainly precluded.

In an effort to achieve just such circumvention, Plaintiff argues that predominance of common questions can still be found if the overriding issue is deemed to be whether the alleged

_____

[12] As Judge Wolff noted in his separate concurring opinion in Clark, allowing such multi-state classes can also, depending on the nature of the class claims and the type of notice that out-of-state class members do or don't receive, implicate very serious jurisdictional concerns as well. See Clark, 106 S.W.3d at 493-495.

conduct of Defendant "violates the Missouri Merchandising Practices Act (and similar statutes of the other 49 states and the District of Columbia)."[13]   (emphasis added)   In this regard, Plaintiff argues that there is "significant similarity" among the various state laws concerning unfair and deceptive trade practices, and that any salient differences between them amount to merely "minor variations in the verbiage used."[14]

This Court disagrees. While it is true that there is a substantial degree of overlap in the various state consumer protection statutes, it is true as well--and this Court knows from its own independent research in previous cases with which it has dealt--that there are also numerous and **significant** variances among many of these statutes, which amount to far more than mere "minor" differences. (See also the in-depth discussion in Lyon v. Caterpillar, Inc., 194 F.R.D. 206, 218-222 (E.D. Pa. 2000), wherein class certification was denied on this very ground.)

In order for class certification of a multi-state class to be appropriate in cases involving significant differences among many various applicable state laws, a movant must "credibly demonstrate, though an extensive analysis of state law variances, that class certification does not present insuperable obstacles." Adams v. Kansas City Life Insurance Co., 192 F.R.D. 274, 277

---

[13] "Plaintiff's Amended Memorandum in Support of Class Certification," at 14.
[14] "Plaintiff's Amended Memorandum in Support of Class Certification, at 22-23.

(W.D. Mo. 2000).  See also Chin v. Chrysler Corp., 182 F.R.D. 448, 453 (D. N.J. 1998) (holding same).

Here, Plaintiff has made a good faith (albeit somewhat belated) attempt to provide such an "extensive analysis," in an effort to meet her burden of demonstrating that the consumer protection statutes of the 50 states and the District of Columbia under which she seeks class certification would "not present insuperable obstacles" to the implementation of the case as a class action.  Such effort was provided in the form of a 10-page spreadsheet offered to the Court and opposing counsel on the day of the class certification hearing, amounting to a rather simplistic survey of the various state statutes.  This survey focused on quoting the purported key "operative text" of each statute, on whether or not the respective state statute prohibited class actions[15], and on what kind of damages/costs each statute allowed.

The Court finds, however, that the survey which Plaintiff offered is not an extensive analysis[16], and comes nowhere near to

---

[15] According to the survey, at least six states flatly prohibit class actions under their respective consumer protection statutes---so presumably residents of those particular states could not be members of the proposed class in any event.

[16] Plaintiff's spreadsheet did not, for example, analyze variances among the state laws as to their intent/reliance requirements (if any), or what conduct is or is not deemed actionable, or their respective statutes of limitations; nor did it uniformly analyze whether a private right of action is allowed under the state's statute.  Nor has Plaintiff suggested a more narrowed and tailored nationwide class that at least in theory perhaps might take into account some of these factors; cf. Saey v. CompUSA, 174 F.R.D. at 449.

14

convincingly demonstrating that litigation of this matter as a class action would not present insuperable obstacles stemming from the variances in the 50+ different state laws. Instead, the Court finds the memorandum which Defendant filed in reply to Plaintiff's state law survey to be both a substantially more in-depth legal analysis, as well as more persuasive, on this issue. Likewise, the Court is persuaded by the careful reasoning and analysis set forth in Lyon v. Caterpillar, Inc., *supra*, 194 F.R.D. at 218-222.

The Court thus finds that because of the existence of the state law variances that would have to be dealt with by the Court if the proposed class were certified, common questions of law would not predominate over individual questions of law.

Notwithstanding the above finding, the Court believes it may also need to examine the conceptually separate issue of whether common questions of **fact** in this case may nevertheless "predominate" over the more individualized questions of law and fact. As to a possible nationwide class, there is some authority for the proposition that even the existence of marked state law variations is, standing alone, not always sufficient to preclude certification.

It is true that a number of courts, even some that have been most skeptical of using the fifty (50) different state consumer protection statutes as a basis for certifying a proposed

15

nationwide class, have nonetheless opined that the "mere existence of state law variations is not alone sufficient to preclude class certification," and indeed that such actions may sometimes be maintained "even when state law variations are marked."[17]   Lyon v. Caterpillar, Inc., 194 F.R.D. 206, 221 (E.D. Pa. 2000).

Those same courts, however, have also and at the same time held that in such cases common issues of fact, in order to overcome and "predominate" over divergent legal issues, must truly cut a wide swath and supersede the latter.  For the plaintiff must demonstrate not just that there may be some common questions, but "that individual factual inquiries do not predominate when all the relevant consumer fraud statutes are applied."  Lyon, 194 F.R.D. at 221.  "When state law variations are significant," courts will approve class certification only where "the evidence in each case on major factual questions was either identical or virtually so."  Id.

For reasons explained more fully below, the Court concludes the Plaintiff here does not meet that strict standard, especially inasmuch as the Court believes it would likely require a mini-trial in the case of each individual putative class member just

---

[17] The Court is uncertain whether that proposition is good law in Missouri given the pronouncements of our Supreme Court concerning multi-state classes and state law variances in Clark, supra, but recognizes that this question perhaps is one that remains somewhat unsettled and open to interpretation.

to determine if the person was, in fact, actually even a member of the class at all. Thus, this Court, like the court in Lyon, finds that the combination of some divergent factual issues, **coupled with** a mass of divergent legal issues stemming from the many state law variances, means that Plaintiff has failed to demonstrate overall "predominance" of common issues of law and/or fact with respect to the proposed nationwide class.

The Court further notes that even if Plaintiff had proposed the same class as herein except that the class was limited solely to Missouri residents (i.e., a statewide class rather than a nationwide class), there would still be at least some significant doubt as to whether, in the final analysis, common questions of law and fact truly "predominated" over individual questions in this case. That is in part because, given the nature of Plaintiff's claim and allegations that she tried to cancel the trial subscription but that Defendant largely ignored her efforts to do so, and/or that Defendant made the phone cancellation process overly difficult, it can perhaps be plausibly argued that this case---much like that in another proposed class action brought under the MMPA where class certification was denied--- would require extensive individual mini-trials for every putative class member just to even reliably determine "whether he or she

17

falls within the class definition." Saey v. CompUSA, 174 F.R.D. at 451.[18]

However, the Court need not decide whether a statewide class could properly be certified in this matter, because Plaintiff has not proposed such a class in any of her class action papers. It is not the Court's role to rule upon classes other than those a plaintiff has formally proposed and sought approval for.

### (2) Lack of Typicality/Adequacy of Representation

The Court further finds that in at least one crucial respect Plaintiff's individual claim is not "typical" of the claims of most class members, because the record in this case shows that a very serious doubt exists as to whether she purchased the magazines in question primarily for personal or family use. As a

---

[18] It must be remembered that class action treatment is still very much the exception, not the norm, even in many situations that might possibly involve consumer fraud. The class action is an "exception to the usual rule that litigation is conducted by and on behalf of individual named parties only." General Telephone Company Southwest v. Falcon, 457 U.S. 147, 155, 102 S. Ct. 2364 (1982). Thus, not all instances of an allegedly widespread pattern or practice of consumer fraud---even when they do meet the four basic requirements of numerosity, commonality, typicality and adequacy of representation---necessarily meet the predominance requirement. In that regard, the Court notes that in **this** case, unlike some cases of alleged unfair or deceptive trade practices where there may be clear proof in each individual instance as to whether or not a putative class member was in fact directly and adversely impacted by the challenged practice (i.e., whether or not the person is in fact even a class member at all), the proof as to class membership here likely would not be nearly so uniform and verifiable. Instead, such proof would appear to necessarily involve a highly **individualized** inquiry in each case as to what efforts the person allegedly made to cancel his or her magazine subscriptions; how many times he or she attempted (whether by phone or otherwise) to reach the company in an effort to cancel; what happened on each of those occasions; whether the efforts to cancel were made before or after the "free trial" period expired; etc.; etc. The requirement of Rule 52.08(b) that common questions must truly "predominate" over any individualized issues is a more stringent test than the commonality requirement of Rule 52.08(a). See Amchen Products, Inc. v. Windsor, 521 U.S. 591, 609, 117 S. Ct. 2231 (1997).

result of this cloud over her individual claim, the Court finds Plaintiff also has not shown that she would adequately represent the interests of the class.

Typicality, in certain respects, is closely related to the ability of a plaintiff to be an adequate representative of class members.  See Amchen Products, Inc. v. Windsor, 521 U.S. 591, 620 (1997).  The underlying premise of the typicality requirement "is simply stated:  as goes the claim of the named plaintiff, so goes the claim of the class."  Sprague v. General Motors Corp., 133 F.3d 388, 399 (6th Cir. 1998).  Typicality is negated when the named plaintiff's claims are unlike those of the absent class members, and/or if there exists a substantial defense unique to the named plaintiff.  Id.; see also Hanon v. Dataproducts Corp., 976 F.2d 497, 508 (9th Cir. 1992).

To satisfy the adequacy requirement, a plaintiff must establish that his interests are coextensive with the putative class, that he has no conflict of interest with the class, and that he will fairly and adequately represent the interests of the putative class; he must also show that his counsel is competent to handle a class action.  Linquist v. Bowen, 633 F. Supp. 846, 859 (W.D. Mo. 1986).  A plaintiff must allege **and prove** facts showing that the plaintiff would adequately represent the class. Craft, 2005 Mo. App. LEXIS 1213, at *19 (citing Kansas City Terminal Ry. Co. v. Industrial Commission, 396 S.W.2d 678, 680

(Mo. 1965)).   Adequate representation "is a fact issue that must be determined under the circumstances of each case."[19]   *Id.* (citing *City of O'Fallon v. Bethman*, 569 S.W.2d 295, 299 (Mo. App. 1978)).

When evaluating adequacy of representation, the trial court must determine if the named plaintiff representative has any conflicts of interest which would adversely affect the interests of the class.   *Id.* (citing *Union Planters*, 142 S.W.3d at 735). This requirement "is particularly important because the due process rights of absent class members may be implicated if they are bound by a final judgment in a suit where they were inadequately represented by the named plaintiff."   *Id.*

It has often been held that representation cannot be adequate, and hence that class certification is not appropriate, "where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation." *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2nd Cir. 1990); see also *Hanon v. Dataproducts*, *supra*, 976 F.2d at 508.

_____

[19] In this regard the Court further notes that, although in determining the propriety of a class action the court generally should avoid any "preliminary inquiry into the merits" of the action (since the issue is not whether the plaintiff likely will prevail on the merits but rather whether the requirements of a class action have been met), nevertheless, it is proper for the court to look at the factual setting of the case and consider the merits to the extent that the merits are intertwined with the issue of whether the class action prerequisites have been met. See *Craft*, 2005 Mo. App. LEXIS 1213, at *12-14.

Here, the Plaintiff is subject to a "unique defense," which would inevitably become a major focus of the litigation in her own particular case.   It is undisputed that Plaintiff ordered the magazines in question from her law office, **and** that they were **sent to** her law office, not her personal residence.   Thus, the record shows there is some real doubt, and a genuine question of fact exists, as to whether Plaintiff ordered the merchandise "primarily for personal, family or household purposes" as the statute requires (see § 407.025), or whether instead she ordered them mainly for business use.[20]   Therefore, although this issue is, as the Court has previously ruled due to the standard which governs motions to dismiss for failure to state a claim, not an issue on which the Defendant can properly seek to have Plaintiff's MMPA claim dismissed[21], it nonetheless is an issue which Defendant clearly can raise and assert as a potentially

---

[20] Contrary to what Plaintiff argues on pages 2-4 of her "Consolidated Reply Memorandum in Support of Class Certification," this issue was **not** somehow "fully and finally resolved" merely because Plaintiff testified in her deposition that she usually took the magazines home to read, that she wasn't sure whether they were ever set out in her office for her clients to read, or because she testified--with poor supporting documentation--that she did not deduct the cost of the magazines from her taxes as a business expense.   Simply put, the jury would not be required to automatically believe Plaintiff's testimony on this point.   On the contrary, the fact that Plaintiff had the magazines mailed to her business address rather than to her home is alone sufficient to support an inference that they were primarily intended for business use; and given the overall record here a reasonable trier of fact would be free to find **either** that the magazines at issue were purchased primarily for personal use, **or** that they were not.

[21] See page 3 of the Court's order in this cause entered on October 29, 2003, the Hon. Michael P. David.

viable defense against Plaintiff---and on which, quite possibly, the Defendant might ultimately prevail.

Moreover, this is a defense which in a real sense would be "unique" to the Plaintiff compared to other class members, since obviously the vast majority of persons who purchase general circulation magazines do so for personal or family/household use rather than for business use. Still further, it is all the more a concern because this issue, properly speaking, is not even an "affirmative defense"---something which a defendant normally has the burden of establishing. Rather, the requirement that a plaintiff must have ordered the merchandise "primarily for personal, family or household purposes" is a **necessary element** of the plaintiff's cause of action, and something which she therefore has the burden of proving[22]. Without establishing this element, Plaintiff simply has no cause of action under the MMPA at all.

Given these considerations, the Court is not persuaded that Plaintiff's claim would be typical of the putative class, or that she could adequately represent the interests of the class when her own claim is so freighted with a unique and potentially viable defense.

----

[22] This is so because the requirement that the merchandise must have been purchased "primarily for personal, family or household purposes" is an express requirement of the part of the Act which creates a private cause of action under the MMPA. (See § 407.025.1 RSMo.) It therefore is a necessary element of such a private claim, though actions brought by the Attorney General under the Act are not subject to the same limitation.

## V. CONCLUSION

**WHEREFORE**, for the foregoing reasons, it is hereby ordered that Plaintiff's motion for class certification is **denied.** It is further ordered that "Defendant's Motion to Preclude Certain Evidence Submitted in Support of Plaintiff's Motion for Class Certification" is **denied as moot.**


                              **SO ORDERED:**

                              _____
                              John J. Riley, Presiding Judge

Dated: _June 15_, 2006


cc:  James J. Rosemergy, Attorney for Plaintiff
     CAREY & DANIS, LLC
     8235 Forsyth Blvd., Suite 1100
     St. Louis, MO  63105

     Jason E. Maschmann, Attorney for Defendant
     BRYAN CAVE LLP
     211 N. Broadway, Suite 3600
     One Metropolitan Square
     St. Louis, MO  63102

# Gilbertsen Exhibit B

Austin, Theodore - Vol. I                    December 11, 2007

1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW JERSEY

- - - - - - - - - - - - - - - X

CHARLES T. McNAIR, on behalf    :

of himself and all others       :

similarly situated,             :

   Plaintiffs,    :    Civil Action No:

  v.                   :    2:06-CV-05072

SYNAPSE GROUP, INC.,            :    (JLL)(CCC)

   Defendants.    :

- - - - - - - - - - - - - - - X

     Washington, D.C.

     Tuesday, December 11, 2007

   Deposition of THEODORE AUSTIN, a

Plaintiff herein, called for examination by counsel

for Defendants in the above-entitled matter, pursuant

to notice, the witness being duly sworn by SUSAN L.

CIMINELLI, CRR, RPR, a Notary Public in and for the

District of Columbia, taken at the offices of Kelley

Drye & Warren, LLP, 3050 K Street, N.W., Washington,

D.C., at 10:05 a.m.

ORIGINAL

Austin, Theodore - Vol. I                                      December 11, 2007

4

1                   P R O C E E D I N G S

2    Whereupon,

3                   THEODORE AUSTIN,

4    was called as a witness by counsel for Defendant, and

5    having been duly sworn by the Notary Public, was

6    examined and testified as follows:

7               EXAMINATION BY COUNSEL FOR DEFENDANT

8               BY MR. GILBERTSEN:

9        Q.    Good morning, Mr. Austin.

10       **A.    Good morning.**

11       Q.    Could you please state your name for the

12   record?

13       **A.    Theodore William Austin, Jr.**

14       Q.    And Mr. Austin, have you ever had your

15   deposition taken before?

16       **A.    Negative.**

17       Q.    The way it works is not terribly

18   complicated.  I will ask you a series of questions

19   and if you understand them, you will answer them.  If

20   you don't understand a question that I ask, though, I

21   would just ask that you bring that to my attention

22   and I'll try to ask a better question, so that you --

Austin, Theodore - Vol. I                              December 11, 2007

5

1    so that we are communicating.  It's not an endurance

2    contest, you know.  If you need to take a break, just

3    say so.  I would only ask that you not take a break

4    while a question is pending, okay?

5         A.    Okay.

6         Q.    You stated your name for the record and

7    what is your address?

8         A.    My house?

9         Q.    Yes.

10        A.    Where I live?

11        Q.    Yes.

12        A.    1234 Massachusetts Avenue, Northwest, Apt.

13   601, Washington, D.C., 20036.  I'm sorry.  20005.

14        Q.    And what line of work are you in?

15        A.    I have two jobs, actually.  I work for --

16   during the day, I work at Carnegie Endowment for

17   International Peace in office services there, and I'm

18   also a doorman at a nightclub, at night.

19        Q.    And could you give us a brief rundown of

20   your educational background?

21        A.    Some college.

22        Q.    Where was that?

Austin, Theodore - Vol. I                    December 11, 2007

10

1   this lawsuit, Charles McNair and others versus

2   Synapse Group, Inc.?

3       A.    That's correct.

4       Q.    And how did you come to find out about

5   this lawsuit?

6       A.    I went -- after calling Synapse to try to

7   cancel a magazine and get my money back, I was a

8   little frustrated that I couldn't talk to a human, so

9   I Googled anything about Synapse.  I just wanted to

10  talk to a person, and what I found was rip-off report

11  and I read that, a little bit about that.  And it

12  said that there was more people that had the same

13  type of problem with this, with Synapse.  And I

14  clicked on that link, which led me to another page

15  that I filled out information.  And then I got an

16  email back regarding the class action suit.

17      Q.    Who emailed you?

18      A.    I believe it was Michael Greene.

19      Q.    Do you recall when that was?

20      A.    It was during the summer.

21      Q.    The summer of this year?

22      A.    This year.  Yes.  This year.

Henderson Legal Services, Inc.

202-220-4158              www.hendersonlegalservices.com

Austin, Theodore - Vol. I                    December 11, 2007

18

1    that?

2         A.    Yes.  It was during lunch.  It's when I

3    always relieve the receptionist so she can go to

4    lunch.

5         Q.    Do you recall there being a button on the

6    screen that you saw that in addition to continue or

7    yes, there was another button that said no thanks?

8    Did you see a button like that?

9         A.    There might have been a no thanks or

10   cancel.  This is a long time ago.  I'm not sure.  I'm

11   not sure.

12        Q.    In terms of the time frame when you

13   selected these magazines that day on the Internet,

14   could it have been in April 2006?

15        A.    April 2006.  Yes it could have been April

16   2006.  Did I say April 2005?

17        Q.    Yes.

18        A.    Correction.  I didn't move to D.C. until

19   October of 2005, and so yes.  That would probably --

20   I started at Carnegie in March of 2006.  So yes.  It

21   would be -- that would be it.  April or May.

22        Q.    After you visited the website, did you --

Austin, Theodore - Vol. I                    December 11, 2007

19

1    and let me start again, and make sure I ask you this

2    clearly.  After that day when you selected these

3    three magazines as you've described it, did you go

4    back to that website again on the following day in an

5    attempt to either -- well, for any reason?  Do you

6    recall doing that?

7        A.    No.

8        Q.    Other than the time you have just

9    described, was there any other time when you selected

10   magazines on a website?

11       A.    There might have been a time before that.

12       Q.    Is it your recollection that you ordered

13   Maxim, ESPN and National Geographic at the same time,

14   and on the same day during that same visit to -- to

15   the web that you described earlier?

16       A.    Yes.

17       Q.    Is it possible that you ordered two of the

18   magazines in March of '06 and then -- Maxim and ESPN,

19   and then ordered National Geographic a month later in

20   April of '06?

21       A.    I'm not exactly sure, because -- and the

22   reason I say that is because I had a subscription

Austin, Theodore - Vol. I                    December 11, 2007

20

1    with National Geographic magazine.   And I know that I

2    was getting two of them every month, so I called

3    National Geographic and I asked them to cancel my

4    subscription.   And they said that they had me on --

5    that they had me on there twice.

6              At the time, I didn't think -- I mean,

7    still, I don't know whether there was an actual

8    connection between whether it was from Synapse or

9    from me ordering from National Geographic, but I know

10   they were billing me twice.   And I was getting two

11   sets of magazines, and I have a very small mailbox

12   and it was clogging --

13        Q.    That's a big magazine?

14        A.    Well, two of them.   And then along with

15   other magazines I was getting at the time, I was

16   single, living in a very small efficiency apartment,

17   so it was like I needed something to --

18        Q.    So were you able to cancel one of them?

19        A.    Yes.

20        Q.    How did you go about doing that?

21        A.    I called National Geographic, went through

22   a few prompts and got an operator.   And then I was

Austin, Theodore - Vol. I                     December 11, 2007

21

1    talking to someone and she asked if I would like to

2    cancel, and I said yes.  And then I think that was

3    that.

4         Q.    Did you have any trouble getting through

5    the prompts to reach the live operator?

6         A.    No.

7         Q.    Did the live operator try to talk you into

8    keeping your second subscription?

9         A.    She might have.  I mean, that stuff goes

10   in one ear and -- when I'm focused on doing -- it's

11   like --

12        Q.    It goes in one ear and out the other?  Is

13   that what you were going to say?

14        A.    Yes.  It's like no, I just want to cancel.

15        Q.    And so was it your intent to cancel one of

16   the National Geographics and continue receiving the

17   other?

18        A.    I don't recall at the time.  I remember,

19   and I mean, I'm just trying to use memory pegs.

20        Q.    Sure.

21        A.    I do remember that my mail couldn't be

22   delivered in my mailbox because I had so many

24

1    **just look for them on line.**

2        Q.    Would you be able to recover your bank

3    statement for the month of July 2006?

4        **A.    2006.  I'm sure that that's possible.  I**

5    **know that, to answer your question, yes.**

6        Q.    Let me just make sure that I understand.

7    To the best of your recollection, did you or did you

8    not get a refund when you canceled that second

9    National Geographic subscription?

10            MR. BRAUNSTEIN:  Object.  It's been asked

11   and answered.  You can answer.

12            THE WITNESS:  Sorry.

13            MR. BRAUNSTEIN:  You can answer.

14            THE WITNESS:  I don't recall.  I don't

15   remember.  But I would -- I would think that I did.

16            MR. BRAUNSTEIN:  I don't want you to

17   guess.  What you know.

18            THE WITNESS:  What I know for a fact, I

19   can't remember.  I would have to research that.  I

20   would have to find out.

21            BY MR. GILBERTSEN:

22       Q.    Did you ask the live rep that you spoke

Austin, Theodore - Vol. I                                    December 11, 2007

25

1    with for a refund?

2        A.    I think, now that -- I think I did.  I

3    think she said that it would be returned.  But what I

4    can't remember was whether I canceled -- I'm -- I

5    think I canceled everything, so it wasn't one or -- I

6    think I canceled both of them and asked for a refund

7    on one of them, because I was being double billed.  I

8    was getting double subscriptions of the magazine.

9        Q.    And when you say that you would -- you

10   would research it to find out if you got a refund,

11   how would you go about that?

12       A.    I would have to just get -- I would have

13   to contact Bank of America and see if I could get two

14   years of bank history of my bank statements.  The

15   ones that are on line, I believe, don't go back that

16   far.

17              MR. GILBERTSEN:  Mr. Braunstein, may I ask

18   that the plaintiffs do that?

19              MR. BRAUNSTEIN:  Can you just -- I'll take

20   it under advisement.  If you would follow up in

21   writing, that would be great.

22              MR. GILBERTSEN:  Well, I think it would be

Austin, Theodore - Vol. I                    December 11, 2007

26

1    responsive to the document request that accompanied

2    the Notice of Deposition.

3              BY MR. GILBERTSEN:

4        Q.    Did there come a time when you cancelled

5    the ESPN Magazine?

6        A.    Yes.

7        Q.    And how did you go about doing that?

8        A.    I went on line to check my bank statement

9    and noticed that there was a withdrawal from my bank

10   account for ESPN Magazine.  There was a number on

11   there.  I called that number.  And then I went

12   through an automated service, very -- I thought it

13   was a very confusing automated service to cancel that

14   magazine.  It wasn't -- it took some time.  I mean, I

15   was looking to speak to, I thought I would be

16   speaking to a human, but I never got that menu.  So

17   --

18       Q.    How long did it take to cancel the ESPN

19   Magazine through that system?

20       A.    Five minutes, five, six minutes.  I think.

21       Q.    And did you get a refund for that?

22       A.    Not immediately.  No.  It took some time.

Austin, Theodore - Vol. I                    December 11, 2007

1      Q.     How long did it take?

2      A.     I can't recall exactly.  I remember I

3   checked my bank account for a few days and it didn't

4   appear.  And then it took some time for it to appear,

5   but when it did appear, it appeared several days

6   after I made that call.  But it took some time, but

7   it did appear.

8      Q.     And how about the Maxim title?  Were you

9   able -- or subscription.  Were you able to cancel

10   that as well?

11      A.     Yes.  Again, the same thing.  Same

12   process.  However, on the refund, I was not refunded

13   the same amount that was taken out.

14      Q.     Do you recall how much you were refunded?

15      A.     Yes.  It was a $20 withdrawal.  I was

16   refunded 18.33.

17      Q.     So you were charged $20 for a renewal to

18   Maxim, correct?

19      A.     I guess it was -- yes.

20      Q.     And do you recall, was that for an

21   additional year of Maxim?

22      A.     I don't know -- I didn't know I was even

Austin, Theodore - Vol. I                    December 11, 2007

29

1    renewal to them?

2          A.    No.   No.

3          Q.    So as far as you're concerned, you've

4    never seen any kind of mailer from Synapse that

5    provides notice of a renewal to these subscriptions

6    and what you could do to either continue receiving

7    them or cancel them?

8          A.    That's correct.

9          Q.    You've indicated that you called some

10   telephone numbers to cancel these subscriptions that

11   we've been talking about.   Where did you obtain the

12   telephone number that you called?

13         A.    It was off my bank statement.

14         Q.    Off of your bank statement?

15         A.    That's correct.   It shows the -- it said

16   TX, TWX or TXW or something like that.   And it said

17   either Maxim or ESPN.   And then it had a 1-800 number

18   that's right next to it.

19         Q.    And is that the number that you, those are

20   the numbers that you called for all of the magazines

21   that we've been talking about to cancel them?

22         A.    That's correct.

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

Austin, Theodore - Vol. I                    December 11, 2007

35

1       Q.    May of '07?

2       **A.    May -- got here on June 11th.   Yes.   May**

3  **of '07.**

4       Q.    Did you have a computer in your home

5  before then?

6       **A.    Yes, I did.**

7       Q.    You indicated that for these magazines

8  that we've been talking about today, and your visit

9  to the Internet when those were ordered, that this

10  was from a computer at work while you were relieving

11  the receptionist during her lunch hour.   Do you

12  recall that?

13      **A.    That's correct.**

14      Q.    Do you have access to a computer -- let me

15  start again.   At work, is there a computer that's

16  assigned to you for your use?

17      **A.    That's correct.   Yes, sir.**

18      Q.    Did you ever receive any email

19  notifications confirming your order of the magazines

20  back in -- when you ordered them?

21      **A.    I don't believe so.   No.**

22      Q.    And is that true for your computer at

Case 2:06-cv-05072-JLL-CCC   Document 123-2   Filed 07/19/10   Page 43 of 123 PageID: 8419

1    left, Massachusetts House on the right.  Right by --

2    going down towards the convention center.

3         Q.    You're pretty close to downtown, like

4    Logan Circle, somewhere around there?

5         A.    Yes.

6         Q.    There is beautiful buildings there as

7    well.  So what's the situation where your mailbox is?

8    Do you just have like a rectangular box that's in a

9    matrix of other mailboxes?

10        A.    That's correct.  It's about that big.

11        Q.    And you're indicating, but it's hard --

12        A.    It's about that big.

13        Q.    What are the dimensions, would you say?

14   It's like three by five maybe, or less.

15        A.    About four -- maybe four by four, four

16   inches -- well, maybe five inches by five inches.

17        Q.    And what -- what's your usual practice

18   with your mail?  Do you review it every day?

19        A.    I have my moments.  There are times when I

20   come in and, the time -- okay, in the routine, a

21   normal routine that I try to set up was to when I get

22   off work to go check the mail, but the mail didn't --

Case 2:06-cv-05072-JLL-CCC   Document 123-2   Filed 07/19/10   Page 44 of 123 PageID: 8420

1     I get off at 4:30, the mail gets delivered at five.

2     So I couldn't go check the box.  So periodically, I

3     know on Tuesdays, I check the mail.  I mean,

4     Wednesdays and Fridays and my roommate also checks

5     the mail occasionally.

6          Q.    For how long have you had a roommate?

7          A.    About a year, a little over a year.  It

8     was not just until recently he started checking the

9     mail because he wasn't paying the full rent, so I

10    controlled the mailbox key as well as some other

11    keys.

12         Q.    You did what now?  I'm sorry?

13         A.    I controlled the mailbox key.

14         Q.    I thought you were going to tell me you

15    put him to work?

16         A.    No.

17         Q.    What are you looking for in this case?

18    What are your losses?

19         A.    The last National Geographic where I tried

20    to cancel, I tried to cancel that and it sent me to

21    some survey.

22              MR. BRAUNSTEIN:  I'm going to object to

Austin, Theodore - Vol. I                          December 11, 2007

45

1    time that this has taken up.  I mean, it's not -- I

2    don't know.  I mean, other than -- I mean, $20 got

3    taken out, I got back $18.33.  I mean, during that

4    whole time when my son was here and the money was

5    getting taken out and there was some stress involved.

6    There was -- but other than that, I mean, I would

7    have to say no.  I mean, I would like just my money

8    back and you know, as far as monetarily.

9              BY MR. GILBERTSEN:

10        Q.    Do you recall the sequence of events from

11   this past summer when you called to try to cancel

12   this last subscription to National Geographic, this

13   was after you had been on the website rip-off.com and

14   you had done that research to find the law firm and

15   you filled out the form, or which came first?

16        A.    The actual events went, and that actually

17   happened very quickly.  It was the -- I tried to call

18   and cancel.  Couldn't cancel.  Looked, started -- I

19   then started looking for any information regarding

20   Synapse, so I can speak to someone.  I found the

21   report.  Filled out the form.  Maybe between half an

22   hour and hour later, I was contacted by Michael

Austin, Theodore - Vol. I                    December 11, 2007

46

1   **Greene and then I was told at that time.**

2          MR. BRAUNSTEIN:   Stop.  If you were told

3   by Michael Greene, don't relate --

4          BY MR. GILBERTSEN:

5   Q.   Don't tell me what he told you, but you

6   can continue with the chronology of events.

7          MR. BRAUNSTEIN:  Anything Mike said to you

8   leave out, but when and how is fine.

9          THE WITNESS:  And that's when I stopped

10   trying to contact Synapse.  That was it.

11          MR. GILBERTSEN:  Let me take one more

12   quick break and we'll wrap things up, I believe.

13          (Recess.)

14          BY MR. GILBERTSEN:

15   Q.   Do you remember providing an email address

16   when you were on the Internet ordering the three

17   magazines that we have been talking about this

18   morning?

19   **A.   I can't recall for sure.**

20   Q.   When you're ordering things on line from

21   Columbia House or Scholastic Books or whomever, what

22   email address do you provide?

# **<u>Gilbertsen Exhibit C</u>**

Bank of America | Online Banking | Account Details | Transaction Register Print          Page 1 of 3

# Bank of America

**Online Banking**

## MyAccess Checking – 53⬛: Account Activity

**Balance Summary**

**$280.97**
Available Balance
as of 07/25/2007[1]

**View:** Today (July 25, 2007)

**All transactions:**

| Date ↓ | Record | Type | Status | Amount | Balance |
|--------|--------|------|--------|--------|---------|
| 06/13/2007 | BKOFAMERICA ATM | | | | |
| 06/12/2007 | | | | | |
| 06/12/2007 | | | | | |
| 06/11/2007 | | | | | |
| 06/11/2007 | | | | | |
| 06/11/2007 | CHECKCARD 0610 TWX*1KXHXW*ESPN MAG 800-973-2664 NY 24692187161000973349983 | | C | $24.00 | $232.45 |
| 06/11/2007 | | | | | |
| 06/11/2007 | | | | | |
| 06/11/2007 | | | | | |
| 06/11/2007 | | | | | |
| 06/11/2007 | | | | | |
| 06/11/2007 | | | | | |
| 06/11/2007 | | | | | |
| 06/11/2007 | | | | | |
| 06/08/2007 | | | | | |
| 06/08/2007 | | | | | |
| 06/08/2007 | | | | | |
| 06/08/2007 | | | | | |
| 06/07/2007 | | | | | |
| 06/07/2007 | | | | | |
| 06/07/2007 | | | | | |

MCNAIR 000043

7/25/2007

Bank of America | Online Banking | Account Details | Transaction Register Print        Page 2 of 3

06/21/2007

06/21/2007

06/20/2007

06/20/2007

06/20/2007

06/20/2007        500 262-2001 IN 2469216717000071794833        198.98   $156.61

06/19/2007    CHECKCARD 0618 TWX*1KXHXW MAXIM MAG        C    -$20.00   $136.61
              800 205-8198 NY 24692167169000051769146

06/18/2007

06/18/2007

06/18/2007

06/18/2007

06/18/2007

06/18/2007

06/18/2007

06/18/2007

06/18/2007

06/18/2007

06/15/2007

06/15/2007

06/15/2007

06/15/2007

06/13/2007

06/13/2007

06/13/2007

06/13/2007

06/13/2007

06/13/2007

06/13/2007    CHECKCARD 0612 TWX*1KXHXW ESPN MAG        C    -$24.00   $430.22
              Stamford NY 74692167163000131636928

MCNAIR    000044

7/25/2007

07/19/2007

07/18/2007

07/18/2007

07/18/2007

07/18/2007

07/18/2007

07/17/2007

07/17/2007

07/16/2007

07/16/2007

07/16/2007

07/16/2007

07/16/2007

07/16/2007

07/16/2007

07/16/2007

07/16/2007    CHECKCARD 0716                                    $34.00    $642.94
              TWX*H32P55*NTLGEOGRPHC 800-205-9198 NY      C
              2469216719600009099111731

07/16/2007

07/16/2007

07/13/2007

07/13/2007

07/13/2007

07/13/2007

07/13/2007

07/13/2007

07/13/2007

07/13/2007

MCNAIR    000045

7/25/2007

# Gilbertsen Exhibit D

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CIVIL ACTION NO:  2:06-CV-05072 (JLL)(CCC)

CHARLES T. McNAIR, THEODORE    :
AUSTIN, DANIELLE DEMETRIOU,
STEVEN NOVAK, ROD BARE,        :
USHMA DESAI and JULIE
DYNKO, on behalf of            :
themselves and all others          DEPOSITION OF:
similarly situated,            :
                                   CHARLES T. McNAIR
            Plaintiffs,    :

            -vs-           :

SYNAPSE GROUP, INC.,           :

            Defendant.    :

------------------------------


B E F O R E:

      SHARON B. STOPPIELLO, a Certified Court

Reporter and Notary Public of the State of New

Jersey, at the offices of KELLEY, DRYE & WARREN,

L.L.P., 200 Kimball Drive, Parsippany, New Jersey,

on Monday, November 5, 2007, commencing at 10:30

a.m., pursuant to Notice.

DepoLink
Court Reporting & Litigation Support Services
Phone (973) 353-9880    Fax (973) 353-9445
www.depolinklegal.com

Page 4

1            (Various documents are received and

2         marked D-1 through D-3 for identification by

3         the Reporter.)

4  C H A R L E S   T.   M c N A I R, 17 Pinkneyville

5         Road, Sparta, New Jersey, is sworn.

6  DIRECT EXAMINATION BY MR. CASTELLO:

7            Q      Good morning, Mr. McNair.  My name is

8  Geoff Castello.  I'm an attorney with the law firm

9  of Kelley, Drye & Warren.  We represent the

10  defendant in this action.  We met a little bit

11  earlier this morning.  I'm just going to go over

12  some ground rules for today.

13            The first thing I'm going to ask you to do

14  this morning is just let me finish whatever I'm

15  saying before you speak.  The court reporter, who's

16  sitting to your left, is going to take down every

17  word that we say.  So if we talk over each other,

18  and I may talk over you, she will not be able to

19  take down our words.  So if you're not done

20  answering one of my questions and I start to talk

21  over you, just tell me to stop, let me know that

22  you're not done answering and I'll stop.  Okay?

23            If I ask you a question this morning and you

24  answer it, I'm going to assume that your answer is

25  your honest answer.  Do you understand that?

```
 1    A       Not always.

 2            Q       When you purchased the four magazines

 3    that came up at the end of your transaction in

 4    August of 2005, did any kind of terms and conditions

 5    or any offer details pop up on your screen?

 6    A       No.

 7            Q       I ask you to take a look at

 8    Defendant's Exhibit 3, McNair 1.  Would you like to

 9    take a moment to read that?  I'm going to ask you a

10    couple of questions about it.

11    A       Okay.

12            Q       Prior to today, Mr. McNair, have you

13    ever seen this document before?

14    A       Yes.

15            Q       Is this a document that you provided

16    to your attorneys?

17    A       Yes.

18            Q       Can you tell me what this document

19    is?

20    A       It's a confirmation e-mail from, it says

21    their processing for subscriptions.

22            Q       Just for the record, McNair 1, which

23    is attached to Defendant's Exhibit 3, reads, "From

24    orders at Mybonuscenter.com to

25    zoespap21c@earthlink.net; is that correct, Mr.
```

1    McNair?

2    A      Yes.

3           Q      Is that your e-mail address on

4    earthlink.net?

5    A      It was at the time.

6           Q      And then it lists four magazines; is

7    that right?

8    A      Yes.

9           Q      Are those magazines that you allege

10   you purchased in the complaint on or about August

11   26th of 2005?

12   A      Yes, they are.

13          Q      I'd like you to look about

14   three-quarters of the way down the page, and I'll

15   read for you where I'd like you to pick up.  It

16   reads, "Your account will be used to process your

17   magazine selections with all the renewal benefits

18   described in the offer details."  Do you see that?

19   A      Yes.

20          Q      When it says, "your account," do you

21   know what that's referring to?

22   A      No.

23          Q      How did you pay for these four

24   magazines when you purchased them on or about August

25   26th of 2005?

Page 59

1          Q        And do you recall making one or more

2     calls to an 800 number in connection with these

3     magazines on July 12th of 2006?

4     A        I cannot recall.

5          Q        Do you recall calling the 800 number

6     that I gave to you earlier, 800-601-1958?

7     A        I recall placing calls to more than one

8     number.  Whether or not it was that specific number,

9     I do not know.  Since I wrote it down, probably,

10    yes.

11         Q        Do you recall placing a second call

12    on July 12th of 2006 and inquiring about a charge

13    amount for Time magazine?

14    A        Yes.

15         Q        Do you recall a prompt to that

16    effect?

17    A        No.

18         Q        Do you recall indicating to a

19    voice-activated system the second time that you

20    called an 800 number, responding "yes" regarding an

21    inquiry about Time magazine?

22    A        Not specifically.

23         Q        Do you recall being presented with

24    promotional offers regarding this magazine?

25    A        No.

DEPOLINK COURT REPORTING & LITIGATION SERVICES   (973) 353-9880

Page 60

1        Q        Do you recall a prompt stating, "Do

2    you want me to cancel just your future charges so

3    you can enjoy the remaining magazines you've already

4    paid for"?

5    A        I recall a similar quote, but it did not

6    include the "future" part of it.  It said, Do you

7    want to receive the magazines you've already paid

8    for.

9        Q        And how did you respond?

10   A        That time?

11       Q        Yes.

12   A        "No."

13       Q        Was your intention to cancel your

14   subscription that was currently existing?

15   A        Yes.

16       Q        Do you recall hearing the voice --

17            MR. GREEN:  If you could just tell us

18   what you mean by "currently existing"?

19            MR. CASTELLO:  On July 12th of 2006.

20            MR. GREEN:  Okay.

21            MR. CASTELLO:  Off the record.

22            (A discussion is held off the record.)

23       Q        Do you recall, Mr. McNair, hearing

24   the voice system say, "I'm sorry you didn't enjoy

25   Time magazine.  I've processed your cancellation"?

Page 80

1    is that right?

2    A       I thought so, but it never got acknowledged

3    or answered.

4            Q       Where did you find the website that

5    you sent the e-mail to?  I'll find it in a second.

6    A       I no longer remember.

7            Q       It was produced as McNair 13, your

8    e-mail dated August 29, 2006 to

9    webmaster@synapsemail.com.

10   A       That's it.

11           Q       You don't recall how you found that

12   e-mail address?

13   A       No, I did not.

14           Q       I'd like you to take a look at a

15   couple of pages of credit card statements that you

16   produced, McNair 8 and McNair 9.

17   A       Okay.

18           Q       On McNair 8 the transaction date of,

19   it looks like June 30, TWX, some letters and

20   numbers, it looks like it's National Geographic

21   Traveler.  Do you see that?

22   A       Yes.

23           Q       And there's a charge for $17.95.  Do

24   you see that?

25   A       Yes.

Page 81

1          Q       If you flip to the next page, there's

2     a transaction date of 7/10.  There's a description

3     of Time magazine with an 800 number.  Do you see

4     that?

5     A       Yes.

6          Q       And then a charge for $54.  Do you

7     see that?

8     A       Yes.

9          Q       A little but further down the page

10    there's a credit for $54 for Time magazine with that

11    transaction date of July 13th.  Do you see that?

12    A       Yes.

13         Q       I believe you testified earlier that

14    that came about as a result of you contacting your

15    credit card company directly and disputing that

16    charge; is that right?

17    A       I can say that I did contact the credit

18    company and disputed the charge.

19         Q       You did dispute that charge through

20    your credit card company; is that right?

21    A       That's correct.

22         Q       And you believed that back in May of

23    2006, when you called the 800 number, that you had

24    already canceled Time magazine; is that right?

25    A       That's also correct.

Page 94

1   prior to or after first contacting an attorney?

2   A      Prior to.

3          Q      Who was the first attorney that you

4   contacted in connection with this matter?

5   A      Attorney Green.

6          Q      Had Mr. Green represented you in any

7   prior actions?

8   A      No.

9          Q      Had he ever represented you in any

10  matter prior to your first contact with him about

11  this particular matter?

12  A      No.

13         Q      How did you come across Mr. Green's

14  name?

15  A      Via the internet.

16         Q      What did you do?

17  A      I contacted him.

18         Q      I wasn't clear.  You got on the

19  internet.  What were you searching for on the

20  internet?

21  A      I was searching for an address or a method

22  of contact for Synapse.

23         Q      And how did you come across Mr.

24  Green's name?

25  A      My recollection is that when I Googled

Page 95

1    Synapse, one of the choices it came up with was his

2    law firm.

3           Q       Was that a website for his law firm?

4    A       Yes.

5           Q       Do you recall what that website said

6    about Synapse?

7    A       Not in detail, however, there is a

8    disclosure document somewhere in this packet or

9    packets.

10          Q       If not in detail, can you tell me

11   what you remember about Mr. Green's law firm's

12   website and Synapse?

13   A       Basically that there was a possibility of a

14   class action lawsuit.

15          Q       Other than Mr. Graifman and Mr.

16   Diamond, did you ever speak with any other attorneys

17   about this matter?

18   A       No.  In addition to Mr. Green.

19          Q       I'm going to ask you if you could,

20   please, to take a look through what we marked as

21   Defendant's Exhibit 3, and just see if you can find

22   a document in there.  I believe you testified it

23   might be in there, or somewhere else, a disclosure

24   form, I believe you called it.

25   A       Well, it is apparently not in here.  That

# Gilbertsen Exhibit E

McNair v Synapse Group-Demetriou 11-12-07.txt

1

```
 1              UNITED STATES DISTRICT COURT

 2             DISTRICT OF NEW JERSEY (NEWARK)

 3            CASE NO. 2:06-CV-05072 (JLL) (CCC)

 4                                          .

 5   CHARLES T. MCNAIR, THEODORE    :

 6   AUSTIN, DANIELLE DEMETRIOU,    :

 7   STEVEN NOVAK, ROD BARE, USHMA  :

 8   DESAI AND JULIE DYNKO, ON      :

 9   BEHALF OF THEMSELVES AND ALL   :

10   OTHERS SIMILARLY SITUATED,     :

11

12                  Plaintiff,   : CIVIL ACTION

13        vs.                      Deposition of:

14                               : DANIELLE
                                   DEMETRIOU
15                                 11/12/07

16   SYNAPSE GROUP INC.,           :

17

18                  Defendants.

19   - - - - - - - - - - - - - - - - - -

20                   DEPOLINK

21    COURT REPORTING & LITIGATION SUPPORT SERVICES

22             ONE RIVERFRONT PLAZA

23             NEWARK, NJ 07102

24              (973) 353-9880

25
```

DEPOLINK COURT REPORTING

2

```
                 McNair v Synapse Group-Demetriou 11-12-07.txt
1                 T R A N S C R I P T of the stenographic
2    notes of the proceedings in the above-entitled
3    matter, as taken by and before RALPH MONTE, a
4    Certified Court Reporter and Notary Public of the
5    State of New Jersey, held at the offices of Green
6    & Pagano, 522 Route 18, East Brunswick, New
7    Jersey, on Monday, November 12, 2007, commencing
8    at approximately 1 o'clock in the afternoon,
9    pursuant to notice.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

DEPOLINK COURT REPORTING

3

```
1    A P P E A R A N C E S:
2
```

Page 2

McNair v Synapse Group-Demetriou 11-12-07.txt
24   April of '07 marathon out in Tempe, Arizona.   And

25   I've redacted the personal information of the

DEPOLINK COURT REPORTING

                                                    22

DIRECT-EXAMINATION BY MR. GILBERTSEN:

 1   person who was doing that.

 2          But it just, in order to get some context

 3   here and refresh your recollection, it shows this

 4   offer on the 1, 2, 3, 4, the fifth page of this

 5   exhibit, shows this type of offer that I believe

 6   you were just describing.  But I guess is what I

 7   would ask you, if this is, to your recollection,

 8   how it was presented to you by the Active.com site

 9   when you were visiting it.  I'm not asking you

10   that yet, but I will.

11          And as well as this other information

12   here about a disclosure on the automatic renewal

13   authorization, just whether you recall seeing

14   things like that when you visited the Active.com

15   site and initially subscribed to the magazines

16   that are at issue here in your case.

17                MR. M. GREEN:  Okay.  Before

18          she answers the question I want to place

19          a number of objections on the record.

20                First is that, this is the

21          first time that plaintiff's counsel or

22          the plaintiff has had an opportunity to

23          see this document.  As was represented by

24          defense counsel this is not a

                         Page 21

McNair v Synapse Group-Demetriou 11-12-07.txt

DEPOLINK COURT REPORTING

☐

24

DIRECT-EXAMINATION BY MR. GILBERTSEN:

1      continue in that vein.

2                  MR. M. GREEN:  Well, in

3      addition, this document, and we don't

4      have any -- so this is D-6.

5                  MR. GILBERTSEN:  D-7.

6                  MR. M. GREEN:  D-7 has, I think

7      you identified it as the fourth page,

8      fifth page, in this box in small print it

9      says, automatic renewal authorization.

10     It continues on Page 6.

11                 I guess that is a blowup of

12     that box?  Is that what Page 6 is?

13                 MR. GILBERTSEN:  Right.  You

14     scroll down and you can get the full text

15     of it.

16                 MR. M. GREEN:  Well, that's my

17     question.  And I think it's a proper one.

18     Is that, are we seeing the full text or

19     are you going to represent that is, in

20     fact, the full text on Page 6 of what is

21     a small box on Page 5 under automatic

22     renewal authorizations?

23                 MR. GILBERTSEN:  Yes.

24                 MR. DIAMOND:  The syntax

25     appears to be off between that first box

McNair v Synapse Group-Demetriou 11-12-07.txt

☐

25

DIRECT-EXAMINATION BY MR. GILBERTSEN:

1        and the second box.

2                MR. GILBERTSEN:  Do you have

3        any other objections before I continue?

4                MR. M. GREEN:  Well, I guess

5        we'd like to have identified what date

6        this was actually printed out, this

7        screen shot on pages 5 and 6.

8                MR. GILBERTSEN:  I'll try to

9        get that information for you.  But for

10       the limited purposes for which I've

11       introduced this to see if I can refresh

12       the witness' recollection about what she

13       saw at the Active.com site, you know, it

14       could be neither here nor there.

15

16                (Whereupon a discussion was

17       held off the record.)

18

19                MR. M. GREEN:  Go ahead.  Now,

20       I just want to caution the witness that

21       when you are asked the questions, before

22       you answer, okay, just allow me to object

23       if I'm going to object before you answer.

24                THE WITNESS:  Sure.

25                MR. M. GREEN:  All right.

DEPOLINK COURT REPORTING

Page 24

McNair v Synapse Group-Demetriou 11-12-07.txt

DIRECT-EXAMINATION BY MR. GILBERTSEN:

1    A       They registered us.  We filled out forms

2    through Leukemia and Lymphoma Society with who our

3    guests are going to be, what size tri suit we

4    need, all that, if we're going to be flying down

5    with them.

6           They supplied us with the forms and they

7    registered us.  Because we got a group rate.

8    There were a number of us doing it.

9           Q       Let's just call that entity the

10   society?

11   A       Okay, sure.

12          Q       Why was the society directing

13   you to the Active.com site, if you recall?

14   A       I think it had to do with if we were

15   looking to do this on our own, or to do any other

16   sort of races, or if we needed to get equipment

17   like a bike, or you know, anything for running or

18   shoes.  Active.com does discounts.

19          If you're a member of Active.com they

20   give you a membership card.  And you can take that

21   to like a Sports Authority and get a 10 percent

22   discount.

23          Q       Okay.  So when you visited

24   Active.com the screen shots that you saw did not

25   include registration for a particular race?

DEPOLINK COURT REPORTING

0

DIRECT-EXAMINATION BY MR. GILBERTSEN:
Page 27

McNair v Synapse Group-Demetriou 11-12-07.txt

1    A        Correct.

2            Q          Not Pat's Run in Tempe, Arizona

3    other any other race?

4    A        No, correct.

5            Q          Okay.  So we'll skip those

6    pages, but at the bottom of Page 5, the format

7    here of the information about these magazines

8    subscription deals, is that similar to what you

9    saw to the best of your recollection?

10   A        I don't recall.

11           Q          Okay.

12   A        I do remember it saying 6 months.  I

13   don't know what form it said it.  I don't know, I

14   don't recall.

15           Q          Okay.  Do you remember seeing

16   an automatic renewal authorization at the

17   Active.com site?

18   A        No, I do not.

19           Q          On the next page of this

20   Exhibit D-7, where what I represent here for you

21   is the language of this automatic renewal

22   authorization, if you were to scroll down and read

23   all of it, taking a moment and reading that

24   language, do you ever recall reading or seeing any

25   language like that in any kind of format or in any

DEPOLINK COURT REPORTING

▯

30

DIRECT-EXAMINATION BY MR. GILBERTSEN:

1    way at the time you initially subscribed to these

Page 28

McNair v Synapse Group-Demetriou 11-12-07.txt

6    A        No.

7             Q          Have you registered for any

8    other events on Active.com?

9    A        No.

10            Q          Did you give an e-mail address

11   to Active.com when you registered?

12   A        Yes.

13            Q          And you get, periodically you

14   get e-mail notices from them or offers from them

15   through your e-mail address?

16   A        Offers, yes.

17            Q          Okay.  What e-mail address was

18   that?

19   A        DaniDemetriou@MSN.com.

20            Q          And that's the e-mail at your

21   home computer?

22   A        Correct.

23            Q          So, I understand that at least

24   from your perspective, after visiting the

25   Active.com site and registering at Active.com you

DEPOLINK COURT REPORTING

☐

35

DIRECT-EXAMINATION BY MR. GILBERTSEN:

1    selected 3 magazines in response to an offer that

2    was made to you on the Active.com website?

3    A        Correct.

4             Q          What were the 3 magazines

5    please?

6    A        Her Sports Fitness, Shape and Fitness.
                          Page 33

McNair v Synapse Group-Demetriou 11-12-07.txt

7          Q          Did you begin receiving these
8     magazines?
9     A          Yes.
10          Q          Do you recall how long after
11     you placed this order you started receiving the
12     magazines?
13     A          I don't recall an exact time.
14          Q          You may not recall the exact
15     time but I guess I'm interested in whether it was
16     fairly immediately thereafter or whether there was
17     some months of delay before the magazines started
18     coming?
19     A          I don't recall specifically, but I would
20     say, I would have to say about a month or 2 after.
21          Q          Okay.  Did you continue
22     receiving the magazines for the time period that
23     you expected to?
24     A          Yes.
25          Q          Did you read them?

DEPOLINK COURT REPORTING

☐

36

DIRECT-EXAMINATION BY MR. GILBERTSEN:
1     A          Yes.
2          Q          Were you familiar with the
3     magazines before you selected them for the
4     subscription offer?
5     A          I was familiar with Shape and Fitness.
6     Her Sport Fitness magazine was the first time I
7     read about it.  First time I heard about it.
                    Page 34

McNair v Synapse Group-Demetriou 11-12-07.txt

8        Q        Had you ever subscribed to

9   Shape or Fitness before?

10   A        No.

11        Q        Had you subscribed to other

12   magazines before?

13   A        Yes.

14        Q        Have you ever been a long-term

15   subscriber to any magazine?

16   A        Long-term meaning --

17        Q        That you renewed subscriptions

18   for longer than 1 or 2 years?

19   A        Yes.

20        Q        So there came a time after you

21   were receiving these 3 magazines that certain

22   charges appeared on your Bank of America card

23   account, is that correct?

24   A        Yes.

25        Q        When did that happen?

DEPOLINK COURT REPORTING

□

37

DIRECT-EXAMINATION BY MR. GILBERTSEN:

1   A        June.

2        Q        Of?

3   A        Of 2007.

4        Q        Okay.  Do you know whether you

5   received any kind of notice from anyone indicating

6   that this was going to happen?

7   A        No, I don't recall.

8        Q        I just want to make sure I
                              Page 35

McNair v Synapse Group-Demetriou 11-12-07.txt

9    understand what you're perspective is.

10         Are you saying that you don't remember

11   seeing anything, or is it your perspective that

12   nothing was ever sent to you?

13   A      It is my perspective that nothing was

14   ever sent to me.

15         Q        Okay.  Do you review your mail

16   every day?

17   A      Yes.

18         Q        Okay.  How do you go about

19   doing that?

20   A      I log on and I check my inbox and my junk

21   mail regularly.

22         Q        And you're, I'm sorry?

23   A      Junk mail.

24         Q        Junk mail?

25   A      Yes.


DEPOLINK COURT REPORTING

□

38


DIRECT-EXAMINATION BY MR. GILBERTSEN:

1          Q        Online?

2    A      Yes.

3          Q        How about the, you know, what

4    they now call snail mail that comes into your

5    mailbox from the Post Office?  I guess it has junk

6    mail in it too, but what's your protocol there for

7    reviewing your postage mail?

8    A      If it's addressed to me I open it and

9    read it.  If it's not, I assume it's junk mail.

                    Page 36

McNair v Synapse Group-Demetriou 11-12-07.txt

16    against your account?

17    A        On June 25th.

18           Q        All right.  And then was it at

19    that point that you began searching online for

20    information about TWX?

21    A        I recall searching when the first charge,

22    when I saw the first charge.

23           I do check my bank account regularly so

24    it could have been on the 14th, the 15th, you

25    know, close to the 14th, but I did the research

DEPOLINK COURT REPORTING

⬚

45

DIRECT-EXAMINATION BY MR. GILBERTSEN:

1     when I saw the Her Sports charge.

2           Q        I see.  Did there come a time

3     when you called to cancel these magazine

4     subscriptions?

5     A        Yes.

6           Q        To the best of your

7     recollection when was that?

8     A        Around the time that I saw the charge on

9     6/14 for Her Sports.

10          Q        Okay.  And then what can you

11    tell me about that call?

12    A        I called the number, the 1-800 number

13    that was listed on my bank statement.  The

14    voice-mail prompt, it said, if you would like

15    to -- this is just from what I can remember, it's

16    not word for word.  Press option 1 if you want to

Page 43

McNair v Synapse Group-Demetriou 11-12-07.txt

17   cancel your subscription and keep renewing or

18   future -- I don't recall exactly what it said.

19         Option 2 was to renew your subscription

20   and option 3 was to cancel and speak to a customer

21   service representative.

22         I pressed option 3.  Music started

23   playing.  It sounded like I was on hold.  It then

24   would say, thank you for holding, we will be with

25   you momentarily, and then it would put me through

DEPOLINK COURT REPORTING

⬜

46

DIRECT-EXAMINATION BY MR. GILBERTSEN:

1    the loop again.  Press option 1 for this, option 2

2    for this, option 3.

3         I would say a good hour had went by.  I

4    wasn't getting anywhere.  I hung up.  I did the

5    research and searched on Google TWX and found the

6    blog of Rip-Off, and I saw a number of people

7    complaining about their accounts being charged,

8    unauthorized charges being charged to their

9    account.

10         One blogger, I guess we can call her, him

11   or her, had said, if you're having trouble with

12   the number on your statement call this number and

13   keep pressing zero.  I did that.  I called the

14   number.  I don't recall what the phone number was.

15   I kept pressing zero and, again, it was through a

16   loop.  It took me probably another hour or so to

17   get a person on the phone.

Page 44

McNair v Synapse Group-Demetriou 11-12-07.txt

18        Once I finally got the person on the
19   phone I explained what had happened.  They had let
20   me know that I authorized this charge.  I let them
21   know that I don't recall authorizing anything.
22   They said they would cancel it and give me a
23   refund.  And I had let them know that if there are
24   any other magazines out there under my name to
25   please cancel all of them.  And they assured me

DEPOLINK COURT REPORTING

口

47

DIRECT-EXAMINATION BY MR. GILBERTSEN:

1    that they would and that was it for that phone
2    call.
3        Q        What happened next?
4    A       In June 25th time period I received
5    another charge from TWX for a different magazine
6    which is Shape.  And, I'm sorry, I actually, it
7    was after that.  It was when the Fitness magazine
8    subscription went through is when I saw the Shape
9    one on June 25th.
10        So, I called a second time probably
11   around somewhere in July, July 5th time period.  I
12   saw the 2 charges, one for Fitness on July 5th,
13   one for Shape on July 25th, and the overdraft
14   charges associated with those transactions.
15        I called back again, went through the
16   loop again.  I didn't call the number that was on
17   my account, I called the initial number, the
18   number that I called back in June 14th.  Went
Page 45

McNair v Synapse Group-Demetriou 11-12-07.txt

19   through a loop again.  It took me about another 2

20   hours on the phone pressing zero, listening to

21   music, pressing zero, listening to music.

22          Finally again after 2 hours got on the

23   phone with somebody.  It was a brief conversation.

24   They assured me that they would refund the charges

25   associated with the magazine subscriptions.  I had

DEPOLINK COURT REPORTING

☐

48

DIRECT-EXAMINATION BY MR. GILBERTSEN:

1   told her that I cancelled in June 14th timeframe,

2   that I don't want any more charges, that I already

3   cancelled this, that I should not have been

4   charged.  They refunded me my money.  I then asked

5   if I could speak to somebody, a supervisor about

6   the overdraft charges.

7          She put me through a supervisor.  They

8   had told me to fax my request over to this

9   customer service number for the refund of the

10   charges.  And I would say probably a week after

11   July 11th I received a phone call from -- I don't

12   recall the person's name, leaving me a voice-mail

13   of, that they are unable to refund the charges,

14   that this is, I incurred the charges, it is my

15   error, I authorized Shape and Fitness to debit my

16   account and they are not authorized to refund my

17   overdraft charges.

18          Q        Is that then your claim in this

19   case is that you want to be compensated for the

Page 46

McNair v Synapse Group-Demetriou 11-12-07.txt

20  overdraft charges?

21  A       My claim as a representative of the class

22  and also for myself is that, yes, I would like to

23  be refunded for myself, but also that this just

24  doesn't happen.  It's not right that people get --

25                  MR. M. GREEN:  If you could let

DEPOLINK COURT REPORTING

□

49

DIRECT-EXAMINATION BY MR. GILBERTSEN:

1           her finish her response.

2  A       I just don't think it's right that our

3  perception of going onto a website and purchasing

4  one thing our accounts being charged for something

5  entirely different.

6           Q       I see.  But in terms of actual

7  losses, I understand you to be saying that you

8  were ultimately refunded for these renewals, and

9  that you are asking to be compensated for

10  overdraft charges that Synapse refused to pay you?

11  A       It's not only the overdraft charges.

12  It's the aggravation of being on hold for 4 hours

13  while at work.  Because I call, when I tried to

14  call when I got home at 6:30 at night I was unable

15  to get anybody.  So I had to spend a total of 4

16  hours or so, 4-and-a-half hours with actually

17  speaking to somebody, during my work hours.  And

18  on top of the overdraft charges being charged to

19  me.

20           Q       Is there any other category or
                        Page 47

McNair v Synapse Group-Demetriou 11-12-07.txt

22          Q          It stands for interactive voice
23   response system.
24          The Synapse system is the one you talk
25   about when you first called in on June 14th, or

DEPOLINK COURT REPORTING

☐
                                                      51


DIRECT-EXAMINATION BY MR. GILBERTSEN:

1   thereabouts.  You were given menu options.  I'm
2   going to refer to that as the IVR.
3   A      Okay.
4          Q          Was June 14th the first time
5   you ever called into Synapse?
6   A      Not specifically on June 14th, around
7   that time, yes, yes.
8          Q          Okay.  Is it your testimony
9   that you did not transact any business on the IVR
10  that you immediately began to try to get to a live
11  operator?
12  A      I don't understand the question.
13         Q          Let me just put it simply.
14         Is it your testimony that you did not
15  conduct and complete any transactions, any
16  cancellations on the Synapse IVR system?
17  A      Yes.
18         Q          Other than the calls into
19  Synapse that we have or that you have talked about
20  already have you made any other calls into
21  Synapse?
22  A      No.
                    Page 49

McNair v Synapse Group-Demetriou 11-12-07.txt

23          Q          So, is it the case that the
24   last call you made to Synapse was at or around the
25   time you faxed in this document that we've marked

DEPOLINK COURT REPORTING

□

52

DIRECT-EXAMINATION BY MR. GILBERTSEN:

1    as Exhibit D-9?
2    A       Yes.
3           Q          And since sending that fax to
4    Synapse have you placed any more calls into that
5    company?
6    A       No.
7           Q          Do you know whether anyone else
8    has made any calls into Synapse on your behalf?
9    A       No, I don't recall.
10          Q          Okay.  Have you directed anyone
11   to make any calls into Synapse on your behalf
12   since that time?
13   A       No.
14          Q          Exhibit D-9 shows an overdraft
15   charge on the 25th of June and it has, it's
16   circled and the letters 2B are written there.  Do
17   you see that?
18   A       Yes.
19          Q          You wrote that, correct?
20   A       Yes.
21          Q          Does that correspondence to
22   what you write in the first page of your fax
23   2B:6/26/07 overdraft charge for the 6/25/07
                    Page 50

McNair v Synapse Group-Demetriou 11-12-07.txt
DEPOLINK COURT REPORTING

56

DIRECT-EXAMINATION BY MR. GILBERTSEN:

1          Q          Resulting in a negative balance

2    of $3.31.  And then according to this document,

3    again we are on Exhibit D-9, and the fourth page

4    of the document, then they present the charge for

5    Shape magazine with the toll free number here.

6    So, it's a $21 presentment being charged against a

7    negative balance of $3.31, end result, negative

8    balance of $24.31.  Do you see that?

9    A       Yes.

10         Q          Now, if the Shape magazine

11   charged had been settled before the Rahway, New

12   Jersey presentment, it would have been a $21

13   charge against an existing balance of $201.69 and,

14   therefore, there would have been no overdraft?

15   A       That's correct.

16         Q          Correct?

17   A       Yes.

18         Q          Okay.  But the order in which

19   Bank of America settled and batched these 2

20   activities from the 25th of June, I guess my

21   question to you is, are you aware of any policy at

22   Bank of America that dictated the order in which

23   they batched and settled those 2 activities?

24   A       I don't.

25              MR. GILBERTSEN:  Why don't we

DEPOLINK COURT REPORTING

Page 54

McNair v Synapse Group-Demetriou 11-12-07.txt

58

DIRECT-EXAMINATION BY MR. GILBERTSEN:

1         Q         And then on the 6th of July

2    there's an item on the prior page that you labeled

3    1B, which is an overdraft item fee for activity of

4    7/06, correct?

5    A    Yes.

6         Q         Thirty-five dollars.

7         And below that there's another overdraft

8    item fee for that same, that's issued on that same

9    day of the 6th of July and that is for other

10   activity, electronic transfers of the 5th of July,

11   is that correct?

12   A    Yes.

13        Q         The account had a negative

14   balance as of the 3rd of July, 2007, correct?

15   A    Uh-huh.

16        Q         And it had several items that

17   were presented unrelated to Synapse that resulted

18   in negative balances until the 6th of July when

19   there was a deposit from Indirect, is that

20   correct?

21   A    Yes.

22        Q         Back to the chronology that we

23   were first talking about when we got started, you

24   indicated when you saw, you indicated a time

25   period during which you saw the Green & Pagano

DEPOLINK COURT REPORTING

0

59

McNair v Synapse Group-Demetriou 11-12-07.txt

DIRECT-EXAMINATION BY MR. GILBERTSEN:

 1   website and responded to it, and then you got a

 2   call back eventually from Mr. Green?

 3   A        Yes.

 4            Q        When did you agree to become a

 5   plaintiff in this case?

 6   A        When he --

 7                     MR. M. GREEN:  Hold on a

 8            second.

 9

10                     (whereupon a discussion was

11            held off the record.)

12

13                     MR. M. GREEN:  Go ahead, you

14            can answer the question.

15   A        When he explained to me what the, what

16   his part was in this whole thing.

17            Q        Don't disclose to me anything

18   like that that he told you, okay.  I'm not asking

19   you for information like that.

20   A        Okay.

21            Q        I don't mean to be abrupt with

22   you either.

23   A        Sure.

24            Q        I'm simply asking when?

25   A        I would -- around the time period of

DEPOLINK COURT REPORTING

Page 57

McNair v Synapse Group-Demetriou 11-12-07.txt
DIRECT-EXAMINATION BY MR. GILBERTSEN:

1   July 11th.

2           Q        Okay.  You testified earlier

3   about seeing a Complaint.  Let me hand you a

4   document that's been marked on a previous

5   deposition as D-2, and ask if you recognize this

6   document?

7   A       Yes.

8           Q        Have you seen it before?

9   A       Yes.

10          Q        This document was filed in

11  court on August 2nd of 2007.  Did you see it

12  before August 2nd?

13  A       I don't recall the exact date, but I

14  remember seeing it in an e-mail.

15          Q        Okay.  Did you see the prior

16  drafts of this document?

17  A       Yes.

18          Q        There was an amendment to it.

19  There was a first draft and then -- I'm assuming

20  this is the amendment.  Did you review the

21  allegations -- let me start again.

22          Did you review parts of this document

23  that deal with yourself?

24  A       Yes.

25          Q        And did you ever suggest any

DEPOLINK COURT REPORTING

61

DIRECT-EXAMINATION BY MR. GILBERTSEN:

Page 58

# **Gilbertsen Exhibit F**

COPY

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW JERSEY (NEWARK)

2:06-CV-05072 (JLL)(CCC)

-------------------------------X

CHARLES T. McNAIR, THEODORE
AUSTIN, DANIELLE DEMETRIOU,
STEVEN NOVAK, ROD BARE, USHMA
DESAI and JULIE DYNKO on behalf
of themselves and all others
similarly situated,

       Plaintiffs,


    vs.


SYNAPSE GROUP, INC.,


       Defendant.

-------------------------------X


DEPOSITION OF USHMA DESAI

MONDAY, NOVEMBER 26, 2007



DEPOLINK

Court Reporting & Litigation Support Services

Phone (973) 353-9880    Fax (973) 353-9445

www.depolinklegal.com

**Page 2**

1     Deposition of USHMA DESAI taken in the
2 above-entitled matter before Mark Iuzzolino, a
3 Certified Shorthand Reporter (License No. X101103)
4 and Notary Public of the State of New Jersey,
5 taken at the offices of KELLEY DRYE & WARREN LLP,
6 200 Kimball Drive, Parsipanny, New Jersey, on
7 MONDAY, NOVEMBER 26, 2007, commencing at
8 10:02 a.m.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 3**

1 A P P E A R A N C E S:
2
3 DIAMOND LAW OFFICE, LLC
4 1605 John Street, Suite 102
5 Fort Lee, New Jersey 07024
6 (201) 242-1110
7 BY: PAUL DIAMOND, ESQ.
8 Attorney for the Plaintiffs
9
10 KELLEY DRYE & WARREN LLP
11 200 Kimball Drive
12 Parsippany, New Jersey 07054
13 973-503-5910
14 BY: LAURI A. MAZZUCHETTI, ESQ.
15     AND
16   GEOFFREY W. CASTELLO, ESQ.
17 Attorney for the Defendant, Synapse Group, Inc.
18
19 GREEN & PAGANO, LLP
20 522 Route 18
21 East Brunswick, New Jersey 08816
22 732-390-0480
23 BY: MICHAEL S. GREEN, ESQ.
24 Attorney for the witness Ushma Desai
25

**Page 4**

1
2         I N D E X
3
4 WITNESS    EXAMINED BY        PAGE
5 USHMA DESAI
6     Ms. Mazzuchetti    5
7
8         E X H I B I T S
9
10 NUMBER    DESCRIPTION    PAGE
11 D-11    Document entitled Request    5
12     for Documents to be
13     Produced
14 D-12    Bank statement dated    5
15     September 12, 2006, to
16     October 12, 2006
17
18
19         REQUESTS
20
21 PAGE    LINE
22 36    10
  60    11
23 66    21
  74    3
24 112    6
25

**Page 5**

1     (Document entitled Request for Documents
2 to be Produced is marked as Defendant's Exhibit 11
3 for Identification.
4     Bank statement dated September 12, 2006,
5 to October 12, 2006, is marked as Defendant's
6 Exhibit 12 for Identification.)
7         USHMA DESAI
8 52 Alexandria Drive, Hackettstown, New Jersey
9 07840, having been first duly sworn, was examined
10 and testified as follows:
11
12     DIRECT EXAMINATION
13 BY MS. MAZZUCHETTI:
14     Q. How are you, Ms. Desai? My name is
15 Gloria Mazzuchetti. I'm with the law firm of
16 Kelley Drye & Warren, and we represent the
17 defendant Synapse Group in this action. Before we
18 start, I'm going to give you some ground rules for
19 your deposition today.
20     Have you ever had your deposition taken
21 before?
22     A. No.
23     Q. Okay. Essentially it will be a
24 question-and-answer session where I will ask you
25 questions, and you will provide answers. I ask

Page 6

1   that you, please, let me speak and finish what I'm
2   saying before you begin to speak because, as you
3   will see, sitting to your left is a court reporter
4   who is going to prepare a transcript of everything
5   that we say today. And obviously, if we speak at
6   the same time, it will make his job much more
7   difficult.
8        Do you understand this instruction?
9        A. Yes.
10       Q. I also ask that your responses be
11  verbal, no shaking the head --
12       A. Right.
13       Q. -- because if you shake your head or
14  nod, the court reporter will not be able to take
15  that down.
16       Do you understand that?
17       A. Yes.
18       Q. Have you ever testified in court before?
19       A. No.
20       Q. Okay. Well, even though that we're in a
21  more -- a less formal setting than a courtroom, do
22  you understand that you are under oath today and
23  that we expect your testimony to be truthful?
24       A. Yes.
25       Q. If you don't understand a question,

Page 7

1   please let me know. If you answer my question,
2   I'm going to assume that you understood the
3   question.
4        Are you suffering from any illness or
5   condition today that would prevent you from
6   providing truthful testimony?
7        A. No.
8        Q. Did you consume any substance or take
9   any medication that would affect your memory?
10       A. No.
11       Q. Did you consume any substance or take
12  any medication that would prevent you from
13  providing truthful testimony?
14       A. No.
15       Q. Is there any reason why you will not be
16  able to testify honestly here today?
17       A. No.
18       Q. Also, if your attorney objects to one of
19  my questions, I ask that you please stop from
20  answering and allow him to place his objection on
21  the record. I may then have something to say to
22  that, and then he will direct you one way or
23  another whether you should provide an answer. If
24  you need to take a break today, please let me
25  know, and we can take a break, but I ask that we

Page 8

1   do not break while a question is pending. I will
2   ask you to provide an answer before we take a
3   break.
4        Do you understand that?
5        A. Yes.
6        Q. Do you have any questions?
7        A. No.
8        Q. Did you review any papers or documents
9   to prepare for this deposition?
10       A. Yes.
11       Q. What did you review?
12       A. I reviewed the amended complaint --
13       Q. Anything else?
14       A. -- and also the letter of deposition.
15       Q. The deposition notice?
16       A. Yes.
17       Q. Anything else?
18       A. I believe that was it.
19       Q. When did you review these documents?
20       A. Well, initially I reviewed the
21  deposition notice. I believe it was last month.
22       Q. And what about the amended complaint?
23       A. The amended complaint I reviewed
24  actually just a few days ago.
25       Q. Other than reviewing documents, did you

Page 9

1   do anything else to prepare for this deposition?
2        A. I had a conference call with my
3   attorney.
4        Q. And how long did that last?
5        A. About an hour.
6        Q. Did you meet with your attorney in
7   person in addition to having that conference call?
8        A. I met with my attorneys on the
9   telephone.
10       Q. Is this the first time that you're
11  meeting them today in person?
12       A. Yes, but I have met them over the
13  telephone.
14       Q. But you have not previously met them in
15  person?
16       A. No.
17       Q. Other than speaking with your attorney
18  and reviewing documents, did you do anything else
19  to prepare for the deposition today?
20       A. No.
21       Q. Have you talked with anyone other than
22  your counsel about today's deposition?
23       A. No.
24       Q. Did you tell anybody that you were even
25  coming here today?

Page 18

1    Q.  Do you know what period of time your
2  bank statements are available on line?
3    A.  That I'm not sure.
4    Q.  Do you know whether they're available
5  for the year 2006?
6    A.  Yes.
7    Q.  They are available?
8    A.  Yes.
9    Q.  When you produced this bank statement
10  from last year to your attorney, was that
11  something that you had maintained in paper, or was
12  that something that you pulled off line?
13    A.  I pulled it off of my online banking.
14    Q.  Did you have the paper statement that
15  was sent to you for that time period?
16    A.  No.  I could not find it.
17    Q.  With respect to your Wachovia Bank
18  account, are you the only account holder on that
19  account?
20    A.  Yes.
21    Q.  So it's not a joint account with your
22  fiance?
23    A.  No.
24    Q.  Do you balance your checking account?
25    A.  Yes.

Page 19

1    Q.  How often do you do that?
2    A.  Almost every day.
3    Q.  How do you go about doing that?
4    A.  I check all my receipts, and every so
5  often I check my online banking.
6    Q.  And what process do you go through to
7  make sure that your checking account is balanced?
8    A.  I balance my checkbook first because I
9  know that everything I purchase, I keep a receipt
10  for.  And I don't make any online purchases, or
11  very rarely I make online purchases, but I keep a
12  receipt for that also.  So I usually balance using
13  my receipts, and then if -- I check on line and if
14  there's something on line that I don't know that's
15  being taken out, I check to make sure that there's
16  nothing there that's not being -- or that there's
17  nothing there that shouldn't be, you know, being
18  taken out.
19    Q.  When you say that you check receipts,
20  are these receipts generated because you're using
21  a debit card that's linked to your checking
22  account?
23    A.  Yes.
24    Q.  And how often do you use your debit
25  card?

Page 20

1    A.  I use my debit card maybe once or twice
2  a day.
3    Q.  What kind of purchases do you make with
4  your debit card?
5    A.  Usually it's gas and little things here
6  or there, like cigarettes.
7    Q.  Do you also have credit cards?
8    A.  Yes.  I have two credit cards.
9    Q.  And are those credit cards linked to
10  your bank account in any way, your checking
11  account?
12    A.  Yes.
13    Q.  How are they linked?
14    A.  For one-time payments.
15    Q.  Can you explain that to me?
16    A.  Basically I just go into my online
17  banking, and it has my bank account number already
18  on there, or I go to my credit card on line, and
19  it already has my personal checking account on
20  there.  So then I instruct my credit card account
21  to make a one-time payment to, you know, pay for
22  my credit card.
23    Q.  Okay.  You may have already told me
24  this, but do you check your online banking
25  statement for Wachovia Bank on a daily basis?

Page 21

1    A.  No, not on a daily basis.
2    Q.  How often do you check it?
3    A.  Usually every couple of days just to
4  make sure that my checkbook and my online banking
5  are at the same balance.
6    Q.  Do you understand that you are a
7  plaintiff in this case?
8    A.  Yes.
9    Q.  How did you come to be a plaintiff?
10    A.  I was on line looking for ways to cancel
11  a TWX magazine subscription, and I came across the
12  web site of Mr. Michael Green and Paul Diamond.
13    Q.  What made you go on the web site to look
14  for TWX magazine?
15    A.  Because I just -- you know, it had
16  things about, you know, people, how they were
17  being ripped off by this company and, you know,
18  with, like, charges and overdraft charges, and so
19  I actually sent an e-mail to Mr. Green.
20    Q.  When did you do that?
21    A.  I did that in -- I believe it was August
22  of this year.
23    Q.  Do you know what the date was in August?
24    A.  I don't recall.
25    Q.  What is TWX?

Page 22

1      A.   "TWX" is what shows up in my bank
2  account.
3      Q.   And what's your understanding of what
4  TWX is?
5      A.   Well, on my statement it was showing
6  "TWX magazine," and then it was showing the actual
7  name of the magazine for which the money was being
8  taken out.
9      Q.   Is it your understanding that TWX is
10  part of Synapse?
11      A.   Yes, now I know that.  I didn't know
12  that previously when these charges were being
13  taken out.
14      Q.   So when I refer to "Synapse," just so
15  we're clear for the record, I'm referring to TWX.
16      A.   Yes.
17      Q.   Do you understand that?
18      A.   Yes.
19      Q.   Okay.  And you said that people were
20  being ripped off?
21      A.   Uh-huh.
22      Q.   Is that a yes?
23      A.   Yeah.  Sorry.
24      Q.   What does that mean?
25      A.   It means that, you know, people are

Page 23

1  signing up for, you know, whatever this magazine,
2  you know, says, like, you know, "Oh, we'll give
3  you three issues or three" -- yeah -- "three
4  issues a month for free, and then, you know, you
5  can decide whether you want the magazine or not."
6  And then, you know, people end up getting, you
7  know, charged in their bank account, and they
8  have, you know, these charges for these magazines
9  being taken out, and then they have overdraft
10  charges because they were not forewarned that this
11  money was going to be taken out.
12      Q.   How did you learn that there were these
13  other people out there that you determined were
14  being ripped you?
15      A.   Because I actually went on ripoff.com.
16      Q.   How did you get to the ripoff.com web
17  site?
18      A.   Well, when I was looking for how to
19  cancel this TWX subscription, then I found this
20  web site called "ripoff.com," and it actually had
21  an 800 number for which you could try and, you
22  know, cancel your subscriptions.  And there were
23  all these, you know, little user messages saying
24  that, you know, because this magazine took out
25  money without my knowing it, then, you know, I got

Page 24

1  overdraft charges in my bank account.  And I
2  looked at it, and I'm, like, "You know what?  This
3  is the same thing that happened to me."
4      Q.   Do you know any of the people who posted
5  user messages?
6      A.   No.
7      Q.   Did you ever communicate with any of the
8  people that posted user messages?
9      A.   No.
10      Q.   Did you post your own user message?
11      A.   No.
12      Q.   Other than ripoff did you look at any
13  other web sites?
14      A.   No.
15      Q.   So how did you come to the ripoff web
16  site?  Did you Google or do some sort of search,
17  term seven for TWX?
18      A.   Yeah, I Googled it.
19      Q.   Do you know when you did that?
20      A.   That was in early August.
21      Q.   What did you do after you found this
22  ripoff web site?
23      A.   Well, I found this 800 number for which
24  I could try and cancel these subscriptions because
25  initially when the money had been taken out of my

Page 25

1  account, I went to Spin magazine, I went to Vibe
2  magazine, I went to Maxim.  I went to Sports
3  Illustrated.  I went to all of their web sites,
4  and I tried to contact their customer service.
5  And apparently they were saying that I did not
6  have a subscription through them.  So then this
7  year I saw that there was a hold put on, like, a
8  2-dollar hold from this TWX magazine in my
9  account, and I was, like, "I'm not going through
10  this again."
11      Q.   So you're saying that back -- in 2006
12  you contacted the magazines directly?
13      A.   Yes.
14      Q.   Why didn't you Google TWX at that time?
15      A.   Because I didn't even realize that it
16  was, you know, through TWX.  I just figured I
17  would call the magazines themselves.
18      Q.   Did you do anything else in 2006?
19      A.   No.
20      Q.   So what happened -- strike that.
21         Did you print out anything from this
22  ripoff.com web site?
23      A.   No.
24      Q.   Did you print out anything whatsoever
25  regarding TWX or Synapse from the internet?

8 (Pages 26 to 29)

Page 26

1    A.  No.  All I did was, I wrote down the 800
2   number on ripoff.com that they gave to cancel the
3   TWX subscriptions.
4    Q.  Did you call that 800 number?
5    A.  Yes.
6    Q.  When did you call that 800 number?
7    A.  I called that 800 number early August.
8    Q.  Was it on the same day that you were
9   doing your Google search?
10    A.  Yes.
11    Q.  Was it on the same day that you sent an
12   e-mail to Mr. Green's law firm?
13    A.  Yes.
14    Q.  After you sent the e-mail to Mr. Green's
15   law firm, when was the first time that somebody
16   contacted you regarding this case?
17    A.  It was probably about the next day or a
18   couple of days later.
19    Q.  Who contacted you?
20    A.  Mr. Green, and also actually Mr. Paul
21   Diamond at the same time.
22    Q.  They called you on the telephone?
23    A.  Yes.
24    Q.  I'm going to show you a document that
25   was previously marked as Defendant's Exhibit 2.

Page 27

1   Please take a moment to look through it and let me
2   know when you are finished.
3    A.  Done.
4      MS. MAZZUCHETTI:  For the record,
5   Defendant's Exhibit 2 is a copy of the First
6   Amended Class Action Complaint and Demand for Jury
7   Trial.  Is that correct?
8    A.  Yes.
9    Q.  When is the first time that you saw this
10   document?
11    A.  I saw it -- I can't even remember.  It
12   was e-mailed to me previously, and then I just
13   recently reviewed it.
14    Q.  When was it e-mailed to you?
15    A.  I don't recall.  I know it was a while
16   ago.
17    Q.  Do you know whether you ever saw a draft
18   of Defendant's Exhibit 2 before it was filed with
19   the Court?
20    A.  I don't recall.
21    Q.  I will represent to you that Defendant's
22   Exhibit 2 was filed with the Court on August 2,
23   2007.
24      Do you know whether you reviewed the First
25   Amended Complaint before August 2, 2007?

Page 28

1    A.  No.
2    Q.  You don't know whether you did, or you
3   did not review it?
4    A.  No, I did not.
5    Q.  When you were e-mailed the complaint
6   previously -- let's just see if we can get
7   somewhat of a timeline down.
8      I know you don't remember specifically, but
9   can you estimate how long ago the complaint was
10   e-mailed to you?
11    A.  I know that I had seen one in my e-mail.
12   I believe it was back in September or October that
13   Mr. Green had e-mailed to me.  I don't remember
14   which version it was.
15    Q.  Have you seen more than one version?
16    A.  Well, I had Mr. Green or Mr. Diamond
17   re-e-mail me a second copy.
18    Q.  Do you have a home computer?
19    A.  Yes.  I have a laptop at home.
20    Q.  And obviously you have an e-mail address
21   on that laptop.  Is that correct?
22    A.  Yes.
23    Q.  And what is that e-mail address?
24    A.  It's just a Yahoo e-mail,
25   desaiu5@yahoo.com.

Page 29

1    Q.  Did you use that e-mail address to
2   communicate with anyone other than your counsel
3   about this lawsuit?
4    A.  No.
5    Q.  Did you use any other e-mail address to
6   communicate with anyone other than your counsel
7   about this lawsuit?
8    A.  No.
9    Q.  When you first received the complaint in
10   September or October this year, did you review the
11   parts of the complaint that relate to you?
12    A.  Yes.
13    Q.  Did you make sure that those statements
14   were accurate?
15    A.  Yes.
16    Q.  And were those statements accurate with
17   respect to you?
18    A.  Yes.
19    Q.  What steps did you make to make sure
20   that the statements pertaining to you were
21   accurate?
22    A.  I read it, and I reviewed it, and I made
23   sure that everything was correct.
24    Q.  Did you look back at your bank
25   statements or any other records to determine

Page 30

1   whether the statements made in the complaint were
2   correct?
3       A.  I couldn't find my statements, so I had
4   to find it on line.
5       Q.  And when you reviewed the complaint in
6   September or October, did you find your bank
7   statement on line at that point?
8       A.  No.
9       Q.  When did you first find your bank
10  statement on line?
11      A.  I just dug it up from my on line banking
12  a few days ago.
13      Q.  Did you ever suggest to your counsel
14  that changes should be made to the complaint?
15      MR. GREEN:  I would object.  Excuse me.
16  I would object.  It's privileged.  I'm not going
17  to allow her to answer the question.
18      Q.  Just so I understand, your testimony is,
19  you reviewed the complaint, you reviewed the
20  allegations with respect to you, and you
21  determined that all of the allegations in the
22  complaint were accurate?  Is that correct?
23      A.  Yes.
24      Q.  Sorry?
25      A.  Yes.  Can I take a break?

Page 31

1       Q.  Sure.
2       (There is a recess taken.)
3   BY MS. MAZZUCHETTI:
4       Q.  Ready?
5       A.  Yes.
6       Q.  Did you speak with anyone other than
7   your counsel on your break?
8       A.  No.
9       Q.  You testified earlier that you asked for
10  the amended complaint a second time?
11      A.  Yes.
12      Q.  Why did you ask for it for a second
13  time?
14      A.  Because I couldn't find it in my e-mail
15  when I went to go back and look at it.
16      Q.  I want to go back in time.  When you
17  reviewed it for the first time, you had indicated
18  that -- I had asked you whether you made -- strike
19  that -- I had asked you whether you reviewed your
20  bank statements, and you indicated that you had
21  not.
22      Did you look for your bank statements at that
23  time?
24      A.  I tried to, and I didn't realize that I
25  could find it through my online banking.

Page 32

1       Q.  Where did you look?
2       A.  I looked in my file folder with all my
3   paper statements where I usually keep them.
4       Q.  And the statement that you produced to
5   your counsel was not in that folder?
6       A.  No.
7       Q.  Did you try to obtain your bank
8   statements off line?
9       A.  No.  I didn't realize that I couldn't --
10  that I could find them on line at that time.
11      Q.  In the complaint you alleged that you
12  ordered four magazines sometime in 2006:  Spin,
13  ESPN, Maxim, and Vibe.  Is that correct?
14      A.  Yes.
15      Q.  How did you order those magazines?
16      A.  I was at F.Y.E. with my boyfriend, and
17  we went there to buy a CD or DVD.  And, you know,
18  the girl at the counter was, like, "Oh, well,
19  there's this offer you could get, you know, for a
20  free three-month trial of these magazines."  So we
21  ended up, you know, signing up for four of them.
22  And there's -- you know, not realizing that, you
23  know, I would be charged.  I was, like, "Oh, okay,
24  whatever.  A free three-month trial.  That's
25  fine."

Page 33

1       Q.  What is F.Y.E.?
2       A.  F.Y.E. is a store, an electronics store,
3   kind of.  It sells CDs, DVDs, video games.
4       Q.  And do you recall when you made this
5   purchase at F.Y.E. where you signed up for this
6   magazine special offer?
7       A.  No, I don't recall exactly when it was.
8       Q.  Do you recall what year it was in?
9       A.  Yes.  It was 2006.
10      Q.  Do you recall what month?
11      A.  No.
12      Q.  And you testified that you were with
13  your boyfriend.  Was that your fiance now?
14      A.  Yes.
15      Q.  If I tell you that Synapse's record
16  indicates that your purchase at F.Y.E. was made
17  somewhere in or around June 17, 2006, does that
18  sound about right to you?
19      A.  That would make sense.
20      Q.  Do you know whether you ordered all four
21  magazines at the same time?
22      A.  I'm pretty sure.
23      Q.  How often do you shop at F.Y.E. music
24  store?
25      A.  Very rarely.  I don't live near the mall

Page 42

1    A.  Just basically, you know, "Which
2  magazines can we pick from?"
3    Q.  What else?
4    A.  That's it.  And then we told which
5  magazines we wanted.
6    Q.  Who made the decision as to what
7  magazines you would order?  Was that decision made
8  by yourself?
9    A.  No.  My boyfriend and I discussed it.
10   Q.  What did you and your boyfriend discuss?
11 Tell me about that conversation.
12   A.  Well, he just picked, you know, three
13 magazines that he wanted, and, you know, we kind
14 of both agreed on one magazine as our fourth.
15   Q.  Which magazines did your boyfriend want?
16   A.  He wanted the ESPN, Vibe, and Maxim.
17   Q.  And you agreed on Spin as your fourth?
18   A.  Yes.
19   Q.  Did you receive any offer details from
20 the clerk?
21   A.  No, not that I recall.
22   Q.  Did the clerk give you any written
23 materials?
24   A.  Not that I recall.
25   Q.  How long did it take you to select your

Page 43

1  magazines?
2    A.  Not very long.  We weren't there for
3  that long.
4    Q.  About how long were you at the counter
5  to complete the entire transaction?
6    A.  I can't even remember.
7    Q.  Can you estimate?
8    A.  There's no way I can estimate if I can't
9  remember.
10   Q.  Were you familiar with each of the
11 magazines before you selected them for the
12 subscription offer?
13   A.  Yes.
14   Q.  And how were you familiar with those
15 magazines?
16   A.  I used to buy Spin at the store, and my
17 boyfriend would buy the other three at the store
18 every once in a while.
19   Q.  Have you ever had a subscription to any
20 of these magazines prior to signing up for the
21 subscriptions at F.Y.E.?
22   A.  No.
23   Q.  Have you ever had a magazine
24 subscription for any magazine?
25   A.  Yes.

Page 44

1    Q.  What magazines did you previously
2  subscribe to?
3    A.  Shape magazine.
4    Q.  How did you subscribe to Shape magazine?
5    A.  I -- well, I've had the subscription for
6  quite some time.  The first thing I did was -- I
7  had bought a magazine, and then I sent them one of
8  the little index cards, the mail-back cards that
9  they have inside the magazine.  And I sent that,
10 and then I started my subscription because I
11 actually sent a check with it.  And then when it
12 comes time to renew, they actually send me a
13 renewal letter with my magazine.  And then, you
14 know, it gives options like, oh, I'll pay with my
15 credit card, or I'll write a check, or, you know,
16 bill me later.  And so they actually send me some
17 sort of correspondence.
18   Q.  And how long have you had the
19 subscription to Shape?
20   A.  For about three years.
21   Q.  And how long was each subscription term?
22   A.  One year.
23   Q.  What did the clerk tell you about how
24 long you would receive the special offer for ESPN,
25 Maxim, Vibe, and Spin?

Page 45

1    A.  All they said was, you just get a free
2  three-month trial offer.
3    Q.  Did you have to fill out a form to
4  provide the clerk with your address for the
5  magazines to be delivered to?
6    A.  No.
7    Q.  How did the clerk have your address?
8    A.  Because my boyfriend gave his address
9  verbally.
10   Q.  What address was that?
11   A.  109 Mountain Lake Road, Belvidere, New
12 Jersey.
13   Q.  Is that where your boyfriend lived at
14 the time?
15   A.  Yes.
16   Q.  But you did not live there?
17   A.  No.  So they took the name from my card,
18 and they used his address to mail these things to.
19   Q.  So who were these magazines for?  Were
20 they for your boyfriend to read or for you to
21 read?
22   A.  Well, three of them were for him to
23 read, and one of them was for me.  Actually, for
24 both of us to read.
25   Q.  Who provided the address to the clerk?

Page 46

1  Was it you or your boyfriend?
2      A.  No.  He gave it.
3      Q.  Were you present for the entire time
4  that your boyfriend was speaking with the clerk?
5      A.  Yes.
6      Q.  Have you talked to your boyfriend about
7  this transaction and this lawsuit?
8      A.  No.  All I did was yell at him for these
9  magazines, you know, the money being taken out of
10  my account.
11      Q.  What did you say to him?
12      A.  All I said was, you know, "These
13  magazines are being taken out of my account."
14  I'm, like, "Why?" I'm, like, "Did you, you know,
15  agree to something?"  And he's, like, "No."
16  Because -- I was, like, "I was there at the same
17  time you were," so I was, like, "These aren't
18  supposed to be taken out."
19      Q.  Did you and your boyfriend have any
20  other conversations about your dealings with TWX,
21  Synapse?
22      A.  No.
23      Q.  So your boyfriend doesn't even know that
24  you're involved in this lawsuit?
25      A.  No.

Page 47

1      Q.  And you live with him?
2      A.  Yes.
3      Q.  Did the clerks give you anything to sign
4  with respect to the subscription offer?
5      A.  No.
6      Q.  When you were paying for your purchase,
7  did you sign a receipt?
8      A.  No.  Actually -- no.  I think I did sign
9  a receipt.
10      Q.  Were there any terms and conditions
11  related to this offer on that receipt?
12      A.  Not that I saw.
13      Q.  Do you know that for sure?
14      A.  All I know is that it was just a regular
15  receipt.
16      Q.  When you signed the receipt, were you
17  signing an electronic credit card pad, or was it a
18  paper receipt?
19      A.  That I don't recall.
20      Q.  Did the clerk tell you that the magazine
21  subscriptions would be automatically renewed if
22  they were not canceled after the three-month
23  initial trial period?
24      A.  No.
25      Q.  Do you remember signing anything that

Page 48

1  advised you that a magazine subscription would be
2  automatically renewed if they were not canceled
3  after the initial three-month trial period?
4      A.  No.
5      Q.  So what did you think you were getting
6  with this trial offer?
7      A.  Just three months of the magazine for
8  free.
9      Q.  Had you ever responded to any other free
10  offers?
11      A.  No.
12      Q.  So you this is the first time you've
13  ever responded to a free offer?
14      A.  Yes.
15      Q.  Do you allow your boyfriend to use your
16  debit card to make purchases for himself?
17      A.  No.
18      Q.  Do you allow anyone to use your debit
19  card to make purchases for themselves?
20      A.  No.
21      Q.  When did your boyfriend live at the 109
22  Mountain Lake Road address?
23      A.  He was living there up until we moved in
24  together in May.
25      Q.  Do you know how long he lived there

Page 49

1  prior to May?
2      A.  Since 2003.
3      Q.  And who did he live there with?
4      A.  His grandmother.
5      Q.  Anyone else?
6      A.  His uncle.
7      Q.  Anyone else?
8      A.  No.
9      Q.  Do his grandmother and uncle still live
10  at that address?
11      A.  His grandmother does, not his uncle.
12      Q.  I'm sorry?
13      A.  His grandmother does, not his uncle.
14      Q.  His uncle lives there, but his
15  grandmother does not?
16      A.  No.  His grandmother does, and his uncle
17  does not.
18      Q.  Okay.  After you signed up for the
19  three-month trial subscriptions for the four
20  magazines, did there come a time when you started
21  receiving the magazines?
22      A.  Yeah.  The magazines started basically,
23  you know, a little bit after we signed up.
24      Q.  How long after?
25      A.  I'm not sure exactly how long after.

14 (Pages 50 to 53)

Page 50

1    Q.  Do you still have the magazines?
2    A.  My fiance might, unless he threw them
3  out.
4    Q.  And where did all four of those -- to
5  what address were all four of those magazines
6  delivered?
7    A.  109 Mountain Lake Road.
8    Q.  How do you know they were delivered?
9    A.  Because I used to see my boyfriend every
10  day, so I would actually see these magazines when
11  they came in the mail.
12    Q.  Do you know if he read the magazines?
13    A.  Yes, he read them.
14    Q.  Did you read the magazines?
15    A.  I read a few, yes.
16    Q.  Do you know that your boyfriend received
17  all of the magazines that he was entitled to
18  receive under the three-month subscription?
19    A.  I'm not sure about that.
20    Q.  Who would know that?
21    A.  I mean, he probably would.  He probably
22  doesn't even remember.
23    Q.  When you were preparing your response or
24  searching for documents with respect to this
25  document request, did you ask your boyfriend

Page 51

1  whether he had any documents?
2    A.  No.
3    Q.  Why not?
4    A.  Because he wouldn't have any documents
5  because everything, you know, would just come
6  there under my name and his address.
7    Q.  How would you know if there was mail
8  that came to you at that address from Synapse or
9  TWX?  How do you know that something wasn't
10  delivered there for you?
11    A.  Well, those magazines were the only
12  piece of mail that were under my name that came to
13  that address because I wasn't living there.
14    Q.  How do you know that for certain?
15    A.  Because I saw, when the magazines would
16  come in, that they had my name and his address,
17  which is why they were delivered to his address.
18    Q.  Did you ever live at 109 Mountain Lake
19  Road with your boyfriend?
20    A.  No.
21    Q.  You testified earlier that your
22  boyfriend or your fiance and you moved in together
23  in May of 2007 to a new place.  Right?
24    A.  Yes.
25    Q.  Did you do a change of address when you

Page 52

1  moved to that new location to have all of your
2  mail forwarded?
3    A.  He did.
4    Q.  Did you?
5    A.  No.
6    Q.  Do you know how he did the change of
7  address?
8    A.  Through the post office.
9    Q.  What did he do at the post office, if
10  you know?
11    A.  Filled out a form for change of address.
12    Q.  How do you know he did that?
13    A.  Because I filled it out for him, and I
14  mailed it out for him.
15    Q.  And did that result in his mail being
16  forwarded to the new address?
17    A.  Yes.
18    Q.  Do you know whether your boyfriend
19  specifically changed his address with Synapse or
20  TWX?
21    A.  All I know is that he just did the post
22  office form.
23    Q.  You don't know whether he changed his
24  address --
25    A.  Well, I mean --

Page 53

1        MR. GREEN:  I would just object.  It's
2  my understanding that Synapse didn't have his
3  address.  They had what they thought was her
4  address.
5        MS. MAZZUCHETTI:  I'm asking the
6  witness.
7        MR. GREEN:  I understand that, but I
8  don't want you to confuse our witness.  You're
9  asking -- let me just understand your question.
10        MS. MAZZUCHETTI:  No.  I prefer that the
11  testimony come from your client.
12        MR. GREEN:  Well, I just want to make
13  sure she has a question posed to her that she
14  understands.
15        MS. MAZZUCHETTI:  Well, she'll let me
16  know if she doesn't understand.
17        MR. GREEN:  Could you repeat the
18  question?
19        MS. MAZZUCHETTI:  Can you read the
20  question back, please?
21        (Counsel requests the reading of the
22  following testimony:
23        "QUESTION:  You don't know whether he
24  changed his address --")
25    Q.  I'll rephrase that.

**Page 62**

1    A.  It would be somewhere in between there,
2  yes.  It may not be the exact date, but it will be
3  somewhere in there.
4    Q.  How many days passed between the day
5  that you first saw the hold on your account in
6  2007 and the date that you went on ripoff.com?
7    A.  It was either the same day or the day
8  after.
9    Q.  And how many days between -- or how much
10  time elapsed between the time that you pulled up
11  the phone number on ripoff.com and you made the
12  call to Synapse?
13    A.  I probably did it within the same day.
14    Q.  You're saying "probably."  Do you have a
15  recollection of doing it on the same day?
16    A.  I might have.
17    Q.  And do you remember whether you
18  contacted Mr. Green's office first in the e-mail
19  that you sent or whether you contacted Synapse
20  first?
21    A.  That I don't recall.
22    Q.  Do you know whether you spoke with
23  Mr. Green prior to making the call to Synapse to
24  cancel the magazines?
25    A.  I'm sorry.  Can you repeat that?

**Page 63**

1    Q.  Had you spoke with Mr. Green on the
2  telephone prior to calling Synapse to cancel the
3  magazines?
4    A.  No.
5    Q.  How do you know that?
6    A.  Oh, wait.  No.  Actually, no, I hadn't.
7  I talked to him after that.
8    Q.  How much after that?
9    A.  That I don't recall.
10    Q.  If you could, just explain to me the
11  chronology because I'm just a little confused.  It
12  seems that you don't remember any of the time
13  period when any of these things happened, but how
14  do you remember that you hadn't spoken to
15  Mr. Green yet when you called to cancel your
16  magazines?
17    A.  Well, because for all I know while I was
18  trying to cancel these magazines, I could have
19  been typing on the computer e-mailing Mr. Green's
20  office.
21    Q.  I'm talking about when you talked to him
22  over the telephone.
23    A.  Well, I know that I talked to him after
24  I canceled these magazines.
25    Q.  Just to make sure I have this straight,

**Page 64**

1  you see the hold on your bank account, you go on
2  line and Google or do a search for TWX, you find
3  ripoffreport, and then you call the number.  Is
4  that how it went?
5    A.  Yeah.  Well, I had two windows open at
6  the same time, the one for Mr. Green's office for
7  that web page, and then the one for the
8  ripoff.com.
9    Q.  Okay.  Do you know whether the 2-dollar
10  charge that was attached to your account in 2007
11  was removed from your account?
12    A.  Yes, it was removed.
13    Q.  When was it removed?
14    A.  I don't know how long after, but it was
15  after I canceled these magazine subscriptions.
16    Q.  Do you have any bank statements that
17  will show the two-dollar-and-1-cent charge?
18    A.  Well, if it was on there, and if it was
19  taken off, because it never said on my online
20  banking, "TWX," you know, "plus $2."  Like, they
21  gave you back a 2-dollar credit.  It just showed
22  up as on my online bank account, so it may not
23  even be on a paper statement.
24    Q.  So it may have just disappeared?
25    A.  Basically.

**Page 65**

1    Q.  I want to go back to the time when you
2  ordered -- the time shortly after you were signing
3  up for this order.
4    Did there come a time after you signed up for
5  this initial three-month period that you were
6  receiving these four magazines that certain
7  charges appeared on your bank statement?
8    A.  After I started receiving the magazines?
9    Q.  Yes.  We're talking about 2006.
10    A.  Yes, I got charges.
11    Q.  And when did that happen?
12    A.  That happened -- well, the charges were
13  in -- I believe it was September of 2006.
14    Q.  And what did you do when you saw those
15  charges?
16    A.  I called up my boyfriend, and I started
17  yelling at him.
18    Q.  Did you do anything else?
19    A.  No.
20    Q.  Did you ask your boyfriend whether he
21  wanted to continue receiving the magazines?
22    A.  No, because I had no idea of how to
23  unsubscribe from them, because that's what I was
24  trying to do.  That's why I found the Spin web
25  site, the ESPN web site, the web sites for Vibe

18 (Pages 66 to 69)

Page 66

1  and Maxim. And I tried to cancel through those
2  web sites, and they were telling me that I had no
3  subscription with them.
4      Q. So did you tell your boyfriend that you
5  were going to cancel these magazines?
6      A. Yeah, I told him I was going to try to.
7      Q. And what steps did you take to try to
8  cancel the magazines?
9      A. I went to the web sites of each of the
10  magazines, and I tried to contact their customer
11  service.
12      Q. Do you have any record of those
13  contacts? Did you print out anything from the web
14  site?
15      A. No, I didn't print anything out.
16      Q. Did you make any handwritten notes when
17  you made those contacts?
18      A. Well, I know I had send an e-mail to
19  ESPN magazine, but I don't know if that's still in
20  my e-mail account.
21      Q. If it is still in your e-mail account, I
22  request that it be produced.
23      MR. GREEN: I'm sorry. Do you have a
24  lot more? only because it's getting close to
25  lunch. So if you do --

Page 67

1      MS. MAZZUCHETTI: If you want to take a
2  break, that's fine. I have a fair amount more.
3      MR. GREEN: You have a fair amount? You
4  want to break for lunch?
5      MS. MAZZUCHETTI: Just give me two
6  seconds to make sure that I complete this thought.
7      MR. GREEN: Sure.
8      Q. Other than e-mailing ESPN, did you
9  e-mail any of the other magazines?
10      A. No.
11      Q. Do you know if -- do you know whether
12  any sort of notice was sent indicating that your
13  account was going to be charged for these
14  magazines in September '06?
15      A. No, I received no notice.
16      Q. Do you know whether your boyfriend
17  received notice?
18      A. No, he did not receive the notice.
19      Q. How do you know he didn't receive the
20  notice?
21      A. Because I go through all of his mail,
22  and his grandma delivers all of his mail to him
23  when it comes to his house.
24      Q. Did you ever ask him whether he received
25  anything?

Page 68

1      A. No, but I know that, you know, it would
2  have been there because all of his mail is always
3  in the same spot when I get to his house.
4      Q. So every single day you go through every
5  piece of mail that he receives?
6      A. Yes.
7      Q. Do you ever miss a day?
8      A. No.
9      MS. MAZZUCHETTI: Okay. We can take a
10  break now.
11      (There is a recess taken.)
12  BY MS. MAZZUCHETTI:
13      Q. Ms. Desai, did you speak with anyone
14  other than counsel on your break?
15      A. No.
16      Q. I'm going to place before you what I
17  previously marked as Defendant's Exhibit 12.
18  Please review that document and let me know when
19  you are finished.
20      A. Okay.
21      Q. Have you ever seen this document before?
22      A. Yes.
23      Q. What is it?
24      A. It is my bank statement.
25      Q. For what time period?

Page 69

1      A. For the time period of 9/12/2006 to
2  10/12/2006.
3      Q. Is this the bank statement that you told
4  me before that you provided to your counsel in
5  response to the document request?
6      A. Yes.
7      Q. On the first page of Defendant's Exhibit
8  D-12, your bank statement, do you see there's a
9  listing toward the bottom of the first page that
10  says "other withdrawals and service fees"?
11      A. Yes.
12      Q. And do you see on the document as a
13  whole there are portions of it blacked out?
14      A. Yes.
15      Q. Did you do that blacking out?
16      A. No.
17      Q. Do you know who did?
18      A. Well, is it really relevant for you to
19  know what goes through my checking account?
20      MR. GREEN: You can answer the question.
21      A. My attorneys did.
22      Q. Did you direct them to do that?
23      MR. GREEN: You know, objection,
24  objection.
25      Q. Okay. So looking at the line that says

**Page 70**

1 "other withdrawals and service fees," do you see
2 that?
3    A.  Yes.
4    Q.  And there are amounts listed.
5    Can you tell me what types of transactions
6 these represent?  And by that, I mean:  Are these
7 transactions made with a debit card or withdrawals
8 made at the bank?
9    A.  Debit cards, and it could be maybe a
10 couple of withdrawals.
11   Q.  Any other types of transactions that are
12 represented under this column that --
13   A.  No.  Just maybe paying my bills.  Using
14 my debit card, there will be a debit transaction.
15   Q.  You used online banking to pay some of
16 your bills?
17   A.  No.  I use my debit card.  I don't
18 actually use my online banking itself, except now
19 I use just for -- you know, my one credit card.
20 But I didn't have this credit card at the time, so
21 it wouldn't be on here.
22   Q.  And you told me that you have banked
23 with Wachovia since 2004.
24   A.  Yes.
25   Q.  How many times have you overdrawn your

**Page 71**

1 Wachovia checking account since 2004?
2    A.  Before this I never did.
3    Q.  And after it?
4    A.  After it I've overdrawn maybe once.
5    Q.  When was that?
6    A.  I have no idea.
7    Q.  Was it within the last year?
8    A.  It could have been, yes.
9    Q.  And what led to that overdraft that
10 happened in the last year?
11   A.  Because I thought that -- well, I may
12 have thought that I had enough in my account.
13   Q.  And do you know what type of transaction
14 that you made that led to your account being in
15 the negative?
16   A.  No.  I mean, for all I know, I could
17 have gotten gas.
18   Q.  Okay.  And you also told me that you
19 have an account with Washington Mutual?
20   A.  Yes.
21   Q.  Have you ever overdrawn that account?
22   A.  No.
23   Q.  Do you know whether your boyfriend has
24 ever overdrawn that account?
25   A.  No, because I balance the checkbook.

**Page 72**

1    Q.  I'm going to ask you to turn to the
2 second page of Exhibit D-12.  About halfway down
3 the page do you see that there's a description
4 on -- dated September 18 of 2006 for $24, and the
5 description is "purchase, TWX"?
6    A.  Yes.
7    Q.  And do you know what that was for?
8    A.  It says right here "ESPN magazine."
9    Q.  And do you know what that charge
10 represents with respect to the ESPN magazine?
11   A.  That the money is being taken out of my
12 account for a subscription to ESPN magazine.
13   Q.  And is it your understanding that that
14 subscription term was for one year?
15   A.  Well, that's what I would figure, yes.
16   Q.  When did you first become aware of the
17 charge, this particular charge?
18   A.  This charge where it says "9/16" next to
19 where it says "ESPN magazine," that's when it
20 first showed up in my online banking.
21   Q.  And this is 9/16 of '06?
22   A.  Right.  And it didn't post until 9/18.
23   Q.  Okay.  So you're telling me that you
24 first saw it on 19/16/06 on line?
25   A.  Yes.

**Page 73**

1    Q.  And what did you do when you saw it?
2    A.  I was, like, "What is going on here?"
3 And at that point I called my boyfriend, and I
4 was, like, "Why am I getting charged for this?"
5    Q.  And what did he say?
6    A.  He was, like, "I don't know," because he
7 was under the same impression that I was, that it
8 was just three-months free trial, and that was it.
9    Q.  Is that all you talked about with your
10 boyfriend?
11   A.  Yes.
12   Q.  And then what did you do?
13   A.  And then I just went in my online -- or
14 I went in my checkbook, and on 9/16 I took it out
15 of my checkbook.
16   Q.  What do you mean, you "took it out" of
17 your checkbook?
18   A.  I entered it into my checkbook.
19   Q.  Do you have that checkbook register?
20   A.  I could.  I don't know.  I'd have to dig
21 it up between one of my boxes from when I was
22 moving.
23   Q.  Did you look for it when you were
24 preparing your responses for the document request
25 that we discussed before?

**Page 74**

1    A.  No.  I've looked for it maybe a couple
2  of weeks ago, but that was it.
3    Q.  I ask that, if you have that, that you,
4  please, produce it.
5    Okay.  You told me that you had made efforts,
6  including an e-mail to ESPN, to determine what
7  this charge was.  Is that correct?
8    A.  Not to determine what the charge was,
9  but to cancel this subscription that apparently
10  was being taken out.
11    Q.  And when did you do that?  When did you
12  make those efforts that you told me about?
13    A.  I did that probably about a couple of
14  days later.
15    Q.  And do you see that in this description
16  on your bank statement there is an 800 number,
17  800-927-3807?
18    A.  I never saw that at the time.
19    Q.  Do you see it now?
20    A.  Yeah, I see it now.
21    Q.  Did you ever make any attempt to call
22  that number?
23    A.  No, because I never saw the number in my
24  online banking.
25    Q.  Is this bank statement the same

**Page 75**

1  format -- in the same format that you see on line?
2    A.  No.
3    Q.  What do you see on line?
4    A.  Well, with my online banking itself, it
5  only has the first line, "purchase, TWX, ESPN
6  magazine."
7    Q.  Okay.  Other than that one change, is
8  the format of your online banking exactly as we
9  see it here?
10    A.  No.  Online banking is a completely
11  different format than a paper statement.
12    Q.  Can you describe to me what that looks
13  like?
14    A.  It's got the date, and in the next
15  column it's got the transaction.  In the next
16  column it's got, you know, debits, and then the
17  next column it's got credits, and then the next
18  column it has, like, posted balance or actual
19  balance, whatever it is.
20    Q.  Like a running balance?
21    A.  Yeah.
22    Q.  Do you have a copy of the online
23  statement in that format for this time period?
24    A.  No, because it doesn't have it on there.
25  It only saves -- with online banking it only saves

**Page 76**

1  90 days previously, like in that format that I
2  just described.  Otherwise, it lets you go into
3  the paper statements into this format.
4    Q.  Okay.  So after you viewed this charge
5  on September 16, you then at some point received
6  this paper statement in the mail.  Is that
7  correct?
8    A.  Yeah.
9    Q.  And do you review those statements?
10    A.  I look them over, yes.  I don't
11  completely review them.
12    Q.  And you told me previously that you
13  pulled this particular statement off line.  Do you
14  know whether this is in the same format that you
15  received in the mail?
16    A.  Yeah, this is the same format.
17    Q.  Do you know what your checking account
18  balance was on September 16 when that charge
19  appeared?
20    A.  I don't know what it is offhand.
21    Q.  When that charge first appeared, do you
22  know whether your account was in the positive or
23  the negative?
24    A.  It was in the positive.
25    Q.  So the $24 was taken out of -- withdrawn

**Page 77**

1  from your account on 9/16/06, and your account was
2  in the positive?
3    A.  Yeah, I mean, as far as I know.  Once it
4  actually posted, though -- because it posts on a
5  different day.  And once it actually posted,
6  that's what caused my account to go into the
7  negative.
8    Q.  Do you know when the money is actually
9  taken out of your account?  You're talking about
10  there's a 9/16 date, which is the date that it
11  first appears, and then there's a date of 9/18,
12  which you're saying is the date it posts.
13    Do you know when the money is actually taken
14  out of your account?
15    A.  No.
16    Q.  Do you know what your checking account
17  balance was as of September 18, 2006?
18    A.  No.
19    Q.  Would your balance be reflected in the
20  check register that you keep?
21    A.  Yes.
22    Q.  And do you recall, when you entered the
23  charge for the ESPN in your check register,
24  whether that put your checking account in the
25  negative?

Page 82

1       A.   Not to Wachovia.  I can't do that to
2    Wachovia.
3       Q.   Why?
4       A.   Because if they say I don't have the
5    funds to do it, then they say I don't have the
6    funds to do it.
7       Q.   If the TWX charge was what caused your
8    account to go into overdraft, and you're telling
9    me that it was a credit transaction, why wasn't
10   your card simply rejected?
11      A.   Because it was a different kind of
12   credit transaction.  It's not like I went to the
13   store, and I went to buy this magazine, and they
14   swiped my card.  This is like one of those, like,
15   automatic things that goes through your account,
16   like if you are going to pay a bill, and it's
17   automatically taken out of your account.
18      Q.   Ms. Desai, sitting here today, can you
19   tell me which two transactions resulted in the
20   70-dollar overdraft fees charged on 9/18?
21      A.   Well, I know for a fact one was the ESPN
22   magazine.
23      Q.   But how do you know that for a fact when
24   you don't even know what your balance was on that
25   day?

Page 83

1       A.   Because I remember what I saw in my
2    online banking.  And you know what?  I should have
3    done a print screen and saved it.
4       Q.   What did you see on your online screen?
5       A.   I saw that because this TWX magazine was
6    being taken out, that my account went into
7    overdraft.
8       Q.   Do you know whether you would have been
9    overdrawn on your account based on the other
10   transactions, had the ESPN 24-dollar charge not
11   been processed against your account?
12      A.   No, I probably wouldn't have had an
13   overdraft fee.
14      Q.   Do you know that for a fact, sitting
15   here today?
16      A.   I can tell you that, yeah.
17      Q.   How can you tell me that?
18      A.   Because when I balance my checkbook, I
19   see everything that goes in and out of my bank
20   account.  And if I had looked on line and seen
21   this, then I could have actually balanced my
22   account properly.
23      Q.   Okay.  And then there's another
24   overdraft fee on 9/19.  Do you see that?
25      A.   Yeah.

Page 84

1       Q.   And what caused that overdraft fee?
2       A.   Let's see.  Probably thinking that I
3    still had money because, you know, this ESPN
4    magazine was just -- shouldn't have been taken
5    out.
6       Q.   Well, correct me if I'm wrong, but if
7    you didn't have the $24 to cover the ESPN
8    magazine, how did you have the 24.14, the 29.90,
9    or the $25 for those three other purchases you
10   made?
11      A.   Because I probably didn't realize that I
12   had overdraft fees.  Either that, or, for all I
13   know, I could have also, you know, gotten a, you
14   know, a paycheck in there somewhere, direct
15   deposited, but this statement is not going to show
16   that.
17      Q.   Is it possible that your account had a
18   negative balance as a result of the transactions
19   that were unrelated to the ESPN magazine?
20      A.   No.
21      Q.   Do you know what protocols and
22   procedures Wachovia Bank follows to settle
23   presentments on individual checking accounts on a
24   day-to-day basis?
25      A.   No.

Page 85

1       Q.   Do you know whether the transactions --
2    excuse me -- the transactions listed on this bank
3    statement are actually occurring within the
4    chronological order that they're appearing on a
5    given day?
6       A.   It all depends on whether they were
7    debit or credit transactions.  That's really what
8    it all comes down to.
9       Q.   So the answer is, then -- correct me if
10   I'm wrong -- that you cannot tell from looking at
11   this bank statement the chronological order that
12   these transactions were made?
13      A.   I don't know.
14      Q.   Do you know whether Wachovia Bank posts
15   credits before debits on a given day?
16      A.   That I'm not sure.
17      Q.   Do you know whether Wachovia has a
18   policy whereby they will attempt to satisfy a
19   larger presentment over a smaller one in the
20   course of one day's settling of accounts?
21      A.   I'm not sure.  All I know is that when
22   my paycheck direct deposits, my funds are
23   available for immediate withdrawal.
24      Q.   Had you ever been provided with any
25   terms and conditions by Wachovia that describes

25 (Pages 94 to 97)

Page 94

1  no records that I had a subscription with them.
2      Q.  Do you know whether you received all of
3  the copies that you were entitled to receive of
4  Vibe, Spin, and Maxim for the one-year renewal
5  period that you were charged for?
6      A.  Yes.
7      Q.  So they were received?
8      A.  Yeah.
9      Q.  Do you know whether the renewal amounts
10  charged by Synapse for the one-year's worth of
11  Vibe, Spin, and Maxim are more expensive or less
12  expensive than you would be able to subscribe to
13  those magazines elsewhere?
14      A.  I have no idea because normally I don't
15  buy these magazines regularly over the counter.
16      Q.  Look at the fourth page of your bank
17  statement, can you tell whether there was any
18  overdraft fee assessed against your account in
19  connection with the charge for Maxim magazine?
20      A.  Not that I can see, no.
21      Q.  Do you know whether any of these
22  redacted amounts represent an overdraft charge?
23      A.  Not that I know of.
24      Q.  I'd like to you to look at Exhibit D-2,
25  which is in front of you, the first amended

Page 95

1  complaint.  Please turn to page 13.
2      Are you on page 13?
3      A.  Yes.
4      Q.  Do you see paragraph 23 that says, "The
5  following are the factual allegations of plaintiff
6  Desai"?
7      A.  Yes.
8      Q.  Do you see under paragraph B it reads,
9  "Approximately three months following plaintiff
10  Desai's original order, defendant charged her bank
11  debit card for subscriptions to the four
12  magazines, which resulted in four overdraft
13  charges of $30 each to her bank account."
14      Do you see that?
15      A.  Yes.
16      Q.  So this statement is not accurate, is
17  it?
18      A.  Well, it was accurate according to my
19  checkbook that I had balanced.
20      Q.  According to the checkbook that you had
21  balanced, you're telling me that you had entered
22  four overdraft charges at $30 per piece each time
23  that you saw there was a charge by TWX?
24      A.  Yes.
25      Q.  So how did you come up with the number

Page 96

1  30 as to overdraft charge?
2      A.  Well, that's what I had thought, but
3  it's actually more, 35.
4      Q.  So did you then adjust your credit --
5  strike that.
6      Did you then adjust your checkbook register
7  when you learned that you had not been assessed
8  overdraft charges with respect to Vibe, Spin, or
9  Maxim?
10      A.  Well, in my online banking it could have
11  said something completely different, which is what
12  I would have recorded into my checkbook.
13      Q.  Are you telling me that this bank
14  statement that you provided to me is not accurate?
15      A.  It could be, or it could not be.  I
16  mean, you know, I wrote this.  I went with my
17  checkbook.
18      Q.  Okay.  So you told me that there came a
19  time in 2007 when you called Synapse to cancel
20  your magazine subscription -- is that correct?
21      A.  Yes.
22      Q.  -- and that you believe that that call
23  took place somewhere around August 1, 2007.  Is
24  that correct?
25      A.  Somewhere between late July and early

Page 97

1  August, yes.
2      Q.  Did you talk to anybody about canceling
3  the magazines before you actually went ahead and
4  canceled them?
5      A.  No.
6      Q.  Do you know whether in 2007 you -- a
7  postcard was sent alerting you to the fact that
8  the magazines were coming up for renewal?
9      A.  There was no postcard sent.
10      Q.  Do you know whether there was a postcard
11  sent to your boyfriend's grandmother's house?
12      A.  I know that there was not one.
13      Q.  I just want to make sure that I
14  understand your testimony.
15      You testify that you did not receive a
16  postcard --
17      A.  Right.
18      Q.  -- from Synapse?
19      A.  Right.
20      Q.  But you can't know, sitting here,
21  whether one was actually sent or not?
22      A.  Well, I know for a fact.
23      Q.  That what?
24      A.  That there was no postcard sent.
25      Q.  What number did you call when you called

Page 98

1    to cancel the magazines?
2        A.  Whatever number was on ripoffreport.com.
3        Q.  Do you have that number written down
4    somewhere?
5        A.  No.
6        Q.  Tell me about the call that you made to
7    cancel the magazines.
8        A.  Oh, it was a major pain, first of all.
9    Second of all, I called.  And, you know,
10   everything was automated, you know.  There was no
11   way that you could get to a customer service
12   person.  And even if you tried to, you know, after
13   you went through all the options and, you know,
14   tried to get you to a customer service rep, you
15   know, it said that, you know, the hold was, you
16   know, a really long time and that, you know,
17   somebody would get to you when they could.  And
18   basically you'd be on hold for forever, and there
19   would be nobody that you could even actually speak
20   to, no live person.
21       Q.  Do you remember how many -- whether the
22   prompt said that there was a certain amount of
23   minutes that you would have to wait to speak with
24   a live person?
25       A.  I don't remember.

Page 99

1        Q.  What's a "really long time"?
2        A.  Anywhere that's over five minutes.
3        Q.  When you first called the number, what
4    was the first thing that you heard?
5        A.  The first thing that I heard -- I don't
6    know what the first thing was, but all I know is
7    that it gave you options, you know, of either --
8    probably either renewing your service or
9    canceling.  I think it was canceling.  And, you
10   know, then it told you you could cancel.  You
11   know, if you provided your bank account number,
12   then it could figure out what your magazine
13   subscriptions were, and then, you know, you could
14   cancel them.  You know -- and I was, like, "I am
15   not giving my bank account number, nothing," so
16   that's why I tried to speak to a customer service
17   representative, and I was never able to get
18   through to one.  So then what I ended up doing
19   was -- you know, I kept going in circles with all
20   these different prompts, and then finally I was
21   able to get to it through -- I believe it was a
22   zip code or, you know, something like that.
23       Q.  So you were able to get to your account?
24       A.  Yeah, after going in circles about
25   50 million times.

Page 100

1        Q.  How about:  How long did it take until
2    you were able to get to this point where you were
3    able to access your account?
4        A.  I was probably on the phone for at least
5    a half an hour.
6        Q.  And then what happened after you got to
7    your account?
8        A.  And then I tried to cancel all of the
9    magazines together in one step, but it wouldn't
10   let me, so then I had to cancel one or cancel, you
11   know, one and try and cancel another.  And then,
12   you know, it just would let me cancel one, and
13   then, you know, I tried to go back through all the
14   options again, and then it wouldn't let me cancel
15   a second one.  So then I had to hang up, call
16   again, you know, go through all these options
17   again, and then basically cancel each magazine
18   individually.
19       Q.  So how many calls altogether did you
20   make?
21       A.  I made about -- well, four to actually
22   cancel, and then, you know, to speak to a
23   representative I probably called once or twice.
24   You know, that was initially when I first called.
25   And to cancel, I had to call, you know, back again

Page 101

1    four times.
2        Q.  And were you successful in canceling the
3    magazines after that call -- those calls?
4        A.  Yes.
5        Q.  How long were you on those four calls
6    collectively?
7        A.  Probably about an hour.
8        Q.  And you testified that you did this
9    while you were at work?
10       A.  Yes.
11       Q.  Please look at paragraph 23J of
12   Exhibit -- Defendant's Exhibit 2.  That paragraph
13   states, "Plaintiff believes that her responses to
14   the options presented by defendant" --
15           MR. GREEN:  If you could wait one
16   second, please.
17           MS. MAZZUCHETTI:  Page 14, 23J.
18           MR. GREEN:  Okay.  You said "exhibit."
19           MS. MAZZUCHETTI:  Sorry.
20       Q.  "Plaintiff believes that her responses
21   to the options presented by defendant's automated
22   telephone system fully canceled any charges that
23   would otherwise follow the 2-dollar-and-1-cent
24   temporary authorization charges that appeared on
25   her bank account statement, and she received

Page 106

1  contained that language or not?
2       A.  No, I don't know whether it did.
3       Q.  I would like you to turn to page 35 of
4  the complaint, Defendant's Exhibit D-2.  I would
5  like you to look at paragraph 86 -- are you there?
6       A.  Yes.
7       Q.  -- which states, "Plaintiffs and the
8  class members have entered into certain contracts
9  and agreements with Synapse when they agreed to
10  obtain the original subscriptions at a discount."
11       Do you see that?
12       A.  Uh-huh, yes.
13       Q.  What contract do you claim that you
14  entered into with Synapse Group?
15       A.  Them taking money out of my bank
16  account.
17       Q.  What was the contract?  What was the
18  agreement?
19       A.  I can't answer that.
20       Q.  Why not?
21       A.  Because I can't recall.
22       Q.  Is it your testimony that there was an
23  agreement between you and Synapse?
24       A.  All I know -- for all I know, the
25  agreement could have been, you know, just you get

Page 107

1  these magazines for ...
2       Q.  What does that mean in your complaint?
3  You say that you entered into a contract with
4  Synapse.  What does that mean?
5       A.  Well, like I was saying, for all I know,
6  it could mean you're going to get, you know, free
7  trial issues, and that's it.
8       Q.  Okay.  And do you see -- moving down to
9  page -- I'm sorry -- paragraph 87, you allege that
10  Synapse Group breached its contract with you.
11       What did Synapse do to breach its contract
12  with you?
13       A.  They charged me for these magazines that
14  I wasn't supposed to be charged for.
15       Q.  Was this contract in writing?
16       A.  I got nothing in writing.
17       Q.  In paragraph 88 you allege that
18  "Plaintiff and the class members satisfied their
19  obligations under these contracts and agreements."
20       What did you do to satisfy -- what were your
21  obligations under the contract?
22       A.  As far as I know, I had no obligations.
23       Q.  Why does it say here that you satisfied
24  your obligations?
25       A.  Well, according to them, if they were

Page 108

1  going to take money out of my account that I never
2  agreed to ...
3       Q.  But that's not what I'm asking you.  I'm
4  asking:  How did you satisfy your obligations?
5       A.  Well, then --
6            MR. GREEN:  There's no question posed.
7       Q.  I'm asking you what you did to satisfy
8  your obligations.
9            MR. GREEN:  I think that was asked and
10  answered already.
11            MS. MAZZUCHETTI:  I don't know if I got
12  an answer.
13            MR. GREEN:  Your answer was that -- if
14  you could, read back what her answer was.
15            (Counsel requests the reading of the
16  following testimony:
17            "ANSWER:  As far as I know, I had no
18  obligations.")
19            MR. GREEN:  Yes.  Thank you.
20       Q.  Can you look at the first page of the
21  complaint, Defendant's Exhibit D-2?
22       Do you see on the caption where your name is
23  listed in addition to six other names?
24       A.  Yes.
25       Q.  Do you know any of the other people that

Page 109

1  are named in the caption?
2       A.  No, I do not.
3       Q.  Have you ever spoken with any of them?
4       A.  No.
5       Q.  Do you have an understanding of what
6  their claims are in this case?
7       A.  From what I've read.
8       Q.  What is your understanding?
9       A.  That they went through the same thing
10  that I did.
11       Q.  And what have you read?
12            MR. GREEN:  Go ahead.  You can answer
13  the question.
14       A.  Basically that everyone else, like me,
15  was ripped off by Synapse Group.
16       Q.  I was asking you what document you read.
17       A.  I read this amended document.
18       Q.  The complaint?
19       A.  Yes.
20       Q.  When did you agree to become a plaintiff
21  in this case?
22       A.  I do not recall the exact date.
23            MR. GREEN:  I think that was already
24  dealt with as well, you know --
25            THE WITNESS:  Yeah.

Page 110

1     MR. GREEN:  I've given you a lot of
2  leeway here, but you've asked a lot of questions
3  repetitively, and I would hope we're coming to the
4  end of this.
5     MS. MAZZUCHETTI:  I don't agree with
6  that.
7     Q.  Did you sign an agreement with any of
8  the lawyers in this case agreeing that they would
9  represent you in this matter?
10    A.  I signed a retainer agreement.
11    Q.  With whom?
12    A.  With Mr. Diamond and Mr. Green and
13  Mr. --
14    Q.  Graysen?
15    A.  Yes.
16    Q.  What was the date of that agreement?
17    A.  I don't remember the exact date.
18    Q.  Can you estimate when you signed it?
19    A.  I have no clue.
20    Q.  Do you know whether it was before or
21  after August 1, 2007?
22    A.  It was -- I know it was after I canceled
23  these magazine subscriptions.
24    Q.  Do you know it was before or after the
25  date that this complaint was filed with the Court?

Page 111

1     A.  I don't know, but, you know, it had to
2  have been.
3     Q.  And have you been promised anything in
4  return for being a class representative in this
5  case?
6     A.  No, just, you know, whatever my own
7  emotions and feelings are, that -- you know, I
8  just want this company to, you know, be stopped
9  and for them to, you know, just go away, I guess
10  you could say.
11    Q.  Do you plan on ordering any magazines --
12  any more magazines from Synapse?
13    A.  No, never.
14    Q.  And you're not their customer now.
15  Right?
16    A.  Not anymore, no.
17    Q.  When you called Synapse to cancel your
18  magazines during the four or five calls that you
19  told me about, was there anyone else on the call
20  with you?
21    A.  No.
22    Q.  Did you make any type of recording of
23  the call?
24    A.  No.
25    Q.  Did you take any notes while you were on

Page 112

1  the call?
2     A.  All I wrote down was my confirmation
3  numbers.
4     Q.  Do you have that note?
5     A.  I don't think so.
6     Q.  If you do, I request that it be
7  produced.
8     Did anyone give you advice as to how you
9  should handle the call with Synapse?
10    A.  No.
11    Q.  Have you filed any other complaints or
12  grievances against Synapse other than the
13  complaint that was filed in this lawsuit?
14    A.  No.
15    Q.  Have you ever filed a complaint against
16  any company with the Better Business Bureau?
17    A.  No.
18    Q.  Have you ever filed a complaint against
19  any company with any state agency?
20    A.  No.
21    Q.  Have you ever filed a complaint against
22  any company with any Federal agency?
23    A.  No.
24    Q.  Have you ever heard of a "blog"?
25    A.  A what?

Page 113

1     Q.  A blog.
2     A.  Like an internet blog?
3     Q.  Yes.
4     A.  I've heard of it, yes.
5     Q.  Have you ever visited any consumer
6  advocacy blog -- I don't know if ripoff.com is a
7  blog -- but other than ripoff.com, we'll say.
8     A.  No.
9     Q.  Have you ever posted a message to or
10  written a blog about Synapse?
11    A.  No.
12    Q.  Have you ever heard the phrase "negative
13  option"?
14    A.  No.
15    Q.  Do you have any understanding of what
16  your responsibilities are as a potential class
17  representative?
18    A.  Yes.
19    Q.  What are your responsibilities?
20    A.  Basically to take this company down, and
21  also to help others from being ripped off by this
22  company.  There's millions of people out there who
23  are going through the same thing, and they
24  shouldn't be going through it.
25    Q.  Any other obligations?

30 (Pages 114 to 115)

Page 114

1    A.  No.
2       MS. MAZZUCHETTI:  Could we just take a
3  break?
4       MR. GREEN:  Sure.
5       (There is a recess taken.)
6  BY MS. MAZZUCHETTI:
7    Q.  Ms. Desai, did you talk to anyone other
8  than counsel during the break?
9    A.  No.
10   Q.  Can I have the correct spelling of your
11 fiance's name?
12   A.  Sure.  It's H-e-l-l-r-i-e-g-e-l.
13   Q.  And his first name is Keith?
14   A.  Yes.
15   Q.  And what Wachovia Banks do you -- what
16 branch do you bank at?
17   A.  There is actually two.  One is in
18 Hackettstown, and actually that's my -- the main
19 one, the second one is in Mansfield.
20      MS. MAZZUCHETTI:  Okay.  That's all I
21 have.  Thank you very much.
22      (Time noted: 1:39 p.m.)
23
24
25

Page 115

1
2       C E R T I F I C A T E
3
4
5       I, MARK IUZZOLINO, a Certified Shorthand
6  Reporter and Notary Public of the State of New
7  Jersey certify that the foregoing is a true and
8  accurate transcript of the testimony of the
9  aforementioned first duly sworn by me.
10      I further certify that I am neither
11 attorney or counsel for, nor related to or
12 employed by, any of the parties to the action in
13 which the deposition is taken, and further that I
14 am not a relative or employee of any attorney or
15 counsel employed in this case, nor am I
16 financially interested in the action.
17
18
19      _____
20      CERTIFIED SHORTHAND REPORTER
21      NOTARY PUBLIC OF NEW JERSEY
22      LICENSE NO. X101103
23
24
25

# **<u>Gilbertsen Exhibit G</u>**

1

1          UNITED STATES DISTRICT COURT

2        FOR THE DISTRICT OF NEW JERSEY (NEWARK)

3             2:06-CV-05072 (JLL) (CCC)

4    ------------------------------------------X
     CHARLES T. McNAIR, THEODORE AUSTIN,
5    DANIELLE DEMETRIOU, STEVEN NOVAK, ROD BARE,
     USHMA DESAI and JULIE DYNKO on behalf of
6    themselves and all others similarly
     situated,

7
                        Plaintiffs,
8        vs.

9
     SYNAPSE GROUP, INC.,
10

11                      Defendant.
     ------------------------------------------:
12

13            DEPOSITION OF JULIE DYNKO

14            Saturday, April 5, 2008

15

16

17

18

19

20

21

22

23                      DEPOLINK
24    Court Reporting & Litigation Support Services
           Phone (973) 353-9880    Fax (973) 353-9445
25               www.depolinklegal.com

3

1              (Documents are marked as Defendant's

2        Exhibit Dynko 13 and 14 for Identification.)

3

4              JULIE C. DYNKO,

5        residing at Two Eva Drive, Peru, New York

6        12972, was called as a witness, and having been

7        first duly sworn, was examined and testified as

8        follows:

9    DIRECT EXAMINATION

10   BY MR. CASTELLO:

11       Q    Good morning, Ms. Dynko, my name is Geoff

12   Castello, I represent the Defendant Synapse Group,

13   Inc. in this case, and you are here for your

14   deposition this morning.  So, what I would like to

15   do is just spend a couple of minutes and go over the

16   ground rules so that you could have an idea of

17   what's going to happen here today.  Have you ever

18   had your deposition taken before?

19       A    Once.  I was involved in an automobile

20   accident and we both went to -- we, at the same

21   time, meeting, having a deposition done.

22       Q    When you say we, who do you mean?

23       A    The other person that was suing my company

24   was there present, as well.

25       Q    Were you defending in that action?

J. Dynko - Direct                18

1        Q     Have you spoken to Mr. Green prior to

2   today?

3        A     Yes.

4        Q     Have you spoken to Mr. Diamond prior to

5   today?

6        A     I believe he was on the conference call

7   that we just had this week.

8        Q     You had a conference call this week?

9        A     About today, to make sure I was coming and

10   I had everything set.

11        Q     When was the first time that you spoke

12   with any attorneys about the possibility of you

13   becoming a party to this action?

14        A     I believe it would have been July of 2007,

15   and it was the original person that saw, like I

16   said, the entry that I made on the -- I hope I am

17   saying this right, RipOff.com, I believe it was.

18            MR. GRAIFMAN:  I would just object to

19        the extent anticipating any questions as to the

20        conversation substance.

21        Q     Yeah, I think I made it clear, but I want

22   to be certain that when I am asking you questions

23   about discussions with attorneys, I am not asking

24   you to tell me about the substance of your

25   communications.  I'm really asking for dates, and we

1     will give Mr. Graifman an opportunity to object to

2     any of my questions, but I want you to know that I

3     am not asking you to tell me about the discussions

4     you had with them, okay?

5          A     Yes.

6          Q     But I am interested in knowing when you

7     first spoke to them.  So, we will go back again.

8     How did you first hear about this lawsuit?

9          A     I received an e-mail in July.

10         Q     Who did you receive an e-mail from?

11         A     I believe it was Mr. Duffy.

12         Q     And who is Mr. Duffy?

13         A     I believe he is another attorney on the

14    case.

15         Q     Do you know how it came that you received

16    an e-mail from an attorney?

17         A     He mentioned in his e-mail that he read my

18    entry on RipOff.com.

19         Q     Is your entry on RipOff.com a part of a

20    comment section?

21         A     Yes.

22         Q     What did you say in your comment section

23    in RipOff.com?

24         A     Basically, did anyone know how to get

25    ahold of a live person, I was having difficulty

J. Dynko - Direct                    21

1    representative, I mean somebody who you are quite

2    certain is living and breathing at the time that you

3    are talking to them, as opposed to maybe a voice

4    recognition system that asks you to answer questions

5    with a yes or no.  You understand that?

6        A    Yes.

7            MR. GRAIFMAN:  Assuming she could

8        guess they are living and breathing.

9        Q    We are going to make the assumption they

10   are living and breathing.  I am not going to make a

11   representation that they are.  But I am quite

12   serious about this.  I want to make sure that we've

13   got this distinction.  So, now I want to ask this

14   question again.  Prior to or up through today, do

15   you know if you've ever spoken to a live human being

16   at Synapse about any magazine subscription that

17   you've had at any time?

18       A    I don't believe I ever spoke to a live

19   person.  I was given offers that I believe was an

20   automated response.  I never spoke, to the best of

21   my recollection, and we have to realize this has

22   been going on since 2002.  It's 2008.  I have three

23   children, and one of whom has been in and out of the

24   hospital, so I've had many other issues that were

25   more important than the magazine issue.  I don't

J. Dynko - Direct                    27

1       this action, did you read the complaint that was

2       initially filed?

3              A    I believe so.

4              Q    What do you recall about that complaint?

5              A    The complaint against Synapse?

6              Q    Yes.

7              A    Basically, that some people receive

8       postcards, some people don't feel they did, that the

9       postcards were confusing, that people were unable to

10      cancel their magazines in a reasonable fashion.  I

11      believe that's about all that I remember

12      specifically seeing.

13             Q    Prior to the time that you were contacted

14      by Mr. Duffy, though, you did receive a postcard, is

15      that correct?

16             A    Yes.

17             Q    On more than one occasion?

18             A    I can't be sure.

19             Q    Have you ever made any, other than this

20      action, have you ever made any other type of

21      consumer complaints to any company?

22                  MR. GRAIFMAN:  I am going to object

23             to the term complaints.  Do you mean like a

24             complaint as we filed here, or just called up

25             and complained that the serviceman didn't show

J. Dynko - Direct                    34

1    that recording, I could actually listen to when it's

2    proposed that I ordered and canceled several

3    magazines, and I did listen to those.

4         Q    Do you know if you received Family Circle

5    in the year 2000?

6         A    I couldn't be sure.

7         Q    Do you know if you received Family Circle

8    in the year 2001?

9         A    I wouldn't be able to be sure.

10        Q    How about 2002?

11        A    I can't be sure.

12        Q    How did 2003?

13        A    I don't know.

14        Q    How did 2004?

15        A    I don't recall.

16        Q    How about 2005?

17        A    I don't recall.

18        Q    Do you ever recall receiving any

19   postcards, with respect to Family Circle Magazine?

20        A    Postcards, yes.  Family Circle, I can't be

21   sure.

22        Q    Do you recall ever dialing any toll free

23   numbers in connection with your subscription to

24   Family Circle?

25        A    I can't be sure which specific magazines I

J. Dynko - Direct                    41

1     document that is in the group of documents marked as

2     D-15, and it has an address or it's addressed to

3     Julie Silver at Two Eva Drive, in Peru, New York.

4     Do you see that?

5           A    Yes, I do.

6           Q    And then if you look at the next page,

7     okay, it's also a part of that same document.  Have

8     you ever seen a document like that?

9           A    I have seen one for Skateboarding.

10          Q    So, if I refer to the postcard today, I am

11    going to be referring to that document.

12          A    I've seen postcards like this for

13    Skateboarding and Preschool Playroom.

14          Q    Have you ever seen a postcard like that

15    for Consumer Reports?

16          A    Not that I recall.

17          Q    Have you ever seen a postcard like that

18    for Family Circle?

19          A    Not that I recall.

20          Q    Have you seen a postcard like that for

21    Sesame Street?

22          A    Not that I remember.

23          Q    Have you ever seen a postcard like that

24    for Family Money?

25          A    I don't even know that magazine exists,

J. Dynko - Direct                    43

1        Q     How did you know what number to call?

2        A     I believe that's one of the ones I

3   received a postcard for, but it could be that I

4   called an 800 number on the Discover Card statement,

5   but I know I received a postcard for Preschool

6   Playroom.  I cannot be certain what year.  I do

7   believe that I called because, as a result of a

8   postcard for that particular magazine.

9        Q     Have you ever heard of a website called

10  Magazine Outlet or MagOutlet.com?

11       A     I don't remember them.

12       Q     Have you ever ordered a magazine entitled

13  Electronic Gaming?

14       A     I believe it could have been ordered.  I

15  don't recall ordering it.  It could have been my

16  husband.  I have a teenage son and I have a younger

17  son who do use electronic equipment, Game Boys,

18  Nintendos, et cetera.

19       Q     Has your husband ever ordered any

20  magazines under your name?

21       A     I don't think he ever would.  He doesn't

22  like to order any magazines.

23       Q     Do you know if you ever ordered Preschool

24  Playroom through MagOutlet.com?

25       A     I don't recall.

1          Q     Do you recall receiving a postcard with

2     respect to Rolling Stone Magazine?

3          A     I believe I might have.

4          Q     Do you recall whether you called any toll

5     free numbers that were on that postcard?

6          A     I believe that's one of the ones I tried.

7     I am not sure if that's the one I was successful or

8     if Discover Card was successful.  I got a partial

9     credit, I believe, on that particular magazine.

10         Q     Do you recall calling the toll free number

11    to cancel Rolling Stone Magazine?

12         A     Yes.

13         Q     Do you recall receiving a postcard for

14    Newsweek Magazine?

15         A     I may have.  I believe I did, and called

16    the number.  But, again, I can't be clear which ones

17    I -- I can't be certain which ones I called because

18    of the number on the Discover Card statement, versus

19    the ones I received a postcard.  I only recall

20    receiving postcards for the last couple of years.

21    Never in the year 2000, 2001, 2, the earlier years

22    you spoke to.

23         Q     The postcards that you did receive, they

24    had toll free numbers on them, is that right?

25         A     Yes, and a date to call by.

J. Dynko - Direct                    57

1          Q     And when you received those postcards, did

2    you know what information that postcard was

3    communicating to you?

4          A     I did after 2005.  In the beginning it

5    looked like, it says moving, with a little band, and

6    I wasn't certain about that, but if you open it up,

7    it does state:  If you would like to continue

8    receiving, do nothing or something -- I'm

9    paraphrasing -- but if you would like to cancel,

10   call this number by this date.  And anytime I did

11   those and called those, I was not successful in

12   doing so, that I recall.

13         Q     But you were successful in calling the

14   number?

15         A     I could call the number, yes.

16         Q     And the postcard gave you the information

17   that you needed?

18         A     Yep, and a date, yes.

19         Q     And you understood that information on the

20   postcard?

21         A     I understood that clearly.

22         Q     It was clear to you?

23         A     It was clear that I needed to call by a

24   specific date to get a full refund, but the outside

25   of the postcard was not, at all, clear.  It did not

J. Dynko - Direct                    58

1    say FYE or Newsweek or Rolling Stone.   I don't

2    even -- well, I could tell by looking now that it

3    says Synapse Connect, apparently.   And it folds in

4    such a manner that you are, it looks like it's a --

5    well, I've received them from the Post Office saying

6    if you are moving, let us know so we could change

7    all of your stuff.   It does not look like it is in

8    any means going to be anything about anything I need

9    to open for any reason.   It just says:  Are you

10   moving?  No?  Okay.

11        Q    But you did open them, right?

12        A    I did in -- I recall opening them in 2005.

13   I received one, I opened it up, I saw I needed to

14   call.   That's how I started getting information

15   about Preschool Playroom.

16        Q    And when you opened it up, when you opened

17   that postcard up, it had information specific to

18   you, is that right?

19        A    About your subscription, yes.

20        Q    And it lists titles of magazines that you

21   are receiving, is that right?

22        A    Yes.

23        Q    That is personal information to you, is

24   that right?

25        A    Yes.

J. Dynko - Direct                    69

1        A    I am not certain.

2        Q    Did you ever call Synapse's automated

3   telephone system in December of 2004 to cancel a

4   subscription to Preschool Playroom?

5        A    I don't recall December 2004, no.

6   December is a busy month.

7        Q    Sitting here today, can you tell me

8   whether you ever canceled a subscription to

9   Electronic Gaming with a live customer service

10  representative from Synapse in September of 2005?

11       A    I don't recall ever speaking to a live

12  person at Synapse, so I would say no.

13       Q    Sitting here today, can you tell me if you

14  recall ever canceling a subscription to Preschool

15  Playroom with a live customer service representative

16  at Synapse in September of 2005?

17       A    Not a live person, no.  I did cancel in

18  2005, but not with a live person, and I believe I

19  got help from Discover Card on that one.

20       Q    Sitting here today, can you tell me if you

21  recall ever canceling a subscription to Budget

22  Living, by speaking with a live customer service

23  representative at Synapse in September of 2005?

24            MR. GRAIFMAN:  Objection.

25       A    No.

# Gilbertsen Exhibit H

Nov 07 07 11:41a                                                                                           p. 2

MagazineSubscriptionAbuse.com| Green & Pagano, LLP | New Jersey Attorneys                    Page 1 of 3



Home

**Attorney Profiles**
Michael Green
Alex Pagano
Anthony Fiore
Antoinietta Milelli
Paul Diamond

**Areas Of Practice**
CLASS ACTIONS
Representative Cases
FAQs
Submit Your Case

INTELLECTUAL
PROPERTY &
PATENT LAW

MATRIMONIAL
MATTERS

CRIMINAL DEFENSE

QUI TAM OR
WHISTLEBLOWER
CASES
FAQs

**Contact Us**
Directions

GREEN & PAGANO, LLP

**Milltown Office**
85 Washington Avenue
Milltown, NJ 08850
Phone 732-390-0480
Fax 732-390-0481
(Directions)

**The Florham Park Office**
30 Vreeland Road
Bldg. A, Suite 230A
Florham Park, NJ 07932
Phone 973-301-2208
Fax 973-301-2277
(Directions)

**MagAbuse.com**

CONSUMER INVESTIGATION WEBSITE:
MAGAZINE SUBSCRIPTION ABUSE

Welcome to Green & Pagano, LLP's website. We are
currently investigating reports of consumer abuse by
magazine subscription services.

HAVE YOU EXPERIENCED ANY OF THESE PROBLEMS
WITH A MAGAZINE SUBSCRIPTION SERVICE?



- Signed up for a special magazine subscription offer,
  but then been unable to cancel an automatic renewal
  of the subscription?
- Experienced difficulty in ending the automatic renewal of your subscription?
- Thought that you canceled your magazine subscription only to find that a charge
  keeps appearing on your credit card bill?
- Been misled as to the terms of a magazine subscription and/or its renewal?

If you have experienced any form of consumer abuse by a magazine subscription service
HAVE LEGAL RIGHTS AND REMEDIES.

Please take a few minutes to fill out our reporting form below.

* First name: ▒▒▒▒

* Last name: ▒▒▒

* Address: ▒▒▒▒▒▒▒▒

http://www.lawgp.com/magabuse/index.html                                    8/29/2006

MCNAIR   000039

* City: ████████

* State: ████████

* Zip: ████████

Day phone: ████████████

Evening phone: ████████

Fax:

* Email: ████████████████

Preferred method of contact: ████████

Best time to contact you: ████████

How did you hear about us? ████████████

Publishing / Subscription Service Name: ████████████████████████████

(You may have received a card in the mail that has the name – if you don't have the card, please provide the name and telephone number that appears in connection with the charge on your credit or debit card.)

Magazine(s) that you are having difficulty with: ██████████████████████████

In what year did your problems start?: ████████

When did you last experience this problem?: ████████████

(for example, when did you last get charged for a renewal that you thought you had canceled.)

What kind of problems have you had?

(Please check as many as apply)

████ I tried but was unable to cancel renewals of the subscription.

████ I received a card in the mail having a telephone call to cancel renewal of the magazine subscription

████ I was confused or misled by the automated sub cancellation system that I called, resulting in non-ca

████ Even though I canceled the subscription, the cl

MCNAIR   000040

Case 2:06-cv-05072-JLL-CCC   Document 123-2   Filed 07/19/10   Page 123 of 123 PageID: 8499

renewal kept appearing on my credit card bill or deb statement.

thought I did everything correctly to cancel the the subscription, but I was charged for the renewal

I had to call the automated cancellation system times to get the renewal cancelled.

Where did you receive the original special offer to subscribe to the magazine (particular website, mail, magazine / please specify):

Please tell us more about the problem(s) you experienced:



* Items in red = required fields

Send

Note: The use of the Internet for communications with the Firm will not establish an attorney-client relationship and messages containing confidential or time-sensitive information should not be sent.

Copyright © 2006 Green & Pagano, LLP.

All Rights Reserved.

Call Toll Free at 1-866-674-5878

DISCLAIMER: The material found on this website is for informational purposes only. It is not legal advice and is not guaranteed to be complete or up to date. Use of t create an attorney-client relationship between the user and the Law Offices Green & Pagano. The listing of areas of practice does not represent official certification a

Website Designed and Hosted by LawyerSites.net

http://www.lawgp.com/magabuse/index.html                                     8/29/2006

MCNAIR   000041